JS-44
(Rev.1/05 DE)

# CIVIL COVER SHEET

## I. (a) PLAINTIFFS

Verizon Washington, DC Inc.

11001

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** ____DC____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

## DEFENDANTS

Communications Workers of America, AFL-CIO (as designated agent and representative for Local 2336)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01460
Assigned To : Friedman, Paul L.
Assign. Date : 8/13/2007
Description: Labor-ERISA

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)      OR      ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

①

○ **G.** *Habeas Corpus/ 2255*
- [ ] 530 Habeas Corpus-General
- [ ] 510 Motion/Vacate Sentence

○ **H.** *Employment Discrimination*
- [ ] 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I.** *FOIA/PRIVACY ACT*
- [ ] 895 Freedom of Information Act
- [ ] 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J.** *Student Loan*
- [ ] 152 Recovery of Defaulted Student Loans (excluding veterans)

⊗ **K.** *Labor/ERISA (non-employment)*
- [ ] 710 Fair Labor Standards Act
- [x] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Labor Railway Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

○ **L.** *Other Civil Rights (non-employment)*
- [ ] 441 Voting (if not Voting Rights Act)
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights
- [ ] 445 American w/Disabilities-Employment
- [ ] 446 Americans w/Disabilities-Other

○ **M.** *Contract*
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholder's Suits
- [ ] 190 Other Contracts
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

○ **N.** *Three-Judge Court*
- [ ] 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**
- (●) 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
29 U.S.C. Section 185, vacate arbitration award where arbitrator exceeded his authority

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES [ ]    NO [x]

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES [ ]    NO [x]    If yes, please complete related case form.

DATE 8/8/07    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT A

# OPINION AND AWARD

|  |  |
|---|---|
| **In the Matter of Arbitration** ) | **Direct Appointment** |
| ) |  |
| **Between** ) | Parties' Case: |
| ) | No. 2001-91650, Voice Mail Group |
| **VERIZON WASHINGTON, DC, INC.** ) | Pay Rate; Article 16B |
| ) | Hearing:  September 15, 2006 |
| **And** ) | Briefs Rec'd:  December 7, 2006 |
| ) | Award:  May 30, 2007 |
| **COMMUNICATIONS WORKERS OF** ) |  |
| **AMERICA, Local 2336, AFL-CIO** ) | Arbitrator:  Paul F. Gerhart |
| ) |  |
| ) |  |

## Present for the Hearing

**For Verizon Washington, DC, Inc.:**

> Julia M. Broas, Esq., Jones Day, Washington, D.C.
> Joseph E. Pankoski, Senior Staff Consultant, Labor Relations
> Marc Gilbert, Area Manager, Verizon DC/WSAM

**For Communications Workers of America, Local 2336:**

> Jimmy Tarlau, CWA Representative
> Gail Evans, CWA Representative, District 2
> Brenda Savoy, Sec/Treasurer, CWA Local 2336
> Robert P. Patrician, CWA Research Economist
> Vallorie B. Coley, Verizon Special Clerk, witness
> Mary Ann Arlene Streeter, Verizon Special Clerk, witness

06-1081 Dir

07 1460

**FILED**

AUG 1 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## Procedural Background

The Communications Workers of America, Local 2336 (the Union) is the bargaining representative for certain employees of Verizon Washington, DC, Inc., Washington, D. C. (the Company). During the term of their 2003-2008 Agreement (JX 1, the "Agreement")[1], the parties were unable to resolve a dispute involving the proper rate of pay for Voice Mail Clerks in the bargaining unit. Under the provisions of the Agreement, Article 16B, New Job Titles and Job Classifications, paragraphs (e) and (f), the undersigned arbitrator was appointed by the parties to issue a final and binding decision on the matter.

Upon the mutual agreement of the parties, oral hearing was conducted at the Courtyard-Marriott Hotel, Greenbelt, MD on September 15, 2006. At the outset of the hearing, the parties stipulated the matter was properly before the arbitrator. Both parties examined witnesses and presented other evidence in support of their respective positions. Witnesses were sworn but not separated. A stenographic record of the matter was made by Wanda L. Granger, MAR Reporting Group, Falls Church, VA. At the conclusion of the presentation of evidence, the parties waived oral argument and agreed to submit post-hearing briefs. Briefs were directly exchanged between the parties and timely received by the arbitrator on December 7, 2007, at which time the record in the matter was closed.

## Relevant contractual provisions

### ARTICLE 16.B
### NEW JOB TITLES AND JOB CLASSIFICATIONS

**SECTION 1.** Whenever the company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a)  The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b)  The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

---

[1] Exhibits are identified as follows: JX for joint exhibits; UX for Union exhibits; and CX for Company exhibits.

(c)  If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and a temporary designation removed.

(d)  If agreement is reached between the parties within 60 days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed-upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e)  If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

(f)  The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days.

## Issue

The Union proposed that the issues before the arbitrator are:

> What is the appropriate schedule of wage rates for the Verizon Corporate Voice Mail Clerks and what should be the effective date of this schedule?

The Company proposed that the issues are:

1.    Whether the Union's final proposal, set forth in Jt. Ex. B, shall be considered by the Arbitrator notwithstanding the language of Article 16B (1) (e) precluding a party from changing its final proposed schedule of wage rates.

2.    Which of the parties' April 2006 proposals offers the appropriate wage rate and schedule for the Voice Mail Clerks.

In a footnote, the Company asserts that the

. . . intent of the language of Article 16B requires that the Arbitrator select among the two proposals rather than establish a wage rate and schedule wholly different than those proposed by the parties.

## Position of the Union

The following is the arbitrator's summary of the argument presented by the Union in its post-hearing brief.

*Introduction.*    This proceeding is to determine the appropriate schedule of wages for a group of ten Verizon employees who work in the Corporate Voice Mail Center.  The issue arises as a result of an award by Arbitrator Susan Mackenzie referring an earlier dispute regarding the wage rates of these workers to the negotiation procedure outlined in the Agreement coupled with the failure of the parties to reach an agreement over the appropriate job classification for the employees.  The original grievance was filed on December 9, 2001 and it will have taken more than five years for resolution.

*A. Background.*    The Voice Mail Clerks are a group of Verizon employees who maintain the voice mail system for the Verizon Corporation, with over 100,000 customers who are Verizon employees.  Their core function is to build, change and delete individual mailboxes for Verizon employees.  Starting in 1997 they were given additional tasks by their supervisor for which they received extra pay.  A few years later they stopped getting the extra pay but continued to do the extra job duties.  The workers filed a grievance on December 9, 2001 and on February 28, 2006, Arbitrator Mackenzie ruled the Company had violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk Job description.

Arbitrator Mackenzie directed the Company to comply with the provision of the contract spelling out the notification and negotiation requirements related to the creation of a new job classification.  In March 2006, the Union and Company

entered into negotiations to determine a schedule of wages for the Voice Mail Clerks. No agreement was reached and in accordance with the procedure, the matter was referred to a third party neutral who is to determine the appropriate schedule of wages for these workers.

B. *Positions of the Parties.* The Voice Mail Clerks are currently classified as General Clerk - Semi Skilled and paid according to Wage Schedule 21. On the Wage Schedule effective August 7, 2005, for Zone Locality Wage Group A, the maximum pay was $804 per week, or $21.44 per hour. The Company proposed that a brand new classification schedule be created for these employees which would pay $809 per week, or $21.57 per hour (JX A). The Union's final proposal was that the Voice Mail Clerks be reclassified as Special Clerks and be paid as skilled clerks, Wage Schedule 22, $832.50 per week, or $22.20 per hour (JX C).

C. *Factors in Determining the Appropriate Wage Schedule.* In order to determine the appropriate wage schedule, it is important to compare the specific job duties of the voice mail clerks with the job duties of other job titles within the Verizon Company. The relevant job titles are those for the clerical workers within the bargaining unit. According to Verizon's Senior Labor Relations specialist, Joe Pankoski, the clerk grades within Verizon are Entry 1 & Entry 3, semi-skilled, skilled and the RCMAC level (Ger Tr 209).[2]

| Entry 1 | $18.27 | (Wage schedule 19) |
| Entry 3 | $20.41 | (Wage schedule 20) |
| Semi-skilled | $21.44 | (Wage schedule 21) |
| Skilled | $22.20 | (Wage schedule 22) |
| RCMAC | $23.14 | (Wage schedule 7) |

For the purpose of clarity, all rates refer to the August 2005 wage schedule. The RCMAC Wage rate is calculated by dividing the weekly rate by 40 hours, which is the weekly schedule for the RCMAC job. The other titles work 37.5 hours per week. The questions for this arbitrator are how the Voice Mail Clerk job duties and responsibilities compare to other jobs in the above classifications and at what pay level they should be placed.

D. *Differences between the various clerical titles.* The clearest enunciation of the differences among the clerical titles came from the testimony of Verizon's

---

[2] Transcripts are referenced as follows: For the hearings before Arbitrator Mackenzie on April 1, 2005 – "Mac1 Tr"; on July 14, 2005 – "Mac2 Tr"; and on October 20, 2005 – "Mac3 Tr". For the hearing before Arbitrator Gerhart on September 15, 2006 – "Ger Tr".

Senior Staff Consultant in Labor Relations, Joe Pankoski. In responding to a question as to what would distinguish a semi-skilled from a skilled clerical worker, Pankoski stated that a semi-skilled clerk would "be able to take an existing process and perform that process quickly, efficient and accurately" (Ger Tr 210). A special clerk at a skilled level would be able to tackle "a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for" (Ger Tr 211). He also described the highest level as RCMAC clerks who perform a "highly technical function" (Ger Tr 210).

Philip Payblas, a Verizon compensation expert, explained the higher level of a special clerk compared with a general clerk in this way, "There's more self-direction. There's more [analysis] of information. And again, the independent judgment, you know, the self-direction of making these directions . . . there's a great deal of decision making . . . judgments based on information they receive" (Mac1 Tr 263).

E. *Comparison of clerical titles based on job briefs.* A number of job briefs describing basic duties and qualifications for each job were submitted into evidence. The Union and the Company submitted job briefs at the semi-skilled level (General Clerk and Manager's Clerk), at the skilled level (Special Clerk, Service Office Administrator) and at the technical level (RCMAC clerk); (UX C; UX 3; CX A; CX C; CX B; respectively). The job brief includes General Duties and Basic Requirements. Chart A compares the basic requirements of the four clerical titles. One can see there is little difference. Only when you get to the RCMAC level do you see a qualitatively different group of job responsibilities:

1. Interpreting and extracting data
2. Processing changes in switches
3. Communicating with various internal LOB
4. Analyzing service order activity from MARCH
5. Review and sequence service orders
6. Operating a multi-windowing computer terminal
7. Coordination of service order activity
8. Must meet deadlines
9. Performing other duties
10. Must be familiar with key customer issues

This is clearly a more detailed level of job responsibilities than either the semi-skilled or skilled levels.

## Chart A
## Job Requirements

| Clerical Level | General Clerk Semi-skilled | Manager's Clerk Semi-skilled | Special Clerk Skilled | Service Order Administrator Skilled |
|---|---|---|---|---|
| Minimum qualifying score on UTB-R | yes | yes | yes | yes |
| Minimum qual score on Data entry test | yes | yes | yes | yes |
| Minimum qual score on typing test | | | | yes |
| Ability to record info | | | | yes |
| Must speak English clearly | yes | yes | yes | yes |
| Write accurately and legibly | yes | | yes | |
| Work in confined working situations | | | | yes |
| Valid drivers license | | | yes | |
| Literate in computers | | | yes | |
| Security background | yes | yes | yes | yes |
| Safety practices | yes | yes | yes | yes |
| Company regs. | yes | yes | yes | yes |
| Normal day time | yes | yes | yes | yes |
| Days, evenings, nights, etc. | | | | |
| Training-On or off the job training | yes | yes | yes | yes |
| Training - 6 weeks of classroom | | | | yes |
| Organizational skills | | yes | | |

Regarding general duties (Chart B), there is also not much difference across the job briefs.

## Chart B
## Comparison of Job Duties

| General Clerk<br>Semi-skilled | Manager's Clerk<br>Semi-Skilled | Special Clerks<br>Skilled | Service Order Adm.<br>Skilled |
|---|---|---|---|
| 1. Handles bills | 1. Handles bills | 1. Prepares reports analyzes and summarizes data | 1. Prepares and formats service orders |
| 2. Computes & summarizes data | 2. Summarizes data | 2. Operates various office machines | 2. Verifies order accuracy |
| 3. Operates various office machines | 3. Performs math computations | 3. Communicates with customers | 3. Operates terminal device |
| 4. Operates terminal - inputting and retrieving data | 4. Prepares and maintains administrative reports | 4. Types when required | 4. Performs keyboard functions while talking to customers |
| 5. Performs mathematical computations | 5. Prepares & transmits payroll reports | 5. Processes work to meet deadlines | 5. Works with other departments |
| 6. Filing and typing data entry | 6. Types letters | 6. Preparing bills and voucher | |
| 7. Answering phones and taking messages | 7. Answers telephone calls | 7. Handling high volume of detail work | |
| 8. Sorting and distributing mail | 8. Accesses pers. computers and assoc. software | 8. The job will vary depending on work group | |
| 9. Interacting w/ the public &/or other employees | | 9. Driving a company vehicle may be required | |
| 10. Heavy client Interfacing | | | |

-8-

*F. Comparison of clerical titles based on testimony of semi-skilled and skilled clerks and Verizon managers.* The testimony of the incumbents in the semi-skilled and skilled titles was contradicted by Verizon managers' accounts of the job skills needed and expectations of people in these titles.

Special Clerk, Valarie Coley, testified that in her job she expedited orders using the SAP computer software program. Ms. Coley knows only the parts of the SAP program she has to access. She also uses Lotus Notes and Excel programs. Ms. Coley doesn't design spreadsheets and does not do any programming in her job (Ger Tr 69). Ms. Coley was a General Clerk before she was a special clerk. She feels that the difference between the two jobs is that as a special clerk she is "more specialized in one particular program or process that a general clerk would not really have a specialty in." (Ger Tr 73) Ms. Street, another Special Clerk, testified that she used Excel and PeopleSoft and that most of her job involves inputting data (Ger Tr 77). She has a set of procedures with her job that she follows in order to do her work (Ger Tr 78).

Verizon Manager Mark Gilbert testified that he supervised a Special Clerk who has major responsibilities, works with little supervision, and works on complex assignments. But Mr. Gilbert also testified that he supervised over 120 people; only one of them is a Special Clerk and he has had had only one Special Clerk working for him in his previous six years as a manager (Ger Tr 203). Mr. Pankoski testified that there were over 200 Special Clerks in the Washington, D.C. area (Ger Tr 227). Thus, Mr. Gilbert's testimony cannot be generalized to all Special Clerks or General Clerks since his experience was limited. Both Mr. Pankoski and Mr. Gilbert believe that the two Special Clerks who testified for the Union (Coley and Street) were working at below the Special Clerk level, which is allowed under the Agreement (Ger Tr 197, 225).

The testimony regarding what the special clerks do is obviously contradictory. Thus, one can only go back to Mr. Pankoski's description of the difference between the semi-skilled and skilled titles as the clearest description of what makes one title different from the other.

*G. Where do the Voice Mail Clerks fit?* First, it is worthwhile to describe what the Voice Mail Clerks do. These employees are exclusively responsible for creating, adjusting and terminating all voice mail accounts for all of the Company's employees and officers. There are some 100,000 customers using 40-45 different voice mail systems. The primary part of their job is to build voice mail accounts, make changes and adjustments, correct errors in the accounts, and

delete accounts when needed. They use computers and software programs (ProComm and others) to access the various voice mail systems. They then input data, instructions and codes into the computer to enable the voice mail accounts to work. Even with this core work, the clerks have to run programs to check to see if there is sufficient capacity for new voice mail boxes and the adequacy or accuracy in the design or set-up of nodes. They must pull out errors or miscoded data. Sometimes these are simple problems, but at other times the clerks have to re-create the problem in order to fix it. They were given additional tasks (the cause of the original grievance) of troubleshooting, investigating trouble reports, running reports to diagnose troubles, analyzing mailbox and system problems, conducting system maintenance, building pagers, creating pager sequences and providing training to other company employees and managers. Voice Mail Clerk Bridget Plonk described the wide variety of activities she performs at the first hearing before Arbitrator Mackenzie (Mac1 Tr, 111, 117, 122-4, 125-6, 138-40).

The Voice Mail Clerks also have a function that relates to pagers. The employees build the data profile of pagers and also troubleshoot and fix pager system defects. They must build pager sequences or codes that are needed to make the pager tones and messaging capabilities function properly. There is no manual for this. The task requires a great deal of judgment and experience to be precise; otherwise the pager sequences will not work at all (Mac1 Tr 131-5, 202-8).

So where do the Voice Mail Clerks fit into the hierarchical level of clerical titles? The only management testimony regarding a determination of the classifi-cation of the Voice Mail Clerks was by Philip Payblas, an employment specialist at Verizon, at the April 1, 2005 hearing before Arbitrator Mackenzie. He described five criteria which he uses to make a determination of the classification of a title – the analytical part of the job, the thought process needed, the technicality of the job, the need for independent judgment, and the amount of training that is needed to perform the job (Mac1 Tr 247). His analysis was based on a "job evaluation request form" submitted by local management as opposed to direct interviews of the incumbents (Mac1 Tr 244). His evaluation focused on the most simple of the tasks performed by the Voice Mail Clerks (processing and completing voice mail requests, additions and changes) and none of the more complicated tasks (troubleshooting the voice mail system problems, diagnostic and maintenance work, building nodes, building pagers and creating pager sequences)(Mac1 Tr 256). Mr. Payblas did not compare the job of the Voice Mail Clerks, with or without the additional functions, to the job of the Special Clerk (Mac1 Tr 261). He also did not evaluate the addi-tional functions that were added to the job of the Voice Mail Clerks (e.g., trouble shooting, pager coding) that were the cause of the original grievance (Mac1 Tr 156).

Robert Patrician, CWA compensation analyst, highlighted a number of areas in which the Voice Mail Clerks compare favorably with the skilled (if not the RCMAC) clerical title levels:

- The Voice Mail Clerks work with a system of some complexity that requires a significant amount of familiarity with its particular requirements. (Ger Tr 89).
- Their work is not form completion or point-and-click kinds of tasks (UX 3).
- They have a developed knowledge of how to establish new coding sequences and must be able to match pager codes of the tests requested (UX 3)
- They must troubleshoot problems with mailboxes (EX 3).
- They must have extensive knowledge of software to be able to manipulate through different menu screens (TR 2, 97).
- They must meet customer requirements on short notice; budgetary prohibition adds to pressure on short notice (UX 3).
- Their use of Automatic Call Distribution systems increases job stress (UX 3).

Patrician describes the normal Voice Mail Clerk's job as more complicated than that of a semi-skilled clerk, "The Voice Mail Clerk has to order his/her next steps in that process to complete the tasks myself or whether someone is giving me, you know, a pile of paper to input into the computer" (Ger Tr 91). This is very close to Pankoski's description of a skilled clerk as someone who has "a problem and that they would put together a process in order to solve that problem" (Ger Tr 210). Patrician also observed that "a person entering data into these menus requires extensive specific knowledge of this software and that this is the software which is used to build and maintain these voice mailboxes" (Ger Tr 97). Patrician emphasized the independent thinking needed for the Voice Mail Clerks to program pager sequences. They "need to know everything that would be required to be known for coding – different values, different codes in these sequences and what those correspond to in terms of how the pager works, how it responds to those codes, what those codes actually do" (Ger Tr 106).

Patrician's analysis and the testimony of the Voice Mail Clerks clearly show that these workers should be classified at least at the level of a skilled clerk. Reviewing the different aspects of the job of the Voice Mail Clerk, one can see that of the seven main components of the job, five of them are at the skilled or technical level. See Chart C.

-11-

## Chart C

|  | General Clerk<br>Semi-skilled | Special Clerk<br>Skilled | RCMAC Clerk<br>Technical level |
|---|---|---|---|
| General description of work at this level from Verizon's labor relations people. | Takes an existing process and performs it quickly, efficiently and accurately | Tackles a problem and puts together a process to solve it; provides whatever information or conclusions are necessary | Highly technical function |
| Answering the phone; taking trouble orders | Yes | | |
| Resetting, building, deleting, and changing mailboxes | Yes | | |
| Assessing the adequacy of existing nodes, pulling our errors or miscoded data | | Yes | |
| Troubleshooting problems in mailboxes, analysis of glitches, malfunctions or error codes | | Yes | |
| Troubleshooting and investigating trouble reports, running reports to diagnose troubles | | Yes | |
| Conducting system maintenance | | | Yes |
| Building pagers, creating pager sequences | | | Yes |

This chart makes it clear that the Voice Mail Clerks must be reclassified at the skilled clerical level if not higher (UX 6).

*H. The arbitrator should not be bound by Arbitrator Mackenzie's statement.* The Company has argued that the arbitrator must make a determination of the proper wage rate based on the following comment in the body of Arbitrator Mackenzie's opinion, "Voice Mail Clerks are engaged in non-General Clerical Work less than 20% of their work time, but how much less than 20% is unclear."

Arbitrator Mackenzie decided in the previous arbitration that the Company violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk job description and that the Company must comply with the provision of the contract requiring notification and negotiation related to the creation of a new job classification – Section 16 B of the Agreement. That section provides, in 16B (1) (f), that a neutral third party shall render an appropriate schedule of wage rates.

The Company may attempt to argue that the doctrines of *stare decisis, collateral estoppel* and/or *res judicata* bind the arbitrator with respect to the sentence quoted from the Mackenzie Award, above. Although these doctrines are applied in courts, arbitrators narrowly apply these principles. (Citations omitted here.) *Stare decisis* clearly does not apply in this case as it is only applied in situations where a principle has become settled in a series of well-reasoned decisions. (Citation omitted here.) Neither do the doctrines of *res judicata* or *collateral estoppel* apply in this case. *Res judicata* prevents a party to a prior action from re-litigating in a subsequent action issues raised and resolved in the prior action. The elements necessary to bring *res judicata* into play are:

- The issue at stake is identical to the one involved in the prior litigation.
- This issue has been actually litigated in the prior suit.
- The determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and
- The party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

Because the effects of the application of *res judicata* are so extreme, in that it precludes consideration of matters that were, or could have been raised, the doctrine operates upon a narrow basis of exact identity of parties, issues and causes of action. See Fairweather, *Practice and Procedure in Labor Arbitration* (3d Edition, 1999), p. 381.

*Collateral estoppel* requires that the following elements be present (citations omitted here):

- Identity in the thing sued for in both actions.
- Identity of the cause of action in both actions.
- Identity of the parties to the actions.
- Identity of the quality or capacity of the persons for or against whom the claim is made.

Arbitrator Mackenzie commented that the Voice Mail Clerks engaged in non-General Clerk work at some unknown percentage rate less than 20. She did not engage in issue determination of what the proper overall wage rate should be. The issues she did determine were whether the Company violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk job description and whether the Company must comply with the Section 16B negotiation requirement related to the creation of the new job classification. The issues that Mackenzie did determine are entirely different from the issue this arbitrator must determine – what is the appropriate schedule of wages for the Voice Mail Clerks.

Although the parties are the same in both arbitrations, the issue and the evidence entered into the record are different. Although some of the record in the first arbitration that related to the wage rate has been incorporated into this arbitration, this was done for efficiency so as to not have to enter relevant evidence into the record twice. The body of evidence in this case is much broader than what was considered in the first arbitration and must be so in order to determine the appropriate wage scale. The testimony in the second hearing explicitly addressed how the Voice Mail Clerk job duties compared to all the other clerical titles. Arbitrator Mackenzie did not hear this testimony.

In addition, the part of Section 16 of the contract that must be considered in this arbitration is different from what was considered in the previous arbitration. The section that applies in this case is the language that gives the arbitrator the authority to determine the wage schedule after negotiations have taken place. In this case, the arbitrator is not bound by the statement of the previous arbitrator and must make an independent review and determination as to how the Voice Mail Clerk job duties and responsibilities compare to other job classifications and at what level they should be placed. Arbitrator David Keefe in *Hydromation Engineering Co.*, (cited in *Practice & Procedure in Labor Arbitration*, 376) stated that an arbitrator: ". . . has an obligation to consider the reasoning and basis that led to the conclusions reached in cited awards. But, nevertheless, his fundamental duty is to make a decision which squares up with his own convictions where equity lies in the case he is to decide". Furthermore, the union and company in ". . . agreeing in

-14-

advance to accept the award the parties do not necessarily promise to agree with all the arbitrator's reasoning", *How Arbitration Works*, (5th Ed., 1999) p. 384.

In fact there is ample evidence in the record to indicate that much more of what the Voice Mail Clerks do is at a higher level than the General Clerk. *There are seven main components of the Voice Mail Clerks Job, and five of them are at the skilled or technical level.* The arbitrator here must decide the correct wage scale to be applied in this situation on the basis of his independent judgment and the record as a whole. Arbitrator Mackenzie only had to evaluate whether duties were changed sufficiently to require review. Here, that review is being made for the first time in a detailed way by examining the duties, the time spent and their relative importance. To the extent that Arbitrator Mackenzie assigned a figure to certain tasks, that was beyond her mandate and is mere *dicta*. Not only is such language not controlling in this case, it arguably went beyond the arbitration issue and was improper. Mackenzie properly deferred the actual resolution of the wage rate to this proceeding – so any other findings or rulings are irrelevant.

We can think of these two cases as two connected parts of one dispute with separate components. The first case was simply to "force" the matter to arbitration before a third party neutral. The second case deals with the actual merits of the dispute.

It is worth mentioning that the 20 percent reference did not attempt to assign any particular weight or quality to the work. If the employees spent only 20 percent of their time on extra duties, but these duties were characteristic of the company's chief executive, a huge wage would be required even if the time spent on these duties were only 20 percent. In this case the third party neutral is called upon to make the determination about time, quality, importance and value. These considerations were not made before.

*I. The Company's position is completely arbitrary and not based on a compensation analysis of the Voice Mail Clerks job duties.* The Company's proposal to pay the Voice Mail Clerks $809 per week is not based on an analysis of the job of these workers but based completely on an interpretation of Arbitrator Mackenzie's statement. Management explained in its final position letter that "over 80% of the work the Voice Mail Clerks perform could be properly characterized as General Clerk (Semi-Skilled 2-B clerk) work." Arbitrator Mackenzie ruled that some of the duties performed by the Voice Mail Clerks had migrated from management (clearing nodes, building pages, etc.) and it is only that work that is

more complex than General Clerk work" (JX A). Joe Pankoski, labor relations specialist for Verizon, confirmed this methodology by testifying that management

> ". . . took the semi-skilled, the General Clerk wage schedule and multiplied by a .8, or took 80% of it, and said this equates to the 80 percent of the job duties that are at the General Clerk level as decided by the arbitrator. We then took – we had to decide what to do with the other 20% . . . and we balanced that 20% against the next highest grade that existed above a general clerk level, and then we combined the two numbers into a number which became our proposed wage rate" (Ger Tr 217).

There are a number of problems with this methodology. First, it does not look at the overall job of the Voice Mail Clerks. Arbitrator Mackenzie directed negotiations over the appropriate wage schedule for this group of workers – not a mechanical formula based on her observations about the job. Second, even if one accepts the fact that 80 percent of the Voice Mail Clerk job is at the semi-skilled level, it does not take into consideration the knowledge and skills necessary for the Voice Mail Clerks to perform those functions that are at a higher level. Those abilities and the use of that knowledge, even if not used 100 percent of the time are necessary for someone to do the job, and raises the whole job to that level. Third, Verizon made a completely arbitrary decision as to the level of the 20 percent of the job functions that Arbitrator Mackenzie determined were above General Clerk work.

Mr. Pankoski testified that to determine the wage rate for the Voice Mail Clerks he calculated the 20 percent at the Skilled Clerk level because it was "the next highest clerical rate" (Ger Tr 217), but he did not independently analyze those functions that were characterized as non-General Clerk work. He interpreted the arbitrator's statement that ". . . RCMAC duties are different than those of Voice Mail Clerks . . ." (Ger Tr 230) as meaning that those duties were at a lower level than RCMAC clerk duties. In fact, Arbitrator Mackenzie did not state it was at a lower level and Verizon management arbitrarily set those 20 percent at the Skilled Clerk level when they could have been set at the RCMAC clerk level – 94 cents per hour higher than the Skilled Clerk level – or at some other level 10 or 20 cents lower than the RCMAC level. The fact is that these duties described by Arbitrator Mackenzie as non-General Clerk functions such as cut-over and other node clearing work, running CDRs, and programming pager sequences are close to what Pankoski describes as a "highly technical function", which characterizes the work of the RCMAC clerk.

Indeed if Verizon management had used the formula of 80 percent at the General Clerk level and 20 percent at the RCMAC level they would have come up with a wage rate of $21.78/hr ($816.75 per week) which is considerably higher than the management proposal.

*J. It makes no sense to set up a completely new classification schedule for the Voice Mail Clerks.* While it is within the authority of the arbitrator to set up a completely new wage schedule for the ten Voice Mail Clerks, it makes more sense to slide them into the next higher classification schedule for clerical workers, the skilled level. Management's proposal to set up a completely new wage schedule for these 10 workers is precedent setting and cumbersome. Not only would it entail the printing up of an addendum for a contract that covers over 15,000 employees, but Verizon's labor relations specialist, Pankoski, who has been the Senior Staff Consultant in labor relations for 15 years, did not recall that a new job classification schedule had ever been created as opposed to sliding people into one of Verizon's existing wage schedules.

*K. The effective date of the new wage schedule.* The effective date of the new wage schedule should be December 9, 2001 when the Union filed a grievance regarding the out of title work issue. The Agreement, Article 16B, Section 1(d) and 1(f) states that the wage rates shall be retroactive to the date the new job was implemented.

While section 1(f) also states that in no event shall the retroactive effect exceed 150 days, that limit is not appropriate in this case. It is obviously not the intent because if the two parties had reached an agreement according to Section 1(d), it would have been retroactive "to the date the change or new job was implemented." The fact that the two parties reached impasse in the negotiations should not penalize the employees. The Company would never negotiate an agreement because they could delay the effective date each time by going to a third party neutral. The 150-day limit only speaks to the additional time it takes to go through the third party neutral process after the parties failed to reach an agreement.

Article 16B deals with the creation of a new job classification and the process for determining the correct wage schedule. This process should have started in the period 1998 to 2000 when the company established the new job classification by adding new job duties and not continuing to compensate the workers. The Union forced the Company to follow the process by filing a grievance on December 9, 2001. Arbitrator McKenzie ruled the Company had

-17-

indeed set up a new classification and that parties should negotiate the appropriate rate. Verizon should not now reap the benefit of its own misconduct by obtaining a limited back pay award. The Company prevented a timely adjustment. That problem can now be remedied by the arbitrator providing fair compensation for the period when the Company refused to utilize Article 16B. This would be part and parcel of the arbitrator's authority to determine the "appropriate remedy". As a result, there is authority for this compensatory relief, and the facts of the case and the employer's years of obstinacy demand this relief.

*Summary.* The issue before the arbitrator has been going on for over five years. A group of workers at the General Clerk level were given new responsibilities. At first they were originally given extra compensation for this work. After the compensation stopped, they realized they were working at a higher level than the classification under which they were being paid and filed a grievance.

Verizon management has been resisting giving these ten workers an upgrade for over five years. After this period of time, management has proposed giving these people a 13 cent raise and limiting it to six months or a little over $125 in increased compensation. This management proposal is a travesty of justice. It is unheard of to create a new classification schedule for ten workers at Verizon. Management is trying to punish these workers for filing a grievance to get their jobs reclassified. Voice Mail Clerks regularly work at the level of a Skilled Clerk and some of their work is of a technical nature that approaches that of an RCMAC clerk. These employees should be upgraded to the Skilled Clerk level and the arbitrator's award should also take into account the five years it took for this issue to be decided.

**Position of the Employer**

The following is the arbitrator's summary of the argument presented by the Employer in its post-hearing brief.

This Article 16B proceeding arises out of a grievance filed by the Union in 2003[3] seeking to upgrade employees in the Company's Voice Mail Clerk group to

---

[3] The arbitrator would note that technically, the instant proceeding arises out of the failure of the parties to reach agreement during negotiations that were directed by Arbitrator Mackenzie in her February 28, 2006 award. The date of the initial grievance upon which Arbitrator Mackenzie rules was December 9, 2001. See UX 1. The 2003 date is apparently a reference to Employment Specialist Philip Payblas's June 3, 2003 denial (CX 2) of an upgrade of the Voice Mail Clerk to the Special Clerk classification that was submitted by Julie Westbrook-Forte on April 2, 2003 (CX 1).

-18-

the grade of RCMAC Clerk. Arbitrator Susan Mackenzie held that the RCMAC Clerk title is not appropriate since "the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk" (Mackenzie Award, 10). She further found, after examining the tasks of the Voice Mail Clerks in detail, that their "typical duties" – comprising more than 80 percent of their job function – are wholly consistent with their existing General Clerk, or Semi-Skilled, clerical grade.

These explicit and binding findings make it quite simple to resolve the primary issue presented in this proceeding. The Company's proposal, which presents a proposed wage rate, consisting of 80 percent of the Voice Mail Clerks' existing rate and 20 percent of the wage schedule of the next higher Skilled clerical grade, is wholly consistent with the percentage distribution of Voice Mail Clerk duties determined by Arbitrator Mackenzie. The Union, in contrast, has completely abandoned this formula. In doing so, it seeks an award that will violate the parameters established by the Mackenzie Award, the plain and unambiguous terms of the Agreement, and settled arbitral and judicial case law. Indeed, not only has the Union flagrantly defied the contractual prohibition against altering its initial Article 16B proposal, it now seeks to defy the parties' additional contractual bargain that arbitral awards are final and binding and that retroactive effect of any award in this proceeding cannot exceed 150 days.

In the end, the Union's various ploys are unavailing. The Award's full and unambiguous findings regarding the nature of and time spent performing Voice Mail Clerk duties compel the selection of the Company's proposal. Likewise, its unequivocal rejection of any degree of comparability between the RCMAC position and the Voice Mail Clerk position requires rejection of the Union's initial proposal, just as the overwhelming weight of the record evidence defeats any notion of comparability between the positions of Voice Mail Clerk and Special Clerk as to warrant a wholesale upgrade to the latter title and wage rate. Finally, in accordance with the contractual scope of the arbitrator's authority, the rate and schedule proposed by the Company can have no retroactive effect beyond 150 days from the date of the award here.

*Facts.* There are four basic grades of clerical positions within Verizon: Entry, Semi-Skilled, Skilled and RCMAC Clerks (Ger Tr 209-10). The Semi-Skilled clerical grade includes the positions of General Clerk and Manager's Clerk, as well as other titles (Ger Tr 210; UX B). Voice Mail Clerks are a Semi-Skilled position and fall under the "General Clerk" job description (Ger Tr 210; CX B). The Skilled clerical grade "includes the Special Clerk and various other titles (Ger

Tr 210). The RCMAC Clerk grade "is a highly technical function and sits at a [clerical] level on its own . . ." (Ger Tr 210). As Joseph Pankoski, a Senior Staff Consultant in Labor Relations for over 14 years, testified, without rebuttal, in making classification decisions involving Semi-Skilled and Skilled clerical titles, the Company considers the critical distinction to be the level of "responsibility involved" (Ger Tr 210). More specifically (Ger Tr 210-211):

> In general terms, for the typical general clerk, you would expect that they would be able to take an existing process and perform that process quickly, efficiently and accurately.

> For a special clerk, you would be able to expect that you could give them a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for.

*Duties and training of Voice Mail Clerks.* Voice Mail Clerks are responsible for maintaining the internal voicemail system for employees of the Verizon companies and their subsidiaries. They work a 37½ hour workweek and are paid in accordance with Wage Schedule 21. Special Clerks also work a 37½ hour workweek and are paid in accordance with Wage Schedule 22.

Voice Mail Clerk "primary functions" consist of building, changing and deleting individual mailboxes based on internal customer requests received by fax, through the corporate web, or through the automated call distribution (ACD) system. These duties require "computer skills in accessing multiple systems for input and retrieval of data and significant communication skills with internal 'customers'" (Mackenzie Award 3). Voice Mail Clerks perform these "most typical" core functions approximately 80 percent of the time. Up to 20 percent of their time is spent on performing various additional tasks, including trouble-shooting and investigating system problems; inside node work such as building classes of service for mailboxes (networks between systems); garbage collects (the removal of old information from within the system); running short forms on the contents of individual systems; clearing error messages; and building and creating pager sequences.

Formal training for the Voice Mail Clerk position is minimal. Most employees receive a two-week period of on-the-job instruction and one week of training by the vendor of the Octel system used at the Center. Some Voice Mail Clerks, however, receive no training whatsoever and simply train themselves (Mac2 Tr 12).

-20-

*Procedural background.* The Union filed its grievance in this matter on July 28, 2003, following the Company's posting of two openings within the Corporate Voice Mail group as "data entry" positions (UX 6, submitted at Mac1 Hearing; Mac1 Tr 32-33).[4] The sole remedy sought in the grievance was an upgrade of the Voice Mail Clerk position to that of "RCMAC Clerk" (Mac1Tr 75; Mac3 Tr 14). Prior to filing the grievance, Union president James Pappas assessed the functions being performed by the Voice Mail Clerks and concluded that "they weren't really doing special clerk work" (Mac3 Tr 7, 9). The parties were unable to resolve the dispute so it went to hearing before Arbitrator Susan T. Mackenzie. Arbitrator Mackenzie issued her Opinion and Award on February 28, 2006.

*The Mackenzie Award.* At the outset, Arbitrator Mackenzie confirmed the scope of the Voice Mail Clerk's "most typical" duties as set forth above. She then found that:

> . . . these "typical duties" are not inconsistent with certain of the "General Duties" set forth in the "General Clerk" Job Description dated June 2000. For example, General Clerk duties set forth in the Job Description include the handling of orders and preparation of reports, accessing multiple systems for inputting retrieval of data on a computer, and "heavy client interfacing at all levels of management." *The substantial part of Voice Mail Clerk functions – that is, adding, deleting and changing mailboxes – is consistent with the description of "General Clerk" duties.* Similarly, the General Clerk Job Description includes in the "Basic Requirements" of the position such factors as excellent interpersonal skills, training through on-the-job instruction and typically daytime working hours. *These requirements as well are consistent with the requirements of the Voice Mail Clerk. . . .* [Mackenzie Award 8, emphasis added.]

With regard to the additional tasks outlined above, Arbitrator Mackenzie concluded that these duties "involve a higher complexity and a greater degree of independent judgment and analysis than is associated with the General Clerk Job Description" (Mackenzie Award 8.) Although she found that certain of these additional assignments, e.g., "changing nodes where the work involves replacing a constellation of phone numbers – entail an increase in volume as opposed to more complexity or analysis" (Mackenzie Award 9), she further found that some "non-typical" tasks, such as cut-overs, other node clearing work, and running CDRs, "exceeds the scope of work included in the General Clerk Job Description"

---

[4] The arbitrator finds no grievance in the record dated 2003. Moreover, UX 6 contains a FAX imprinted dated of June 21, 2001. As indicated in note 3, supra, the original grievance was filed on December 9, 2001. Bridget Plonk testified that her grievance was motivated, as the Company Brief states, by the reference to "data entry" in the job description contained in JX 6.

(Mackenzie Award 10). She then held that "Voice Mail Clerks are engaged in [such] non-General Clerk work less than 20 of their work time . . ." (Mackenzie Award 11).

Consistent with these findings, Arbitrator Mackenzie concluded that the Company "sufficiently established that the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk." (Mackenzie Award 10). Based on the record establishing performance of the additional tasks up to 20 percent of their time, she then held that "the extent to which additional duties assigned to Voice Mail Clerks constitutes a redefinition of the Voice Mail Clerk job classification is appropriately the subject of negotiations between the parties pursuant to Section 1 of Article 16.B" (Mackenzie Award 11). Accordingly, she directed the Company to comply with the notification and negotiation requirements of that provision within 60 days of receipt of the Award.

*The Parties' Article 16B proposals.* In accordance with this direction, the Company considered various means of calculating an appropriate increase for the Voice Mail Clerks that would form the basis for an Article 16B proposal (Ger Tr 215). Although it initially commissioned a market study of the General Clerk and Special Clerk positions as one possible means for calculating the increase, the Company ultimately was guided in crafting its proposal by what it understood to be the Mackenzie Award's fundamental and binding instruction:

> That the proposed salary would include two components. One would represent the fact that 80 percent or maybe a little more of the job duties were general clerk or semi-skilled job duties, and that something less than 20 percent was beyond general clerk duties without any specification as to how much beyond. [Ger Tr 215.]

The Company ultimately determined that the Award's finding of "the 80-20 split" in the Voice Mail Clerk duties precluded any consideration of the pricing study, as it did not directly track Arbitrator Mackenzie's decision (Ger Tr 218). It bears mention, however, that the study revealed that both positions are paid well above the market in this locality (Ger Tr 217-18).

Thus, the Company created an equation for calculating a proposed increase that directly tracked the "80-20 split" created by the Mackenzie Award (Ger Tr 218). Labor Relations Director James Davis reiterated this approach in transmitting the Company's proposal to the Union on April 24, 2006:

-22-

> As you know, the arbitrator agreed with the Company's position that RCMAC Clerk work was substantially more complex than the work performed by corporate voicemail clerks, and accordingly that the RCMAC Clerk title is not appropriate. The arbitrator further found that over 80% of the work the voicemail clerks perform could be properly characterized as General Clerk (Semi-Skilled 2-B Clerk) work. The arbitrator ruled that some of the duties performed by the Voice Mail Clerks had migrated from management (clearing nodes, building pagers, etc.) and it is only that work that is more complex than General Clerk work.
>
> Here's the Company's 16B Notice. It applies the Skilled 1-B wage to 20% of the current wage schedule for the Voice Mail Clerks (rounded up to the closest $.50) and increases the Pension band by one step for Voice Mail Clerks in Locality Wage Group B. [JX A, 1.]

This calculation resulted in a new starting weekly wage rate for the Voice Mail Clerks of $388.00.

The Company selected the Skilled 1-B (Special Clerk) wage rate for the 20 percent of the equation because it "was the next highest clerical rate" (Ger Tr 217). Although bumping the Voice Mail Clerks to the Special Clerk grade in its entirety was one of the scenarios initially considered, the Company rejected this option for several reasons. First, it determined that applying the Special Clerk rate in its entirety would have violated the award's finding "that 80 percent of the job duties were obviously at the general clerk job description" (Ger Tr 218). Likewise, the Company rejected using the RCMAC Clerk rate as the basis for any aspect of the wage rate calculation because the Award was "quite specific that there wasn't any connection between the RCMAC job duties and the corporate voice mail clerk duties" (Ger Tr 219). Second, and consistent with this finding, the Company assessed the positions based on a review of the job briefs, and its knowledge of their functions, and concluded that "there was a discernable difference between the two jobs" (Ger Tr 220). Finally, the Company determined that its policies and practices for classifying employees precluded any upgrade for a group of employees, like the Voice Mail Clerks, when the vast majority of their duties were consistent with their existing classification (Ger Tr 221-22).

The Union communicated its first Article 16B proposal to the Company shortly before the Company made its April 24 offer. On April 13, 2006, the Union stated as follows:

> The Arbitrator felt that the employees were working at a level higher than their General Clerk classification but agreed with the company that there [sic] work was not quite as complex as that of a RCMAC Clerk.

> The General Clerk-Semi-Skilled 2(B) is paid at the rate of $21.44/hour.
> The RCMAC Clerk is paid at the rate of $23.125/hour.
>
> We believe that the appropriate pay for the Voice Mail Clerks is 22.70/hour.
> [JX B.]

Holding to this position, the Union rejected the Company's April 26 counter-proposal. Shortly before the Article 16B hearing commenced, the Union offered a second proposal, seeking to apply Wage Schedule 22 – the wage schedule for a Skilled 1-B Clerk – to the Voice Mail Clerks (JX C; Ger Tr 225). For the reasons it had previously declined to bump the Voice Mail Clerks to the Special Clerk grade when drafting its own proposal, the Company rejected the Union's second proposal.

*Argument.* Consistent with the contractual mandates contained in Articles 13 and 16B, as well as the preclusive findings of the Mackenzie Award, the arbitrator has no choice but to select the Company's proposal for the new wage rate and schedule for the Voice Mail Clerks. Only the Company's proposal is supported by evidence presented at the Article 16B hearing. Only the Company's proposal comports with the explicit and binding findings of the Mackenzie Award. And only the Company's proposal properly reflects the nature of the duties actually performed by the Voice Mail Clerks and the percentage of time they spend performing them.

*I. The Union's "Final" proposal contained in Joint Exhibit C cannot be considered pursuant to Article 16B (1) (e).* On April 13, 2006, the Union started the Article 16B negotiations by putting forth a proposal that the appropriate pay for the Voice Mail Clerks is $22.70 per hour" (JX B). Aside from stating the hourly wage rates for the General Clerk and RCMAC Clerk grades, the proposal provided no explanation of the bases for its calculation. Around August 2006, the Union changed its position and offered a "final" proposal on the eve of the hearing that set the schedule of rates for the Voice Mail Clerks according to Wage Schedule 22, the schedule for Skilled 1-B Clerks (JX C). The Union's modification of its proposal violates the plain language of Article 16B (e). That provision states in clear and unequivocal terms that the proposed schedule of wage rates presented by the parties immediately after a demand for a neutral third party hearing has been made "cannot thereafter be changed." This plain language proscription must be enforced in full by this arbitrator. (Citations omitted here.)

Application of this provision shifts the entire landscape of this proceeding. In practical effect, the Union is left without any record evidence explaining and

supporting its first (and final) proposal to the arbitrator. Inasmuch as the Company respectfully submits that the arbitrator is constrained to select one of the two proposals submitted in April 2006, given the comparatively overwhelming weight of evidence supporting the Company's proposal, there is but one possible outcome in this proceeding – selection of the Company's proposed wage rate and schedule set forth in Joint Exhibit A.

II. *The Company's proposal must be accepted because it is the only proposal that comports with the Mackenzie Award and reflects the actual distribution of Voice Mail Clerk duties.* Even if the arbitrator elects to consider the position advocated in the Union's August 2006 proposal, the record still compels acceptance of the Company's proposal. Most fundamentally, because Voice Mail Clerks spend more than 80 percent of their time performing tasks that are entirely consistent with their existing Semi-Skilled clerical grade and title, there is no basis in fact or law for bumping them to a higher grade. The Company's proposal, moreover, adheres to the binding findings of the Mackenzie Award and appropriately reflects the distribution of the Voice Mail Clerks' various duties.

A. *The Award's "80/20" formula is binding in this proceeding.* As noted, Arbitrator Mackenzie's Award contains findings and conclusions resulting from three days of hearing and presentation of evidence on the merits of the Union's grievance seeking to upgrade the Voice Mail Clerks to the RCMAC Clerk position. Notwithstanding the Award's detailed explanation of the bases for these findings and conclusions, the Union repeatedly characterized them throughout the Article 16B proceeding as mere "interpretations" that are not binding upon the arbitrator here. See, e.g., Ger Tr at 13, 147. This characterization both violates the plain language of the Agreement and defies fundamental and long-standing tenets of arbitral and judicial case law.

First, it is undisputed that the Award contains a "full statement of the grounds" under which the Union's grievance was decided, including a full statement of the typical and non-typical duties performed by Voice Mail Clerks, the percentage of time spent performing them, and the fact that more than 80 percent of their duties is wholly consistent with the General Clerk job description (Mackenzie Award 8-11). Based on the clear and unambiguous terms of the contract, these findings and all other findings in the decision are "final". Thus the parties – and this arbitrator – must abide by them in determining the appropriate wage rate and schedule for the Voice Mail Clerks.

Second, settled principles of *res judicata* likewise require that these findings be given preclusive effect. Rules covering issue preclusion "bar a party from pursuing issues actually determined in an earlier action from being relitigated in a later proceeding" [*Specialized Distrib. Mgmt., Inc.*, 1997 WL 828804 (1996) (Snow, Arb.) (citing Restatement (Second) of Judgments, 13 (1982) at 131)]. The rule has long been applied in the arbitral context. (Citations omitted here.) For the findings in a prior arbitration award to be given preclusive effect, the issues must be "identical" and "the subsequent dispute cannot be distinguished from the one earlier ruled upon." (*Specialized Distrib. Mgmt., Inc.*, 6; *Accord Regions Hosp.*, 118 LA 26, 28 (2002, Bognanno, Arb.) Four "prerequisites" must exist for issue preclusion to apply:

> (1) the issue determined in the prior action and the present issue [must be] the same; (2) final adjudication [must have been] reached on the issue; (3) the estopped party [must be] the prior party; and (4) the estopped party [must have been] given a full and fair opportunity to be heard on the adjudicated issue. [At 28.]

The nature of and time spent on Voice Mail Clerks' duties meets this test. Whether or not these duties are consistent with the General Clerk job title – the crux of the question presented in this Article 16B proceeding – was the very issue presented to and ruled upon by Arbitrator Mackenzie. The Union had ample opportunity to, and did, present witnesses and other evidence on the issue over three days of hearing. Accordingly, the Union cannot now use what is, in essence, just another stage of the same proceeding to relitigate an issue already litigated and ruled upon simply because it disagrees with the ruling. The Mackenzie Award's finding that more than 80 percent of the Voice Mail Clerks' duties are wholly consistent with the General Clerk job description thus is binding upon and must direct this arbitrator's determination of their new wage rate and schedule.

*B. The Company's proposal applies the "80/20" formula and properly reflects the distribution of the Voice Mail Clerks' duties.* The record is unequivocal that the Company's proposal adheres to the Award's "80/20" formula to the letter as Joseph Pankoski, Senior Staff Consultant, Labor Relations explained (Ger Tr 216-17). [The Union brief quoted Pankoski also, above at 16.]

Indeed, not only does the Company's proposal comport with the Award's formula, but, in doing so, it properly recognizes and reflects the percentage distribution of the Voice Mail Clerks' duties. As the arbitrator suggested in the November 20, 2005 email, a factor in determining the appropriate wage rate should be the "mix" of duties, or the "time devoted to various tasks." Based on the bind-

ing findings of Arbitrator Mackenzie, this factor dictates that the equation for determining the proper wage rate for the Voice Mail Clerks must be heavily weighted toward the rate negotiated for the General Clerk grade. In short, it requires selection of the Company's proposal.

It is not appropriate that the rate reflecting a Verizon employee's highest skill and capability alone should determine his or her wage rate. As Senior Staff Consultant for Labor Relations, Joseph Pankoski, testified without rebuttal, it is the Company's practice and procedure to base its classification decisions on where the majority of the duties lie (Ger Tr 222). Indeed, in his 14 years in this position, it has never happened that a group of employees were bumped up a grade when, as here, the majority of their duties were consistent with the lower grade.

*III. The Special Clerk title and wage schedule cannot be adopted because it would violate the Mackenzie Award and Special Clerk is not a comparable position.* A wholesale upgrade of the Voice Mail Clerk group to the Special Clerk title and wage rate would, on its face, fail to comply with findings of the Mackenzie Award. This fatal flaw requires that the position advanced in the Union's second, and untimely, proposal be rejected. But that position is flawed in another fundamental respect as well. The record demonstrates conclusively that there is a "discernible difference" between the Voice Mail Clerk and Special Clerk jobs (Ger Tr 220). Indeed, there is no record evidence whatsoever that even the "non-typical" General Clerk duties performed by the Voice Mail Clerks equate to the important functions of the Special Clerk position. The significant difference between the jobs and the Union's failure to prove that any of the Voice Mail Clerks' duties are actually consistent with the key tasks of a Special Clerk further mandates that the Company's proposal be selected.

*A. The Union's own president admitted that Voice Mail Clerks are not doing Special Clerk work.* During the merits hearing before Arbitrator Mackenzie, evidence was adduced that, prior to filing the underlying grievance in this case, Union President Jim Pappas reviewed the General Clerk job description covering the Voice Mail Clerks as well as the next higher grade title of Special Clerk (Mac3 Tr 7). After performing this review, his "conclusion was that they weren't really doing special clerk work" (at 7). As there is no evidence that the duties of the Voice Mail Clerks changed between the time Mr. Pappas reached this conclusion and the Article 16B hearing, this testimony, standing alone, confirms that a wholesale upgrade to Special Clerk is not warranted.

*B. Voice Mail Clerk work is not comparable to Special Clerk work as to justify a wholesale upgrade to that title and wage rate.* The overwhelming weight of the record evidence only underscores Mr. Pappas' conclusion. Again, the cornerstone premise of any comparability analysis is the Award's finding that the "substantial part of Voice Mail Clerk functions . . . is consistent with the description of 'General Clerk' duties" (Mackenzie Award 8) – a finding that alone precludes the conclusion that the two jobs are comparable. Based on the evidence adduced at the hearing, however, not even the "non-typical" tasks of the Voice Mail Clerks that involve "a level of complexity and the exercise of discretion and judgment that exceeds the scope of work included in the General Clerk job description" reflect the level of responsibility, self-direction and decision-making, and array of contacts that characterize Special Clerk work (Mackenzie Award 10).

As noted, examples of the "more complex duties" performed by the Voice Mail Clerks include troubleshooting, call notification and building sequences for pagers, inside node work, garbage collects and running short forms and CDRs. To be sure, certain of these tasks are more complex from a technical perspective than building, maintaining or deleting voice mailboxes, which essentially entails entering data in the form of names, phone numbers, beeper numbers, and other figures into drop-down boxes in a Windows-style screen on the computer (Mac1 Tr 106; Mac2 Tr 69-70). The record is undisputed, however, that the Voice Mail Clerks follow established procedures or templates even in performing these more complex functions.

For example, "garbage collects," which clean out excess material from the nodes, is simply a pre-established three-step process. It requires "going into menu 20 . . . press number 4 for the miscellaneous . . . [and] when the third page comes up, garbage collect is number 1" (Mac1 Tr 129-30). The garbage collect, at that point, runs automatically. Likewise, Voice Mail Clerk "troubleshooting" efforts are limited to correcting erroneously entered data, again by simply following a trail of preset screens and drop-down boxes. More complex work is elevated either to management or to an inside technician (Mac2 Tr 35, 41-42; Mac1 Tr at 124). Indeed, even the task of building sequences for pagers, which the Union made much of during the Article 16B hearing, follows an established set of methods and procedures. As Union witness Bridget Plonk explained during the merits hearing, each of the numbers and letters used to code a pager sequence has the same meaning each time it is used; all "Ps" mean pauses, for example, and all "#s" mean stop. The Voice Mail Clerks listen to the pager and, based on their experience, figure out what digits and letters to put in, when to place pauses, and so on (Mac1 Tr 202-08). While the actual ordering of the numbers and letters will vary, the

processes for determining their order, and the resulting codes themselves, thus adhere to preset methods and procedures that cannot be altered.

In contrast, there are no methods, procedures or templates that Special Clerks can follow in order to accomplish their given objectives (Ger Tr 189). Area Manager for Outside Plant Construction, Marc Gilbert, provided the following overview of the higher level of autonomy and creative decision-making expected of a Special Clerk (Ger Tr 193-94):

> I feel that I can give a special clerk a lot more latitude and not as much oversight in coming up with new processes.
>
> .    .    .    .    .    .
>
> I mean to be more independent, to come up with analysis and be more independent with just the way she works or he works.
>
> .    .    .    .    .    .
>
> So I would be comfortable with giving them tasks that were very, very important to me, tasks that had a bearing on my objectives and my ability to meet those objectives. And there's nothing more important to me than that.

To illustrate these concepts with more specificity, Mr. Gilbert described an ongoing responsibility of the Special Clerk who reports directly to him to ensure that his reporting group of 116 local technicians and 9 local managers work at a 0.9 ratio of motor vehicles to technicians. With only the statement of Mr. Gilbert's objective and the time frame to guide her effort, the Special Clerk went out to the field and collected and analyzed the data relating to the entire motor vehicle fleet assigned to Mr. Gilbert's area. Based on her analysis, she made recommendations about the ideal composition of the fleet and which vehicles should be replaced or given up; as well, she made suggestions about how creatively to characterize certain vehicles so that they would not be counted in calculating the ratio.

To accomplish these tasks, she created multiple databases on the fleet and educated herself about the work functions performed by the various vehicles. She also dealt with a wide spectrum of contacts, from the motor vehicle supervisors at multiple garages to local managers, and "consensus-built to make sure that the decision she was going to make was something they could live with that wouldn't hurt their ability to do the job and do it efficiently" (Ger Tr 190-91). In all respects, she demonstrated "a high level of decision-making. She had to reach some conclusions which required data analysis, also a job knowledge of the business" (Ger Tr 187). Ultimately, the Special Clerk created "very detailed

analysis sheets" reflecting her conclusions and met (and continues to maintain) the goal of arranging Mr. Gilbert's technicians and fleet to the target 0.9 ratio.

These independent, discretionary tasks typify the type of duties expected to be performed under the Special Clerk job brief (CX C). In addition, had the project required, the Special Clerk could even have driven a Company vehicle to the field to do site surveys at the garages. No evidence was adduced in this or the merits proceeding that the Voice Mail Clerks function at a comparably high level of autonomy, independent judgment and discretion. Nor was any evidence adduced demonstrating their ability to engage in sophisticated data analyses or their certification to drive a Company vehicle. Indeed, the General Clerk job description contains no mention whatsoever of the duties of analyzing data or computing mathematical data, which predominately describe the functions performed by Mr. Gilbert's Special Clerk. Compare CX B with CX C. Put simply, the jobs are not comparable; thus, there is no evidentiary justification for upgrading the Voice Mail Clerks to the Special Clerk grade and wage schedule.

   C. *The Union's Special Clerk witnesses perform General Clerk work and thus prove nothing about the comparability of the Special Clerk job.* In an attempt to counter this evidence, the Union offered the testimony of two Special Clerks as to the tasks that they perform on a daily basis. In a nutshell, both employees work with spreadsheets, entering data obtained from other sources in order to place orders for supplies (Ger Tr 63-72, 75-78). They use Lotus Notes, PeopleSoft and other applications to retrieve and enter this data, and both follow established templates or procedures in performing their functions.

   This testimony proves nothing about the Special Clerk position. As an initial matter, the tasks described by Ms. Streeter and Ms. Coley simply comport with generic clerical duties that are listed on both the Special Clerk and General Clerk job briefs. Compare, e.g., CX B ("Operating various office machines") with CX C ("Operating various office machines"). Neither witness engages in any of the unique and essential duties listed on the Special Clerk job description such as analysis of the data they retrieve and input. See CX C.

   In fact, the duties performed by the Union's Special Clerk witnesses barely, if at all, characterize the level of responsibility and complexity of the work performed by employees in other Semi-Skilled clerical positions, including Manager's Clerks. See CX A. For example, the Manager's Clerk currently working for Mr. Gilbert populates fields in spreadsheets and databases and retrieves data from Verizon managers and other employees in much the same way as Ms. Streeter and

Ms. Coley. In other duties, however, she exercises significantly more responsibility and handles matters of more complexity, such as tracking absences and expenses, preparing Mr. Gilbert's daily reports, raising "red flags" for him about the expense and absence data for which she is responsible, and prioritizing the importance of the telephone calls he receives. In these regards, she works with "very little supervision," although, as a Semi-Skilled clerical, she still follows established steps and procedures.

Ultimately, the record establishes that Ms. Streeter and Ms. Coley are not really working as Special Clerks at all. As Company witnesses Joseph Pankoski and Marc Gilbert testified without rebuttal, based on the duties described, they actually are working down to the General Clerk grade, which the Company routinely assigns Special Clerks to do as business needs dictate.

Mr. Gilbert's unrebutted testimony regarding the exercise of discretion and autonomy demonstrated by the General Clerk at the bill paying center he oversaw in 2003 and the General Clerk at the customer care center he supervised from 1997-2000 confirm that the Union's Special Clerk witnesses are simply performing functions typical of the Semi-Skilled clerical grade. Significantly, and quite logically, however, the mere fact that some Special Clerks work down a grade, even for long periods of time, does not qualify Voice Mail Clerks or any other Semi-Skilled Clerks to an upgrade to the Special Clerk position. (See *Accord, supra.*)

D. *The Union's "expert" testimony to the contrary should be excluded.* In further support of its second proposal, the Union offered the testimony of a purported comparability expert, Robert Patrician. Based on his review of the job briefs of the General Clerk, Special Clerk and RCMAC Clerk positions and of the Award and the prior testimony, Mr. Patrician posited various assumptions about the complexity of the Voice Mail Clerks' duties and developed a comparison of the three positions. He concluded from his review that the Voice Mail Clerks "should be a Special Clerk" (Ger Tr 111).

This testimony, and Mr. Patrician's opinions as a whole, should be excluded. Arbitrators routinely accept expert testimony from professionals "to assist them in drawing proper inferences from proven facts which the arbitrator might otherwise be incompetent to draw on her own." (Citations omitted here.) However, the expert's knowledge must be "scientific, technical, or specialized" and must be qualified "by knowledge, skill, experience, training, or education" in order to testify in the form of an opinion. (Citations omitted here.) In addition to these

-31-

requirements, the expert's testimony must be "reliable." Accordingly, where the purported expert lacks experience in the field or utilizes an incomplete or selective set of data in his methodology, courts and arbitrators have not hesitated to exclude or disregard his testimony. See *Midas Int'l Corp.*, 2002 WL 31161180 (2002) (Goldstein, Arb.) at 16 (finding expert testimony "essentially useless" in pay rate grievance where all relevant elements of job evaluation plan were not considered and precise methodology was not fully utilized).

Mr. Patrician's testimony is "essentially useless" when considered against these standards. First, by his own admission and "stipulation," he is not "a job evaluator in the telecommunications industry" (Ger Tr 109-10). Indeed, on cross-examination, he readily admitted that not having "years of experience in the industry limits [his] knowledge of the way the work goes on in the industry" (at 131); that he was not familiar with the systems about which he was testifying (at 134); that he was not familiar with the level of complexity involved in clearing error messages and performing garbage collects (at 134-35); and that, in fact, he did not even know what it meant to perform the Voice Mail Clerks' primary function of building, deleting and making changes to mailboxes (at 134). Accordingly, for reasons of inexperience alone, his testimony should be disregarded.

Second, Mr. Patrician's data review was so incomplete as to render his methodology fatally flawed. Again, on cross-examination, he freely acknowledged that he did not interview any Voice Mail Clerks about the work they actually performed (Ger Tr 122). Nor did he talk to any managers of Voice Mail Clerks, Special Clerks or other General Clerks about their expectations for the jobs (at 122-23). More significantly, he neglected to review other Semi-Skilled job briefs or undertake any additional investigation into the duties of employees in other Semi-Skilled positions (at 123-24). Thus, he completely failed to take into account in his comparability analysis the fact that the job briefs of other Semi-Skilled Clerks, such as the Manager's Clerk, contained the very tasks that he found significant in the work performed by the Special Clerks who testified in the Union's direct case (at 123, 135-39).

In sum, the overwhelming weight of the evidence demonstrates that Mr. Patrician's opinion is not the product of reliable principles and methods and is based on an undisputed lack of experience and familiarity with the industry. His opinions, including his ultimate opinion that the Voice Mail Clerks should become Special Clerks, therefore should be excluded.

*IV. Retroactive effect of an award here cannot exceed 150 days given the plain language of the Agreement.* Article 16B(1)(f) explicitly addresses the retroactive effect of new wage schedules resulting from an Article 16B proceeding. In plain and unambiguous terms, it provides:

> In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, *except that in no event shall the retroactive effect exceed 150 days.* [Emphasis added here.]

Notwithstanding these unambiguous terms, the Union argued for the first time at the hearing that the 150-day contractual limit "is not appropriate in this case" because the Company purportedly engaged in "misconduct" by not utilizing the Article 16B procedures years before (Ger Tr 18, 19). This classic ruse to expand the parties' written agreement is specious as a matter of fact and law.

First, there is no evidence in the record whatsoever to support the Union's preposterous allusion to misconduct on the part of the Company. To the contrary, while the grievance was proceeding through the normal channels, the Company simultaneously engaged in a formal review of the job and determined that the wage rate was appropriate; the Union then had a full opportunity to challenge that determination during the three-day merits hearing before Arbitrator Mackenzie. Nothing in this scenario suggests anything but respect for and adherence to the parties' collectively bargained dispute resolution processes.

Second, the plain language of Article 16B quashes this argument at its inception. Again, the provision is crystal clear that "in no event shall the retroactive effect exceed 150 days." The Arbitrator is compelled to give this unequivocal and unambiguous language its full force and effect. (Citations omitted here.)

Consistent with these entrenched principles of contract interpretation, regardless of the procedural history of the grievance or the process that led to this formal Article 16B hearing, the proposal adopted by the arbitrator in this proceeding cannot be given retroactive effect beyond 150 days from the date of the Award. Indeed, to accept the Union's eleventh-hour plea on this issue, the arbitrator would effectively be rewriting the Agreement, in clear violation of Article 13 ("The arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement"). (Citations omitted here.)

*Conclusion.* For the foregoing reasons, the Company's Article 16B proposal, establishing a weekly wage rate for Voice Mail Clerks of $388.00 (adjusted to reflect recent across-the-board increases) should be accepted and should be given a retroactive effect of 150 days from the date of the award in this proceeding.

## Discussion

### A. *Background*

This case arises out of the Union's attempt to have the Company adjust the pay rate of approximately ten Voice Mail Clerks working in the Washington, D.C. area. From the mid-1990's when their office was created, the primary function of Voice Mail Clerks has been to build, modify, maintain and delete individual voice mailboxes throughout the Company. The number of clients has grown to over 100,000 with the Company's acquisitions. Using the phone and personal computers, Voice Mail Clerks access multiple systems for the input and retrieval of data and engage in significant communication with their internal customers.

There is no dispute that about 1997, the Voice Mail Clerk's manager, Brenda Moses, began to assign tasks to the clerks on an ad hoc basis that had previously been performed by her. The clerks received temporary assignment (TA) pay over and above their normal rate of pay when they performed these duties including troubleshooting; building, maintaining and correcting errors in nodes; and building and maintaining pager sequences. The clerks have continued to perform these duties, but at some point prior to 2001, they ceased receiving added pay for this work.

On December 9, 2001, the Union filed a grievance seeking to upgrade the classification of the Voice Mail Clerks from General Clerk (semi-skilled) to RCMAC Clerk (technical).[5] This grievance was denied by the Company with the assertion that the work assigned to the Voice Mail Clerks was within the description of the "General Clerk" job title – Semi-Skilled Wage Schedule 21 – the wage schedule to which Voice Mail Clerks are presently assigned. There was apparently no dispute about the actual work assigned to the Voice Mail Clerks. Rather, the dispute centered on whether the work (or at least some of it) was more properly within the job description and pay range for a higher grade clerk, particu-

---

[5] The "technical" level is one step above the "skilled" level. "Semi-skilled" is one step below "skilled". So the Union's demand was essentially for a two-step increase in the classification of the Voice Mail Clerk title.

larly the RCMAC Clerk – Technical Wage Schedule 07 – or the Special Clerk – Skilled Wage Schedule 22. For reference the RCMAC wage schedule, if adjusted to a 7½ hour daily schedule, would amount to a little more than a 14 percent increase in pay while the Special Clerk wage schedule, also a 7½ hour schedule, would amount to about a 3½ percent increase.

The parties were unable to resolve the grievance so on April 1, July 14, and October 20, 2005, Arbitrator Susan Mackenzie heard the Union's grievance which she characterized in her opinion dated February 28, 2006 (at 4) as,

> . . . asserting a violation of the General Agreement and more specifically "unfair treatment" for performing "work of the RCMAC Clerks while titled and paid as General Clerks."

Arbitrator Mackenzie concluded (at 7),

> . . . the Arbitrator finds that to the extent set forth below, certain of the duties assigned to Voice Mail Clerks exceed the duties and requirements of the General Clerk title.

Moreover, Arbitrator Mackenzie wrote in her award (at 13),

> The Company did violate Article 16.B of the General Agreement by its assignment of certain duties to Voice Mail Clerks outside of the scope of their General Clerk Job Description without notification to the Union and opportunity to negotiate.

> Within 60 days of receipt of this Opinion and Award, the Company is directed to comply with the Article 16.B.1, notification and negotiations requirements.

Pursuant to Arbitrator Mackenzie's award, the Parties commenced negotiations in 2006, but were unable to reach agreement, so the undersigned was appointed, pursuant to the provisions of Article 16B, which is set forth in relevant part above, at pages 2-3, to issue a binding award as to the appropriate classification and wage rate for the Voice Mail Clerks.

Aside from the above essential finding and award, the Company cited a number of observations and inferences that it draws from Arbitrator Mackenzie's Opinion and asserts that they are somehow binding on the instant arbitrator. Plainly, Arbitrator Mackenzie's award, and any *necessary* conclusions she reached in coming to that award, would ordinarily be given considerable weight by any arbitrator dealing with the same issue, parties, contractual language and fact pattern. The issue before arbitrator Mackenzie was, however, different from the

one before the instant arbitrator. Although she necessarily assessed whether there had been a significant restructuring or redefinition of the Voice Mail Clerk job as it had been established in the mid-1990's in order to reach her decision that the Company had violated Article 16B, she determined that the issue of an appropriate rate of pay was *not* before her. In fact, she referred that matter back to the parties for negotiation pursuant to Article 16B. That is, in fact, the issue before the instant arbitrator.

In particular, the Company asserts that the instant arbitrator is somehow bound by an "80/20" formula derived from the Mackenzie award. Inasmuch as Arbitrator Mackenzie herself determined that she could not properly decide the appropriate wage rate for Voice Mail Clerks, it is clear that she had no intention that any part of her award would be used to determine the new wage rate for Voice Mail Clerks. Thus, any attempt to derive a wage rate from her award is misplaced and has been disregarded by the instant arbitrator.

## B. *Application of controlling contractual language*

Article 16B was quoted in all its potentially relevant parts at pages 2-3 above. After Arbitrator Mackenzie's holding that the Company did effectively "restructure or redefine" the Voice Mail Clerk's job title, she directed, as noted above, that within 60 days, the Company was "to comply with the 16.B.1 notification and negotiations requirements." Article 16B.1(a) provides, in relevant part,

> The Company shall notify the Union in writing of such job title or classification and ***shall furnish a job description of the duties and the wage rates and schedules*** initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. (Emphasis added here.)

Thus, by approximately April 30, 2006, the Company was obligated to furnish "a job description of the duties and the wage rates and schedules" initially determined for the Voice Mail Clerk. Nothing in the record indicates that the Company furnished a description of the Voice Mail Clerk duties to the Union.[6] Instead, before the expiration of the 60 days provided for by Arbitrator Mackenzie, on April 13, 2006, Union representative Jimmy Tarlau initiated negotiations by

---

[6] Although "Job Briefs" for General Clerk, Special Clerk, RCMAC Clerk and a number of other job titles were introduced, there is no specific "Job Brief" for the Voice Mail Clerk in the record. The instant arbitrator is thus required to rely upon the testimony adduced at the hearings in the instant matter and that before Arbitrator Mackenzie, as well as the Associate Job Evaluation Request Form (CX 1) introduced before Arbitrator Mackenzie, to determine the duties and other requirements of the job he has been asked to evaluate.

proposing, by e-mail, a rate of $22.70/hour ($851.25/week) for the Voice Mail Clerks (JX B). (For reference, this compares with the hourly rates of $21.44 for General Clerks and $23.125 for RCMAC Clerks, at that time.) Mr. Tarlau thus initiated the negotiations provided for in 16B.1(b). On April 24, Company representative, James R. Davis, responded to Mr. Tarlau with his proposal for a rate of $809/week (JX A) For reverence this is approximately equal to $21.57 per hour. He explained in his e-mail that this proposed rate was calculated by weighting the then current General Clerk and Special Clerk rates at 80% and 20% respectively, and was based on his reading of Arbitrator Mackenzie's Opinion and Award.

Article 16B.1(e) provides that if negotiations fail to resolve the matter, the Union may demand that "the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party." Apparently the Union filed such a request because on August 9, 2006, the undersigned arbitrator was notified that he had been appointed by the parties to hear this matter. A hearing date was set for September 15. It is not clear from the record when the Union demanded arbitration of the matter.

Article 16B.1(e) provides, "[w]ithin seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed." In an e-mail printout that contains no date, but apparently was sent sometime between the demand for arbitration and the date of the hearing, Mr. Tarlau wrote to Company attorney, Julia Broas, "This is to confirm in writing that the Union's final proposed schedule of rates for the corporate Voice Mail Clerks is Wage Schedule: 22 . . ." (JX C). (For reference, at the time of the earlier proposals in April 2006, the top rate for Schedule 22 was $832.50 or $22.20/hour.) At the hearing and in its brief, the Company alleged that this "final proposed schedule of rates" (JX C) from Mr. Tarlau reflected a change in the Union's "final offer" from April 13 and thereby violated Article 16B.1(e) as set forth above. Accordingly, the Company argued that it should not therefore be considered by the arbitrator.

This allegation could have relevance if the arbitrator holds, as asserted by the Company, that the arbitrator is constrained to accept either the Union' or the Company's final proposal, and that he may not award a wage schedule that is different from what one or the other of the parties has offered. (See the assertion by the Company in its proposal of the issues before the arbitrator, above at page 4 and on page 9 of the Company's post-hearing brief.) This matter will be discussed below.

-37-

Finally, Article 16B.1(f) provides,

> [w]hile it is not intended that such third party undertake a full and complete job evaluation study, he or she ***shall review other job titles or classifications and their wage schedules*** for comparison purposes . . . . In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, ***except that in no event shall the retroactive effect exceed 150 days***. [Emphasis added here.]

Thus, the Agreement provides a specific methodology to be relied upon by the instant arbitrator – a review of other job titles or classifications and their wage schedules.[7] This has been undertaken below. See Section E. In addition, based on the language involving retroactivity, the Company also raised another issue that must be addressed by the arbitrator – the effective date of the application of the new wage schedule. This will also be addressed below. See Section F.

## C. *Summary of the questions before the arbitrator.*

1. The threshold issue before the arbitrator is to determine what discretion the Agreement affords him in fashioning an award in this matter. That is, is the arbitrator constrained to choose between the positions of the parties as in "last offer" arbitration, or is he free to identify and award some other outcome in the matter?

2. The principal issue before the arbitrator is, of course, to determine an award with respect to the appropriate wage schedule for the Voice Mail Clerks.

3. Finally, the arbitrator must determine a remedy. This will require the arbitrator to interpret the language of Article 16B.1(f) which states that "in no event shall the retroactive effect exceed 150 days." Did the drafters of the Agreement intend, as the Company contends, that the new wage rate for the Voice Mail Clerks must be effective no more than 150 days prior to the date of the instant arbitrator's award, or, pursuant to the Union's interpreta-

---

[7] Both parties offered evidence of what selected individuals in the General and Special Clerk titles actually do in their jobs. Such evidence is of limited use because, on the one hand, individuals assigned to the Special Clerk title can be assigned to "work down" from their classifications, and, on the other hand, some individuals in the General Clerk status may be stellar performers and therefore outliers from the typical performer. Such evidence could be useful only if an adequately large and random sample were provided.

-38-

tion, that the revised wage rate must have effect 150 days prior to the Union's initial grievance, i.e., December 9, 2001?

## D. *Is the arbitrator constrained to select one or the other of the parties' proposals?*

In footnote 5, at page 9 of its post-hearing brief, the Company asserts:

> The Company submits that the intent of the language of Article 16B requires that the Arbitrator select among the two proposals rather than establish a wage rate and schedule wholly different than those proposed by the parties.

The Company also contends that the Union improperly attempted to change its "final offer" by offering a new proposal on the eve of the hearing in this matter (JX C). Article 16B.1(e) explicitly provides,

> . . . Within seven (7) days of [a demand for submission to a neutral third party], each party shall submit its final proposed schedule of wage rates to the other patty, *which cannot thereafter be changed.* [Emphasis added here.]

(See above at 24 and Company post-hearing brief at 10).

With regard to the first assertion – that the arbitrator's discretion is limited to the extent that he must select one of the two final offers of the parties – the Company provides no evidence or argument to support such a conclusion. The entire argument for this position is contained in footnote 5 of the brief quoted above. Contrary to the Company's conclusion, the arbitrator notes the following direction to him that appears in Article 16B.1(f),

> . . . A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party . . . . In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect . . . .

This language simply states that if the neutral determines that "a different schedule of rates" from the schedule initially implemented by the Company is appropriate, such schedule shall be placed into effect. The Company's assertion would suggest that if, for any reason, the arbitrator had found the Company's proposal inappropriate, he would be obliged to award the Union's position. In the absence of any language that states the arbitrator is to "select the more reasonable" of two offers, or other similar language that is routinely found in "last offer"

provisions, the arbitrator is compelled to conclude that the parties intended for him to make an unfettered decision of the "appropriate schedule of wage rates".

Inasmuch as the arbitrator is free to identify an appropriate schedule of wage rates that is different from either the Company's or Union's proposals, the second issue raised by the Company concerning the Union's "final offer" (JX C) is moot. In any event, the arbitrator would observe only that there is no evidence that the Union made more than one "final offer" *after* its demand that the matter be submitted to a neutral third party. The first offer (JX B) clearly came at the outset of negotiations, before any demand for neutral involvement, and in no way could be construed as a "final offer". Thus, the "final offer" (JX C) was the first and only "final offer" from the Union that is in the record.

### E. How do the job duties of the Voicemail Clerk compare with those of the prototypical General Clerk and Special Clerk?

To answer this question, the arbitrator has been guided primarily by the format of the Company's Associate Job Evaluation Request Form (CX 1, hereinafter "JER") introduced in the first hearing before Arbitrator Mackenzie. This exhibit lays out a clear guideline for evaluating any job and follows traditional job analysis dimensions and evaluation criteria, viz., (1) identification of the essential duties and functions of the job, (2) training and experience requirements, (3) responsibility (particularly with respect to supervision and impact of errors), and (4) working conditions.

*1. "Essential Duties/Functions" of the Voice Mail Clerk.* In any job evaluation, the first step is an *analysis* of the job which is completed by identifying and understanding the tasks – duties and functions – performed by job holders as well as the skills and abilities required of them. Ordinarily the analyst will observe and interview the employee, his or her immediate supervisor, and other relevant individuals.

In this case, the job analysis was actually completed by the immediate supervisor of the Voice Mail Clerks, Jackie Westbrook-Forte, who sought to have the Voice Mail Clerks classification changed from General Clerk to Special Clerk through what is known as a Job Evaluation Request Form (CX 1, hereinafter, "JER"). Westbrook-Forte's effort was endorsed by the group manager, Randolph

Harrison, the HR Business Partner, Candy Caldwell, and the Business Unit Vice President, Levi Nigg.[8]

The JER identified essential functions of the Voice Mail Clerk as:

- Process and complete Voice Mail requests, additions and changes to corporate employees.
- Handle and complete Voice Mail requests from the corporate web.
- Process and complete additions, deletions, and changes to nodes (exchanges) on our Voice Mail network.
- Handle verbal requests from corporate clients though the Automated Call Distributor
- Perform projects that have to do with system cut-overs and installations on an as needed basis.
- Performs other duties as requested.

Philip Payblas, an employment specialist at Verizon, described the five criteria he uses to make a determination regarding the classification of a title – the analytical part of the job, the thought process needed, the "technicality" of the job, the need for independent judgment, and the amount of training that is needed to perform the job (Mac1 Tr 247-248). In this particular case, Mr. Payblas testified that he did not interview the incumbents in person nor did he make a physical inspection. Instead, he relied entirely on the JER which had been prepared by Westbrook-Forte (Mac1 Tr 260). Mr. Payblas was a key member of the team that decided against the change thereby denying Westbrook-Forte's request to upgrade the job to Special Clerk per the JER.

A critical part of his testimony follows (Mac1 Tr 263-265):

Q:  Now, what is it about the special clerk that makes them a special clerk as opposed to a general clerk?

A:  They have self direction. There's more analyzation of information. And again, the independent judgment, you know, the self direction of making those decisions.

·   ·   ·   ·   ·   ·   ·

Q:  How do you get over that hurdle to the special clerk level?

---

[8] Westbrook-Forte's supervisor, Randolph Harrison, testified that it was actually a team effort with a group of managers and supervisors having a role in the development of the JER. As immediate supervisor, Westbrook-Forte signed off on it. He indicated that none of the Voice Mail Clerks had been involved in the preparation of the JER, however. (Mac3 Tr 103.)

A:   Well, we're looking for, you know, where there is a great deal of decision-making, you know, that person is making, you know, judgments based on information they receive.

In this situation with the general clerk, we felt more like the information was provided to them and they were to process a request or, you know, input information into a system to provide the product or service in this situation,

Q:   So your thinking was that they were really getting information from outside sources, looking up information in the computer and imputing information into the computer

A:   Um-hum

Q:   Almost like a data entry function?

A:   Um-hum

Q:   But they weren't really proactively trying to gather information, nor were they proactively trying to analyze problems in order to come up with a solution based on a variety of potential options

A:   No.

The testimony of Voice Mail Clerk Bridget Plonk concerning her work was at considerable variance from the assumptions reflected Mr. Payblas's testimony. Plonk's testimony did not contradict the JER prepared by her immediate supervisor but it did supplement what was in the JER. Ms. Plonk, who filed the original grievance in this matter, testified that the trigger for her grievance was her discovery that her Voice Mail Clerk job was described in a job opening announcement merely as "data entry" (Mac1 Tr 84, UX 6). Contrary to such a characterization, she testified that her supervisor in the late 1990's, Brenda Moses, had delegated a number of tasks related to voce mail boxes to the Voice Mail Clerks. The clerks no longer merely built, modified, and deleted mailboxes by entering data into a set of screen menus from paper mailbox orders. These extra tasks, which were integrally related to building, modifying and deleting voice mailboxes, included node modification, building pager sequences and troubleshooting (Mac1 Tr 81).

Ms. Plonk testified that the Voice Mail Clerks also man the automatic call drop (ACD) system taking calls from clients (Verizon employees nationwide) who are experiencing problems with their voice mailboxes. Again, this function has expanded over time. Although historically, the clerks merely took notes and passed along the problems to someone else, since the late 1990's, under the guidance of Ms. Moses, they have engaged in troubleshooting with the clients during these calls. Such calls obviously interrupt whatever the particular clerk is working on at the time.

-42-

When a customer's call drops through the ADC system to Plonk, she attempts to diagnose the customer's mailbox problem. This can involve trying different actions to recreate the problem. Some of the problems she deals with are the failure of the "stutter" tone or message light to indicate there are mailbox messages waiting; failure of the phone to roll over into the mailbox; mailbox disappearance and loss of messages; failure of pagers to respond; and most important, that the customer did not get a mailbox that they expected to be set up. Obviously, some of these problems are quite serious and can be dysfunctional in the extreme for those affected.

To correct such problems, Ms. Plonk relies on the ProComm program on her desktop. The answers are not obvious, and she is frequently required to try different solutions. After eliciting as much information from the customer as possible, she can usually correct the problem but occasionally she has to confer with her co-workers to get their advice and ideas (Mac1 Tr 121-122). Sometimes she has to call and coordinate with a tech for external problems that are beyond her control. There is no one procedure that is used to diagnose and correct problems. Where there are alternative explanations for a problem, she tries the easiest and fastest first. If more complex solutions do not work, then she confers with her co-workers and supervisor.

Sometimes problems are caused by the customer, himself, when he inadvertently turns off his pager or otherwise changes the settings on his mailbox. Diagnosing that possibility and courteously walking the customer through the steps necessary to correct the problem is also a regular part of troubleshooting the ACD calls that come in.

The most typical request Plonk receives is a request to build, modify or delete a voice mailbox. Such requests come by e-mail or fax. What Plonk's testimony clarified is that even this most common part of the job is not the same as it was in 1995. That is, while she simply did "point and click" in the earlier days, now when the procedure does not produce the intended results, she herself researches the problem and attempts to solve it rather than passing it along to her supervisor. Plainly, although the essential function – "Process and complete Voice Mail requests, additions and changes to corporate employees" – listed on the JER is completely accurate, its meaning has changed substantially over time.

Another of the essential duties is "Handle verbal requests from corporate clients though the Automated Call Distributor." This function initially required only that Plonk take messages and pass them along to her supervisor, but over time, it too has evolved to the point where she actually performs troubleshooting

-43-

and solves most of the requests, herself. Plonk indicated that in using the "CDR" function to deal with customer mailbox problems, she can actually see inside a person's mailbox, identify who called, when calls were retrieved, and look at pager records to see who called, so she obviously has access to highly confidential information of both a corporate and personal nature.

Plonk is also assigned "projects" involving the migration of groups as large as an entire department on occasion. Node work (effectively building a new exchange or modifying and existing one) is sometimes required when migrations occur in order to "provide room" for the new mailboxes in the system. Such work requires coordination with others outside her department including project managers in other parts of the country. Often, in connection with such work, there may be a deletion of a large batch of mailboxes. In such situations, Plonk testified that she did maintenance work such as "garbage collects" (Mac1 Tr 91). This requires her to identify and remove old or obsolete information from the system as voice mailboxes are deleted. Other tasks include collecting space left on systems for mailboxes, and "clearing" NameNet problems – correcting problems with the system that records and holds a person's name.

Ms. Plonk testified that her original set of tasks in the mid-1990's included only the routine building, modifying and deleting of mailboxes based on e-mail or fax requests. But beginning in 1997, Ms. Moses began to delegate the above types of tasks that Moses herself had previously performed to the Voice Mail Clerks (Mac1 Tr 96). Moses introduced "little" workshops to train the Voice Mail Clerks on the new tasks. Initially, when Moses assigned such tasks to an individual, the clerk was given temporary assignment (TA) pay for it. Sometime in 1998, however, the TA pay stopped although the duties continued to be assigned (Mac1 Tr 98).

Training others is also an occasional duty. After the merger of NYNEX into Verizon, she went to New York to train the new Verizon personnel. She received TA pay for that. Recently, however, she has been training former GTE personnel in the same skills from her workstation. She has not received extra compensation, however (Mac1 Tr 144).

Some of Ms Plonk's responses to questions about the RCMAC Clerk job brief give further insight into her job. Although part of the RCMAC job is similar to hers, the RCMAC Clerk job is more demanding because RCMAC Clerks must translate among several systems of acronyms and rely on other systems such as MARCH to complete their mailbox work. Like the RCMAC Clerk, however, Ms. Plonk is required to coordinate service activity projects and cut-overs with techs and cus-

-44-

tomers. Moreover, she is required to prioritize her work on a daily basis because she receives requests for service from a number of sources including her supervisor. While she is in the middle of one task, she receives another assignment from a customer phone request, a fax or an e-mail. It is left to her to decide which has priority. Another element of her work involves contact and coordination with the vendor of the Voice Mail system – Lucent. As changes are made in customer services, the Voice Mail Clerks must coordinate the tasks for which they are responsible with the vendor (Mac1 Tr 181).

With respect to pager sequences, Ms. Plonk must determine the sequence herself based on the client request (Mac1 Tr 206-207). There are patterns but in any given instance a new sequence might have to be developed. She testified,

> A: What we would generally do is call the pager and . . . listen to it. . . . So when we build the sequence we are listening to how long it takes from the time we call the pager telephone number until the time the pager tells us what to do. If the pager has a code, . . . we're telling it to stop with the pound, stop again and then delete.
>
> Q: So is there anything that tells you there are seven pauses in there?
>
> A: Well it's just a knack. You get the ear for it. You listen to your pager.

Finally, Ms. Plonk testified that the General Clerk job brief does not fully reflect what she does. It makes no provision for the maintenance work she does on the node system, voice mail system, the paging system or any of the troubleshooting work she does. Nor is there any reference to the "garbage collect" work or mainten- ance of the NameNet system. She reviewed the job brief of the Maintenance Administrator (UX 4) who, for reference, is several job grades above General Clerk (Mac1 Tr 226). She indicated that she performs a number of parallel functions including: acting as the customer's representative in resoling problems with other departments; screening trouble reports; and routing customers to places where their problems can be resolved based on her experience. There are no guidelines for these activities. She also uses her computer to track down trouble. She contacts custom- ers by phone to verify trouble and negotiates with them concerning how and when problems or orders can be resolved. Sometimes the customers she deals with are irate.

On cross-examination, Ms. Plonk testified that 80 percent of her time was spent building, changing, and deleting mailboxes (Mac2 Tr 8). This statement has led to considerable misunderstanding in the record of this matter. In reality, according to her Department Manager, Randolph Harrison, this number should be closer to 95 percent (Mac3 Tr 87) because this is her essential job function.

-45-

Unfortunately, Plonk's statement was taken out of context or interpreted to mean that 80 percent of the time she was engaged in the simplistic 1995 version of building mailboxes based on fax or e-mail requests. Plainly, as her cross examination proceeded, it became clear that "building mailboxes" became more challenging and complex after Ms. Moses began to delegate some of her functions to the Voice Mail Clerks about 1997. Ms. Plonk continued that her estimate included "[d]oing everything . . . you can't really put an estimate on how many boxes we are going to build on a particular day." (Mac2 Tr 8)  She further stated that she never knows from one day to the next what she will be doing (Mac 2 Tr 9).  She was asked (Mac2 Tr 10-12),

Q:  . . . I am trying to take out a broader view than just what you would be doing tomorrow . . . to the extent that you can break it out. So when you say that the ACD – for example, is there ACD work that's separate and apart from what you do, building mailboxes, deleting.

A:  Hum-um. All of it is the same. [The arbitrator interprets this to be a "No."]

Q:  It's all part of the same . . .

A:  Yes.

.    .    .    .    .    .    .

Q:  Okay, give me some example of the individual projects that you would work on.

A:  Well, we might have a project where we are deleting a number of mailboxes. We might have a project where a department is moving and we have to input their mailboxes. We might have a department where the people are moving around or just changing desks. And it might be over 100 people so we might be transferring mailboxes.

You might have where someone is moving from one location to another so they are getting brand-new mailboxes. Then you might have something dealing with the nodes as far as putting in a number of exchanges for migrations or conversions or something like that. But it all depends.

Q:  But from what you just described, it sounds like the vast majority of that work is also in connection with building, moving, changing mailboxes.

A;  Um-hum. ["Yes.]

*Conclusions with respect to Voice Mail Clerk job analysis.*  A job analyst must exercise care in interpreting what an employee says about his or her job. This is not only because it is in the employee's interest to embellish somewhat the roles they play, but the employee obviously does not have the perspective that the analyst or members of management might have. Here, however, weight must be given to Ms. Plonk's testimony because it is clear that changes have occurred that even her

department manager acknowledges he is not fully aware of. Randolph Harrison was asked about the changes that had occurred in the Voice Mail function over time. He emphasized the increase in volume and workload which obviously puts a strain on the Voice Mail Clerks' immediate supervisor and is what undoubtedly led to greater delegation of what were formerly supervisory tasks to the clerks. As to substantive changes, he said he was not aware of any but admitted, "I mean, there could be some things but that is handled on a day-to-day basis by their team leader." He further indicated, "I know the node building has escalated and there has been more of that because of all of the mergers and the building out of the system. But . . . building of the nodes has pretty much been the same as far as how it is done." (Mac3 Tr 78-79) Since the Voice Mail Clerks' immediate supervisor did not testify, the only witness with a bird's eye view of what goes on at the workplace was Ms. Plonk.

The job analysis prepared by Supervisor Westbrook-Forte that is contained in Sections A and B of the Associate Job Evaluation Request Form (CX 1, p 2-3) is certainly not inaccurate, based on Plonk's testimony, but it does allow incorrect inferences about the level of what Voice Mail Clerks do on a daily basis. For example, the first two statements under General: "Process and complete Voice Mail requests, additions and changes to corporate employees" and "Handle and complete Voice Mail requests from the corporate web" could be interpreted, as Mr. Payblas testified, to mean that the Voice Mail Clerks are simply presented with paper or e-mail requests for voice mailbox additions, modifications or deletions, and that they merely enter the necessary data into the screen menus on their desk top computers to comply with such requests. In a perfect world, this might be a simple task. In the real world though, based on Ms. Plonk's unrefuted testimony, every one of these mailbox tasks involves a potential complication, e.g., on rare occasions node work may be required, or it may involve pager sequence building, or some other kind of troubleshooting. Moreover, after the action is completed, some clean-up ("garbage collect") may be advisable or required to make the system function properly. Although only a minority of voice mailbox orders may require such actions, they are generally unpredictable. These are the tasks that migrated over to Voice Mail Clerks from Ms. Moses. It takes training, experience, and perseverance to recognize and resolve the variety of complications that may arise in this task, and these character-istics are more typical of skilled work than semi-skilled work, where most operations are routine and unchallenging.

The statement, "Handle verbal requests from corporate clients through the Automated Call Distributor (ACD)" may be misinterpreted to mean that the Voice Mail Clerk merely takes down information and passes it along to others who resolve the difficulty being reported by the client. Although the ambiguous term – "handle"

-47-

– often implies such limited input, such an interpretation would be a completely inaccurate reading of what Voice Mail Clerks do, however, based on Ms. Plonk's testimony. According to Ms. Plonk, the Voice Mail Clerks actually *resolve* most of the ACD calls through troubleshooting on the basis of their experience. Finally, the statement "Perform projects that have to do with system cut-overs and installations on a (sic) as needed basis" does not reflect the degree to which Ms. Plonk and her colleagues are responsible for *coordinating* the actions of technicians as well as clients to assure a smooth transition from one location to another for the client.

Several conclusions follow. First, a fair understanding of what is involved in Voice Mail work leads to an appreciation of the value the Voice Mail Clerks add to the Company when they are effective and efficient in the performance of their jobs. Plainly, a failure to resolve ACD calls efficiently would create unnecessary down-time and inefficiencies for the clients and their organizations. Similarly, the ineffective coordination of project work would lead to inefficiencies across large groups of Company employees. Mistakes could cause substantial losses in time and performance for individuals or groups of clients.

Second, although training is largely informal, along with experience, it is essential for effective performance of a Voice Mail Clerk. It is no coincidence that Ms. Moses, the first supervisor of this group did not begin to assign the more complex aspects of voice mail work to the clerks for several years. Although increased work volume was perhaps the motivator, the enabler of task migration from Moses to her subordinates was their acquisition of experience in the job. Ms. Plonk's statement with respect to knowing how to sequence a pager, quoted above, is illustrative of much of this work: "Well it's just a knack. You get the ear for it." In short, the learning curve for this job is much longer than the mere week or two that it takes to learn how to input the data to create a new voice mailbox.

An additional conclusion that follows from the above is that the percentages of effort reflected under "Tasks Performed" in the JER (p 3), and also in Bridget Plonk's testimony (Mac2 Tr 8) are largely irrelevant. The so-called "extra tasks beyond building voice mailboxes", such as node work, project work, and responses to ACD calls are in no way separate and distinct, or "beyond building mailboxes". Rather they are an integral part of effective and efficient mailbox building and maintenance. This is the point that Ms. Plonk was making when she responded that the work could not be separated out – it was "all part of the same" effort (Mac2 Tr 10). So what was formerly the straightforward General Clerk task of building, modifying and deleting mailboxes has become a more complex task.

-48-

The above findings are not dispositive of what the appropriate classification for Voice Mail Clerks should be. A consideration of how the job compares with the job briefs for both General Clerk and Special Clerk, particularly with regard to experience and training requirements, responsibility, and working conditions is necessary for such a determination.

    2. *Training and experience requirements.* Based on the testimony of Ms. Plonk, initially in 1995, the training received by Voice Mail Clerks was limited to on-the-job, informal training. Nevertheless, although Ms. Plonk made the comment, "I trained myself" (Mac2 Tr 12), it is clearly a misinterpretation of that remark to conclude that some Voice Mail Clerks, "receive no training whatsoever and simply train themselves" as the Company brief asserts (at 4).

Mr. Harrison explained in response to a question about classroom training, "No. We are fairly unique within the Company and kind of train internally. It's pretty much on the job." (Mac3 Tr 81). He went on to indicate that the 10 or 12 clerks within his voice mail function cover all of the needs of the Company and no one else in the Company performs the same duties or functions. This small number explains why there is no formal classroom training or even computer based training specifically aimed at the Voice Mail Clerks. The economies of scale do not exist.

New Voice Mail Clerks sit with incumbents for two weeks to gain an understanding of the job and use of the computer based menus of the ProComm program. Ms. Plonk also attended a week of training provided by the vendor at the "Octel University" which is apparently off site. As mentioned previously, Ms. Moses also arranged her own series of "little" workshop training sessions which she conducted in order to instruct the Voice Mail Clerks on the more complex aspects node building and modification, pager sequencing, and "garbage collect" (Mac1 Tr 97).

The Company, in its brief, argued that almost every aspect of the Voice Mail Clerk's job, including the more complex tasks that are above the level of a General Clerk, is menu driven – "point and click" work. The implication is that the job could not therefore be very complex. After deciding to do a "garbage collect", for example, the clerk need only go to the proper menu, point and click. Likewise, "troubleshooting" efforts are limited to correcting erroneously entered data by simply following a trail of preset screens and drop-down boxes. Even the task of building sequences for pagers follows an established set of methods and procedures.

The fact that much of the work is menu driven is certainly true, but it begs the question of how a Voice Mail Clerk comes to know which choice to make on a menu, or which letter of a pager sequence code must be selected. At a General Clerk level, very little thought is needed. That is, the clerk merely reads from a document or is otherwise instructed on which choice to make. Here, even if, for the sake of argument, there are a limited number of choices at any point in the process of troubleshooting, generating a pager sequence, or performing a "garbage collect", it takes time and experience to learn what is necessary in order to accomplish the task at hand efficiently and effectively. This is why these tasks were originally assigned to a supervisor. Moreover, there are simply a lot of different tasks, each with its own unique elements. The arbitrator is persuaded that with the level and extent of knowledge required, this factor points to the Skilled 1-B Clerk classification as being more appropriate than the Semi-Skilled Clerk Classification.

The fact that most of the training is on-the-job and is primarily experience driven in no way undermines the fact that a substantial amount of training and experience is necessary to become a fully proficient Voice Mail Clerk. The arbitrator is mindful of the fact that in most job evaluation systems, it is the level of training and experience required to enter the job that is ordinarily the principal basis for determining the degree of a compensable factor. This will be considered in fashioning the award in this matter. The arbitrator is also mindful that Ms. West-brook-Forte indicated in the JER (p 4) that the minimum time to learn to perform the job satisfactorily was only two weeks. Undoubtedly her time frame was based on how long it would take for an individual to pick up the basic skills to build, modify or delete mailboxes where there are no complexities requiring the use of node building, pager sequencing, or "garbage collect" and no troubleshooting, i.e., about the level of skill that one might have been expected to have in 1995. It is apparent, however, that full proficiency for the job in 2007 could not be attained within two weeks since Ms. Westbrook-Forte indicated that at a minimum another week of vendor training ordinarily follows (CX 1, p 4). Moreover, based on the preceding discussion of the job analysis, it is plain to the arbitrator that one would need many months on the job to experience all of the various challenges that might arise and to become fully proficient.

In conclusion, the arbitrator does not disagree with the identification of the fourth degree of "Knowledge of Methods and Procedures" (JER, p 3) identified by Ms. Westbrook-Forte. That is, the job requires a "[t]horough degree of knowledge in a specific working area. Some technical expertise required." This level of proficiency is consistent with the Skilled or Special Clerk classification.

-50-

*3. Responsibility.* The closeness of supervision, impact of error, and access to confidential information are important factors in evaluating any job. In the JER these issues are covered on page 6, "Instructions, Guidance and Accuracy."

Supervision. Joseph Pankoski, Senior Staff Consultant in Labor Relations for over 14 years, testified that in making classification decisions involving Semi-Skilled and Skilled clerical titles, the Company considers the critical distinction to be the level of "responsibility involved". More specifically (Ger Tr 210-211):

> In general terms, for the typical general clerk, you would expect that they would be able to take an existing process and perform that process quickly, efficiently and accurately.

> For a special clerk, you would be able to expect that you could give them a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for.

Mr. Payblas testified in the first Mackenzie hearing about what distinguishes a Special Clerk from a General Clerk (Mac1 Tr 263-265, quoted above at 43-44). In particular, he cited self-direction, the clerk's analysis of information and use of independent judgment. Although all clerks have some responsibility for self direction, analysis and independent judgment, the Special Clerk would engage in a "great deal of decision-making" and judgment based on the information they receive.

As noted above, Mr. Payblas and his team concluded that all necessary information was provided to the Voice Mail Clerks from customers or supervisors via paper or e-mail requests and that they simply processed the information by inputting it into their computers, much like a data entry function. The unrefuted testimony of Bridget Plonk, however, showed that the original voice mail supervisor, Brenda Moses, had delegated a number of her tasks to the Voice Mail Clerks. After receiving instruction from Moses, the clerks, independent of any direct supervision from Moses, began to work on nodes – adding and deleting exchanges, building pager sequences, and troubleshooting problems brought to them through calls that dropped to them through the ACD system. Moreover, Voice Mail Clerks are required to prioritize their own work almost continuously (obviously without supervision) in order to respond to ACD phone requests from customers.

It is apparent that Voice Mail Clerks exercise a great deal of independent judgment particularly as they work through the problems presented through the

ACD system, but also with respect to when and how to modify nodes, how to construct pager sequences, or in their "negotiation" with project managers concerning cut-overs and other activities related to the projects they are assigned. In short, although Jackie Westbrook-Forte indicated that the Voice Mail clerks work under general supervision, since they do have some latitude in their decision making, it is probably more accurate to characterize their degree of self direction in the next higher category – "Work is performed under moderate supervision. Some latitude for decision making."

Impact of error. Ms. Westbrook-Forte indicated on the JER (p 6) that "Error would result in loss of employee and other's time with the work group to correct." On the basis of the job analysis discussion above, however, it is clear that mistakes could cause substantial losses in time and performance for clients or groups of clients throughout Verizon. Although losses are not likely to be catastrophic, it is clear that the next degree of required accuracy is more appropriate, i.e., "Error may impact a single department or phase of company activities."

Access to confidential information. Ms. Plonk indicated that in using the "CDR" function to deal with customer mailbox problems, she can actually see inside a person's mailbox, identify who called, when calls were retrieved, and look at pager records to see who called (Mac1 Tr 117). Although an ordinary level of confidentiality undoubtedly exists for any employee who works for a telephone company, access to such personal confidential information in someone's voice mailbox is extraordinary. To have access even to the names of persons who called a customer, and when, alone, is a significant piece of confidential information. Such level of access to potentially sensitive information is beyond what can ordinarily be expected for a General Clerk.

Summary. With regard to all three dimensions of responsibility, an admittedly important differentiator between semi-skilled and skilled clerks, it is apparent that the skilled classification is more appropriate for experienced Voice Mail Clerks although for less experienced clerks, who undoubtedly need more assistance from co-workers or supervision, it is not as apparent.

4. *Working conditions.* Here, the physical working conditions are generally pleasant but a significant factor affecting working conditions is the stress related to the ACD system. Clerks are interrupted by calls that are dropped to them. They lose the autonomy of controlling their work. Some of these calls may simply be requests for changes in voice mailboxes or messaged that must be forwarded on to others, but some may be complaints from upset customers or reports of problems

with mailboxes. Ms. Plonk testified that the Voice Mail Clerk's responsibility is to try to resolve the customer's problem and if that fails, the clerk must know where the customer should be referred for further assistance.

Ms. Westbrook-Forte lists in the JER (p 5) that mental effort is required to meet customer requirements on short notice and that the Voice Mail Clerk must work with Verizon project managers to complete voice mail projects throughout the Company. In this regard, a General Clerk's duties include: "Answering phones and taking messages"; "Interacting with the public, outside vendors, customers and/or other employees"; "Heavy client interfacing at all levels of management". Among the Basic Requirements is, "May be required to have face-to-face contact with the public. Excellent interpersonal skills required." (CX B) On the other hand, the Special Clerk's duties include: "Communicating with customers, outside business firms or employees in other departments to accomplish tasks"; "Processing work to meet deadlines"; "Handling high volume of detailed work". (CX C) The last of these is precisely on target with respect to the Voice Mail Clerk. Moreover, the factor that stands out here is that Voice Mail Clerks do much more than merely "answering phones and taking messages" which is the level of task required of General Clerks. Moreover, with respect to project work, they are required to coordinate their work with others (e.g., Project Managers) which implies they are required to meet deadlines as well. This is in line with the Special Clerk duties.

Thus, on balance, at least for experienced Voice Mail Clerks, this factor would appear to be more compatible with the Special Clerk at the Skilled Level than the General Clerk at the Semi-Skilled Level.

5. *Summary.* On the basis of the above analysis it is plain that the level of the work performed by an experienced Voice Mail Clerk like Ms. Plonk should be classified at the Skilled Clerk level. The level of training, and particularly experience, is comparable to the training and experience of a skilled Special Clerk and well above that of a semi-skilled General Clerk. Further, both the level of responsibility and job stress due to the ACD calls and deadlines for project work are also comparable to the levels of a Special Clerk.

The Company brief twice cites the statement by Union President Pappas that Voice Mail Clerks "weren't really doing special clerk work" (Ger Tr 7). The arbitrator notes that this was said in a context where Mr. Pappas went on to say that as the Voice Mail Clerks described their jobs, he was reminded of RCMAC Clerks, a classification *above* Special Clerks, and that apparently is what led to the

-53-

Union's initial grievance demand that the Voice Mail Clerks be reclassified as RCMAC Clerks. It is apparent that what Pappas meant by his remark was that the specific tasks or duties performed by Voice Mail Clerks were not similar to the specific tasks or duties of any Special Clerks he knew. Such a statement in no way implies that Pappas did not think the work of Voice Mail Clerks was of a *skilled* nature. If he had not thought of it as being at least skilled, he would not have thought about the appropriateness of the RCMAC Clerk title which is even higher – at the "technical" level.

In summary, with respect to the specific tasks performed by Voice Mail Clerks, determining whether node work is necessary and deciding what and how to do it, building pager sequences, troubleshooting both voice mailbox and pager malfunctions, investigating and clearing error codes, running reports to diagnose trouble, coordinating with managers in other departments on project work and doing all of this without immediate supervision clearly places this job in the Skilled Clerk (Wage Schedule 22) category.

## F. Remedy

In light of the learning curve for becoming fully proficient in all of the tasks performed by experienced Voice Mail Clerks in creating, modifying, maintaining and deleting voice mailboxes, the current Voice Mail Clerk job title must be retained in Semi-Skilled 2-B Clerk Wage Schedule 21 for all newly entering associates performing corporate voice mail work. During their first two years on the job, Voice Mail Clerks cannot be expected to have mastered all of the nuances of voice mail work. During their first two years on the job, however, they should be afforded the opportunity to learn all the more complex elements of voice mail work including node building and maintenance, building pager sequences, performing "garbage collects", project management, troubleshooting including how to work with the CDR function for internal examination of voice mailboxes and other advanced tasks related to building, modifying, maintaining, or deleting voice mailboxes. Upon the completion of *two actual years of service*[9] as a Voice Mail Clerk, current Voice Mail Clerks, as well as those appointed hereafter, should be allowed to apply for and immediately be promoted to the Senior Voice Mail Clerk job title.

---

[9] The arbitrator's intent is to assure that Voice Mail Clerks have two years of experience performing Voice Mail tasks, so that time away from the job for any reason should not be counted toward the two actual years of service requirement for achieving the Senior Voice Mail Clerk title. Any long term absence of more than a month, or cumulative absences exceeding a month over the two year period, should lead to an adjustment of the eligibility date for Senior Voice Mail Clerk status.

-54-

The job title of Senior Voice Mail Clerk (Skilled 1-B Clerk Wage Schedule 22) should be created immediately. In addition to the duties and functions of the Voice Mail Clerk, a Senior Voice Mail Clerk should be completely proficient in:

- Creating, modifying, maintaining, or deleting nodes (exchanges)
- Building pager sequences
- Performing "garbage collects"
- Managing assigned projects
- Troubleshooting voice mailbox/pager problems
- Other advanced tasks related to the corporate voice mail system

All current Voice Mail Clerks with two or more years of *actual service* in that title should immediately be offered the opportunity to upgrade to the Senior Voice Mail Clerk job.

*Effective date.* Inasmuch as the upgrade of experienced Voice Mail Clerks should have taken place in 2001, the effective date of the creation of the Senior Voice Mail job title shall be December 9, 2001, the date of the Union's grievance in this matter. Any Voice Mail Clerk with two or more years of actual service as of that date should receive a pay adjustment reflecting the difference between what they have actually earned since that date and what they would have earned had they been properly classified as of that date. Any Voice Mail Clerk who achieved two years of actual service after December 9, 2001, should receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk.

The arbitrator is mindful of the admonition in Article 16B.1(f) which asserts that "in no event shall the retroactive effect exceed 150 days." Had the Company not violated the Agreement as found by Arbitrator Mackenzie, and had the Company properly notified the Union of the changes in the Voice Mail Clerk job in response to the Union's December 2001 grievance, and had the matter been processed and ultimately referred to a "neutral third party" as required by Article 16B.1(e) and (f), a decision by the neutral third party would have been rendered on or about May 9, 2002 which is 150 days after December 9, 2001. Thus in the absence of the contractual violation by the Company, this neutral third party award would have been effective on December 9, 2001, fully within the boundaries of retroactivity prescribed by the Agreement. It would shock the sensibilities of any reasonable person if the Company were allowed to benefit from its own breech of

the Agreement, as found by Arbitrator Mackenzie, particularly since it violated the very Article of the Agreement that it now seeks to use to limit the contractually agreed-upon remedy in this matter.

Having considered all of the evidence and argument in this matter, the arbitrator, in accord with the remedy outlined above, awards as follows:

# AWARD

1. The existing Voice Mail Clerk job title shall be retained in Semi-Skilled 2-B Clerk Wage Schedule 21. All existing Voice Mail Clerks and all newly hired Voice Mail Clerks shall be assigned to such title and classification until they attain *two actual years of service* as Voice Mail Clerks. (See footnote 9, supra.)

2. During their first two years on the job, Voice Mail Clerks shall be allowed the opportunity to learn all the more complex elements of voice mail work including node building and maintenance, building pager sequences, performing "garbage collects", project management, troubleshooting including how to work with the CDR function for internal examination of voice mailboxes and other advanced tasks related to building, modifying, maintaining, or deleting voice mailboxes. Upon the completion of *two actual years service* as a Voice Mail Clerk, current Voice Mail Clerks as well as those appointed hereafter may apply for and shall be immediately promoted to the Senior Voice Mail Clerk job title.

3. The job title of Senior Voice Mail Clerk (Skilled 1-B Clerk Wage Schedule 22) shall be created immediately. In addition to the duties and functions of the Voice Mail Clerk as presently defined, a Senior Voice Mail Clerk shall be completely proficient in:

    - Creating, modifying, maintaining, or deleting nodes (exchanges)
    - Building pager sequences
    - Performing "garbage collects"
    - Managing assigned projects
    - Troubleshooting voice mailbox/pager problems
    - Other advanced tasks related to the corporate voice mail system

4. All current Voice Mail Clerks with two or more years of *actual service* in that title shall immediately be offered the opportunity to upgrade to the Senior Voice Mail Clerk job.

5. Any Voice Mail Clerk with two or more years of *actual service* as of December 9, 2001 shall receive a pay adjustment reflecting the difference between what she (or he) actually earned and what she would have earned had she been properly classified as of that date.   Any Voice Mail Clerk who achieved two years of *actual service* after December 9, 2001, shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk.

ARBITRATOR

Grand County, Colorado
May 30, 2007

-57-

# EXHIBIT B



# GENERAL AGREEMENT

Between

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

August 3, 2003

07 1460

**FILED**

AUG 1 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



Art. 13

(d) The demotion (for just cause, if disciplinary) of an employee who at the time of demotion had been continuously in the job from which demoted for at least six (6) months.

### Article 13. - Procedures for Regular and Expedited Arbitration

**SECTION 1.** The procedure for arbitration shall be as follows:

(a) Arbitration shall be conducted before an Impartial Arbitrator selected by the Union and the Company in accordance with the provisions of Section (b).

(b) As soon as possible, a master list of twelve (12) arbitrators shall be selected by the parties. This master list shall be organized in alphabetical order. Each arbitrator shall serve until the termination of this Agreement unless his services are terminated earlier by written notice from either party to the other. The arbitrator shall be notified of his termination by a joint letter from the parties. The arbitrator shall conclude his services by deciding any grievance previously heard. A successor arbitrator shall be selected by the parties. Any successor arbitrator shall be added to the master list in alphabetical order.

(c) Each case shall be assigned to the arbitrator at the top of the master list in order of receipt. After an arbitrator is assigned a case, he shall be placed at the bottom of the list. After the grievances have been assigned arbitrators, the Union must, within twenty-four (24) months from the date of the letter appealing the grievance to arbitration, (thirty (30) months for grievances appealed to arbitration prior to August 3, 2003), notify the Company and the arbitrator of the Union's desire to schedule the case for hearing. Failure to do so shall constitute withdrawal of the grievance.

(d) Upon receipt of the Union's request to schedule a grievance for hearing, the assigned arbitrator shall provide the parties with four dates on which the arbitrator is available to hear the grievance. These dates must be within one hundred and eighty (180) days of the date on which the arbitrator is notified of the Union's request to schedule the grievance for hearing. If the arbitrator cannot provide the parties with four possible hearing dates within this time period, either party may assign the grievance to the next arbitrator on the master list. Within four weeks

18

of the joint receipt of the arbitrator's proposed hearing dates, the parties will select one of the arbitrator's proposed dates or request additional hearing dates.

(e) Hearings shall be commenced and carried to a conclusion as expeditiously as possible. The hearings and decision of the arbitrator shall be confined to the issue or issues presented in the grievance procedure. The parties shall, prior to the hearings, jointly stipulate in writing such issue or issues if they can agree, and if they cannot agree, the arbitrator shall reduce such issue or issues to writing at or before the commencement of the hearings. The hearing shall be conducted in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association, and if possible, the arbitrator shall render a decision in writing within three weeks following the closing of the hearing.

(f) The arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement, and in no event shall a decision have retroactive effect more than thirty (30) calendar days prior to the initial presentation of the grievance. Both parties agree to participate in the arbitration proceedings and the decision of the arbitrator which shall contain a full statement of the grounds under which the issue or issues have been decided, shall be final and the Union, the Locals, their representatives, employees and the Company agree to abide thereby.

(g) Each party shall bear the expense of preparing and presenting its own case. The compensation and expenses of the arbitrator and any other expenses relative to the procedures shall be borne equally by the parties.

(h) The Company's Director of Labor Relations and the Union's Bargaining Chair shall meet quarterly to schedule any grievances reinstated as a result of the Union's internal appeal process.

**SECTION 2.** The procedure in this Section will apply only to grievances which are arbitrable under the provisions of Article 12, Section 4 (b), (c) and (d). In lieu of the procedure specified in Section 1 of this Article, any grievances involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration

**Art. 13**

under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which are specifically subject to arbitration under Article 12, Section 4, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided. The election shall be in writing and, when signed by authorized representatives of the parties, shall be irrevocable. If no such election is made within the foregoing time period, the arbitration procedure in Section 1 of this Article shall be followed.

(a)  Arbitrators on the master list established pursuant to Section 1(b) of this Article shall be offered cases in rotating order without regard to their place on the master list based on application of Section 1(c). If an arbitrator does not commit to hearing a case within one hundred and twenty (120) calendar days, the case will be offered to the next arbitrator. If no arbitrator commits to hearing the case within one hundred and twenty (120) calendar days, the case will be assigned to the arbitrator who can hear the case on the earliest date.

The arbitrator selected shall be placed at the bottom of the list for purposes of selection pursuant to this Section.

(b)  The procedures for expedited arbitration shall be as follows:

(1)  Within three (3) working days the parties shall notify the arbitrator in writing of his assignment to decide a grievance by expedited arbitration. The arbitrator shall confirm his acceptance of this assignment in writing within five (5) working days.

(2)  The parties may submit to the arbitrator prior to the hearing a written stipulation of all facts not in dispute.

(3)  The hearing shall be informal without formal rules of evidence and without a transcript. However, the arbitrator shall be satisfied that the evidence submitted is of a type on which he can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the arbitrator.

(4)  Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at

the hearing and arguments supporting its position. The arbitrator shall give his decision within five (5) working days after receiving the briefs. He shall provide the parties a brief written statement of the reasons supporting his decision.

(5) The arbitrator's decision shall apply only to the instant grievance, which shall be resolved thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the decision or a modification thereof is adopted by the written concurrence of the authorized representatives of the parties.

(6) The time limits in (1) and (4) of this Paragraph (b) may be extended by agreement of the parties or at the arbitrator's request, in either case only in emergency situations. Such extensions shall not circumvent the purpose of this procedure.

(7) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for back pay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(8) The arbitrator shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(9) The decision of the arbitrator will resolve the grievance, and the Company and the Union agree to abide by such decision. The compensation and expenses of the arbitrator and the general expenses of the arbitration shall be borne by the Company and the Union in equal parts. Each party shall bear the expense of its representatives and witnesses.

## Article 14. - Pension and Sickness and Accident Disability Benefit Plans

**SECTION 1.** Except as provided in this Article, there shall be no negotiations during the life of this Agreement upon changes in pensions or any other subject covered by the "Verizon Pension Plan for

**Art. 16B**

(b)  "Job related training" shall mean training which is work related and preparatory for the job or job family into which the individual is hired. "Job related training" may include a college degree. The amount of credit shall be at the Company's discretion.

(c)  "Job related experience and/or job related training" may include military experience or training.

**SECTION 2.** This Agreement shall not be construed to prevent the Company from engaging employees at starting rates which in the Company's judgment are commensurate with their previous job related training, and/or job related experience.

**SECTION 3.** Employees may be hired into any titles at rates in excess of the minimum hiring rate at the Company's discretion. If an employee is hired into a title at a pay rate in excess of the minimum hiring rate for reasons other than job related experience and/or job related training, any employee in that title in the building into which the employee is hired who is at a lower rate of pay will be raised to the rate of the individual hired.

## Article 16B. - New Job Titles and Job Classifications

**SECTION 1.** Whenever the Company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a)  The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b)  The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

(c)  If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and the temporary designation removed.

24

(d) If agreement is reached between the parties within the sixty (60) days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e) If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

(f) The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days.

(g) The procedures set forth in this Article shall be the exclusive means by which the Union may contest the schedule of wage rates which the Company sets for any new, restructured, or redefined job title or classification.

(h) The cost of the neutral third party shall be borne one-half by the Company and one-half by the Union.

25

FILED

AUG 1 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VERIZON WASHINGTON, DC INC.,
930 V. Street, N.E.
Washington, D.C. 20018

        Plaintiff,

        v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO (as designated agent
and representative for Local 2336),
501 3rd Street, N.W.
Washington, D.C. 20001

        Defendant.

Civil Action No.

Case: 1:07-cv-01460
Assigned To : Friedman, Paul L.
Assign. Date : 8/13/2007
Description: Labor-ERISA

## COMPLAINT TO PARTIALLY VACATE ARBITRATION AWARD

Plaintiff, Verizon Washington, DC Inc. ("Verizon Washington, DC" or "the Company"), by and through its undersigned counsel, files this Complaint pursuant to Section 301 of the Labor Management Relations Act ("Act"), 29 U.S.C. § 185, to partially vacate an arbitrator's award, and states as follows in support hereof:

### Introduction

1.     This case arises out of arbitration award ("Award") issued by Arbitrator Paul Gerhart in connection with a grievance filed under Article 16B of the collective bargaining agreement (Agreement") between the Communications Workers of America ("CWA" or "Union") and Verizon Washington, DC. The Award was dated May 31, 2007. A copy of the Award is attached hereto as Exhibit A.

2.     The Award found, in part, that the level of work performed by experienced

1

employees in the position of Voice Mail Clerks should be classified and compensated in accordance with the Skilled Clerk (Wage Schedule 22) category set forth in the Agreement. After reaching this conclusion, the arbitrator then issued a remedy requiring that: (1) the Company create immediately a Senior Voice Mail Clerk job title, which shall be classified and compensated according to the Skilled 1-B Clerk Wage Schedule 22, which is the wage category above the category in which Voice Mail Clerks currently are placed; (2) all Voice Mail Clerks with two actual years of service shall be allowed to apply for and be promoted immediately to the Senior Voice Mail Clerk job title; and (3) the effective date of the creation of the Senior Voice Mail Clerk job title, and all attendant compensation increases, shall be December 9, 2001. The arbitrator established this effective date nothwithstanding his express recognition of the fact that the Agreement plainly and unambiguously states that "in no event shall the retroactive effect [of an award under Article 16B] exceed 150 days."

      3.     In rendering the above-stated portion of the Award, the arbitrator purposely rejected the bargain reached by the parties and thereby exceeded the scope of his contractual authority. This is an action pursuant to Section 301 to vacate that portion of the Award.

## The Parties

      4.     Verizon Washington, DC is a company engaged in the telecommunications business that is incorporated in the state of Delaware and maintains a principal place of business in Washington, DC at 930 V. Street, N.E., Washington, D.C. 20018.

      5.     The CWA is a labor organization that represents plant, services and financial employees in Verizon Washington, DC's facilities. CWA maintains a principal place of business in Washington, DC at 501 Third Street, NW, Washington, D.C. 20001-2797.

## Jurisdiction

      6.     Verizon Washington, DC is an employer within the meaning of 29 U.S.C. §

152(2) and engages in a business affecting commerce.

7.     CWA is a labor organization within the meaning of 29 U.S.C. §152(5), is the authorized bargaining representative of certain employees of Verizon Washington, DC and therefore represents employees in an industry affecting commerce.

8.     This Court has subject matter jurisdiction over the claims set forth herein pursuant to Section 301(a) of the Act, 29 U.S.C. § 185(a), and 28 U.S.C. § 1331.

## Venue

9.     Venue is proper in this Court pursuant to Section 301(a) of the Act, 29 U.S.C. §185(a), in that this Court has jurisdiction over the parties, which maintain principal places of business in this District.  Venue is also appropriate pursuant to the provisions of 28 U.S.C. §1391(b) as the events giving rise to this matter occurred in this District.

## The Collective Bargaining Agreements

10.     For many years and at all times relevant to this action, Verizon Washington, DC and the CWA have been parties to successive collective bargaining agreements.  The relevant portions of the Agreement are attached hereto as Exhibit B.

11.     Article 13, Section 1(f), of the Agreement states, *inter alia*, that "[t]he arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement, . . . . Both parties agree to participate in the arbitration proceedings and the decision of the arbitrator which shall contain a full statement of the grounds under which the issue or issues have been decided, shall be final and the Union, the Locals, their representatives, employees and the Company agree to abide thereby."

12.     Article 16B of the Agreement states, *inter alia*, that, "[i]n the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule

shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days."

## The Subject of the Grievance

13.    The Union filed its grievance in this matter on July 28, 2003, following the Company's posting of two openings within the Corporate Voice Mail group as "data entry" positions. The sole remedy sought in the grievance was an upgrade of the Voice Mail Clerk position to that of RCMAC Clerk.

14.    The parties were unable to resolve the dispute during the multi-step grievance process. Thereafter, they presented testimony and other evidence over three days of hearing on the merits of the grievance before Arbitrator Susan T. Mackenzie. Arbitrator Mackenzie issued her Opinion and Award on February 28, 2006.

15.    In her award, Arbitrator Mackenzie concluded, *inter alia*, that the Company "sufficiently established that the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk."

16.    Based on conclusion that Voice Mail Clerks might perform additional tasks beyond those normally assigned to the position up to 20% of their time, Arbitrator Mackenzie then held that "the extent to which additional duties assigned to Voice Mail Clerks constitutes a redefinition of the Voice Mail Clerk job classification is appropriately the subject of negotiations between the parties pursuant to Section 1 of Article 16.B." Accordingly, she directed the Company to comply with the notification and negotiation requirements of that provision.

17.    Pursuant to the requirements of Article 16B, the parties submitted proposals regarding possible wage rates for the Voice Mail Clerks to the appointed neutral third party, Arbitrator Paul Gerhart.

18.    The Company's proposal a proposed wage rate consisting of 80% of the Voice Mail Clerks' existing rate and 20% of the wage schedule of the next higher clerical grade, that of the Skilled 1-B (Special Clerk).

19.    The Union initially proposed that the Voice Mail Clerks be paid at $22.70/hour, somewhere between the General Clerk-Semi-Skilled 2(B) rate of $21.44/hour and the RCMAC Clerk rate of $23.125/hour.  Shortly before the Article 16B hearing commenced, the Union offered a second proposal, seeking to apply Wage Schedule 22 – the wage schedule for a Skilled 1-B Clerk – to the Voice Mail Clerks.

## The Underlying Arbitration and Award

20.    Arbitrator Gerhart held a hearing on the parties' proposals on September 15, 2006.

21.    On May 31, 2007, he issued his Award, which found, *inter alia*, that "the level of work performed by an experienced Voice Mail Clerk . . . should be classified at the Skilled Clerk level."

22.    Arbitrator Gerhart issued a multi-part remedial formula.  First, all newly entering associates performing corporate voice mail work would remain at the Semi-Skilled 2-B Clerk Wage Schedule 21 for two years.

23.    Second, upon completion of two years service as a Voice Mail Clerk, Voice Mail Clerks may apply for and immediately be promoted to a new job title, that of Senior Voice Mail Clerk.  The Senior Voice Mail title should be created immediately with certain requisite functions and will be paid according to Skilled 1-B Clerk Wage Schedule 22.

24.    Third, any current Voice Mail Clerks with two or more years of experience should be immediately be offered the opportunity to upgrade to the Senior Voice Mail Clerk job.

25.    Fourth, Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date. Any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk.

### Count I

26.    Verizon Washington, DC incorporates by reference Paragraphs 1 through 25 of this Complaint as if restated in full.

27.    With respect to his rulings that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart exceeded his authority by ordering a remedy that conflicts with the express terms of the Agreement.

28.    With respect to the ruling that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart's Award imposes

upon the Company additional obligations not provided for in the Agreement.

29.    With respect to the ruling that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart's Award is improperly based on subjective considerations of fairness and equity rather than the terms of the Agreement that he was tasked with applying.

30.    With respect to the ruling that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart's Award deviates from the clear and unequivocal language in Article 16B.  In so doing, the Award manifestly disregards and fails to draw its essence from the collectively-bargained Agreement and, in issuing it, Arbitrator Gerhart exceeded the contractual scope of his authority.

31.    With respect to his ruling that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they

attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart exceeded his authority because he had no jurisdiction to fashion a remedy after finding no violation of the Agreement.

32.    With respect to his ruling that Voice Mail Clerks with two or more years of actual service as of December 9, 2001 shall received a pay adjustment reflecting the difference between what he or she actually earned and what she would have earned had he or she been classified as a Senior Voice Mail Clerk as of that date and that any Voice Mail Clerk who achieved two years actual service after December 9, 2001 shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk, Arbitrator Gerhart's Award must be vacated.

### Prayer for Relief

WHEREFORE, Plaintiff Verizon Washington, DC Inc. requests that the Court enter an order vacating the portion of Arbitrator's Gerhart's Award setting forth the retroactive effective date of the remedy of December 9, 2001; establishing an effective date of any pay adjustments resulting from the Award not to exceed 150 days prior to the date of the Award in accordance with Article 16B; awarding costs and attorneys' fees to Verizon Washington, DC Inc.; and awarding any other relief that the Court deems to be appropriate.

Dated: August _13_ 2007

Respectfully submitted,

_____
Willis J. Goldsmith (DC Bar No. 945956)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

_____
Julia M. Broas (DC Bar No. 396119)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Counsel for Plaintiff
VERIZON WASHINGTON, DC INC.