**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERIZON WASHINGTON, DC INC., <br><br> Plaintiff, <br><br> v. <br><br> COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO (as designated agent and representative for Local 2336), <br><br> Defendant. | Civil Action No. 1:07-CV-01460 (PLF) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO PARTIALLY
VACATE ARBITRATION AWARD**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Plaintiff

Verizon Washington, DC Inc. files this motion seeking summary judgment to partially vacate the

arbitration award issued by Arbitrator Paul Gerhart on May 30, 2007. A memorandum of law in

support of this motion and a proposed Order accompany this Motion.

Dated: November 14, 2007

/s/ Julia M. Broas
(DC Bar No. 396119)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700

/s/ Willis J. Goldsmith
(DC Bar No. 945956)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of Plaintiff's motion for summary judgment to partially vacate arbitration award, a memorandum in support and a proposed Order were served on the attorneys of record for each party by electronic notice on November 14, 2007.

/s Julia M. Broas
Julia M. Broas

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERIZON WASHINGTON, D.C. INC.,<br><br>    Plaintiff,<br><br>        v.<br><br>COMMUNICATIONS WORKERS OF<br>AMERICA, AFL-CIO (as designated agent<br>and representative for Local 2336),<br><br>    Defendant. | Civil Action No. 1:07-CV-01460 (PLF) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF
VERIZON WASHINGTON, D.C. INC.'S MOTON FOR SUMMARY JUDGMENT**

Plaintiff, Verizon Washington, D.C. Inc. (the "Company"), submits the following

memorandum in support of its motion for summary judgment on its complaint against Defendant

Communications Workers of America, AFL-CIO (the "Union").  The complaint seeks to

partially vacate the May 30, 2007 award issued by Arbitrator Paul F. Gerhart.[1]

**INTRODUCTION**

This case presents a textbook example of arbitral abuse of authority.  The facts are

straightforward and undisputed.  At the direction of an arbitrator after a merits hearing, the

Company and Union attempted to negotiate the appropriate classification and wage scale for a

small group of employees called Voice Mail Clerks pursuant to Article 16B of the Agreement.

The resulting impasse triggered arbitration before Arbitrator Paul Gerhart under that provision.

---

[1] References throughout the brief are as follows:  to the May 30, 2007 arbitration award
("Award), attached hereto as Exhibit A; and to the August 3, 2003 General Agreement between
the Company and the Union ("Agreement"), attached hereto as Exhibit B.

Article 16B is narrow in its scope and in the authority it grants the arbitrator. Its scope extends only to the confirmation of existing or the establishment of new job titles and classifications. Its authority allows an arbitrator to order a new classification and retroactive wage rate, if appropriate, but commands clearly and unambiguously that, "[i]n the event that the [arbitrator] determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that **in no event shall the retroactive effect exceed 150 days**." Ex. B, Art. 16B.1(f) (emphasis added).

The bulk of the Award is devoted to Arbitrator Gerhart's creation of a new job title, classification and wage rate for the Voice Mail Clerks. The Company does not challenge those findings and conclusions here. Incredibly, however, despite the plain, unambiguous language of Article 16B.1(f), the Arbitrator established a retroactive effective date of December 9, 2001 for the new rate – *nearly 2,000 days* before the Award's issuance. Even more incredibly, he did so while expressly noting that he was "mindful of the admonition" in Article 16B limiting the retroactive effect to 150 days. Award at 55. Having noted the restriction, though, he summarily discarded it on grounds that "[i]t would shock the sensibilities of any reasonable person if the Company were allowed to benefit from its own breech [sic] of the Agreement." *Id*. at 55-56.

The sole issue before this Court is whether Arbitrator Gerhart's creation of the five-plus years-long effective date defies the plain and unambiguous language of the Agreement and thereby constitutes an abuse of his contractual authority. By the Arbitrator's own admission, it clearly does, for reasons associated with his own brand of industrial justice. Accordingly, this portion of the Award must be vacated.

## STATEMENT OF UNDISPUTED FACTS

**A.    Factual Background**

1.    In the mid-1990s, Verizon created the position of Voice Mail Clerk.  The Voice Mail Clerk's primary function has always been and continues to be maintaining the internal voice mail system of Verizon employees by creating, changing, and deleting voice mailboxes. Award at 34.

2.    There are four grades of clerical positions within the Company:  Entry, Semi-Skilled, Skilled and RCMAC Clerks.  Award at 19.  The Semi-Skilled clerical grade includes two subcategories – General Clerk and Manager's Clerk, as well as other titles.  Id.  Voice Mail Clerks are a Semi-Skilled position and fall under the "General Clerk" job description and Semi-Skilled wage schedule 21.  Id. at 34.  Above the Semi-Skilled grade is the Skilled clerical grade, in wage schedule 22, which includes the subcategory Special Clerk and various other titles.  Id. at 19, 35.  Above the Skilled grade is the RCMAC Clerk grade, a highly technical function that sits on a clerical level on its own.  Id. at 20, 35.

3.    Beginning in the late 1990s, the Voice Mail Clerks' manager, from time to time, assigned them to perform additional duties, including troubleshooting and investigating system problems; inside node work, such as building classes of service for mailboxes (networks between systems); garbage collects (the removal of old information from within the system); running short forms on the contents of individual systems; clearing error messages; and building and creating pager sequences.  Award at 4, 20, 28, 34.  For a period of time, because of these additional duties, Verizon paid the Voice Mail Clerks temporary assignment pay over and above their normal salaries but the additional pay eventually ceased.  Id. at 34.

**B.    The Agreement**

4.    The August 3, 2003 General Agreement between the Union and the Company establishes a process to settle issues related to the "creat[ion] [of] a new job title and job classification in the bargaining unit."  Agreement, Art. 16B.1.  Pursuant to that process, when it is appropriate to create a new title or classification, the parties should engage in negotiations about them.  Id., Art. 16B.1(b).  The Agreement further states that, if the negotiations reach impasse, the matter shall be submitted to a "neutral third party" (i.e., an arbitrator).  Id., Art. 16B.1(e).

5.    The scope of the neutral third party's authority is strictly and purposely constrained by the Agreement.  He or she has the power to set "an appropriate schedule of wage rates" (id.) and to render a "written decision" supporting such schedule "within sixty (60) days of the date that the matter is referred for resolution."  Id., Art. 16B.1(f).  And, while any new schedule of rates "shall be placed in effect retroactive to the date the change or new job was implemented" (id.), the Agreement provides an express and unequivocal exception to such effect: "[**I**]**n no event** shall the retroactive effect exceed 150 days."  Id. (emphasis added).

**C.    Procedural Background**

6.    The Union filed its grievance in this matter on December 9, 2001, claiming that the job duties for the position had changed so as to warrant a new classification and higher wage rate.  Award at 4, 17, 34.  The sole remedy sought by the Union in the grievance was an upgrade of the Voice Mail Clerk position to that of RCMAC Clerk.  Id. at 21, 34.

7.    In response to the Union's grievance, the Company conducted an internal assessment of the position and concluded that no material modification had occurred and that an upgrade to RCMAC Clerk was unwarranted.  Accordingly, as the parties could not resolve the

grievance, a three-day arbitration hearing before Susan Mackenzie followed on April 1, July 14 and October 20, 2005. Id. at 35.

8.        In her Award, issued on February 28, 2006, Arbitrator Mackenzie found, *inter alia*, that approximately 80% of Voice Mail Clerks' typical duties comport with General Clerk work and less than 20% exceed the scope of work included in the General Clerk Job Description. Award at 13-15, 20-21. She did not, however, determine precisely how far below 20% the additional duties fell. Id. at 35.

9.        Consistent with these findings, Arbitrator Mackenzie concluded that the Company "sufficiently established that the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk." See Award at 22. Based on the record establishing performance of the additional tasks up to 20% of their time, she then held that the extent to which additional duties assigned to Voice Mail Clerks constitutes a redefinition of the Voice Mail Clerk job classification is appropriately the subject of negotiations between the parties pursuant to Section 1 of Article 16.B. Id. Accordingly, she directed the Company to comply with the notification and negotiation requirements of that provision within 60 days of receipt of the Award. Id. at 35.

**D.        The Gerhart Award**

10.        The Company and Union entered negotiations under Article 16B and attempted to reach agreement regarding the job title, classification and wage rate for the Voice Mail Clerks. Upon reaching impasse, the parties appeared before Arbitrator Gerhart on September 15, 2006. Award at 2, 35.

11.        Arbitrator Gerhart summarized the issues as three-fold: whether he was constrained to choose between the position of the parties as in "last offer arbitration" or could identify and award some other outcome in the matter; whether he was to determine an award

with respect to the appropriate wage schedule of the Voice Mail Clerks; and the scope and nature

of any remedy.  Award at 38 (quotations omitted).  With respect to the third issue, Arbitrator

Gerhart expressly stated:

> This will require the arbitrator to interpret the language of Article
> 16B.1(f) which states that "in no event shall the retroactive effect
> exceed 150 days."

Id.  He queried whether "the Agreement intend[ed] . . . that the new wage rate" not exceed 150

days "prior to the date of the instant arbitrator's award" as the Company contended or, as the

Union argued, "that the revised wage rate must have effect 150 days prior to the Union's initial

grievance . . . ?"  Id. at 38-39.

        12.     On May 30, 2007, Arbitrator Gerhart issued his Award.  Award at 1.  Tracking his

list of issues, he first established that he was free to establish a wage rate and job title for the

Voice Mail Clerk position different from those proposed by the parties.  Id. at 39-40.  Next, he

created a new job title, Senior Voice Mail Clerk, to be classified and compensated according to

the Skilled 1-B Clerk Wage Schedule 22.  Id. at 55.  He directed that all Voice Mail Clerks with

two actual years of service be allowed to apply for and be promoted immediately to the new job

title.  Id.  Finally, he stated that the effective date of the creation of the Senior Voice Mail Clerk

job title, and all attendant compensation increases, "shall be December 9, 2001."  Id.

        13.     Acknowledging that he was "mindful of the admonition in Article 16B.1(f) which

asserts that 'in no event shall the retroactive effect exceed 150 days'" (id.), Arbitrator Gerhart

justified his order on the following basis:

> Had the Company not violated the Agreement as found by
> Arbitrator Mackenzie, and had the Company properly notified the
> Union of the changes in the Voice Mail Clerk job in response to
> the Union's December 2001 grievance, and had the matter been
> processed and ultimately referred to a "neutral third party" as
> required by Article 16B.1(e) and (f), a decision by the neutral third
> party would have been rendered on or about May 9, 2002 which is

> 150 days after December 9, 2001. Thus, in the absence of the
> contractual violation by the Company, this neutral third party
> award would have been effective on December 9, 2001, fully
> within the boundaries of retroactivity prescribed by the Agreement.
> It would shock the sensibilities of any reasonable person if the
> Company were allowed to benefit from its own breech [sic] of the
> Agreement, as found by Arbitrator Mackenzie, particularly since it
> violated the very Article of the Agreement that it now seeks to use
> to limit the contractually agreed-upon remedy in this matter.

Id. at 55-56.

## ARGUMENT

I.    **Governing Legal Standards**

    A.    **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986). Evidence that is "merely colorable, or is not significantly probative" will not withstand summary judgment. Id. at 249 (citation omitted). In cases such as this where the facts are undisputed and "the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous." Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 169 (D.C. Cir. 1981).

    B.    **Standards Relating to Judicial Review of Arbitration Awards**

Judicial review of an arbitrator's award is limited. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987); Am. Postal Workers Union v. United States Postal Serv., 362 F. Supp. 2d 284, 288 (D.D.C. 2005). So long as the award "draws its essence from the collective bargaining agreement," a court must confirm it. United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960).

A reviewing court is not powerless in all circumstances, however.  Arbitrators are confined to the "interpretation and application" of the parties' agreement; accordingly, courts "retain full authority to vacate awards that fail to confine themselves to matters within the scope of the arbitrator's assigned jurisdiction." Comm'ns Workers of Am. v. Am. Tel. & Tel. Co., 903 F. Supp. 3, 5 (D.D.C. 1995).  For example, an arbitrator "may not "ignore the plain language of the contract." Misco, 484 U.S. at 38.  "Nor can an arbitrator simply . . . 'dispense his own brand of industrial justice.'" Madison Hotel v. Hotel & Rest. Employees, Local 25, 144 F.3d 855, 859 (D.C. Cir. 1998)(citation omitted).  Notably, a reviewing court also need not take an all or nothing approach to an arbitral award; it has authority to vacate only that part in which the arbitrator exceeded his authority. Comm'ns Workers of Am., 903 F. Supp. at 6.

## II.    Arbitrator Gerhart's Award Regarding its Retroactive Effective Date Is Unenforceable Because He Exceeded His Contractual Authority

In his Award, Arbitrator Gerhart explicitly acknowledged the specific limitation in the Agreement on his authority to award a retroactive remedy of no more than 150 days' effect. Instead of abiding by that unambiguous contractual limitation, however, he chose wholly to ignore it, and his attempt to justify his excessive remedial order by invoking notions of equity and reasonable persons' "sensibilities" only underscores the abuse of his power.  In these circumstances, this Court has no choice but to exercise its "full authority" and vacate that portion of the Award. Comm'ns Workers of Am., 903 F. Supp. at 5.

### A.    Arbitrators Are Constrained to Apply Clear and Unambiguous Contract Language Setting Forth the Limits on Their Authority

"If the language of [a collective bargaining] agreement is clear and unequivocal, an arbitrator cannot give it a meaning other than that expressed by the agreement." Ga. Pac. Corp. v. Local 27, United Paperworkers Int'l Union, 864 F.2d 940, 944 (1st Cir. 1989).  Accord Comm'ns Workers of Am, 903 F. Supp. at 5 (recognizing that the collective bargaining

agreement frames the arbitrator's jurisdiction). Thus, where the agreement expressly limits the arbitrator's authority and he or she disregards those limits, a reviewing court must vacate the award. Davis, 667 F.2d at 164. See also Safeway Stores, Inc. v. United Food & Commercial Workers Union, Local 400, 621 F. Supp. 1233, 1237 (D.D.C. 1985)(when arbitrators disregard their "conferred authority," it "produce[s] an award that [does] not 'draw its essence' from the labor agreement, and thus [should] not be upheld by a reviewing court")(citation omitted); N.W. Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 530 F.2d 1048, 1050 (D.C. Cir. 1976) ("When an [arbitrator] ventures outside the scope of the authority conferred on [him] by the collective bargaining agreement, [he] lacks the power to bind the parties."); Ga. Pac. Corp., 864 F.2d at 945 (declaring it a "patent example of arbitral excess" when the arbitrator mitigated mandatory remedy provided in the agreement). This is true where the limitation relates to the remedial portion of the award. See, e.g., Bruno's, Inc. v. United Food & Commercial Workers Int'l Union, Local 1657, 858 F.2d 1529, 1531 (11th Cir. 1988) (an arbitrator "may not impose a remedy which directly contradicts the express language of the collective bargaining agreement").

**B.    Arbitrator Gerhart Exceeded his Authority by Deviating from the Plain Language of the Agreement and Ordering a Remedial Effect for his Award Far Exceeding 150 Days**

In this matter, as noted, the parties collectively bargained for a process to settle issues related to new or modified job titles and classifications. The Agreement clearly and unequivocally charges the arbitrator to decide the appropriate wage schedule and to render a written decision within sixty days of receiving the matter. Agreement, Art. 16B.1(f). It further dictates that, should he or she determine that " a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented." Id. Importantly, however, this clause includes an additional, and dispositive,

limitation, namely, that "**in no event** shall the retroactive effect exceed 150 days." Id. (emphasis added).[2]

This plain and specific limitation is susceptible of but one reasonable interpretation: that no new schedule of rates shall have a retroactive effect of more than 150 days prior to the arbitrator's issuance of his or her written decision. Despite this wholly unambiguous language, however, Arbitrator Gerhart proceeded to establish an effective date for the Award of well over *ten times* the number of days permitted by the parties' bargain. And he left no doubt that the meaning of this language was crystal clear to him, prefacing his defense of the effective date with the statement that "[t]he arbitrator is mindful of the admonition in Article 16B.1(f) which asserts that 'in no event shall the retroactive effect exceed 150 days.'" Award at 55. Plainly, even he knew that, once he determined a different wage rate, the Agreement did not authorize the years-long retroactive effective date he then directed.

This Court has not hesitated to vacate arbitral awards in similar circumstances, as it did recently in Hay Adams Hotel v. Hotel & Restaurant Employees, Local 25, No. 06-968, 2007 WL 1378490 (D.D.C. May 9, 2007). There, the employer terminated an employee after the employee violated "several rules related to proper conduct in the workplace." Id. at *1. The union and employer agreed that the employee would be reinstated, but subject to a last chance agreement ("LCA"). The LCA stated that, should the employee engage in similar misconduct again, the employer could terminate him and the union "waive[d] its right to grieve such [a] future

---

[2] In addition to the provisions of Article 16B, the Agreement contains other language delineating the powers granted to arbitrators that are equally binding on Arbitrator Gerhart. More specifically, Article 13.1(f) provides that an "arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of [the] Agreement." Id., Art. 13.1(f). Accordingly, when the parties appeared before him for the Article 16B arbitration, Arbitrator Gerhart's powers were limited to establishing the wage rate and setting the retroactive effective date of that rate to one no more than 150 days from the date of his Award. Id., Art. 16B.1(f).

incident." Id. at *1 n.2.  Thereafter, the "employee violated additional rules," the employer

terminated him, and the union filed a grievance.  Arbitration ensued.  The arbitrator "framed the

issue before him as 'whether the [employee] violated the [LCA], and if so, whether the penalty

of termination was appropriate.'"  Id. at *2.  He found that the employee had violated the LCA,

but determined that a "more appropriate" remedy would be to reinstate him conditionally so that

he could receive psychological help.  In vacating the award on grounds that the arbitrator had

"exceeded his authority" (id. at *4), the Court emphasized that the LCA "clearly and

unambiguously" stated that, if the employee committed similar misconduct, the union agreed to

waive its right to grieve.  Id.  Thus, the arbitrator's award of a "more appropriate" remedy –

namely, to reinstate the employee on a conditional basis so that he could receive psychological

help – did not draw its essence from the agreement.  Id.  The court emphasized that the

arbitrator's perception that the LCA was "unfair or harsh" did not authorize him to ignore the

agreement's plain, unambiguous language; "it was bargained for by the parties" and thus was

"binding on the arbitrator."  Id.

Similarly, in Grand Rapids Die Casting Corp. v. Local Un. No. 159, United Automotive,

Aerospace & Agricultural Workers of America, 684 F.2d 413 (6th Cir. 1982), the court vacated

an arbitral award where the arbitrator ignored the agreement's plain language because the

agreement "shock[ed] [his] conscience."  Id. at 415.  Given this displeasure with the actual

contract language, he "substituted terms and discipline he felt were reasonable [in place of] the

terms of the agreement."  Id. at 416.  The court held that such reasoning "did not draw its essence

from the collective bargaining agreement" and, in issuing such an award, the arbitrator thereby

exceeded his authority.  Id.

Just as the arbitrators in <u>Hay Adams</u> and <u>Grand Rapids</u> were found to have abused their authority when they ignored the governing agreements' plain language, so too did Arbitrator Gerhart exceed his authority here when he ordered a retroactive effective date of December 9, 2001. The Agreement's express and unambiguous statement that "in no event shall the [retroactive effective] date [of an Article 16B award] exceed 150 days" does not mean, as Arbitrator Gerhart suggests, that the 150-day limitation applies unless the established grievance procedures take longer than the Union would like. Nor does it mean that the limitation is lifted if the Company, or the Union for that matter, is found to have breached the contract in some respect. And it does not mean, as Arbitrator Gerhart concluded, that the limitation is voided even where the years' long grievance and arbitration process may be attributed to Company malfeasance. <u>See</u> Award at 55-56.

In short, Arbitrator Gerhart's "sensibility"-based justifications for his remedial order are nothing other than an ill-disguised attempt to impose his own notions of equity – and his own brand of industrial justice – on the parties' relationship. As the Agreement contains no "shock the sensibilities" proviso, the law, of course, precludes such interference.[3] <u>See</u> <u>Safeway Stores</u>, 621 F. Supp. at 1237 (arbitrator cannot "substitute his view of what the parties . . . should have agreed to for what the parties actually did agree to").

## CONCLUSION

Article 16B, together with the other provisions of the Agreement, "governs the rights and liabilities of the parties" in this matter. <u>Stromberg Sheet Metal Works, Inc. v. Wash. Gas &</u>

---

[3] The parties were free to bargain for such a provision but did not. <u>See, e.g.</u>, <u>Pioneer Natural Res. USA, Inc. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local 4-487</u>, No. CIV. A. 2:00-cv-0214-J, 2001 WL 1143254, at *1 (N.D. Tex. Sept. 18, 2001) (arbitration provision precluded arbitrator from modifying disciplinary actions imposed by the company "unless the penalty imposed is so unreasonable . . . as to shock the consciousness of a reasonable arbitrator")(internal quotation marks omitted).

<u>Energy Sys., Inc.</u>, 448 F. Supp. 2d 64, 68-69 (D.D.C. 2006)(internal quotation marks omitted). By ordering a retroactive effective date of well over five years prior to the issuance of the Award, Arbitrator Gerhart deliberately departed from the plain and unambiguous language of the Agreement. His own notions of equity and sensibility are irrelevant to his duty to construe and apply the contract as written and cannot excuse his blatant disregard for the terms for which the parties expressly bargained. Because this portion of the Award thus is unenforceable, the Court should grant the Company's motion for summary judgment and order a retroactive backdate of no more than 150 days from the date of his Award, May 30, 2007.

Respectfully submitted,


<u>/s Willis J. Goldsmith</u>
Willis J. Goldsmith (DC Bar No. 945956)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Julia M. Broas (DC Bar No. 396119)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Dated:  November 14, 2007

# OPINION AND AWARD

|  |  |
|---|---|
| ) | |
| ) | |
| **In the Matter of Arbitration** ) | **Direct Appointment** |
| ) | |
| **Between** ) | Parties' Case: |
| ) |   No. 2001-91650, Voice Mail Group |
| **VERIZON WASHINGTON, DC, INC.** ) |   Pay Rate; Article 16B |
| ) | Hearing:  September 15, 2006 |
| **And** ) | Briefs Rec'd:  December 7, 2006 |
| ) | Award:  May 30, 2007 |
| **COMMUNICATIONS WORKERS OF** ) | |
| **AMERICA, Local 2336, AFL-CIO** ) | Arbitrator:  Paul F. Gerhart |
| ) | |
| ) | |

## Present for the Hearing

**For Verizon Washington, DC, Inc.:**

> Julia M. Broas, Esq., Jones Day, Washington, D.C.
> Joseph E. Pankoski, Senior Staff Consultant, Labor Relations
> Marc Gilbert, Area Manager, Verizon DC/WSAM

**For Communications Workers of America, Local 2336:**

> Jimmy Tarlau, CWA Representative
> Gail Evans, CWA Representative, District 2
> Brenda Savoy, Sec/Treasurer, CWA Local 2336
> Robert P. Patrician, CWA Research Economist
> Vallorie B. Coley, Verizon Special Clerk, witness
> Mary Ann Arlene Streeter, Verizon Special Clerk, witness

06-1081 Dir

## Procedural Background

The Communications Workers of America, Local 2336 (the Union) is the bargaining representative for certain employees of Verizon Washington, DC, Inc., Washington, D. C. (the Company). During the term of their 2003-2008 Agreement (JX 1, the "Agreement")[1], the parties were unable to resolve a dispute involving the proper rate of pay for Voice Mail Clerks in the bargaining unit. Under the provisions of the Agreement, Article 16B, New Job Titles and Job Classifications, paragraphs (e) and (f), the undersigned arbitrator was appointed by the parties to issue a final and binding decision on the matter.

Upon the mutual agreement of the parties, oral hearing was conducted at the Courtyard-Marriott Hotel, Greenbelt, MD on September 15, 2006. At the outset of the hearing, the parties stipulated the matter was properly before the arbitrator. Both parties examined witnesses and presented other evidence in support of their respective positions. Witnesses were sworn but not separated. A stenographic record of the matter was made by Wanda L. Granger, MAR Reporting Group, Falls Church, VA. At the conclusion of the presentation of evidence, the parties waived oral argument and agreed to submit post-hearing briefs. Briefs were directly exchanged between the parties and timely received by the arbitrator on December 7, 2007, at which time the record in the matter was closed.

## Relevant contractual provisions

### ARTICLE 16.B
### NEW JOB TITLES AND JOB CLASSIFICATIONS

**SECTION 1.** Whenever the company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a)  The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b)  The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

---

[1] Exhibits are identified as follows: JX for joint exhibits; UX for Union exhibits; and CX for Company exhibits.

(c)  If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and a temporary designation removed.

(d)  If agreement is reached between the parties within 60 days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed-upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e)  If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

(f)  The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days.

## Issue

The Union proposed that the issues before the arbitrator are:

> What is the appropriate schedule of wage rates for the Verizon Corporate Voice Mail Clerks and what should be the effective date of this schedule?

The Company proposed that the issues are:

1.    Whether the Union's final proposal, set forth in Jt. Ex. B, shall be considered by the Arbitrator notwithstanding the language of Article 16B (1) (e) precluding a party from changing its final proposed schedule of wage rates.

2.    Which of the parties' April 2006 proposals offers the appropriate wage rate and schedule for the Voice Mail Clerks.

In a footnote, the Company asserts that the

. . . intent of the language of Article 16B requires that the Arbitrator select among the two proposals rather than establish a wage rate and schedule wholly different than those proposed by the parties.

## Position of the Union

The following is the arbitrator's summary of the argument presented by the Union in its post-hearing brief.

*Introduction.*  This proceeding is to determine the appropriate schedule of wages for a group of ten Verizon employees who work in the Corporate Voice Mail Center.  The issue arises as a result of an award by Arbitrator Susan Mackenzie referring an earlier dispute regarding the wage rates of these workers to the negotiation procedure outlined in the Agreement coupled with the failure of the parties to reach an agreement over the appropriate job classification for the employees.  The original grievance was filed on December 9, 2001 and it will have taken more than five years for resolution.

*A. Background.*  The Voice Mail Clerks are a group of Verizon employees who maintain the voice mail system for the Verizon Corporation, with over 100,000 customers who are Verizon employees.  Their core function is to build, change and delete individual mailboxes for Verizon employees.  Starting in 1997 they were given additional tasks by their supervisor for which they received extra pay.  A few years later they stopped getting the extra pay but continued to do the extra job duties.  The workers filed a grievance on December 9, 2001 and on February 28, 2006, Arbitrator Mackenzie ruled the Company had violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk Job description.

Arbitrator Mackenzie directed the Company to comply with the provision of the contract spelling out the notification and negotiation requirements related to the creation of a new job classification.  In March 2006, the Union and Company

entered into negotiations to determine a schedule of wages for the Voice Mail Clerks. No agreement was reached and in accordance with the procedure, the matter was referred to a third party neutral who is to determine the appropriate schedule of wages for these workers.

*B. Positions of the Parties.* The Voice Mail Clerks are currently classified as General Clerk - Semi Skilled and paid according to Wage Schedule 21. On the Wage Schedule effective August 7, 2005, for Zone Locality Wage Group A, the maximum pay was $804 per week, or $21.44 per hour. The Company proposed that a brand new classification schedule be created for these employees which would pay $809 per week, or $21.57 per hour (JX A). The Union's final proposal was that the Voice Mail Clerks be reclassified as Special Clerks and be paid as skilled clerks, Wage Schedule 22, $832.50 per week, or $22.20 per hour (JX C).

*C. Factors in Determining the Appropriate Wage Schedule.* In order to determine the appropriate wage schedule, it is important to compare the specific job duties of the voice mail clerks with the job duties of other job titles within the Verizon Company. The relevant job titles are those for the clerical workers within the bargaining unit. According to Verizon's Senior Labor Relations specialist, Joe Pankoski, the clerk grades within Verizon are Entry 1 & Entry 3, semi-skilled, skilled and the RCMAC level (Ger Tr 209).[2]

| | | |
|---|---|---|
| Entry 1 | $18.27 | (Wage schedule 19) |
| Entry 3 | $20.41 | (Wage schedule 20) |
| Semi-skilled | $21.44 | (Wage schedule 21) |
| Skilled | $22.20 | (Wage schedule 22) |
| RCMAC | $23.14 | (Wage schedule 7) |

For the purpose of clarity, all rates refer to the August 2005 wage schedule. The RCMAC Wage rate is calculated by dividing the weekly rate by 40 hours, which is the weekly schedule for the RCMAC job. The other titles work 37.5 hours per week. The questions for this arbitrator are how the Voice Mail Clerk job duties and responsibilities compare to other jobs in the above classifications and at what pay level they should be placed.

*D. Differences between the various clerical titles.* The clearest enunciation of the differences among the clerical titles came from the testimony of Verizon's

---

[2] Transcripts are referenced as follows: For the hearings before Arbitrator Mackenzie on April 1, 2005 – "Mac1 Tr"; on July 14, 2005 – "Mac2 Tr"; and on October 20, 2005 – "Mac3 Tr". For the hearing before Arbitrator Gerhart on September 15, 2006 – "Ger Tr".

Senior Staff Consultant in Labor Relations, Joe Pankoski. In responding to a question as to what would distinguish a semi-skilled from a skilled clerical worker, Pankoski stated that a semi-skilled clerk would "be able to take an existing process and perform that process quickly, efficient and accurately" (Ger Tr 210). A special clerk at a skilled level would be able to tackle "a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for" (Ger Tr 211). He also described the highest level as RCMAC clerks who perform a "highly technical function" (Ger Tr 210).

Philip Payblas, a Verizon compensation expert, explained the higher level of a special clerk compared with a general clerk in this way, "There's more self-direction. There's more [analysis] of information. And again, the independent judgment, you know, the self-direction of making these directions . . . there's a great deal of decision making . . . judgments based on information they receive" (Mac1 Tr 263).

E. *Comparison of clerical titles based on job briefs.* A number of job briefs describing basic duties and qualifications for each job were submitted into evidence. The Union and the Company submitted job briefs at the semi-skilled level (General Clerk and Manager's Clerk), at the skilled level (Special Clerk, Service Office Administrator) and at the technical level (RCMAC clerk); (UX C; UX 3; CX A; CX C; CX B; respectively). The job brief includes General Duties and Basic Requirements. Chart A compares the basic requirements of the four clerical titles. One can see there is little difference. Only when you get to the RCMAC level do you see a qualitatively different group of job responsibilities:

1. Interpreting and extracting data
2. Processing changes in switches
3. Communicating with various internal LOB
4. Analyzing service order activity from MARCH
5. Review and sequence service orders
6. Operating a multi-windowing computer terminal
7. Coordination of service order activity
8. Must meet deadlines
9. Performing other duties
10. Must be familiar with key customer issues

This is clearly a more detailed level of job responsibilities than either the semi-skilled or skilled levels.

## Chart A

### Job Requirements

| Clerical Level | General Clerk Semi-skilled | Manager's Clerk Semi-skilled | Special Clerk Skilled | Service Order Administrator Skilled |
|---|---|---|---|---|
| Minimum qualifying score on UTB-R | yes | yes | yes | yes |
| Minimum qual score on Data entry test | yes | yes | yes | yes |
| Minimum qual score on typing test | | | | yes |
| Ability to record info | | | | yes |
| Must speak English clearly | yes | yes | yes | yes |
| Write accurately and legibly | yes | | yes | |
| Work in confined working situations | | | | yes |
| Valid drivers license | | | yes | |
| Literate in computers | | | yes | |
| Security background | yes | yes | yes | yes |
| Safety practices | yes | yes | yes | yes |
| Company regs. | yes | yes | yes | yes |
| Normal day time | yes | yes | yes | yes |
| Days, evenings, nights, etc. | | | | |
| Training-On or off the job training | yes | yes | yes | yes |
| Training - 6 weeks of classroom | | | | yes |
| Organizational skills | | yes | | |

Regarding general duties (Chart B), there is also not much difference across the job briefs.

## Chart B
## Comparison of Job Duties

| General Clerk Semi-skilled | Manager's Clerk Semi-Skilled | Special Clerks Skilled | Service Order Adm. Skilled |
|---|---|---|---|
| 1. Handles bills | 1. Handles bills | 1. Prepares reports analyzes and summarizes data | 1. Prepares and formats service orders |
| 2. Computes & summarizes data | 2. Summarizes data | 2. Operates various office machines | 2. Verifies order accuracy |
| 3. Operates various office machines | 3. Performs math computations | 3. Communicates with customers | 3. Operates terminal device |
| 4. Operates terminal - inputting and retrieving data | 4. Prepares and maintains administrative reports | 4. Types when required | 4. Performs keyboard functions while talking to customers |
| 5. Performs mathematical computations | 5. Prepares & transmits payroll reports | 5. Processes work to meet deadlines | 5. Works with other departments |
| 6. Filing and typing data entry | 6. Types letters | 6. Preparing bills and voucher | |
| 7. Answering phones and taking messages | 7. Answers telephone calls | 7. Handling high volume of detail work | |
| 8. Sorting and distributing mail | 8. Accesses pers. computers and assoc. software | 8. The job will vary depending on work group | |
| 9. Interacting w/ the public &/or other employees | | 9. Driving a company vehicle may be required | |
| 10. Heavy client Interfacing | | | |

*F. Comparison of clerical titles based on testimony of semi-skilled and skilled clerks and Verizon managers.* The testimony of the incumbents in the semi-skilled and skilled titles was contradicted by Verizon managers' accounts of the job skills needed and expectations of people in these titles.

Special Clerk, Valarie Coley, testified that in her job she expedited orders using the SAP computer software program. Ms. Coley knows only the parts of the SAP program she has to access. She also uses Lotus Notes and Excel programs. Ms. Coley doesn't design spreadsheets and does not do any programming in her job (Ger Tr 69). Ms. Coley was a General Clerk before she was a special clerk. She feels that the difference between the two jobs is that as a special clerk she is "more specialized in one particular program or process that a general clerk would not really have a specialty in." (Ger Tr 73) Ms. Street, another Special Clerk, testified that she used Excel and PeopleSoft and that most of her job involves inputting data (Ger Tr 77). She has a set of procedures with her job that she follows in order to do her work (Ger Tr 78).

Verizon Manager Mark Gilbert testified that he supervised a Special Clerk who has major responsibilities, works with little supervision, and works on complex assignments. But Mr. Gilbert also testified that he supervised over 120 people; only one of them is a Special Clerk and he has had had only one Special Clerk working for him in his previous six years as a manager (Ger Tr 203). Mr. Pankoski testified that there were over 200 Special Clerks in the Washington, D.C. area (Ger Tr 227). Thus, Mr. Gilbert's testimony cannot be generalized to all Special Clerks or General Clerks since his experience was limited. Both Mr. Pankoski and Mr. Gilbert believe that the two Special Clerks who testified for the Union (Coley and Street) were working at below the Special Clerk level, which is allowed under the Agreement (Ger Tr 197, 225).

The testimony regarding what the special clerks do is obviously contradictory. Thus, one can only go back to Mr. Pankoski's description of the difference between the semi-skilled and skilled titles as the clearest description of what makes one title different from the other.

*G. Where do the Voice Mail Clerks fit?* First, it is worthwhile to describe what the Voice Mail Clerks do. These employees are exclusively responsible for creating, adjusting and terminating all voice mail accounts for all of the Company's employees and officers. There are some 100,000 customers using 40-45 different voice mail systems. The primary part of their job is to build voice mail accounts, make changes and adjustments, correct errors in the accounts, and

delete accounts when needed. They use computers and software programs (ProComm and others) to access the various voice mail systems. They then input data, instructions and codes into the computer to enable the voice mail accounts to work. Even with this core work, the clerks have to run programs to check to see if there is sufficient capacity for new voice mail boxes and the adequacy or accuracy in the design or set-up of nodes. They must pull out errors or miscoded data. Sometimes these are simple problems, but at other times the clerks have to re-create the problem in order to fix it. They were given additional tasks (the cause of the original grievance) of troubleshooting, investigating trouble reports, running reports to diagnose troubles, analyzing mailbox and system problems, conducting system maintenance, building pagers, creating pager sequences and providing training to other company employees and managers. Voice Mail Clerk Bridget Plonk described the wide variety of activities she performs at the first hearing before Arbitrator Mackenzie (Mac1 Tr, 111, 117, 122-4, 125-6, 138-40).

The Voice Mail Clerks also have a function that relates to pagers. The employees build the data profile of pagers and also troubleshoot and fix pager system defects. They must build pager sequences or codes that are needed to make the pager tones and messaging capabilities function properly. There is no manual for this. The task requires a great deal of judgment and experience to be precise; otherwise the pager sequences will not work at all (Mac1 Tr 131-5, 202-8).

So where do the Voice Mail Clerks fit into the hierarchical level of clerical titles? The only management testimony regarding a determination of the classification of the Voice Mail Clerks was by Philip Payblas, an employment specialist at Verizon, at the April 1, 2005 hearing before Arbitrator Mackenzie. He described five criteria which he uses to make a determination of the classification of a title – the analytical part of the job, the thought process needed, the technicality of the job, the need for independent judgment, and the amount of training that is needed to perform the job (Mac1 Tr 247). His analysis was based on a "job evaluation request form" submitted by local management as opposed to direct interviews of the incumbents (Mac1 Tr 244). His evaluation focused on the most simple of the tasks performed by the Voice Mail Clerks (processing and completing voice mail requests, additions and changes) and none of the more complicated tasks (troubleshooting the voice mail system problems, diagnostic and maintenance work, building nodes, building pagers and creating pager sequences)(Mac1 Tr 256). Mr. Payblas did not compare the job of the Voice Mail Clerks, with or without the additional functions, to the job of the Special Clerk (Mac1 Tr 261). He also did not evaluate the additional functions that were added to the job of the Voice Mail Clerks (e.g., trouble shooting, pager coding) that were the cause of the original grievance (Mac1 Tr 156).

Robert Patrician, CWA compensation analyst, highlighted a number of areas in which the Voice Mail Clerks compare favorably with the skilled (if not the RCMAC) clerical title levels:

- The Voice Mail Clerks work with a system of some complexity that requires a significant amount of familiarity with its particular requirements. (Ger Tr 89).

- Their work is not form completion or point-and-click kinds of tasks (UX 3).

- They have a developed knowledge of how to establish new coding sequences and must be able to match pager codes of the tests requested (UX 3)

- They must troubleshoot problems with mailboxes (EX 3).

- They must have extensive knowledge of software to be able to manipulate through different menu screens (TR 2, 97).

- They must meet customer requirements on short notice; budgetary prohibition adds to pressure on short notice (UX 3).

- Their use of Automatic Call Distribution systems increases job stress (UX 3).

Patrician describes the normal Voice Mail Clerk's job as more complicated than that of a semi-skilled clerk, "The Voice Mail Clerk has to order his/her next steps in that process to complete the tasks myself or whether someone is giving me, you know, a pile of paper to input into the computer" (Ger Tr 91). This is very close to Pankoski's description of a skilled clerk as someone who has "a problem and that they would put together a process in order to solve that problem" (Ger Tr 210). Patrician also observed that "a person entering data into these menus requires extensive specific knowledge of this software and that this is the software which is used to build and maintain these voice mailboxes" (Ger Tr 97). Patrician emphasized the independent thinking needed for the Voice Mail Clerks to program pager sequences. They "need to know everything that would be required to be known for coding – different values, different codes in these sequences and what those correspond to in terms of how the pager works, how it responds to those codes, what those codes actually do" (Ger Tr 106).

Patrician's analysis and the testimony of the Voice Mail Clerks clearly show that these workers should be classified at least at the level of a skilled clerk. Reviewing the different aspects of the job of the Voice Mail Clerk, one can see that of the seven main components of the job, five of them are at the skilled or technical level. See Chart C.

## Chart C

| | General Clerk<br>Semi-skilled | Special Clerk<br>Skilled | RCMAC Clerk<br>Technical level |
|---|---|---|---|
| General description of work at this level from Verizon's labor relations people. | Takes an existing process and performs it quickly, efficiently and accurately | Tackles a problem and puts together a process to solve it; provides whatever information or conclusions are necessary | Highly technical function |
| Answering the phone; taking trouble orders | Yes | | |
| Resetting, building, deleting, and changing mailboxes | Yes | | |
| Assessing the adequacy of existing nodes, pulling our errors or miscoded data | | Yes | |
| Troubleshooting problems in mailboxes, analysis of glitches, malfunctions or error codes | | Yes | |
| Troubleshooting and investigating trouble reports, running reports to diagnose troubles | | Yes | |
| Conducting system maintenance | | | Yes |
| Building pagers, creating pager sequences | | | Yes |

This chart makes it clear that the Voice Mail Clerks must be reclassified at the skilled clerical level if not higher (UX 6).

*H. The arbitrator should not be bound by Arbitrator Mackenzie's statement.* The Company has argued that the arbitrator must make a determination of the proper wage rate based on the following comment in the body of Arbitrator Mackenzie's opinion, "Voice Mail Clerks are engaged in non-General Clerical Work less than 20% of their work time, but how much less than 20% is unclear."

Arbitrator Mackenzie decided in the previous arbitration that the Company violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk job description and that the Company must comply with the provision of the contract requiring notification and negotiation related to the creation of a new job classification – Section 16 B of the Agreement. That section provides, in 16B (1) (f), that a neutral third party shall render an appropriate schedule of wage rates.

The Company may attempt to argue that the doctrines of *stare decisis, collateral estoppel* and/or *res judicata* bind the arbitrator with respect to the sentence quoted from the Mackenzie Award, above. Although these doctrines are applied in courts, arbitrators narrowly apply these principles. (Citations omitted here.) *Stare decisis* clearly does not apply in this case as it is only applied in situations where a principle has become settled in a series of well-reasoned decisions. (Citation omitted here.) Neither do the doctrines of *res judicata* or *collateral estoppel* apply in this case. *Res judicata* prevents a party to a prior action from re-litigating in a subsequent action issues raised and resolved in the prior action. The elements necessary to bring *res judicata* into play are:

- The issue at stake is identical to the one involved in the prior litigation.
- This issue has been actually litigated in the prior suit.
- The determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and
- The party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

Because the effects of the application of *res judicata* are so extreme, in that it precludes consideration of matters that were, or could have been raised, the doctrine operates upon a narrow basis of exact identity of parties, issues and causes of action. See Fairweather, *Practice and Procedure in Labor Arbitration* (3d Edition, 1999), p. 381.

*Collateral estoppel* requires that the following elements be present (citations omitted here):

-13-

- Identity in the thing sued for in both actions.
- Identity of the cause of action in both actions.
- Identity of the parties to the actions.
- Identity of the quality or capacity of the persons for or against whom the claim is made.

Arbitrator Mackenzie commented that the Voice Mail Clerks engaged in non-General Clerk work at some unknown percentage rate less than 20. She did not engage in issue determination of what the proper overall wage rate should be. The issues she did determine were whether the Company violated the Agreement by assigning the Voice Mail Clerks certain duties outside the scope of their General Clerk job description and whether the Company must comply with the Section 16B negotiation requirement related to the creation of the new job classification. The issues that Mackenzie did determine are entirely different from the issue this arbitrator must determine – what is the appropriate schedule of wages for the Voice Mail Clerks.

Although the parties are the same in both arbitrations, the issue and the evidence entered into the record are different. Although some of the record in the first arbitration that related to the wage rate has been incorporated into this arbitration, this was done for efficiency so as to not have to enter relevant evidence into the record twice. The body of evidence in this case is much broader than what was considered in the first arbitration and must be so in order to determine the appropriate wage scale. The testimony in the second hearing explicitly addressed how the Voice Mail Clerk job duties compared to all the other clerical titles. Arbitrator Mackenzie did not hear this testimony.

In addition, the part of Section 16 of the contract that must be considered in this arbitration is different from what was considered in the previous arbitration. The section that applies in this case is the language that gives the arbitrator the authority to determine the wage schedule after negotiations have taken place. In this case, the arbitrator is not bound by the statement of the previous arbitrator and must make an independent review and determination as to how the Voice Mail Clerk job duties and responsibilities compare to other job classifications and at what level they should be placed. Arbitrator David Keefe in *Hydromation Engineering Co.*, (cited in *Practice & Procedure in Labor Arbitration*, 376) stated that an arbitrator: ". . . has an obligation to consider the reasoning and basis that led to the conclusions reached in cited awards. But, nevertheless, his fundamental duty is to make a decision which squares up with his own convictions where equity lies in the case he is to decide". Furthermore, the union and company in ". . . agreeing in

-14-

advance to accept the award the parties do not necessarily promise to agree with all the arbitrator's reasoning", *How Arbitration Works,* (5th Ed., 1999) p. 384.

In fact there is ample evidence in the record to indicate that much more of what the Voice Mail Clerks do is at a higher level than the General Clerk. *There are seven main components of the Voice Mail Clerks Job, and five of them are at the skilled or technical level.* The arbitrator here must decide the correct wage scale to be applied in this situation on the basis of his independent judgment and the record as a whole. Arbitrator Mackenzie only had to evaluate whether duties were changed sufficiently to require review. Here, that review is being made for the first time in a detailed way by examining the duties, the time spent and their relative importance. To the extent that Arbitrator Mackenzie assigned a figure to certain tasks, that was beyond her mandate and is mere *dicta.* Not only is such language not controlling in this case, it arguably went beyond the arbitration issue and was improper. Mackenzie properly deferred the actual resolution of the wage rate to this proceeding – so any other findings or rulings are irrelevant.

We can think of these two cases as two connected parts of one dispute with separate components. The first case was simply to "force" the matter to arbitration before a third party neutral. The second case deals with the actual merits of the dispute.

It is worth mentioning that the 20 percent reference did not attempt to assign any particular weight or quality to the work. If the employees spent only 20 percent of their time on extra duties, but these duties were characteristic of the company's chief executive, a huge wage would be required even if the time spent on these duties were only 20 percent. In this case the third party neutral is called upon to make the determination about time, quality, importance and value. These considerations were not made before.

*I. The Company's position is completely arbitrary and not based on a compensation analysis of the Voice Mail Clerks job duties.* The Company's proposal to pay the Voice Mail Clerks $809 per week is not based on an analysis of the job of these workers but based completely on an interpretation of Arbitrator Mackenzie's statement. Management explained in its final position letter that "over 80% of the work the Voice Mail Clerks perform could be properly characterized as General Clerk (Semi-Skilled 2-B clerk) work." Arbitrator Mackenzie ruled that some of the duties performed by the Voice Mail Clerks had migrated from management (clearing nodes, building pages, etc.) and it is only that work that is

more complex than General Clerk work" (JX A). Joe Pankoski, labor relations specialist for Verizon, confirmed this methodology by testifying that management

> ". . . took the semi-skilled, the General Clerk wage schedule and multiplied by a .8, or took 80% of it, and said this equates to the 80 percent of the job duties that are at the General Clerk level as decided by the arbitrator. We then took – we had to decide what to do with the other 20% . . . and we balanced that 20% against the next highest grade that existed above a general clerk level, and then we combined the two numbers into a number which became our proposed wage rate" (Ger Tr 217).

There are a number of problems with this methodology. First, it does not look at the overall job of the Voice Mail Clerks. Arbitrator Mackenzie directed negotiations over the appropriate wage schedule for this group of workers – not a mechanical formula based on her observations about the job. Second, even if one accepts the fact that 80 percent of the Voice Mail Clerk job is at the semi-skilled level, it does not take into consideration the knowledge and skills necessary for the Voice Mail Clerks to perform those functions that are at a higher level. Those abilities and the use of that knowledge, even if not used 100 percent of the time are necessary for someone to do the job, and raises the whole job to that level. Third, Verizon made a completely arbitrary decision as to the level of the 20 percent of the job functions that Arbitrator Mackenzie determined were above General Clerk work.

Mr. Pankoski testified that to determine the wage rate for the Voice Mail Clerks he calculated the 20 percent at the Skilled Clerk level because it was "the next highest clerical rate" (Ger Tr 217), but he did not independently analyze those functions that were characterized as non-General Clerk work. He interpreted the arbitrator's statement that ". . . RCMAC duties are different than those of Voice Mail Clerks . . ." (Ger Tr 230) as meaning that those duties were at a lower level than RCMAC clerk duties. In fact, Arbitrator Mackenzie did not state it was at a lower level and Verizon management arbitrarily set those 20 percent at the Skilled Clerk level when they could have been set at the RCMAC clerk level – 94 cents per hour higher than the Skilled Clerk level – or at some other level 10 or 20 cents lower than the RCMAC level. The fact is that these duties described by Arbitrator Mackenzie as non-General Clerk functions such as cut-over and other node clearing work, running CDRs, and programming pager sequences are close to what Pankoski describes as a "highly technical function", which characterizes the work of the RCMAC clerk.

-16-

Indeed if Verizon management had used the formula of 80 percent at the General Clerk level and 20 percent at the RCMAC level they would have come up with a wage rate of $21.78/hr ($816.75 per week) which is considerably higher than the management proposal.

J. *It makes no sense to set up a completely new classification schedule for the Voice Mail Clerks.* While it is within the authority of the arbitrator to set up a completely new wage schedule for the ten Voice Mail Clerks, it makes more sense to slide them into the next higher classification schedule for clerical workers, the skilled level. Management's proposal to set up a completely new wage schedule for these 10 workers is precedent setting and cumbersome. Not only would it entail the printing up of an addendum for a contract that covers over 15,000 employees, but Verizon's labor relations specialist, Pankoski, who has been the Senior Staff Consultant in labor relations for 15 years, did not recall that a new job classification schedule had ever been created as opposed to sliding people into one of Verizon's existing wage schedules.

K. *The effective date of the new wage schedule.* The effective date of the new wage schedule should be December 9, 2001 when the Union filed a grievance regarding the out of title work issue. The Agreement, Article 16B, Section 1(d) and 1(f) states that the wage rates shall be retroactive to the date the new job was implemented.

While section 1(f) also states that in no event shall the retroactive effect exceed 150 days, that limit is not appropriate in this case. It is obviously not the intent because if the two parties had reached an agreement according to Section 1(d), it would have been retroactive "to the date the change or new job was implemented." The fact that the two parties reached impasse in the negotiations should not penalize the employees. The Company would never negotiate an agreement because they could delay the effective date each time by going to a third party neutral. The 150-day limit only speaks to the additional time it takes to go through the third party neutral process after the parties failed to reach an agreement.

Article 16B deals with the creation of a new job classification and the process for determining the correct wage schedule. This process should have started in the period 1998 to 2000 when the company established the new job classification by adding new job duties and not continuing to compensate the workers. The Union forced the Company to follow the process by filing a grievance on December 9, 2001. Arbitrator McKenzie ruled the Company had

-17-

indeed set up a new classification and that parties should negotiate the appropriate rate. Verizon should not now reap the benefit of its own misconduct by obtaining a limited back pay award. The Company prevented a timely adjustment. That problem can now be remedied by the arbitrator providing fair compensation for the period when the Company refused to utilize Article 16B. This would be part and parcel of the arbitrator's authority to determine the "appropriate remedy". As a result, there is authority for this compensatory relief, and the facts of the case and the employer's years of obstinacy demand this relief.

*Summary.* The issue before the arbitrator has been going on for over five years. A group of workers at the General Clerk level were given new responsibilities. At first they were originally given extra compensation for this work. After the compensation stopped, they realized they were working at a higher level than the classification under which they were being paid and filed a grievance.

Verizon management has been resisting giving these ten workers an upgrade for over five years. After this period of time, management has proposed giving these people a 13 cent raise and limiting it to six months or a little over $125 in increased compensation. This management proposal is a travesty of justice. It is unheard of to create a new classification schedule for ten workers at Verizon. Management is trying to punish these workers for filing a grievance to get their jobs reclassified. Voice Mail Clerks regularly work at the level of a Skilled Clerk and some of their work is of a technical nature that approaches that of an RCMAC clerk. These employees should be upgraded to the Skilled Clerk level and the arbitrator's award should also take into account the five years it took for this issue to be decided.

## Position of the Employer

The following is the arbitrator's summary of the argument presented by the Employer in its post-hearing brief.

This Article 16B proceeding arises out of a grievance filed by the Union in 2003[3] seeking to upgrade employees in the Company's Voice Mail Clerk group to

---

[3] The arbitrator would note that technically, the instant proceeding arises out of the failure of the parties to reach agreement during negotiations that were directed by Arbitrator Mackenzie in her February 28, 2006 award. The date of the initial grievance upon which Arbitrator Mackenzie rules was December 9, 2001. See UX 1. The 2003 date is apparently a reference to Employment Specialist Philip Payblas's June 3, 2003 denial (CX 2) of an upgrade of the Voice Mail Clerk to the Special Clerk classification that was submitted by Julie Westbrook-Forte on April 2, 2003 (CX 1).

the grade of RCMAC Clerk. Arbitrator Susan Mackenzie held that the RCMAC Clerk title is not appropriate since "the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk" (Mackenzie Award, 10). She further found, after examining the tasks of the Voice Mail Clerks in detail, that their "typical duties" – comprising more than 80 percent of their job function – are wholly consistent with their existing General Clerk, or Semi-Skilled, clerical grade.

These explicit and binding findings make it quite simple to resolve the primary issue presented in this proceeding. The Company's proposal, which presents a proposed wage rate, consisting of 80 percent of the Voice Mail Clerks' existing rate and 20 percent of the wage schedule of the next higher Skilled clerical grade, is wholly consistent with the percentage distribution of Voice Mail Clerk duties determined by Arbitrator Mackenzie. The Union, in contrast, has completely abandoned this formula. In doing so, it seeks an award that will violate the parameters established by the Mackenzie Award, the plain and unambiguous terms of the Agreement, and settled arbitral and judicial case law. Indeed, not only has the Union flagrantly defied the contractual prohibition against altering its initial Article 16B proposal, it now seeks to defy the parties' additional contractual bargain that arbitral awards are final and binding and that retroactive effect of any award in this proceeding cannot exceed 150 days.

In the end, the Union's various ploys are unavailing. The Award's full and unambiguous findings regarding the nature of and time spent performing Voice Mail Clerk duties compel the selection of the Company's proposal. Likewise, its unequivocal rejection of any degree of comparability between the RCMAC position and the Voice Mail Clerk position requires rejection of the Union's initial proposal, just as the overwhelming weight of the record evidence defeats any notion of comparability between the positions of Voice Mail Clerk and Special Clerk as to warrant a wholesale upgrade to the latter title and wage rate. Finally, in accordance with the contractual scope of the arbitrator's authority, the rate and schedule proposed by the Company can have no retroactive effect beyond 150 days from the date of the award here.

*Facts.* There are four basic grades of clerical positions within Verizon: Entry, Semi-Skilled, Skilled and RCMAC Clerks (Ger Tr 209-10). The Semi-Skilled clerical grade includes the positions of General Clerk and Manager's Clerk, as well as other titles (Ger Tr 210; UX B). Voice Mail Clerks are a Semi-Skilled position and fall under the "General Clerk" job description (Ger Tr 210; CX B). The Skilled clerical grade "includes the Special Clerk and various other titles (Ger

Tr 210). The RCMAC Clerk grade "is a highly technical function and sits at a [clerical] level on its own . . ." (Ger Tr 210). As Joseph Pankoski, a Senior Staff Consultant in Labor Relations for over 14 years, testified, without rebuttal, in making classification decisions involving Semi-Skilled and Skilled clerical titles, the Company considers the critical distinction to be the level of "responsibility involved" (Ger Tr 210). More specifically (Ger Tr 210-211):

> In general terms, for the typical general clerk, you would expect that they would be able to take an existing process and perform that process quickly, efficiently and accurately.
>
> For a special clerk, you would be able to expect that you could give them a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for.

*Duties and training of Voice Mail Clerks.* Voice Mail Clerks are responsible for maintaining the internal voicemail system for employees of the Verizon companies and their subsidiaries. They work a 37½ hour workweek and are paid in accordance with Wage Schedule 21. Special Clerks also work a 37½ hour workweek and are paid in accordance with Wage Schedule 22.

Voice Mail Clerk "primary functions" consist of building, changing and deleting individual mailboxes based on internal customer requests received by fax, through the corporate web, or through the automated call distribution (ACD) system. These duties require "computer skills in accessing multiple systems for input and retrieval of data and significant communication skills with internal 'customers'" (Mackenzie Award 3). Voice Mail Clerks perform these "most typical" core functions approximately 80 percent of the time. Up to 20 percent of their time is spent on performing various additional tasks, including trouble-shooting and investigating system problems; inside node work such as building classes of service for mailboxes (networks between systems); garbage collects (the removal of old information from within the system); running short forms on the contents of individual systems; clearing error messages; and building and creating pager sequences.

Formal training for the Voice Mail Clerk position is minimal. Most employees receive a two-week period of on-the-job instruction and one week of training by the vendor of the Octel system used at the Center. Some Voice Mail Clerks, however, receive no training whatsoever and simply train themselves (Mac2 Tr 12).

*Procedural background.* The Union filed its grievance in this matter on July 28, 2003, following the Company's posting of two openings within the Corporate Voice Mail group as "data entry" positions (UX 6, submitted at Mac1 Hearing; Mac1 Tr 32-33).[4] The sole remedy sought in the grievance was an upgrade of the Voice Mail Clerk position to that of "RCMAC Clerk" (Mac1Tr 75; Mac3 Tr 14). Prior to filing the grievance, Union president James Pappas assessed the functions being performed by the Voice Mail Clerks and concluded that "they weren't really doing special clerk work" (Mac3 Tr 7, 9). The parties were unable to resolve the dispute so it went to hearing before Arbitrator Susan T. Mackenzie. Arbitrator Mackenzie issued her Opinion and Award on February 28, 2006.

*The Mackenzie Award.* At the outset, Arbitrator Mackenzie confirmed the scope of the Voice Mail Clerk's "most typical" duties as set forth above. She then found that:

> ... these "typical duties" are not inconsistent with certain of the "General Duties" set forth in the "General Clerk" Job Description dated June 2000. For example, General Clerk duties set forth in the Job Description include the handling of orders and preparation of reports, accessing multiple systems for inputting retrieval of data on a computer, and "heavy client interfacing at all levels of management." *The substantial part of Voice Mail Clerk functions – that is, adding, deleting and changing mailboxes – is consistent with the description of "General Clerk" duties.* Similarly, the General Clerk Job Description includes in the "Basic Requirements" of the position such factors as excellent interpersonal skills, training through on-the-job instruction and typically daytime working hours. *These requirements as well are consistent with the requirements of the Voice Mail Clerk. ...* [Mackenzie Award 8, emphasis added.]

With regard to the additional tasks outlined above, Arbitrator Mackenzie concluded that these duties "involve a higher complexity and a greater degree of independent judgment and analysis than is associated with the General Clerk Job Description" (Mackenzie Award 8.) Although she found that certain of these additional assignments, e.g., "changing nodes where the work involves replacing a constellation of phone numbers – entail an increase in volume as opposed to more complexity or analysis" (Mackenzie Award 9), she further found that some "non-typical" tasks, such as cut-overs, other node clearing work, and running CDRs, "exceeds the scope of work included in the General Clerk Job Description"

---

[4] The arbitrator finds no grievance in the record dated 2003. Moreover, UX 6 contains a FAX imprinted dated of June 21, 2001. As indicated in note 3, supra, the original grievance was filed on December 9, 2001. Bridget Plonk testified that her grievance was motivated, as the Company Brief states, by the reference to "data entry" in the job description contained in JX 6.

(Mackenzie Award 10). She then held that "Voice Mail Clerks are engaged in [such] non-General Clerk work less than 20 of their work time . . ." (Mackenzie Award 11).

Consistent with these findings, Arbitrator Mackenzie concluded that the Company "sufficiently established that the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk." (Mackenzie Award 10). Based on the record establishing performance of the additional tasks up to 20 percent of their time, she then held that "the extent to which additional duties assigned to Voice Mail Clerks constitutes a redefinition of the Voice Mail Clerk job classification is appropriately the subject of negotiations between the parties pursuant to Section 1 of Article 16.B" (Mackenzie Award 11). Accordingly, she directed the Company to comply with the notification and negotiation requirements of that provision within 60 days of receipt of the Award.

*The Parties' Article 16B proposals.* In accordance with this direction, the Company considered various means of calculating an appropriate increase for the Voice Mail Clerks that would form the basis for an Article 16B proposal (Ger Tr 215). Although it initially commissioned a market study of the General Clerk and Special Clerk positions as one possible means for calculating the increase, the Company ultimately was guided in crafting its proposal by what it understood to be the Mackenzie Award's fundamental and binding instruction:

> That the proposed salary would include two components. One would represent the fact that 80 percent or maybe a little more of the job duties were general clerk or semi-skilled job duties, and that something less than 20 percent was beyond general clerk duties without any specification as to how much beyond. [Ger Tr 215.]

The Company ultimately determined that the Award's finding of "the 80-20 split" in the Voice Mail Clerk duties precluded any consideration of the pricing study, as it did not directly track Arbitrator Mackenzie's decision (Ger Tr 218). It bears mention, however, that the study revealed that both positions are paid well above the market in this locality (Ger Tr 217-18).

Thus, the Company created an equation for calculating a proposed increase that directly tracked the "80-20 split" created by the Mackenzie Award (Ger Tr 218). Labor Relations Director James Davis reiterated this approach in transmitting the Company's proposal to the Union on April 24, 2006:

As you know, the arbitrator agreed with the Company's position that RCMAC Clerk work was substantially more complex than the work performed by corporate voicemail clerks, and accordingly that the RCMAC Clerk title is not appropriate. The arbitrator further found that over 80% of the work the voicemail clerks perform could be properly characterized as General Clerk (Semi-Skilled 2-B Clerk) work. The arbitrator ruled that some of the duties performed by the Voice Mail Clerks had migrated from management (clearing nodes, building pagers, etc.) and it is only that work that is more complex than General Clerk work.

Here's the Company's 16B Notice. It applies the Skilled 1-B wage to 20% of the current wage schedule for the Voice Mail Clerks (rounded up to the closest $.50) and increases the Pension band by one step for Voice Mail Clerks in Locality Wage Group B. [JX A, 1.]

This calculation resulted in a new starting weekly wage rate for the Voice Mail Clerks of $388.00.

The Company selected the Skilled 1-B (Special Clerk) wage rate for the 20 percent of the equation because it "was the next highest clerical rate" (Ger Tr 217). Although bumping the Voice Mail Clerks to the Special Clerk grade in its entirety was one of the scenarios initially considered, the Company rejected this option for several reasons. First, it determined that applying the Special Clerk rate in its entirety would have violated the award's finding "that 80 percent of the job duties were obviously at the general clerk job description" (Ger Tr 218). Likewise, the Company rejected using the RCMAC Clerk rate as the basis for any aspect of the wage rate calculation because the Award was "quite specific that there wasn't any connection between the RCMAC job duties and the corporate voice mail clerk duties" (Ger Tr 219). Second, and consistent with this finding, the Company assessed the positions based on a review of the job briefs, and its knowledge of their functions, and concluded that "there was a discernable difference between the two jobs" (Ger Tr 220). Finally, the Company determined that its policies and practices for classifying employees precluded any upgrade for a group of employees, like the Voice Mail Clerks, when the vast majority of their duties were consistent with their existing classification (Ger Tr 221-22).

The Union communicated its first Article 16B proposal to the Company shortly before the Company made its April 24 offer. On April 13, 2006, the Union stated as follows:

The Arbitrator felt that the employees were working at a level higher than their General Clerk classification but agreed with the company that there [sic] work was not quite as complex as that of a RCMAC Clerk.

-23-

The General Clerk-Semi-Skilled 2(B) is paid at the rate of $21.44/hour.
The RCMAC Clerk is paid at the rate of $23.125/hour.

We believe that the appropriate pay for the Voice Mail Clerks is 22.70/hour.
[JX B.]

Holding to this position, the Union rejected the Company's April 26 counter-proposal. Shortly before the Article 16B hearing commenced, the Union offered a second proposal, seeking to apply Wage Schedule 22 – the wage schedule for a Skilled 1-B Clerk – to the Voice Mail Clerks (JX C; Ger Tr 225). For the reasons it had previously declined to bump the Voice Mail Clerks to the Special Clerk grade when drafting its own proposal, the Company rejected the Union's second proposal.

*Argument.* Consistent with the contractual mandates contained in Articles 13 and 16B, as well as the preclusive findings of the Mackenzie Award, the arbitrator has no choice but to select the Company's proposal for the new wage rate and schedule for the Voice Mail Clerks. Only the Company's proposal is supported by evidence presented at the Article 16B hearing. Only the Company's proposal comports with the explicit and binding findings of the Mackenzie Award. And only the Company's proposal properly reflects the nature of the duties actually performed by the Voice Mail Clerks and the percentage of time they spend performing them.

*I. The Union's "Final" proposal contained in Joint Exhibit C cannot be considered pursuant to Article 16B (1) (e).* On April 13, 2006, the Union started the Article 16B negotiations by putting forth a proposal that the appropriate pay for the Voice Mail Clerks is $22.70 per hour" (JX B). Aside from stating the hourly wage rates for the General Clerk and RCMAC Clerk grades, the proposal provided no explanation of the bases for its calculation. Around August 2006, the Union changed its position and offered a "final" proposal on the eve of the hearing that set the schedule of rates for the Voice Mail Clerks according to Wage Schedule 22, the schedule for Skilled 1-B Clerks (JX C). The Union's modification of its proposal violates the plain language of Article 16B (e). That provision states in clear and unequivocal terms that the proposed schedule of wage rates presented by the parties immediately after a demand for a neutral third party hearing has been made "cannot thereafter be changed." This plain language proscription must be enforced in full by this arbitrator. (Citations omitted here.)

Application of this provision shifts the entire landscape of this proceeding. In practical effect, the Union is left without any record evidence explaining and

-24-

supporting its first (and final) proposal to the arbitrator. Inasmuch as the Company respectfully submits that the arbitrator is constrained to select one of the two proposals submitted in April 2006, given the comparatively overwhelming weight of evidence supporting the Company's proposal, there is but one possible outcome in this proceeding – selection of the Company's proposed wage rate and schedule set forth in Joint Exhibit A.

II. *The Company's proposal must be accepted because it is the only proposal that comports with the Mackenzie Award and reflects the actual distribution of Voice Mail Clerk duties.* Even if the arbitrator elects to consider the position advocated in the Union's August 2006 proposal, the record still compels acceptance of the Company's proposal. Most fundamentally, because Voice Mail Clerks spend more than 80 percent of their time performing tasks that are entirely consistent with their existing Semi-Skilled clerical grade and title, there is no basis in fact or law for bumping them to a higher grade. The Company's proposal, moreover, adheres to the binding findings of the Mackenzie Award and appropriately reflects the distribution of the Voice Mail Clerks' various duties.

A. *The Award's "80/20" formula is binding in this proceeding.* As noted, Arbitrator Mackenzie's Award contains findings and conclusions resulting from three days of hearing and presentation of evidence on the merits of the Union's grievance seeking to upgrade the Voice Mail Clerks to the RCMAC Clerk position. Notwithstanding the Award's detailed explanation of the bases for these findings and conclusions, the Union repeatedly characterized them throughout the Article 16B proceeding as mere "interpretations" that are not binding upon the arbitrator here. See, e.g., Ger Tr at 13, 147. This characterization both violates the plain language of the Agreement and defies fundamental and long-standing tenets of arbitral and judicial case law.

First, it is undisputed that the Award contains a "full statement of the grounds" under which the Union's grievance was decided, including a full statement of the typical and non-typical duties performed by Voice Mail Clerks, the percentage of time spent performing them, and the fact that more than 80 percent of their duties is wholly consistent with the General Clerk job description (Mackenzie Award 8-11). Based on the clear and unambiguous terms of the contract, these findings and all other findings in the decision are "final". Thus the parties – and this arbitrator – must abide by them in determining the appropriate wage rate and schedule for the Voice Mail Clerks.

Second, settled principles of *res judicata* likewise require that these findings be given preclusive effect. Rules covering issue preclusion "bar a party from pursuing issues actually determined in an earlier action from being relitigated in a later proceeding" [*Specialized Distrib. Mgmt., Inc.*, 1997 WL 828804 (1996) (Snow, Arb.) (citing Restatement (Second) of Judgments, 13 (1982) at 131)]. The rule has long been applied in the arbitral context. (Citations omitted here.) For the findings in a prior arbitration award to be given preclusive effect, the issues must be "identical" and "the subsequent dispute cannot be distinguished from the one earlier ruled upon." (*Specialized Distrib. Mgmt., Inc.*, 6; *Accord Regions Hosp.*, 118 LA 26, 28 (2002, Bognanno, Arb.) Four "prerequisites" must exist for issue preclusion to apply:

> (1) the issue determined in the prior action and the present issue [must be] the same; (2) final adjudication [must have been] reached on the issue; (3) the estopped party [must be] the prior party; and (4) the estopped party [must have been] given a full and fair opportunity to be heard on the adjudicated issue. [At 28.]

The nature of and time spent on Voice Mail Clerks' duties meets this test. Whether or not these duties are consistent with the General Clerk job title – the crux of the question presented in this Article 16B proceeding – was the very issue presented to and ruled upon by Arbitrator Mackenzie. The Union had ample opportunity to, and did, present witnesses and other evidence on the issue over three days of hearing. Accordingly, the Union cannot now use what is, in essence, just another stage of the same proceeding to relitigate an issue already litigated and ruled upon simply because it disagrees with the ruling. The Mackenzie Award's finding that more than 80 percent of the Voice Mail Clerks' duties are wholly consistent with the General Clerk job description thus is binding upon and must direct this arbitrator's determination of their new wage rate and schedule.

B. *The Company's proposal applies the "80/20" formula and properly reflects the distribution of the Voice Mail Clerks' duties.* The record is unequivocal that the Company's proposal adheres to the Award's "80/20" formula to the letter as Joseph Pankoski, Senior Staff Consultant, Labor Relations explained (Ger Tr 216-17). [The Union brief quoted Pankoski also, above at 16.]

Indeed, not only does the Company's proposal comport with the Award's formula, but, in doing so, it properly recognizes and reflects the percentage distribution of the Voice Mail Clerks' duties. As the arbitrator suggested in the November 20, 2005 email, a factor in determining the appropriate wage rate should be the "mix" of duties, or the "time devoted to various tasks." Based on the bind-

ing findings of Arbitrator Mackenzie, this factor dictates that the equation for determining the proper wage rate for the Voice Mail Clerks must be heavily weighted toward the rate negotiated for the General Clerk grade. In short, it requires selection of the Company's proposal.

It is not appropriate that the rate reflecting a Verizon employee's highest skill and capability alone should determine his or her wage rate. As Senior Staff Consultant for Labor Relations, Joseph Pankoski, testified without rebuttal, it is the Company's practice and procedure to base its classification decisions on where the majority of the duties lie (Ger Tr 222). Indeed, in his 14 years in this position, it has never happened that a group of employees were bumped up a grade when, as here, the majority of their duties were consistent with the lower grade.

*III. The Special Clerk title and wage schedule cannot be adopted because it would violate the Mackenzie Award and Special Clerk is not a comparable position.* A wholesale upgrade of the Voice Mail Clerk group to the Special Clerk title and wage rate would, on its face, fail to comply with findings of the Mackenzie Award. This fatal flaw requires that the position advanced in the Union's second, and untimely, proposal be rejected. But that position is flawed in another fundamental respect as well. The record demonstrates conclusively that there is a "discernible difference" between the Voice Mail Clerk and Special Clerk jobs (Ger Tr 220). Indeed, there is no record evidence whatsoever that even the "non-typical" General Clerk duties performed by the Voice Mail Clerks equate to the important functions of the Special Clerk position. The significant difference between the jobs and the Union's failure to prove that any of the Voice Mail Clerks' duties are actually consistent with the key tasks of a Special Clerk further mandates that the Company's proposal be selected.

*A. The Union's own president admitted that Voice Mail Clerks are not doing Special Clerk work.* During the merits hearing before Arbitrator Mackenzie, evidence was adduced that, prior to filing the underlying grievance in this case, Union President Jim Pappas reviewed the General Clerk job description covering the Voice Mail Clerks as well as the next higher grade title of Special Clerk (Mac3 Tr 7). After performing this review, his "conclusion was that they weren't really doing special clerk work" (at 7). As there is no evidence that the duties of the Voice Mail Clerks changed between the time Mr. Pappas reached this conclusion and the Article 16B hearing, this testimony, standing alone, confirms that a wholesale upgrade to Special Clerk is not warranted.

   *B. Voice Mail Clerk work is not comparable to Special Clerk work as to justify a wholesale upgrade to that title and wage rate.* The overwhelming weight of the record evidence only underscores Mr. Pappas' conclusion. Again, the cornerstone premise of any comparability analysis is the Award's finding that the "substantial part of Voice Mail Clerk functions . . . is consistent with the description of 'General Clerk' duties" (Mackenzie Award 8) – a finding that alone precludes the conclusion that the two jobs are comparable. Based on the evidence adduced at the hearing, however, not even the "non-typical" tasks of the Voice Mail Clerks that involve "a level of complexity and the exercise of discretion and judgment that exceeds the scope of work included in the General Clerk job description" reflect the level of responsibility, self-direction and decision-making, and array of contacts that characterize Special Clerk work (Mackenzie Award 10).

   As noted, examples of the "more complex duties" performed by the Voice Mail Clerks include troubleshooting, call notification and building sequences for pagers, inside node work, garbage collects and running short forms and CDRs. To be sure, certain of these tasks are more complex from a technical perspective than building, maintaining or deleting voice mailboxes, which essentially entails entering data in the form of names, phone numbers, beeper numbers, and other figures into drop-down boxes in a Windows-style screen on the computer (Mac1 Tr 106; Mac2 Tr 69-70). The record is undisputed, however, that the Voice Mail Clerks follow established procedures or templates even in performing these more complex functions.

   For example, "garbage collects," which clean out excess material from the nodes, is simply a pre-established three-step process. It requires "going into menu 20 . . . press number 4 for the miscellaneous . . . [and] when the third page comes up, garbage collect is number 1" (Mac1 Tr 129-30). The garbage collect, at that point, runs automatically. Likewise, Voice Mail Clerk "troubleshooting" efforts are limited to correcting erroneously entered data, again by simply following a trail of preset screens and drop-down boxes. More complex work is elevated either to management or to an inside technician (Mac2 Tr 35, 41-42; Mac1 Tr at 124). Indeed, even the task of building sequences for pagers, which the Union made much of during the Article 16B hearing, follows an established set of methods and procedures. As Union witness Bridget Plonk explained during the merits hearing, each of the numbers and letters used to code a pager sequence has the same meaning each time it is used; all "Ps" mean pauses, for example, and all "#s" mean stop. The Voice Mail Clerks listen to the pager and, based on their experience, figure out what digits and letters to put in, when to place pauses, and so on (Mac1 Tr 202-08). While the actual ordering of the numbers and letters will vary, the

processes for determining their order, and the resulting codes themselves, thus adhere to preset methods and procedures that cannot be altered.

In contrast, there are no methods, procedures or templates that Special Clerks can follow in order to accomplish their given objectives (Ger Tr 189). Area Manager for Outside Plant Construction, Marc Gilbert, provided the following overview of the higher level of autonomy and creative decision-making expected of a Special Clerk (Ger Tr 193-94):

> I feel that I can give a special clerk a lot more latitude and not as much oversight in coming up with new processes.
>
> .    .    .    .    .    .
>
> I mean to be more independent, to come up with analysis and be more independent with just the way she works or he works.
>
> .    .    .    .    .    .
>
> So I would be comfortable with giving them tasks that were very, very important to me, tasks that had a bearing on my objectives and my ability to meet those objectives. And there's nothing more important to me than that.

To illustrate these concepts with more specificity, Mr. Gilbert described an ongoing responsibility of the Special Clerk who reports directly to him to ensure that his reporting group of 116 local technicians and 9 local managers work at a 0.9 ratio of motor vehicles to technicians. With only the statement of Mr. Gilbert's objective and the time frame to guide her effort, the Special Clerk went out to the field and collected and analyzed the data relating to the entire motor vehicle fleet assigned to Mr. Gilbert's area. Based on her analysis, she made recommendations about the ideal composition of the fleet and which vehicles should be replaced or given up; as well, she made suggestions about how creatively to characterize certain vehicles so that they would not be counted in calculating the ratio.

To accomplish these tasks, she created multiple databases on the fleet and educated herself about the work functions performed by the various vehicles. She also dealt with a wide spectrum of contacts, from the motor vehicle supervisors at multiple garages to local managers, and "consensus-built to make sure that the decision she was going to make was something they could live with that wouldn't hurt their ability to do the job and do it efficiently" (Ger Tr 190-91). In all respects, she demonstrated "a high level of decision-making. She had to reach some conclusions which required data analysis, also a job knowledge of the business" (Ger Tr 187). Ultimately, the Special Clerk created "very detailed

analysis sheets" reflecting her conclusions and met (and continues to maintain) the goal of arranging Mr. Gilbert's technicians and fleet to the target 0.9 ratio.

These independent, discretionary tasks typify the type of duties expected to be performed under the Special Clerk job brief (CX C). In addition, had the project required, the Special Clerk could even have driven a Company vehicle to the field to do site surveys at the garages. No evidence was adduced in this or the merits proceeding that the Voice Mail Clerks function at a comparably high level of autonomy, independent judgment and discretion. Nor was any evidence adduced demonstrating their ability to engage in sophisticated data analyses or their certification to drive a Company vehicle. Indeed, the General Clerk job description contains no mention whatsoever of the duties of analyzing data or computing mathematical data, which predominately describe the functions performed by Mr. Gilbert's Special Clerk. Compare CX B with CX C. Put simply, the jobs are not comparable; thus, there is no evidentiary justification for upgrading the Voice Mail Clerks to the Special Clerk grade and wage schedule.

*C. The Union's Special Clerk witnesses perform General Clerk work and thus prove nothing about the comparability of the Special Clerk job.* In an attempt to counter this evidence, the Union offered the testimony of two Special Clerks as to the tasks that they perform on a daily basis. In a nutshell, both employees work with spreadsheets, entering data obtained from other sources in order to place orders for supplies (Ger Tr 63-72, 75-78). They use Lotus Notes, PeopleSoft and other applications to retrieve and enter this data, and both follow established templates or procedures in performing their functions.

This testimony proves nothing about the Special Clerk position. As an initial matter, the tasks described by Ms. Streeter and Ms. Coley simply comport with generic clerical duties that are listed on both the Special Clerk and General Clerk job briefs. Compare, e.g., CX B ("Operating various office machines") with CX C ("Operating various office machines"). Neither witness engages in any of the unique and essential duties listed on the Special Clerk job description such as analysis of the data they retrieve and input. See CX C.

In fact, the duties performed by the Union's Special Clerk witnesses barely, if at all, characterize the level of responsibility and complexity of the work performed by employees in other Semi-Skilled clerical positions, including Manager's Clerks. See CX A. For example, the Manager's Clerk currently working for Mr. Gilbert populates fields in spreadsheets and databases and retrieves data from Verizon managers and other employees in much the same way as Ms. Streeter and

-30-

Ms. Coley. In other duties, however, she exercises significantly more responsibility and handles matters of more complexity, such as tracking absences and expenses, preparing Mr. Gilbert's daily reports, raising "red flags" for him about the expense and absence data for which she is responsible, and prioritizing the importance of the telephone calls he receives. In these regards, she works with "very little supervision," although, as a Semi-Skilled clerical, she still follows established steps and procedures.

Ultimately, the record establishes that Ms. Streeter and Ms. Coley are not really working as Special Clerks at all. As Company witnesses Joseph Pankoski and Marc Gilbert testified without rebuttal, based on the duties described, they actually are working down to the General Clerk grade, which the Company routinely assigns Special Clerks to do as business needs dictate.

Mr. Gilbert's unrebutted testimony regarding the exercise of discretion and autonomy demonstrated by the General Clerk at the bill paying center he oversaw in 2003 and the General Clerk at the customer care center he supervised from 1997-2000 confirm that the Union's Special Clerk witnesses are simply performing functions typical of the Semi-Skilled clerical grade. Significantly, and quite logically, however, the mere fact that some Special Clerks work down a grade, even for long periods of time, does not qualify Voice Mail Clerks or any other Semi-Skilled Clerks to an upgrade to the Special Clerk position. (See *Accord, supra.*)

*D. The Union's "expert" testimony to the contrary should be excluded.* In further support of its second proposal, the Union offered the testimony of a purported comparability expert, Robert Patrician. Based on his review of the job briefs of the General Clerk, Special Clerk and RCMAC Clerk positions and of the Award and the prior testimony, Mr. Patrician posited various assumptions about the complexity of the Voice Mail Clerks' duties and developed a comparison of the three positions. He concluded from his review that the Voice Mail Clerks "should be a Special Clerk" (Ger Tr 111).

This testimony, and Mr. Patrician's opinions as a whole, should be excluded. Arbitrators routinely accept expert testimony from professionals "to assist them in drawing proper inferences from proven facts which the arbitrator might otherwise be incompetent to draw on her own." (Citations omitted here.) However, the expert's knowledge must be "scientific, technical, or specialized" and must be qualified "by knowledge, skill, experience, training, or education" in order to testify in the form of an opinion. (Citations omitted here.) In addition to these

-31-

requirements, the expert's testimony must be "reliable." Accordingly, where the purported expert lacks experience in the field or utilizes an incomplete or selective set of data in his methodology, courts and arbitrators have not hesitated to exclude or disregard his testimony. See *Midas Int'l Corp.*, 2002 WL 31161180 (2002) (Goldstein, Arb.) at 16 (finding expert testimony "essentially useless" in pay rate grievance where all relevant elements of job evaluation plan were not considered and precise methodology was not fully utilized).

Mr. Patrician's testimony is "essentially useless" when considered against these standards. First, by his own admission and "stipulation," he is not "a job evaluator in the telecommunications industry" (Ger Tr 109-10). Indeed, on cross-examination, he readily admitted that not having "years of experience in the industry limits [his] knowledge of the way the work goes on in the industry" (at 131); that he was not familiar with the systems about which he was testifying (at 134); that he was not familiar with the level of complexity involved in clearing error messages and performing garbage collects (at 134-35); and that, in fact, he did not even know what it meant to perform the Voice Mail Clerks' primary function of building, deleting and making changes to mailboxes (at 134). Accordingly, for reasons of inexperience alone, his testimony should be disregarded.

Second, Mr. Patrician's data review was so incomplete as to render his methodology fatally flawed. Again, on cross-examination, he freely acknowledged that he did not interview any Voice Mail Clerks about the work they actually performed (Ger Tr 122). Nor did he talk to any managers of Voice Mail Clerks, Special Clerks or other General Clerks about their expectations for the jobs (at 122-23). More significantly, he neglected to review other Semi-Skilled job briefs or undertake any additional investigation into the duties of employees in other Semi-Skilled positions (at 123-24). Thus, he completely failed to take into account in his comparability analysis the fact that the job briefs of other Semi-Skilled Clerks, such as the Manager's Clerk, contained the very tasks that he found significant in the work performed by the Special Clerks who testified in the Union's direct case (at 123, 135-39).

In sum, the overwhelming weight of the evidence demonstrates that Mr. Patrician's opinion is not the product of reliable principles and methods and is based on an undisputed lack of experience and familiarity with the industry. His opinions, including his ultimate opinion that the Voice Mail Clerks should become Special Clerks, therefore should be excluded.

*IV. Retroactive effect of an award here cannot exceed 150 days given the plain language of the Agreement.* Article 16B(1)(f) explicitly addresses the retroactive effect of new wage schedules resulting from an Article 16B proceeding. In plain and unambiguous terms, it provides:

> In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, *except that in no event shall the retroactive effect exceed 150 days.* [Emphasis added here.]

Notwithstanding these unambiguous terms, the Union argued for the first time at the hearing that the 150-day contractual limit "is not appropriate in this case" because the Company purportedly engaged in "misconduct" by not utilizing the Article 16B procedures years before (Ger Tr 18, 19). This classic ruse to expand the parties' written agreement is specious as a matter of fact and law.

First, there is no evidence in the record whatsoever to support the Union's preposterous allusion to misconduct on the part of the Company. To the contrary, while the grievance was proceeding through the normal channels, the Company simultaneously engaged in a formal review of the job and determined that the wage rate was appropriate; the Union then had a full opportunity to challenge that determination during the three-day merits hearing before Arbitrator Mackenzie. Nothing in this scenario suggests anything but respect for and adherence to the parties' collectively bargained dispute resolution processes.

Second, the plain language of Article 16B quashes this argument at its inception. Again, the provision is crystal clear that "in no event shall the retroactive effect exceed 150 days." The Arbitrator is compelled to give this unequivocal and unambiguous language its full force and effect. (Citations omitted here.)

Consistent with these entrenched principles of contract interpretation, regardless of the procedural history of the grievance or the process that led to this formal Article 16B hearing, the proposal adopted by the arbitrator in this proceeding cannot be given retroactive effect beyond 150 days from the date of the Award. Indeed, to accept the Union's eleventh-hour plea on this issue, the arbitrator would effectively be rewriting the Agreement, in clear violation of Article 13 ("The arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement"). (Citations omitted here.)

*Conclusion.* For the foregoing reasons, the Company's Article 16B proposal, establishing a weekly wage rate for Voice Mail Clerks of $388.00 (adjusted to reflect recent across-the-board increases) should be accepted and should be given a retroactive effect of 150 days from the date of the award in this proceeding.

## Discussion

### A. *Background*

This case arises out of the Union's attempt to have the Company adjust the pay rate of approximately ten Voice Mail Clerks working in the Washington, D.C. area. From the mid-1990's when their office was created, the primary function of Voice Mail Clerks has been to build, modify, maintain and delete individual voice mailboxes throughout the Company. The number of clients has grown to over 100,000 with the Company's acquisitions. Using the phone and personal computers, Voice Mail Clerks access multiple systems for the input and retrieval of data and engage in significant communication with their internal customers.

There is no dispute that about 1997, the Voice Mail Clerk's manager, Brenda Moses, began to assign tasks to the clerks on an ad hoc basis that had previously been performed by her. The clerks received temporary assignment (TA) pay over and above their normal rate of pay when they performed these duties including troubleshooting; building, maintaining and correcting errors in nodes; and building and maintaining pager sequences. The clerks have continued to perform these duties, but at some point prior to 2001, they ceased receiving added pay for this work.

On December 9, 2001, the Union filed a grievance seeking to upgrade the classification of the Voice Mail Clerks from General Clerk (semi-skilled) to RCMAC Clerk (technical).[5] This grievance was denied by the Company with the assertion that the work assigned to the Voice Mail Clerks was within the description of the "General Clerk" job title – Semi-Skilled Wage Schedule 21 – the wage schedule to which Voice Mail Clerks are presently assigned. There was apparently no dispute about the actual work assigned to the Voice Mail Clerks. Rather, the dispute centered on whether the work (or at least some of it) was more properly within the job description and pay range for a higher grade clerk, particu-

---

[5] The "technical" level is one step above the "skilled" level. "Semi-skilled" is one step below "skilled". So the Union's demand was essentially for a two-step increase in the classification of the Voice Mail Clerk title.

larly the RCMAC Clerk – Technical Wage Schedule 07 – or the Special Clerk – Skilled Wage Schedule 22. For reference the RCMAC wage schedule, if adjusted to a 7½ hour daily schedule, would amount to a little more than a 14 percent increase in pay while the Special Clerk wage schedule, also a 7½ hour schedule, would amount to about a 3½ percent increase.

The parties were unable to resolve the grievance so on April 1, July 14, and October 20, 2005, Arbitrator Susan Mackenzie heard the Union's grievance which she characterized in her opinion dated February 28, 2006 (at 4) as,

> . . . asserting a violation of the General Agreement and more specifically "unfair treatment" for performing "work of the RCMAC Clerks while titled and paid as General Clerks."

Arbitrator Mackenzie concluded (at 7),

> . . . the Arbitrator finds that to the extent set forth below, certain of the duties assigned to Voice Mail Clerks exceed the duties and requirements of the General Clerk title.

Moreover, Arbitrator Mackenzie wrote in her award (at 13),

> The Company did violate Article 16.B of the General Agreement by its assignment of certain duties to Voice Mail Clerks outside of the scope of their General Clerk Job Description without notification to the Union and opportunity to negotiate.
>
> Within 60 days of receipt of this Opinion and Award, the Company is directed to comply with the Article 16.B.1, notification and negotiations requirements.

Pursuant to Arbitrator Mackenzie's award, the Parties commenced negotiations in 2006, but were unable to reach agreement, so the undersigned was appointed, pursuant to the provisions of Article 16B, which is set forth in relevant part above, at pages 2-3, to issue a binding award as to the appropriate classification and wage rate for the Voice Mail Clerks.

Aside from the above essential finding and award, the Company cited a number of observations and inferences that it draws from Arbitrator Mackenzie's Opinion and asserts that they are somehow binding on the instant arbitrator. Plainly, Arbitrator Mackenzie's award, and any *necessary* conclusions she reached in coming to that award, would ordinarily be given considerable weight by any arbitrator dealing with the same issue, parties, contractual language and fact pattern. The issue before arbitrator Mackenzie was, however, different from the

-35-

one before the instant arbitrator. Although she necessarily assessed whether there had been a significant restructuring or redefinition of the Voice Mail Clerk job as it had been established in the mid-1990's in order to reach her decision that the Company had violated Article 16B, she determined that the issue of an appropriate rate of pay was *not* before her. In fact, she referred that matter back to the parties for negotiation pursuant to Article 16B. That is, in fact, the issue before the instant arbitrator.

In particular, the Company asserts that the instant arbitrator is somehow bound by an "80/20" formula derived from the Mackenzie award. Inasmuch as Arbitrator Mackenzie herself determined that she could not properly decide the appropriate wage rate for Voice Mail Clerks, it is clear that she had no intention that any part of her award would be used to determine the new wage rate for Voice Mail Clerks. Thus, any attempt to derive a wage rate from her award is misplaced and has been disregarded by the instant arbitrator.

## B. Application of controlling contractual language

Article 16B was quoted in all its potentially relevant parts at pages 2-3 above. After Arbitrator Mackenzie's holding that the Company did effectively "restructure or redefine" the Voice Mail Clerk's job title, she directed, as noted above, that within 60 days, the Company was "to comply with the 16.B.1 notification and negotiations requirements." Article 16B.1(a) provides, in relevant part,

> The Company shall notify the Union in writing of such job title or classification and *shall furnish a job description of the duties and the wage rates and schedules* initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. (Emphasis added here.)

Thus, by approximately April 30, 2006, the Company was obligated to furnish "a job description of the duties and the wage rates and schedules" initially determined for the Voice Mail Clerk. Nothing in the record indicates that the Company furnished a description of the Voice Mail Clerk duties to the Union.[6] Instead, before the expiration of the 60 days provided for by Arbitrator Mackenzie, on April 13, 2006, Union representative Jimmy Tarlau initiated negotiations by

---

[6] Although "Job Briefs" for General Clerk, Special Clerk, RCMAC Clerk and a number of other job titles were introduced, there is no specific "Job Brief" for the Voice Mail Clerk in the record. The instant arbitrator is thus required to rely upon the testimony adduced at the hearings in the instant matter and that before Arbitrator Mackenzie, as well as the Associate Job Evaluation Request Form (CX 1) introduced before Arbitrator Mackenzie, to determine the duties and other requirements of the job he has been asked to evaluate.

proposing, by e-mail, a rate of $22.70/hour ($851.25/week) for the Voice Mail Clerks (JX B). (For reference, this compares with the hourly rates of $21.44 for General Clerks and $23.125 for RCMAC Clerks, at that time.) Mr. Tarlau thus initiated the negotiations provided for in 16B.1(b). On April 24, Company representative, James R. Davis, responded to Mr. Tarlau with his proposal for a rate of $809/week (JX A) For reverence this is approximately equal to $21.57 per hour. He explained in his e-mail that this proposed rate was calculated by weighting the then current General Clerk and Special Clerk rates at 80% and 20% respectively, and was based on his reading of Arbitrator Mackenzie's Opinion and Award.

Article 16B.1(e) provides that if negotiations fail to resolve the matter, the Union may demand that "the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party." Apparently the Union filed such a request because on August 9, 2006, the undersigned arbitrator was notified that he had been appointed by the parties to hear this matter. A hearing date was set for September 15. It is not clear from the record when the Union demanded arbitration of the matter.

Article 16B.1(e) provides, "[w]ithin seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed." In an e-mail printout that contains no date, but apparently was sent sometime between the demand for arbitration and the date of the hearing, Mr. Tarlau wrote to Company attorney, Julia Broas, "This is to confirm in writing that the Union's final proposed schedule of rates for the corporate Voice Mail Clerks is Wage Schedule: 22 . . ." (JX C). (For reference, at the time of the earlier proposals in April 2006, the top rate for Schedule 22 was $832.50 or $22.20/hour.) At the hearing and in its brief, the Company alleged that this "final proposed schedule of rates" (JX C) from Mr. Tarlau reflected a change in the Union's "final offer" from April 13 and thereby violated Article 16B.1(e) as set forth above. Accordingly, the Company argued that it should not therefore be considered by the arbitrator.

This allegation could have relevance if the arbitrator holds, as asserted by the Company, that the arbitrator is constrained to accept either the Union' or the Company's final proposal, and that he may not award a wage schedule that is different from what one or the other of the parties has offered. (See the assertion by the Company in its proposal of the issues before the arbitrator, above at page 4 and on page 9 of the Company's post-hearing brief.) This matter will be discussed below.

Finally, Article 16B.1(f) provides,

> [w]hile it is not intended that such third party undertake a full and complete job evaluation study, he or she *shall review other job titles or classifications and their wage schedules* for comparison purposes . . . . In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, *except that in no event shall the retroactive effect exceed 150 days*. [Emphasis added here.]

Thus, the Agreement provides a specific methodology to be relied upon by the instant arbitrator – a review of other job titles or classifications and their wage schedules.[7] This has been undertaken below. See Section E. In addition, based on the language involving retroactivity, the Company also raised another issue that must be addressed by the arbitrator – the effective date of the application of the new wage schedule. This will also be addressed below. See Section F.

## C. Summary of the questions before the arbitrator.

1. The threshold issue before the arbitrator is to determine what discretion the Agreement affords him in fashioning an award in this matter. That is, is the arbitrator constrained to choose between the positions of the parties as in "last offer" arbitration, or is he free to identify and award some other outcome in the matter?

2. The principal issue before the arbitrator is, of course, to determine an award with respect to the appropriate wage schedule for the Voice Mail Clerks.

3. Finally, the arbitrator must determine a remedy. This will require the arbitrator to interpret the language of Article 16B.1(f) which states that "in no event shall the retroactive effect exceed 150 days." Did the drafters of the Agreement intend, as the Company contends, that the new wage rate for the Voice Mail Clerks must be effective no more than 150 days prior to the date of the instant arbitrator's award, or, pursuant to the Union's interpreta-

---

[7] Both parties offered evidence of what selected individuals in the General and Special Clerk titles actually do in their jobs. Such evidence is of limited use because, on the one hand, individuals assigned to the Special Clerk title can be assigned to "work down" from their classifications, and, on the other hand, some individuals in the General Clerk status may be stellar performers and therefore outliers from the typical performer. Such evidence could be useful only if an adequately large and random sample were provided.

tion, that the revised wage rate must have effect 150 days prior to the Union's initial grievance, i.e., December 9, 2001?

### D. Is the arbitrator constrained to select one or the other of the parties' proposals?

In footnote 5, at page 9 of its post-hearing brief, the Company asserts:

> The Company submits that the intent of the language of Article 16B requires that the Arbitrator select among the two proposals rather than establish a wage rate and schedule wholly different than those proposed by the parties.

The Company also contends that the Union improperly attempted to change its "final offer" by offering a new proposal on the eve of the hearing in this matter (JX C). Article 16B.1(e) explicitly provides,

> ... Within seven (7) days of [a demand for submission to a neutral third party], each party shall submit its final proposed schedule of wage rates to the other party, *which cannot thereafter be changed.* [Emphasis added here.]

(See above at 24 and Company post-hearing brief at 10).

With regard to the first assertion – that the arbitrator's discretion is limited to the extent that he must select one of the two final offers of the parties – the Company provides no evidence or argument to support such a conclusion. The entire argument for this position is contained in footnote 5 of the brief quoted above. Contrary to the Company's conclusion, the arbitrator notes the following direction to him that appears in Article 16B.1(f),

> ... A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party .... In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect ....

This language simply states that if the neutral determines that "a different schedule of rates" from the schedule initially implemented by the Company is appropriate, such schedule shall be placed into effect. The Company's assertion would suggest that if, for any reason, the arbitrator had found the Company's proposal inappropriate, he would be obliged to award the Union's position. In the absence of any language that states the arbitrator is to "select the more reasonable" of two offers, or other similar language that is routinely found in "last offer"

provisions, the arbitrator is compelled to conclude that the parties intended for him to make an unfettered decision of the "appropriate schedule of wage rates".

Inasmuch as the arbitrator is free to identify an appropriate schedule of wage rates that is different from either the Company's or Union's proposals, the second issue raised by the Company concerning the Union's "final offer" (JX C) is moot. In any event, the arbitrator would observe only that there is no evidence that the Union made more than one "final offer" *after* its demand that the matter be submitted to a neutral third party. The first offer (JX B) clearly came at the outset of negotiations, before any demand for neutral involvement, and in no way could be construed as a "final offer". Thus, the "final offer" (JX C) was the first and only "final offer" from the Union that is in the record.

### E. *How do the job duties of the Voicemail Clerk compare with those of the prototypical General Clerk and Special Clerk?*

To answer this question, the arbitrator has been guided primarily by the format of the Company's Associate Job Evaluation Request Form (CX 1, hereinafter "JER") introduced in the first hearing before Arbitrator Mackenzie. This exhibit lays out a clear guideline for evaluating any job and follows traditional job analysis dimensions and evaluation criteria, viz., (1) identification of the essential duties and functions of the job, (2) training and experience requirements, (3) responsibility (particularly with respect to supervision and impact of errors), and (4) working conditions.

*1. "Essential Duties/Functions" of the Voice Mail Clerk.* In any job evaluation, the first step is an *analysis* of the job which is completed by identifying and understanding the tasks – duties and functions – performed by job holders as well as the skills and abilities required of them. Ordinarily the analyst will observe and interview the employee, his or her immediate supervisor, and other relevant individuals.

In this case, the job analysis was actually completed by the immediate supervisor of the Voice Mail Clerks, Jackie Westbrook-Forte, who sought to have the Voice Mail Clerks classification changed from General Clerk to Special Clerk through what is known as a Job Evaluation Request Form (CX 1, hereinafter, "JER"). Westbrook-Forte's effort was endorsed by the group manager, Randolph

Harrison, the HR Business Partner, Candy Caldwell, and the Business Unit Vice President, Levi Nigg.[8]

The JER identified essential functions of the Voice Mail Clerk as:

- Process and complete Voice Mail requests, additions and changes to corporate employees.
- Handle and complete Voice Mail requests from the corporate web.
- Process and complete additions, deletions, and changes to nodes (exchanges) on our Voice Mail network.
- Handle verbal requests from corporate clients though the Automated Call Distributor
- Perform projects that have to do with system cut-overs and installations on an as needed basis.
- Performs other duties as requested.

Philip Payblas, an employment specialist at Verizon, described the five criteria he uses to make a determination regarding the classification of a title – the analytical part of the job, the thought process needed, the "technicality" of the job, the need for independent judgment, and the amount of training that is needed to perform the job (Mac1 Tr 247-248). In this particular case, Mr. Payblas testified that he did not interview the incumbents in person nor did he make a physical inspection. Instead, he relied entirely on the JER which had been prepared by Westbrook-Forte (Mac1 Tr 260). Mr. Payblas was a key member of the team that decided against the change thereby denying Westbrook-Forte's request to upgrade the job to Special Clerk per the JER.

A critical part of his testimony follows (Mac1 Tr 263-265):

Q: Now, what is it about the special clerk that makes them a special clerk as opposed to a general clerk?

A: They have self direction. There's more analyzation of information. And again, the independent judgment, you know, the self direction of making those decisions.

. . . . . . .

Q: How do you get over that hurdle to the special clerk level?

---

[8] Westbrook-Forte's supervisor, Randolph Harrison, testified that it was actually a team effort with a group of managers and supervisors having a role in the development of the JER. As immediate supervisor, Westbrook-Forte signed off on it. He indicated that none of the Voice Mail Clerks had been involved in the preparation of the JER, however. (Mac3 Tr 103.)

A:    Well, we're looking for, you know, where there is a great deal of decision-making, you know, that person is making, you know, judgments based on information they receive.

In this situation with the general clerk, we felt more like the information was provided to them and they were to process a request or, you know, input information into a system to provide the product or service in this situation,

Q:    So your thinking was that they were really getting information from outside sources, looking up information in the computer and imputing information into the computer

A:    Um-hum

Q:    Almost like a data entry function?

A:    Um-hum

Q:    But they weren't really proactively trying to gather information, nor were they proactively trying to analyze problems in order to come up with a solution based on a variety of potential options

A:    No.

The testimony of Voice Mail Clerk Bridget Plonk concerning her work was at considerable variance from the assumptions reflected Mr. Payblas's testimony. Plonk's testimony did not contradict the JER prepared by her immediate supervisor but it did supplement what was in the JER. Ms. Plonk, who filed the original grievance in this matter, testified that the trigger for her grievance was her discovery that her Voice Mail Clerk job was described in a job opening announcement merely as "data entry" (Mac1 Tr 84, UX 6). Contrary to such a characterization, she testified that her supervisor in the late 1990's, Brenda Moses, had delegated a number of tasks related to voce mail boxes to the Voice Mail Clerks. The clerks no longer merely built, modified, and deleted mailboxes by entering data into a set of screen menus from paper mailbox orders. These extra tasks, which were integrally related to building, modifying and deleting voice mailboxes, included node modification, building pager sequences and troubleshooting (Mac1 Tr 81).

Ms. Plonk testified that the Voice Mail Clerks also man the automatic call drop (ACD) system taking calls from clients (Verizon employees nationwide) who are experiencing problems with their voice mailboxes. Again, this function has expanded over time. Although historically, the clerks merely took notes and passed along the problems to someone else, since the late 1990's, under the guidance of Ms. Moses, they have engaged in troubleshooting with the clients during these calls. Such calls obviously interrupt whatever the particular clerk is working on at the time.

When a customer's call drops through the ADC system to Plonk, she attempts to diagnose the customer's mailbox problem. This can involve trying different actions to recreate the problem. Some of the problems she deals with are the failure of the "stutter" tone or message light to indicate there are mailbox messages waiting; failure of the phone to roll over into the mailbox; mailbox disappearance and loss of messages; failure of pagers to respond; and most important, that the customer did not get a mailbox that they expected to be set up. Obviously, some of these problems are quite serious and can be dysfunctional in the extreme for those affected.

To correct such problems, Ms. Plonk relies on the ProComm program on her desktop. The answers are not obvious, and she is frequently required to try different solutions. After eliciting as much information from the customer as possible, she can usually correct the problem but occasionally she has to confer with her co-workers to get their advice and ideas (Mac1 Tr 121-122). Sometimes she has to call and coordinate with a tech for external problems that are beyond her control. There is no one procedure that is used to diagnose and correct problems. Where there are alternative explanations for a problem, she tries the easiest and fastest first. If more complex solutions do not work, then she confers with her co-workers and supervisor.

Sometimes problems are caused by the customer, himself, when he inadvertently turns off his pager or otherwise changes the settings on his mailbox. Diagnosing that possibility and courteously walking the customer through the steps necessary to correct the problem is also a regular part of troubleshooting the ACD calls that come in.

The most typical request Plonk receives is a request to build, modify or delete a voice mailbox. Such requests come by e-mail or fax. What Plonk's testimony clarified is that even this most common part of the job is not the same as it was in 1995. That is, while she simply did "point and click" in the earlier days, now when the procedure does not produce the intended results, she herself researches the problem and attempts to solve it rather than passing it along to her supervisor. Plainly, although the essential function – "Process and complete Voice Mail requests, additions and changes to corporate employees" – listed on the JER is completely accurate, its meaning has changed substantially over time.

Another of the essential duties is "Handle verbal requests from corporate clients though the Automated Call Distributor." This function initially required only that Plonk take messages and pass them along to her supervisor, but over time, it too has evolved to the point where she actually performs troubleshooting

-43-

and solves most of the requests, herself. Plonk indicated that in using the "CDR" function to deal with customer mailbox problems, she can actually see inside a person's mailbox, identify who called, when calls were retrieved, and look at pager records to see who called, so she obviously has access to highly confidential information of both a corporate and personal nature.

Plonk is also assigned "projects" involving the migration of groups as large as an entire department on occasion. Node work (effectively building a new exchange or modifying and existing one) is sometimes required when migrations occur in order to "provide room" for the new mailboxes in the system. Such work requires coordination with others outside her department including project managers in other parts of the country. Often, in connection with such work, there may be a deletion of a large batch of mailboxes. In such situations, Plonk testified that she did maintenance work such as "garbage collects" (Mac1 Tr 91). This requires her to identify and remove old or obsolete information from the system as voice mailboxes are deleted. Other tasks include collecting space left on systems for mailboxes, and "clearing" NameNet problems – correcting problems with the system that records and holds a person's name.

Ms. Plonk testified that her original set of tasks in the mid-1990's included only the routine building, modifying and deleting of mailboxes based on e-mail or fax requests. But beginning in 1997, Ms. Moses began to delegate the above types of tasks that Moses herself had previously performed to the Voice Mail Clerks (Mac1 Tr 96). Moses introduced "little" workshops to train the Voice Mail Clerks on the new tasks. Initially, when Moses assigned such tasks to an individual, the clerk was given temporary assignment (TA) pay for it. Sometime in 1998, however, the TA pay stopped although the duties continued to be assigned (Mac1 Tr 98).

Training others is also an occasional duty. After the merger of NYNEX into Verizon, she went to New York to train the new Verizon personnel. She received TA pay for that. Recently, however, she has been training former GTE personnel in the same skills from her workstation. She has not received extra compensation, however (Mac1 Tr 144).

Some of Ms Plonk's responses to questions about the RCMAC Clerk job brief give further insight into her job. Although part of the RCMAC job is similar to hers, the RCMAC Clerk job is more demanding because RCMAC Clerks must translate among several systems of acronyms and rely on other systems such as MARCH to complete their mailbox work. Like the RCMAC Clerk, however, Ms. Plonk is required to coordinate service activity projects and cut-overs with techs and cus-

-44-

tomers. Moreover, she is required to prioritize her work on a daily basis because she receives requests for service from a number of sources including her supervisor. While she is in the middle of one task, she receives another assignment from a customer phone request, a fax or an e-mail. It is left to her to decide which has priority. Another element of her work involves contact and coordination with the vendor of the Voice Mail system – Lucent. As changes are made in customer services, the Voice Mail Clerks must coordinate the tasks for which they are responsible with the vendor (Mac1 Tr 181).

With respect to pager sequences, Ms. Plonk must determine the sequence herself based on the client request (Mac1 Tr 206-207). There are patterns but in any given instance a new sequence might have to be developed. She testified,

> A: What we would generally do is call the pager and . . . listen to it. . . . So when we build the sequence we are listening to how long it takes from the time we call the pager telephone number until the time the pager tells us what to do. If the pager has a code, . . . we're telling it to stop with the pound, stop again and then delete.
>
> Q: So is there anything that tells you there are seven pauses in there?
>
> A: Well it's just a knack. You get the ear for it. You listen to your pager.

Finally, Ms. Plonk testified that the General Clerk job brief does not fully reflect what she does. It makes no provision for the maintenance work she does on the node system, voice mail system, the paging system or any of the troubleshooting work she does. Nor is there any reference to the "garbage collect" work or maintenance of the NameNet system. She reviewed the job brief of the Maintenance Administrator (UX 4) who, for reference, is several job grades above General Clerk (Mac1 Tr 226). She indicated that she performs a number of parallel functions including: acting as the customer's representative in resoling problems with other departments; screening trouble reports; and routing customers to places where their problems can be resolved based on her experience. There are no guidelines for these activities. She also uses her computer to track down trouble. She contacts customers by phone to verify trouble and negotiates with them concerning how and when problems or orders can be resolved. Sometimes the customers she deals with are irate.

On cross-examination, Ms. Plonk testified that 80 percent of her time was spent building, changing, and deleting mailboxes (Mac2 Tr 8). This statement has led to considerable misunderstanding in the record of this matter. In reality, according to her Department Manager, Randolph Harrison, this number should be closer to 95 percent (Mac3 Tr 87) because this is her essential job function.

Unfortunately, Plonk's statement was taken out of context or interpreted to mean that 80 percent of the time she was engaged in the simplistic 1995 version of building mailboxes based on fax or e-mail requests. Plainly, as her cross examination proceeded, it became clear that "building mailboxes" became more challenging and complex after Ms. Moses began to delegate some of her functions to the Voice Mail Clerks about 1997. Ms. Plonk continued that her estimate included "[d]oing everything . . . you can't really put an estimate on how many boxes we are going to build on a particular day." (Mac2 Tr 8)  She further stated that she never knows from one day to the next what she will be doing (Mac 2 Tr 9).  She was asked (Mac2 Tr 10-12),

Q: . . . I am trying to take out a broader view than just what you would be doing tomorrow . . . to the extent that you can break it out.  So when you say that the ACD – for example, is there ACD work that's separate and apart from what you do, building mailboxes, deleting.

A: Hum-um.  All of it is the same.  [The arbitrator interprets this to be a "No."]

Q: It's all part of the same . . .

A: Yes.

. . . . . . .

Q: Okay, give me some example of the individual projects that you would work on.

A: Well, we might have a project where we are deleting a number of mailboxes. We might have a project where a department is moving and we have to input their mailboxes.  We might have a department where the people are moving around or just changing desks.  And it might be over 100 people so we might be transferring mailboxes.

You might have where someone is moving from one location to another so they are getting brand-new mailboxes.  Then you might have something dealing with the nodes as far as putting in a number of exchanges for migrations or conversions or something like that.  But it all depends.

Q: But from what you just described, it sounds like the vast majority of that work is also in connection with building, moving, changing mailboxes.

A; Um-hum.  ["Yes.]

*Conclusions with respect to Voice Mail Clerk job analysis.*  A job analyst must exercise care in interpreting what an employee says about his or her job.  This is not only because it is in the employee's interest to embellish somewhat the roles they play, but the employee obviously does not have the perspective that the analyst or members of management might have.  Here, however, weight must be given to Ms. Plonk's testimony because it is clear that changes have occurred that even her

department manager acknowledges he is not fully aware of. Randolph Harrison was asked about the changes that had occurred in the Voice Mail function over time. He emphasized the increase in volume and workload which obviously puts a strain on the Voice Mail Clerks' immediate supervisor and is what undoubtedly led to greater delegation of what were formerly supervisory tasks to the clerks. As to substantive changes, he said he was not aware of any but admitted, "I mean, there could be some things but that is handled on a day-to-day basis by their team leader." He further indicated, "I know the node building has escalated and there has been more of that because of all of the mergers and the building out of the system. But . . . building of the nodes has pretty much been the same as far as how it is done." (Mac3 Tr 78-79) Since the Voice Mail Clerks' immediate supervisor did not testify, the only witness with a bird's eye view of what goes on at the workplace was Ms. Plonk.

The job analysis prepared by Supervisor Westbrook-Forte that is contained in Sections A and B of the Associate Job Evaluation Request Form (CX 1, p 2-3) is certainly not inaccurate, based on Plonk's testimony, but it does allow incorrect inferences about the level of what Voice Mail Clerks do on a daily basis. For example, the first two statements under General: "Process and complete Voice Mail requests, additions and changes to corporate employees" and "Handle and complete Voice Mail requests from the corporate web" could be interpreted, as Mr. Payblas testified, to mean that the Voice Mail Clerks are simply presented with paper or e-mail requests for voice mailbox additions, modifications or deletions, and that they merely enter the necessary data into the screen menus on their desk top computers to comply with such requests. In a perfect world, this might be a simple task. In the real world though, based on Ms. Plonk's unrefuted testimony, every one of these mailbox tasks involves a potential complication, e.g., on rare occasions node work may be required, or it may involve pager sequence building, or some other kind of troubleshooting. Moreover, after the action is completed, some clean-up ("garbage collect") may be advisable or required to make the system function properly. Although only a minority of voice mailbox orders may require such actions, they are generally unpredictable. These are the tasks that migrated over to Voice Mail Clerks from Ms. Moses. It takes training, experience, and perseverance to recognize and resolve the variety of complications that may arise in this task, and these character-istics are more typical of skilled work than semi-skilled work, where most operations are routine and unchallenging.

The statement, "Handle verbal requests from corporate clients through the Automated Call Distributor (ACD)" may be misinterpreted to mean that the Voice Mail Clerk merely takes down information and passes it along to others who resolve the difficulty being reported by the client. Although the ambiguous term – "handle"

-47-

– often implies such limited input, such an interpretation would be a completely inaccurate reading of what Voice Mail Clerks do, however, based on Ms. Plonk's testimony. According to Ms. Plonk, the Voice Mail Clerks actually *resolve* most of the ACD calls through troubleshooting on the basis of their experience. Finally, the statement "Perform projects that have to do with system cut-overs and installations on a (sic) as needed basis" does not reflect the degree to which Ms. Plonk and her colleagues are responsible for *coordinating* the actions of technicians as well as clients to assure a smooth transition from one location to another for the client.

Several conclusions follow. First, a fair understanding of what is involved in Voice Mail work leads to an appreciation of the value the Voice Mail Clerks add to the Company when they are effective and efficient in the performance of their jobs. Plainly, a failure to resolve ACD calls efficiently would create unnecessary down-time and inefficiencies for the clients and their organizations. Similarly, the ineffective coordination of project work would lead to inefficiencies across large groups of Company employees. Mistakes could cause substantial losses in time and performance for individuals or groups of clients.

Second, although training is largely informal, along with experience, it is essential for effective performance of a Voice Mail Clerk. It is no coincidence that Ms. Moses, the first supervisor of this group did not begin to assign the more complex aspects of voice mail work to the clerks for several years. Although increased work volume was perhaps the motivator, the enabler of task migration from Moses to her subordinates was their acquisition of experience in the job. Ms. Plonk's statement with respect to knowing how to sequence a pager, quoted above, is illustrative of much of this work: "Well it's just a knack. You get the ear for it." In short, the learning curve for this job is much longer than the mere week or two that it takes to learn how to input the data to create a new voice mailbox.

An additional conclusion that follows from the above is that the percentages of effort reflected under "Tasks Performed" in the JER (p 3), and also in Bridget Plonk's testimony (Mac2 Tr 8) are largely irrelevant. The so-called "extra tasks beyond building voice mailboxes", such as node work, project work, and responses to ACD calls are in no way separate and distinct, or "beyond building mailboxes". Rather they are an integral part of effective and efficient mailbox building and maintenance. This is the point that Ms. Plonk was making when she responded that the work could not be separated out – it was "all part of the same" effort (Mac2 Tr 10). So what was formerly the straightforward General Clerk task of building, modifying and deleting mailboxes has become a more complex task.

-48-

The above findings are not dispositive of what the appropriate classification for Voice Mail Clerks should be. A consideration of how the job compares with the job briefs for both General Clerk and Special Clerk, particularly with regard to experience and training requirements, responsibility, and working conditions is necessary for such a determination.

2. *Training and experience requirements.* Based on the testimony of Ms. Plonk, initially in 1995, the training received by Voice Mail Clerks was limited to on-the-job, informal training. Nevertheless, although Ms. Plonk made the comment, "I trained myself" (Mac2 Tr 12), it is clearly a misinterpretation of that remark to conclude that some Voice Mail Clerks, "receive no training whatsoever and simply train themselves" as the Company brief asserts (at 4).

Mr. Harrison explained in response to a question about classroom training, "No. We are fairly unique within the Company and kind of train internally. It's pretty much on the job." (Mac3 Tr 81). He went on to indicate that the 10 or 12 clerks within his voice mail function cover all of the needs of the Company and no one else in the Company performs the same duties or functions. This small number explains why there is no formal classroom training or even computer based training specifically aimed at the Voice Mail Clerks. The economies of scale do not exist.

New Voice Mail Clerks sit with incumbents for two weeks to gain an understanding of the job and use of the computer based menus of the ProComm program. Ms. Plonk also attended a week of training provided by the vendor at the "Octel University" which is apparently off site. As mentioned previously, Ms. Moses also arranged her own series of "little" workshop training sessions which she conducted in order to instruct the Voice Mail Clerks on the more complex aspects node building and modification, pager sequencing, and "garbage collect" (Mac1 Tr 97).

The Company, in its brief, argued that almost every aspect of the Voice Mail Clerk's job, including the more complex tasks that are above the level of a General Clerk, is menu driven – "point and click" work. The implication is that the job could not therefore be very complex. After deciding to do a "garbage collect", for example, the clerk need only go to the proper menu, point and click. Likewise, "troubleshooting" efforts are limited to correcting erroneously entered data by simply following a trail of preset screens and drop-down boxes. Even the task of building sequences for pagers follows an established set of methods and procedures.

-49-

The fact that much of the work is menu driven is certainly true, but it begs the question of how a Voice Mail Clerk comes to know which choice to make on a menu, or which letter of a pager sequence code must be selected. At a General Clerk level, very little thought is needed. That is, the clerk merely reads from a document or is otherwise instructed on which choice to make. Here, even if, for the sake of argument, there are a limited number of choices at any point in the process of troubleshooting, generating a pager sequence, or performing a "garbage collect", it takes time and experience to learn what is necessary in order to accomplish the task at hand efficiently and effectively. This is why these tasks were originally assigned to a supervisor. Moreover, there are simply a lot of different tasks, each with its own unique elements. The arbitrator is persuaded that with the level and extent of knowledge required, this factor points to the Skilled 1-B Clerk classification as being more appropriate than the Semi-Skilled Clerk Classification.

The fact that most of the training is on-the-job and is primarily experience driven in no way undermines the fact that a substantial amount of training and experience is necessary to become a fully proficient Voice Mail Clerk. The arbitrator is mindful of the fact that in most job evaluation systems, it is the level of training and experience required to enter the job that is ordinarily the principal basis for determining the degree of a compensable factor. This will be considered in fashioning the award in this matter. The arbitrator is also mindful that Ms. Westbrook-Forte indicated in the JER (p 4) that the minimum time to learn to perform the job satisfactorily was only two weeks. Undoubtedly her time frame was based on how long it would take for an individual to pick up the basic skills to build, modify or delete mailboxes where there are no complexities requiring the use of node building, pager sequencing, or "garbage collect" and no troubleshooting, i.e., about the level of skill that one might have been expected to have in 1995. It is apparent, however, that full proficiency for the job in 2007 could not be attained within two weeks since Ms. Westbrook-Forte indicated that at a minimum another week of vendor training ordinarily follows (CX 1, p 4). Moreover, based on the preceding discussion of the job analysis, it is plain to the arbitrator that one would need many months on the job to experience all of the various challenges that might arise and to become fully proficient.

In conclusion, the arbitrator does not disagree with the identification of the fourth degree of "Knowledge of Methods and Procedures" (JER, p 3) identified by Ms. Westbrook-Forte. That is, the job requires a "[t]horough degree of knowledge in a specific working area. Some technical expertise required." This level of proficiency is consistent with the Skilled or Special Clerk classification.

*3. Responsibility.* The closeness of supervision, impact of error, and access to confidential information are important factors in evaluating any job. In the JER these issues are covered on page 6, "Instructions, Guidance and Accuracy."

<u>Supervision.</u> Joseph Pankoski, Senior Staff Consultant in Labor Relations for over 14 years, testified that in making classification decisions involving Semi-Skilled and Skilled clerical titles, the Company considers the critical distinction to be the level of "responsibility involved". More specifically (Ger Tr 210-211):

> In general terms, for the typical general clerk, you would expect that they would be able to take an existing process and perform that process quickly, efficiently and accurately.

> For a special clerk, you would be able to expect that you could give them a problem and that they would put together a process in order to solve that problem and provide whatever information or conclusions we were looking for.

Mr. Payblas testified in the first Mackenzie hearing about what distinguishes a Special Clerk from a General Clerk (Mac1 Tr 263-265, quoted above at 43-44). In particular, he cited self-direction, the clerk's analysis of information and use of independent judgment. Although all clerks have some responsibility for self direction, analysis and independent judgment, the Special Clerk would engage in a "great deal of decision-making" and judgment based on the information they receive.

As noted above, Mr. Payblas and his team concluded that all necessary information was provided to the Voice Mail Clerks from customers or supervisors via paper or e-mail requests and that they simply processed the information by inputting it into their computers, much like a data entry function. The unrefuted testimony of Bridget Plonk, however, showed that the original voice mail supervisor, Brenda Moses, had delegated a number of her tasks to the Voice Mail Clerks. After receiving instruction from Moses, the clerks, independent of any direct supervision from Moses, began to work on nodes – adding and deleting exchanges, building pager sequences, and troubleshooting problems brought to them through calls that dropped to them through the ACD system. Moreover, Voice Mail Clerks are required to prioritize their own work almost continuously (obviously without supervision) in order to respond to ACD phone requests from customers.

It is apparent that Voice Mail Clerks exercise a great deal of independent judgment particularly as they work through the problems presented through the

-51-

ACD system, but also with respect to when and how to modify nodes, how to construct pager sequences, or in their "negotiation" with project managers concerning cut-overs and other activities related to the projects they are assigned. In short, although Jackie Westbrook-Forte indicated that the Voice Mail clerks work under general supervision, since they do have some latitude in their decision making, it is probably more accurate to characterize their degree of self direction in the next higher category – "Work is performed under moderate supervision. Some latitude for decision making."

Impact of error. Ms. Westbrook-Forte indicated on the JER (p 6) that "Error would result in loss of employee and other's time with the work group to correct." On the basis of the job analysis discussion above, however, it is clear that mistakes could cause substantial losses in time and performance for clients or groups of clients throughout Verizon. Although losses are not likely to be catastrophic, it is clear that the next degree of required accuracy is more appropriate, i.e., "Error may impact a single department or phase of company activities."

Access to confidential information. Ms. Plonk indicated that in using the "CDR" function to deal with customer mailbox problems, she can actually see inside a person's mailbox, identify who called, when calls were retrieved, and look at pager records to see who called (Mac1 Tr 117). Although an ordinary level of confidentiality undoubtedly exists for any employee who works for a telephone company, access to such personal confidential information in someone's voice mailbox is extraordinary. To have access even to the names of persons who called a customer, and when, alone, is a significant piece of confidential information. Such level of access to potentially sensitive information is beyond what can ordinarily be expected for a General Clerk.

Summary. With regard to all three dimensions of responsibility, an admittedly important differentiator between semi-skilled and skilled clerks, it is apparent that the skilled classification is more appropriate for experienced Voice Mail Clerks although for less experienced clerks, who undoubtedly need more assistance from co-workers or supervision, it is not as apparent.

*4. Working conditions.* Here, the physical working conditions are generally pleasant but a significant factor affecting working conditions is the stress related to the ACD system. Clerks are interrupted by calls that are dropped to them. They lose the autonomy of controlling their work. Some of these calls may simply be requests for changes in voice mailboxes or messaged that must be forwarded on to others, but some may be complaints from upset customers or reports of problems

with mailboxes. Ms. Plonk testified that the Voice Mail Clerk's responsibility is to try to resolve the customer's problem and if that fails, the clerk must know where the customer should be referred for further assistance.

Ms. Westbrook-Forte lists in the JER (p 5) that mental effort is required to meet customer requirements on short notice and that the Voice Mail Clerk must work with Verizon project managers to complete voice mail projects throughout the Company. In this regard, a General Clerk's duties include: "Answering phones and taking messages"; "Interacting with the public, outside vendors, customers and/or other employees"; "Heavy client interfacing at all levels of management". Among the Basic Requirements is, "May be required to have face-to-face contact with the public. Excellent interpersonal skills required." (CX B) On the other hand, the Special Clerk's duties include: "Communicating with customers, outside business firms or employees in other departments to accomplish tasks"; "Processing work to meet deadlines"; "Handling high volume of detailed work". (CX C) The last of these is precisely on target with respect to the Voice Mail Clerk. Moreover, the factor that stands out here is that Voice Mail Clerks do much more than merely "answering phones and taking messages" which is the level of task required of General Clerks. Moreover, with respect to project work, they are required to coordinate their work with others (e.g., Project Managers) which implies they are required to meet deadlines as well. This is in line with the Special Clerk duties.

Thus, on balance, at least for experienced Voice Mail Clerks, this factor would appear to be more compatible with the Special Clerk at the Skilled Level than the General Clerk at the Semi-Skilled Level.

*5. Summary.* On the basis of the above analysis it is plain that the level of the work performed by an experienced Voice Mail Clerk like Ms. Plonk should be classified at the Skilled Clerk level. The level of training, and particularly experience, is comparable to the training and experience of a skilled Special Clerk and well above that of a semi-skilled General Clerk. Further, both the level of responsibility and job stress due to the ACD calls and deadlines for project work are also comparable to the levels of a Special Clerk.

The Company brief twice cites the statement by Union President Pappas that Voice Mail Clerks "weren't really doing special clerk work" (Ger Tr 7). The arbitrator notes that this was said in a context where Mr. Pappas went on to say that as the Voice Mail Clerks described their jobs, he was reminded of RCMAC Clerks, a classification *above* Special Clerks, and that apparently is what led to the

-53-

Union's initial grievance demand that the Voice Mail Clerks be reclassified as RCMAC Clerks. It is apparent that what Pappas meant by his remark was that the specific tasks or duties performed by Voice Mail Clerks were not similar to the specific tasks or duties of any Special Clerks he knew. Such a statement in no way implies that Pappas did not think the work of Voice Mail Clerks was of a *skilled* nature. If he had not thought of it as being at least skilled, he would not have thought about the appropriateness of the RCMAC Clerk title which is even higher – at the "technical" level.

In summary, with respect to the specific tasks performed by Voice Mail Clerks, determining whether node work is necessary and deciding what and how to do it, building pager sequences, troubleshooting both voice mailbox and pager malfunctions, investigating and clearing error codes, running reports to diagnose trouble, coordinating with managers in other departments on project work and doing all of this without immediate supervision clearly places this job in the Skilled Clerk (Wage Schedule 22) category.

## F. Remedy

In light of the learning curve for becoming fully proficient in all of the tasks performed by experienced Voice Mail Clerks in creating, modifying, maintaining and deleting voice mailboxes, the current Voice Mail Clerk job title must be retained in Semi-Skilled 2-B Clerk Wage Schedule 21 for all newly entering associates performing corporate voice mail work. During their first two years on the job, Voice Mail Clerks cannot be expected to have mastered all of the nuances of voice mail work. During their first two years on the job, however, they should be afforded the opportunity to learn all the more complex elements of voice mail work including node building and maintenance, building pager sequences, performing "garbage collects", project management, troubleshooting including how to work with the CDR function for internal examination of voice mailboxes and other advanced tasks related to building, modifying, maintaining, or deleting voice mailboxes. Upon the completion of *two actual years of service*[9] as a Voice Mail Clerk, current Voice Mail Clerks, as well as those appointed hereafter, should be allowed to apply for and immediately be promoted to the Senior Voice Mail Clerk job title.

---

[9] The arbitrator's intent is to assure that Voice Mail Clerks have two years of experience performing Voice Mail tasks, so that time away from the job for any reason should not be counted toward the two actual years of service requirement for achieving the Senior Voice Mail Clerk title. Any long term absence of more than a month, or cumulative absences exceeding a month over the two year period, should lead to an adjustment of the eligibility date for Senior Voice Mail Clerk status.

The job title of Senior Voice Mail Clerk (Skilled 1-B Clerk Wage Schedule 22) should be created immediately. In addition to the duties and functions of the Voice Mail Clerk, a Senior Voice Mail Clerk should be completely proficient in:

- Creating, modifying, maintaining, or deleting nodes (exchanges)
- Building pager sequences
- Performing "garbage collects"
- Managing assigned projects
- Troubleshooting voice mailbox/pager problems
- Other advanced tasks related to the corporate voice mail system

All current Voice Mail Clerks with two or more years of *actual service* in that title should immediately be offered the opportunity to upgrade to the Senior Voice Mail Clerk job.

*Effective date.* Inasmuch as the upgrade of experienced Voice Mail Clerks should have taken place in 2001, the effective date of the creation of the Senior Voice Mail job title shall be December 9, 2001, the date of the Union's grievance in this matter. Any Voice Mail Clerk with two or more years of actual service as of that date should receive a pay adjustment reflecting the difference between what they have actually earned since that date and what they would have earned had they been properly classified as of that date. Any Voice Mail Clerk who achieved two years of actual service after December 9, 2001, should receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk.

The arbitrator is mindful of the admonition in Article 16B.1(f) which asserts that "in no event shall the retroactive effect exceed 150 days." Had the Company not violated the Agreement as found by Arbitrator Mackenzie, and had the Company properly notified the Union of the changes in the Voice Mail Clerk job in response to the Union's December 2001 grievance, and had the matter been processed and ultimately referred to a "neutral third party" as required by Article 16B.1(e) and (f), a decision by the neutral third party would have been rendered on or about May 9, 2002 which is 150 days after December 9, 2001. Thus in the absence of the contractual violation by the Company, this neutral third party award would have been effective on December 9, 2001, fully within the boundaries of retroactivity prescribed by the Agreement. It would shock the sensibilities of any reasonable person if the Company were allowed to benefit from its own breech of

the Agreement, as found by Arbitrator Mackenzie, particularly since it violated the very Article of the Agreement that it now seeks to use to limit the contractually agreed-upon remedy in this matter.

Having considered all of the evidence and argument in this matter, the arbitrator, in accord with the remedy outlined above, awards as follows:

## AWARD

1. The existing Voice Mail Clerk job title shall be retained in Semi-Skilled 2-B Clerk Wage Schedule 21. All existing Voice Mail Clerks and all newly hired Voice Mail Clerks shall be assigned to such title and classification until they attain *two actual years of service* as Voice Mail Clerks. (See footnote 9, supra.)

2. During their first two years on the job, Voice Mail Clerks shall be allowed the opportunity to learn all the more complex elements of voice mail work including node building and maintenance, building pager sequences, performing "garbage collects", project management, troubleshooting including how to work with the CDR function for internal examination of voice mailboxes and other advanced tasks related to building, modifying, maintaining, or deleting voice mailboxes. Upon the completion of *two actual years service* as a Voice Mail Clerk, current Voice Mail Clerks as well as those appointed hereafter may apply for and shall be immediately promoted to the Senior Voice Mail Clerk job title.

3. The job title of Senior Voice Mail Clerk (Skilled 1-B Clerk Wage Schedule 22) shall be created immediately. In addition to the duties and functions of the Voice Mail Clerk as presently defined, a Senior Voice Mail Clerk shall be completely proficient in:
   - Creating, modifying, maintaining, or deleting nodes (exchanges)
   - Building pager sequences
   - Performing "garbage collects"
   - Managing assigned projects
   - Troubleshooting voice mailbox/pager problems
   - Other advanced tasks related to the corporate voice mail system

4. All current Voice Mail Clerks with two or more years of *actual service* in that title shall immediately be offered the opportunity to upgrade to the Senior Voice Mail Clerk job.

5. Any Voice Mail Clerk with two or more years of *actual service* as of December 9, 2001 shall receive a pay adjustment reflecting the difference between what she (or he) actually earned and what she would have earned had she been properly classified as of that date. Any Voice Mail Clerk who achieved two years of *actual service* after December 9, 2001, shall receive a pay adjustment from the date on which they attained two years of actual service as a Voice Mail Clerk.

_____
ARBITRATOR

Grand County, Colorado
May 30, 2007

-57-

# GENERAL AGREEMENT

Between

    

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2003**

Exhibit B

**UNION-MANAGEMENT RELATIONSHIPS**

A JOINT STATEMENT BY
COMMUNICATIONS WORKERS OF AMERICA

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2003**

**August 3, 2003**

**TO MANAGEMENT AND ASSOCIATES:**

The Communications Workers of America is the recognized bargaining representative for all employees in the collective bargaining unit described in the General Agreement between Verizon Washington, DC Inc., Verizon Maryland Inc., Verizon Virginia Inc., Verizon West Virginia Inc., Verizon Services Corp., Verizon Advanced Data Inc. ("VADI"), Verizon Avenue Corp., Verizon South Inc. (Virginia) and Verizon Corporate Services Corp. (the "Companies") and CWA. This relationship carries with it serious obligations and responsibilities which the Companies and the Union are determined to fulfill. As a sign of good faith between them, the Companies and the Union have included in this General Agreement, Article 10 - Responsible Union-Company Relationship.

What is meant by a "Responsible Union-Company Relationship"? While Article 10 does not change or modify the intent or meaning of the other articles of the General Agreement, here are some examples that both the Companies and the Union agree upon:

1.  The Union's status as exclusive bargaining representative confers upon its Local and Union Representatives an equality of relationship with Company Representatives in the handling of appropriate matters between them. The Companies and the Union always will endeavor to deal reasonably and in good faith with the representatives of the other.

2.  There is no place in a relationship of mutual responsibility and respect for attempts to pull rank, or for words, written or spoken, or for other actions on the part of either Company or Union representatives which are intended or appear to belittle or undercut the representatives of the other party regarding any matter involved in the relationship. The Companies and the Union will do their best to see that this attitude is understood and practiced.

3.  Respect for the grievance procedure as a means for the orderly settlement of disputes and for the clarification of understanding in the application and interpretation of the terms of the General Agreement implies the genuine willingness of both parties to stand ready to find reasonable solutions to disputes before the procedure is invoked where feasible and prior to the conclusion of each succeeding step.

4. In their endeavor to administer the grievance procedure fairly, the Companies and the Union will afford each other's representatives an adequate opportunity to present each case properly and will give careful and respectful consideration to all views and facts presented. The Union agrees that the grievance procedure is not intended to be used and will not condone its use as an irritant or as a means of harassing management.

5. The Companies are not anti-union and the Union is not anti-management. Both parties believe that a strong and responsible Union that fairly represents employees will contribute more to the vitality and continued success of the business than will a weak and irresponsible Union. A member's loyalty to the Union or his participation in legitimate Union activities will have no bearing on his treatment as an employee. Both parties also believe that it is to the best interests of employees and their Union that the Companies are financially sound and provide the best possible service to their customers at all times.

6. The Companies and the Union affirm their responsibility to train and instruct their respective representatives in the meaning and spirit of the General Agreement to the end that their relations will be conducted in a businesslike manner at all times in an atmosphere free from harassment, attempted humiliation, browbeating or threats of intimidation.

In summary, the Companies and CWA pledge themselves to continuous and sincere effort to work together harmoniously each respecting the rights and viewpoints of the other, to resolve any disputes or misunderstandings which may exist or develop between them.

Verizon Washington, DC Inc.  
Verizon Maryland Inc.  
Verizon Virginia Inc.  
Verizon West Virginia Inc.  
Verizon Services Corp.  
Verizon Advanced Data Inc.  
Verizon Avenue Corp.  
Verizon South Inc. (Virginia)  
Verizon Corporate Services Corp.

Communications Workers  
of America

By _____  
Company Bargaining Chair

By _____  
Union Bargaining Chair

# GENERAL AGREEMENT

between

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2003**

**TABLE OF CONTENTS**

| Article | Page |
|---|---|
| 1. Recognition | 2 |
| 2. Collective Bargaining | 4 |
| 3. Payroll Deduction of Union Dues, etc. | 5 |
| 4. Agency Shop | 5 |
| 5. Union Bulletin Boards | 6 |
| 6. Information Furnished Union | 7 |
| 6A. Union Access to Employee Personnel Files | 8 |
| 7. Promotion or Transfer of Union Officers | 9 |
| 8. Union Activity on Company Premises | 9 |
| 9. Absence for Union Business | 10 |
| 10. Responsible Union-Company Relationship | 12 |
| 10A. Occupational Safety and Health | 13 |
| 11. Non-Discrimination | 14 |
| 12. Grievances and Grievance Meeting Procedure | 14 |
| 13. Procedures for Regular and Expedited Arbitration | 18 |
| 14. Pension and Sickness and Accident Disability Benefit Plans | 21 |
| 15. Federal or State Laws | 22 |
| 16. Basic Wage Schedules | 22 |
| 16A. Wage Start Rates | 23 |
| 16B. New Job Titles and Job Classifications | 24 |
| 16C. Team-Based Incentive Pay Plan | 26 |
| 17. Corporate Profit Sharing Plan | 26 |
| 18. Special City Allowance | 30 |
| 19. Differentials | 31 |
| 20. Union Representation | 32 |
| 21. Promotional Wage Adjustments | 32 |
| 22. Temporary Assignments | 35 |
| 23. Transfer and Reassignment | 36 |
| 24. Overtime and Sunday Practices | 42 |
| 25. Work Schedules and Changes in Scheduled Work Time | 44 |
| 26. Inclement Weather | 46 |
| 27. Emergency Call-Outs | 46 |
| 28. Travel Allowances, Travel Time and Expense Payments | 48 |
| 29. Reimbursement of Incidental Expenses | 52 |
| 30. Holidays | 53 |
| 31. Vacations | 56 |
| 32. Payments During First Seven Days of Sickness Absence | 61 |

**Table of Contents**
**(continued)**

| Article | Page |
|---|---|
| 33. Excused Time | 62 |
| 34. Seniority | 64 |
| 35. Force Adjustment, Layoff, Part-Timing and Rehiring After Layoff | 67 |
| 36A. Income Security Plan | 73 |
| 36B. Employment Security Training | 75 |
| 36C. Reassignment Pay Protection Program | 78 |
| 37. Termination Allowances | 79 |
| 38. Excused Work Days | 80 |
| 39. Contract Labor | 81 |
| 40. Definitions | 82 |
| 41. Cancellation and Duration | 87 |
| Exhibit I Authorization for Payroll Deduction of Amounts Equal to Union Dues | 89 |
| Exhibit II Negotiated Agreements on Job Duties | 91 |
| Exhibit III Pension Band Table | 100 |
| Exhibit IV Transfer Plan and Intercompany Job Bank | 101 |
| Exhibit V Broadband Network Employment Security Provisions | 106 |
| Exhibit VI Enhanced Income Security Plan | 111 |
| Letters of Understanding Index | 112 |

**WAGE SCHEDULES**

| Exhibit A | i-x |
|---|---|

THIS AGREEMENT, made this 3rd day of August, 2003, by and between Verizon Washington, DC Inc., Verizon Maryland Inc., Verizon Virginia Inc., Verizon West Virginia Inc., Verizon Services Corp., Verizon Advanced Data Inc., Verizon Avenue Corp., Verizon Corporate Services Corp., Verizon South Inc. (Virginia) (hereinafter referred to collectively as the "Companies," or individually as the "Company," which shall mean the employing Company) and Communications Workers of America, hereinafter referred to as the "Union."

## WITNESSETH:

WHEREAS, the Union hereby certifies to the Companies that a majority of the employees in the bargaining unit hereinafter defined are members of the Union and have designated the Union as their representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment; and

WHEREAS, the Companies are willing to recognize the Union as the exclusive bargaining representative of the employees in the said bargaining unit and to enter into a collective bargaining agreement with the Union as the representative of said employees; and

WHEREAS, the Companies and the Union have engaged in joint collective bargaining which has resulted in this Agreement resolving all issues in dispute;

NOW, THEREFORE, in consideration of the convenants and the terms and conditions herein contained, the parties hereto mutually agree as follows:

### Article 1. - Recognition

**SECTION 1.** The Companies hereby recognize the Union as the exclusive representative of all employees in the bargaining unit hereinafter defined for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment; provided that any individual employee or a group of employees shall have the right at any time to present grievances.

**SECTION 2**. The bargaining unit shall consist of:

(a) *Washington Area* - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, (1) employed by Verizon Washington, DC Inc., (2) employed by Verizon Maryland Inc. within the geographical portion of the Washington Metropolitan Area currently designated as the Washington Suburban Area-Maryland, (3) employed by Verizon Virginia Inc. or Verizon Avenue Corp. within the geographical portion of the Washington Metropolitan Area currently designated as the Northern Virginia Area, and (4) employed by Verizon Services Corp., Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within the District of Columbia, the Washington Suburban Area - Maryland, or the Northern Virginia Area.

(b) *Maryland Area* - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon Maryland Inc. or Verizon Services Corp., Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within Maryland, excluding employees who are located in that portion of the Washington Metropolitan Area currently designated as the Washington Suburban Area - Maryland.

(c) *Virginia Area* - All regular and temporary non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon Virginia Inc. or Verizon Services Corp. or Verizon Advanced Data Inc. or Verizon Corporate Services Corp. or Verizon South Inc. within Virginia, excluding employees within the geographical portion of the Washington Metropolitan Area currently designated as the Northern Virginia Area.

(d) *West Virginia Area* - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon West Virginia Inc. or Verizon Services Corp. or Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within West Virginia.

(e) Employees of Verizon South Inc. are limited to those (1) set forth in the "Transfer of Certain Verizon South Inc. Employees to the Potomac Bargaining Unit dated August 2, 2003"; and (2) Directory employees of Verizon South Inc. in Warsaw, VA, who are subject to modifications to this General Agreement set forth in General Agreement.

(f) Employees of Verizon Avenue are limited to Systems Technicians only.

**SECTION 3.** Those portions of the bargaining unit described in paragraphs (a), (b), (c) and (d) of Section 2 above shall hereinafter be referred to as the "Washington Area," "Maryland Area," "Virginia Area," and "West Virginia Area," respectively.

**SECTION 4.** A copy of the General Agreement with wage schedules applicable to the appropriate Area shall be furnished by the Company to each employee in the bargaining unit. The Company will provide the Union with a copy of the contract between the Communications Workers of America and the Companies in the word processing format that the Company generally uses at the time new contracts are printed.

**SECTION 5.** Within fifteen (15) days of his initial employment by the Company, a new employee will be introduced to a Local Representative by his supervisor for purposes of permitting the Local Representative to provide the employee with information about the Union. As an exception to the provisions of Article 8, which prohibit Union activity during work time, the Local Representative and the new employee may be released for up to one-half (1/2) hour of paid work time, provided the time taken is during the employee's and Local Representative's assigned tours. The discussion between the Local Representative and the employee shall be conducted away from space where Company operations or administrative work is performed, as required by Article 8.

The Company will advise a Local Representative within fifteen (15) days of an employee's transfer into a work group.

### Article 2. - Collective Bargaining

**SECTION 1.** The Companies and the Union agree to keep each other informed, in writing, regarding the names of their authorized representatives on their respective Collective Bargaining Committees.

**SECTION 2.** Negotiations concerning the interpretation of this Agreement (except those involved in grievances) and negotiations concerning matters for which the Union is recognized for purposes of collective bargaining shall take place only between the Collective Bargaining Committee of the Union (which shall not exceed eight (8) members) and the Collective Bargaining Committee of the Companies. If agreements are reached in these negotiations modifying the provisions of this Agreement or covering conditions not contained in this Agreement, they shall be reduced to writing in the form of an addition or amendment to this Agreement and signed by the authorized representatives for both the Union and the Companies.

**SECTION 3.** Meeting for negotiations, as provided in the preceding section, shall be held upon request of either party at a time and place agreeable to both parties. Local Representatives on the Union's Collective Bargaining Committee who are active employees of the Company shall be excused with pay on each day they participate in meetings with the Companies' Collective Bargaining Committee. Pay for attendance at such meetings shall not exceed the employee's normal work week at the employee's basic weekly wage.

**SECTION 4.** The Union will notify the Company in writing of any changes in its roster of Officers, Representatives and Job Stewards, including their alternates, within thirty (30) days after the date of such changes.

**SECTION 5.** The Company will provide the Union with copies of notices which it issues concerning changes in its management organization up through the department head level as soon as practicable after such notices are issued.

**SECTION 6.** It is the intention of the parties, with respect to the collective bargaining of future replacing agreements, to conduct their negotiations thereon in such a manner as to reach a new Agreement on or before the termination date of this present Agreement.

### Article 3. - Payroll Deduction of Union Dues, Etc.

**SECTION 1.** The Company shall deduct from the pay (including sickness or accident disability payments) of employees, all applicable Union initiation fees, regular membership dues or "amounts equivalent thereto" upon receipt of properly executed authorizations signed by the employee for whom deductions are to be made, delivered to the Company at least ten (10) days prior to the date the first deduction is to be made. The Company will continue to honor effective dues deduction authorizations on file with the Company as of the effective date of this Agreement in accordance with their terms. The Company will accept new authorizations only in the form of Exhibit I.

**SECTION 2.** The Secretary-Treasurer of the Union shall specify the amount to be deducted in each interval by the Company. The Company shall forward monthly such deductions to the Secretary-Treasurer of the Union.

**SECTION 3.** The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise out of the honoring by the Company of deduction authorizations in accordance with the provisions of this Article, the making up of sums owed the Union in cases of inadvertent failure to timely honor authorizations, and the transmitting of such deductions to the Secretary-Treasurer of the Union.

### Article 4. - Agency Shop*

**SECTION 1.** Each employee who is a member of the Union or who is obligated to tender to the Union amounts equal to periodic dues on the effective date of this Agreement, or who later becomes a member, and all employees entering into the bargaining unit on or after the effective date of this Agreement, shall as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members, for the period from such effective date or, in the case of employees entering into the bargaining unit after the effective date, on or after the thirtieth day after such entrance, whichever of these dates is later, until the termination of this Agreement. For the purpose of this Article, "employee" shall mean any person entering into the bargaining unit, except an occasional employee.

---

* Where permitted by law.

Each employee who is a member of the bargaining unit on or before the effective date of this Agreement and who on the effective date of this Agreement was not required as a condition of employment to pay or tender to the Union amounts equal to the periodic dues applicable to members, shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period beginning 30 days after the effective date of this Agreement, until the termination of this Agreement.

**SECTION 2.** The condition of employment specified above shall not apply during periods of formal separation** from the bargaining unit by any such employee but shall reapply to such employee on the thirtieth day following his return to the bargaining unit.

#### Article 5. - Union Bulletin Boards

**SECTION 1.** Arrangements for Bulletin Boards - The Company will install and maintain bulletin boards upon its property for use by the Union at such locations and of such size and type as may from time to time be mutually agreed upon by the parties. The cost of providing, installing, maintaining and relocating such boards will be paid by the Union. The bulletin boards shall be designated as Union bulletin boards in a manner mutually agreeable to the Company and the Union.

**SECTION 2.** Material Permitted on Bulletin Boards - Union bulletin boards, as referred to in Section 1 of this Article, shall be used only for:

(a) Factual notices and announcements of the Union pertaining to the following:

  (1) Meetings and Convention calls of the Union,

  (2) Nominations and elections of the Union,

  (3) Results of Union elections,

  (4) Appointments to Union offices and committees, and

  (5) Social and recreational affairs of the Union.

_____
**The term "formal separation" includes transfers out of the bargaining unit, removal from the payroll of the Company, and leaves of absence of more than one month duration.

(b) Full or partial copies of Collective Bargaining Agreements concluded by the Union and the Companies.

(c) Announcements or letters issued jointly by the Union and the Company.

The term "Union" as used in (a) of this Section 2 shall be construed to include any Local of the Union which admits employees of the Company to its membership.

**SECTION 3.** General Limitations on Bulletin Board Use - Material posted shall not contain anything of a controversial or political nature, anything derogatory to any of the Companies, their Management or any of their employees, or anything derogatory to any labor or other organization among its employees.

**SECTION 4.** Special Requests for Bulletin Board Use - Should the Union desire to post any material, including promotional and organizational material, not provided for in Section 2 of this Article, it shall be posted only after an International Representative of the Union has secured the written approval of the Director - Labor Relations, or his designated representative.

**SECTION 5.** Responsibility for Proper Bulletin Board Use - The Union assumes responsibility for complete compliance with the spirit and intent of the provisions of this Article. Should the Company believe that posted material is not in accordance with the spirit and intent of the provisions of this Article, such material shall be brought to the attention of any Local or International Representative of the Union and it shall be removed by the Union immediately after such notification. Failure to comply, shall entitle the Company to cover up or remove the bulletin board(s) involved.

Material removed in accordance with the above provisions of this Section 5 may be posted again only after a mutual agreement that it is appropriate for posting has been reached between an authorized International Representative of the Union and the Director - Labor Relations, or his designated representative.

### Article 6. - Information Furnished Union

**SECTION 1.** The Company will furnish the Union, as soon as practicable after the first of each month, the following information in connection with employees represented by the Union:

7

(a) Name, social security number, payroll number, net credited service date, classification (regular full-time, regular part-time, temporary full-time, temporary part-time, regular term or occasional), basic weekly wages, work location, date of birth, race, sex, home address and Union local.

(b) Appropriate codes identifying any current changes in this information, as well as identification of those currently added to, or separated from, or transferred into any of the Areas; or going on, returning from, or presently on, leave of absence.

(c) The following information for those with effective Authorization for Payroll Deduction of Union Dues, etc., cards on file:

    (1) Amount of deduction.

    (2) Amount omitted or made up.

    (3) Appropriate codes indicating changes in deductions or cancellations.

    (4) Last weekly dues rate of reporting month.

**SECTION 2.** Prior to engaging a regular term employee or employees for any project, the Company shall notify the Union of the purpose, job title(s), location(s) and expected duration of employment in connection with the project.

**SECTION 3.** The Company agrees to furnish the information set forth in Section 1 of this Article to the Union. Should the Union request and the Company agree to furnish additional information, the costs for such information will be billed to the Union.

### Article 6A. - Union Access to Employee Personnel Files

**SECTION 1.** The Union and the Company reaffirm their commitment to maintain optimum confidentiality for employee personnel records. The parties, moreover, appreciate that the privacy of employee records would be impaired by improvident access to and/or duplication or publication of materials or information contained in employee personnel files. Consistent with these concerns, the Union agrees that it will be judicious in requests for access to or copies of materials in individual employee personnel files and that it will handle all such materials with an abiding respect for the need to maintain optimum confidentiality of personally identifiable information balanced against its obligation as bar-

gaining representative to process grievances and administer the General Agreement.

**SECTION 2.** When reasonably required in the judgment of a Union Representative to administer the General Agreement or to process a grievance, the Company will make available for review and/or furnish copies to said Union Representative all, or designated, materials in an individual employee's personnel file in accordance with Section 4 of this Article.

**SECTION 3.** When reasonably required in the judgment of a Local Representative to process a grievance, the Company will make available for review and/or furnish copies to said Local Representative all, or designated, materials in an individual employee's personnel file in accordance with Section 4; provided, that the Local Representative furnishes the Company with the express written consent of the employee.

**SECTION 4.** Review of an employee's personnel file pursuant to Sections 2 and 3 shall be at a time and place designated by the Company upon reasonable notice to the employee's immediate supervisor. Copies of personnel files or designated portions thereof shall be furnished upon receipt of a written request on a Company-provided form. For each page copied and furnished by the Company to a Union Representative or an authorized Local Representative pursuant to this Article, the Union shall pay the Company fifteen cents ($.15) per page.

### Article 7. - Promotion or Transfer of Union Officers

**SECTION 1.** Except when a shorter notice is mutually agreed to by the parties, the Company will furnish the Local President with thirty days notice before the effective date of a promotion or transfer out of the bargaining unit or from the jurisdiction of one Local to another, or of a temporary transfer involving board and lodging, of any employee whom the Union has previously advised the Company in writing is a Local Officer, namely, President, Vice President, Secretary, Treasurer, or other elected member of the Local executive board.

### Article 8. - Union Activity on Company Premises

**SECTION 1.** Neither the Union nor the Locals, their representatives or members, shall conduct Union business or carry on Union

9

activities on Company premises or on Company time, except that Union and Local members who are employees (and authorized representatives of the Union who are not employees of the Company, by mutual agreement of the Company and the Union) may solicit members and carry on other legitimate Union activities outside of working periods in space where no Company operations or administrative work is performed; provided that such solicitation or other legitimate Union activity shall be limited to small groups of employees and shall not interfere with the operation of the Company or the use of space by other persons or employees for the purposes for which the space is intended.

#### Article 9. - Absence for Union Business

**SECTION 1.** To the extent that the Company determines that force and service conditions permit, employees who are authorized representatives of the Union or a Local will be excused without pay upon request by the employee to his immediate supervisor, or granted leaves of absence without pay at the request of an authorized officer or representative of the Union to attend to the business of the Union or his Local in accordance with the following provisions of this Article:

(a) Excused Absences: All requests for excused absences shall be made as far in advance as possible, ordinarily not later then 3:00 P.M. of the second preceding calendar day, and the Company shall act promptly on each request. Excused absences shall not exceed thirty (30) consecutive calendar days or a total of 90% of the scheduled working days in any calendar year. Absence in excess of such limits will not be authorized except by a leave of absence to be applied for in writing by the employee and an authorized officer or representative of the Union. In the interpretation and application of this paragraph, the term "scheduled working days" shall include no more than five (5) normal daily tours in any calendar week and shall exclude scheduled vacation periods, sickness absence days (unless such sickness absence is preceded or followed by a scheduled working day), Excused Work Days and days observed as holidays. A period of "consecutive calendar days" of excused absence shall be considered to be broken by any calendar day on which the Company pays the employee wages for a normal daily tour or its equivalent.

(b) Leaves of Absence: All requests for leave of absence shall be

made as far in advance as possible, ordinarily not less than two (2) weeks, and the Company shall act promptly upon each request. The initial period of a leave of absence granted hereunder shall not exceed twelve (12) months. Additional leaves for periods not to exceed twelve (12) months each may be granted.*

Leaves of Absence under this Article shall be granted only for the purpose of enabling the employee to accept full-time employment with the Union or his Local except that the Company may agree to grant leave of absence hereunder for the purpose of permitting the employee to accept full-time employment with the AFL-CIO staff or in a union-sponsored position with a nonprofit charitable or community organization such as the United Way.

**SECTION 2.** Under the provisions of this Article the number of employees to be on leave of absence at any one time shall not exceed ten (10) in any Area. No more than sixty (60) employees in any Area, shall be excused at any one time under the provisions of this Article. Additional employees may be excused without pay at the request of the Union for incidental absences of short duration to the extent that Company determines that force and service conditions permit.

**SECTION 3.** A Union or Local representative upon return from an excused absence or leave of absence shall be reinstated at work generally similar to that in which he was last engaged prior to his absence, subject, however, to the provisions of this Agreement relating to layoffs, part-timing and rehiring and, in case the employee had been on leaves of absence for a total of more than three (3) years during his service life, subject to there being a suitable job available. He shall be placed on the payroll at the rate received when such absence began, adjusted for any general changes in wage level made during the period of absence. Adjustments shall also be made for any changes in location or position in accordance with existing practices and wage schedules. No physical or other examination shall be required as a requisite of reinstatement except where an obvious physical or mental condition exists which requires medical advice regarding job placement or fitness for work.

**SECTION 4.** In computing his net credited service, a Union or Local Representative shall be allowed full credit for periods of leaves of absence during his total Bell System service (through 12-

31-83) and his Bell Atlantic or Verizon service (after 1-1-84).\*
Except for the sole purpose of pension computation, an employee
shall not receive credit for wage progression purposes for periods
covered by leaves of absence granted pursuant to this Article.
Employees shall retain eligibility, if any, to death benefits during
any leave of absence granted under this Article.

**SECTION 5.** During any period of leave of absence granted pur-
suant to this Article the employee shall pay the premiums for the
Dental Expense Plan and the Vision Care Plan. The Company shall
pay premiums for Basic coverage under the Group Life Insurance
Program, and the same amount toward the employee's (single or
family) coverage under the Medical Expense Plan as the Company
would have paid if the employee had remained on the active payroll.

**SECTION 6.** When an employee is excused without pay or grant-
ed a leave of absence without pay under the provisions of this
Article he will not be paid for time spent in attending grievance
meetings with Company or other meetings with the Company,
unless mutually agreed to by the Company and the Union.

**SECTION 7.** Notwithstanding the provisions of this Agreement
relating to its termination or any action taken thereunder, this Article
shall continue in effect for one (1) year and thereafter until specifi-
cally terminated by either party on sixty (60) days written notice.

### Article 10. - Responsible Union-Company Relationship

**SECTION 1.** The Company and the Union recognize that it is in the
best interests of both parties, the employees, and the public that all
dealings between them continue to be characterized by mutual
responsibility and respect. To insure that this relationship continues
and improves, the Company and the Union and their respective
representatives at all levels will apply the terms of this Agreement
fairly in accord with its intent and meaning and consistent with the
Union's status as exclusive bargaining representative of all
employees in the unit. Each party shall bring to the attention of all
employees in the unit, including new hires, their purpose to con-

_____
\*Net credited service for leaves taken prior to August 7, 1977, prior to August
10, 1980, prior to August 7, 1983, prior to August 9, 1986 and prior to August
6, 1989 shall be limited to four (4) years, nine (9) years, twelve (12) years,
fifteen (15) years and eighteen (18) years, respectively.

duct themselves in a spirit of responsibility and respect and of the measures they have agreed upon to insure adherence to this purpose.

**SECTION 2.** Should either party claim a violation of Section 1 of this Article, its authorized representative will provide written notice of the complaint to the authorized representative of the other party. The written notice shall identify the actions, persons, dates and other details of the complaint with sufficient particularity to allow for a fair and thorough investigation of the complaint. The receiving party shall respond in writing to the complaint. The parties may by mutual agreement also meet to discuss the matter.

**SECTION 3.** It is agreed that appropriate action shall be taken by each party to resolve complaints presented pursuant to Section 2 of this Article in a prompt and conclusive manner; however, no provision of this Article shall be subject to the grievance procedure and the procedure outlined in Section 2 shall be the exclusive means to resolve any questions regarding the interpretation or application of this Article.

#### Article 10A. - Occupational Safety and Health

**SECTION 1.** The Company and the Union mutually recognize the need for a work environment in which safe operations can be achieved in accomplishing all phases of work, and the need to promote better understanding and acceptance of the principles of safety and occupational health on the part of all employees to provide for their own safety and health and that of their fellow employees, customers and the general public. In specific recognition of the extensive use of video display terminals (VDTs), the parties re-emphasize their joint goal to maximize the advantages of VDTs and minimize any potential disadvantages their use may present to employees.

**SECTION 2.** To help achieve the above principles, the Company and the Union agree to participate in an Advisory Committee on Occupational Safety and Health principles at the Company headquarters level. The Committee shall consist of not more than a combined total of six (6) management representatives from the Companies and six (6) representatives appointed by the Union. The Committee shall meet from time to time but at least three times per year and during these meetings shall consider an agen-

da which may include ergonomics and other issues related to
VDTs.

**SECTION 3.** The Companies agree to reimburse for actual time
spent by active employees in attendance at Committee meetings
during the employee's scheduled tour at his basic hourly rate of
pay.

### Article 11. - Non-Discrimination

**SECTION 1.** In a desire to restate their respective policies, neither
the Company nor the Union shall unlawfully discriminate against
any employee because of such employee's race, color, religion,
sex, sexual orientation, age, disability, or national origin; or
because of his activities in behalf of the Union; or because he is a
disabled veteran or a veteran of the Vietnam era; Provided, how-
ever, that nothing in this provision shall be construed to create
rights under any provision of the Company's pension or welfare
benefits plans or to modify or affect those plans in any way.

**SECTION 2.** The use of the masculine or feminine gender in this
General Agreement shall be construed as including both genders
and not as a sex limitation.

### Article 12. - Grievances and Grievance Meeting Procedure

**SECTION 1.** Any individual employee or group of employees shall
have the right to present grievances directly to the Company and
to have such grievances adjusted without the intervention of the
Union as long as the adjustment is not inconsistent with the terms
of this Agreement.

**SECTION 2.** The following provisions shall apply to the presenta-
tion and processing of all grievances by the Union:

(a) *How Grievances are Presented:* In presenting any grievance,
the aggrieved employee(s) involved, if any, shall be identified,
the action(s) complained of and dates thereof shall be speci-
fied, the contract provision(s) alleged to have been violated
shall be stated, if any, and the remedy requested.

(b) *Discussion or Settlement of Grievances:* Once any Local or
Union representative has dealt with a Company representative
to negotiate a grievance, the Company will not discuss or
attempt to settle the matter with the individual employee or

14

employees involved without affording the Local or Union an opportunity to be present.

(c) *Time Limit for Presenting Grievances:* No grievance need be considered by the Company or the Union unless presented within thirty (30) calendar days after the action or occurrence complained of last occurred. In no event shall the settlement of any grievances have retroactive effect more than thirty (30) calendar days prior to the initial presentation of the grievance.

(d) *Grievance Terminated Unless Appealed:* At the conclusion of the first step in the grievance procedure, the grievance shall be considered as finally disposed of unless it is appealed to the second step within the time limits specified in Section 3 of this Article.

(e) *Limitations on Number of Persons Attending Grievance Meetings:* The total number of aggrieved employees and authorized Local and Union representatives to attend grievance meetings with Company representatives shall not exceed four (4) at the first step and five (5) at the second step. A maximum of four (4) employees at the first step and five (5) employees at the second step will be excused without loss of time or pay for regularly scheduled work time during the normal work week for attendance at such grievance meetings; provided that pay for attendance at grievance meetings shall be limited to time spent in meeting with the Company representatives and actual time required in traveling to and from such meetings, such travel time not to exceed a total of one and one-half (1-1/2) hours.

(f) *Method of Settling Grievances:* It is agreed that neither the Company, its representatives, nor the Union, the Locals, their representatives or members, will attempt by means other than the grievance procedure to bring about the settlement of any issue which is properly a subject for disposition through the grievance or arbitration procedures.

(g) By mutual agreement of the parties, grievance meetings may be conducted via video or teleconference.

**SECTION 3.** *Grievance Meeting Procedure:* It is the intent of both parties that grievances shall be handled as expeditiously as practicable and within the time limits spelled out in each step of the grievance procedure. It is understood that by mutual consent expressed

in writing, the time limits specified at any given step, or the time limits for taking the grievance to the second step may be extended with respect to a specific grievance. However, time limits for presentation of a grievance may not be extended. Steps may be waived by written agreement between the Company's appropriate Director or his designated representative and the International Representative of the Union. The Company shall provide the Local Representative at the first step with all information relevant to the specific circumstances and actions leading to the instant grievance.

(a) *First Step:* The grievance shall be presented initially by a designated Local Representative to the immediate supervisor of the aggrieved employee(s) or in the event of his unavailability to another supervisor designated by the Company. The meeting at this step shall be held concurrent with the presentation or within seven (7) calendar days after the request to meet, and seven (7) calendar days beginning with the day of the meeting shall be allowed for settlement.

(b) *Second Step:* If the grievance is appealed to the Second Step, the Local involved shall submit a written notice of appeal within seven (7) calendar days after the expiration of the time limits in Step 1 to the Director of the immediate supervisor, except that in a grievance involving a promotion or demotion the written statement of appeal shall be submitted to the Director of the supervisor who effected the promotion or demotion. The appeal letter shall identify the aggrieved employee(s) involved, if any, set forth the act or occurrence complained of, the date(s) of said act(s) or occurrence(s), the contract provisions alleged to have been violated, if any, and the remedy requested. The grievance may then be presented by the Union Representative or his designee to the appropriate Director or his designated representative. If the grievance involves a dismissal for cause, a Director's designee shall be another Director or higher level manager. However, if the grievance involves a dismissal for cause of an employee with five (5) or more years of net credited service, the grievance will be heard by the person to whom the Director reports. The Company's designated representative at this step will not be the same representative who heard the first step.

For all other grievances, a Director's designee shall be a Manager or higher level manager. The meeting at this step shall be held within fourteen (14) calendar days after the

Company receives the written notice of appeal, and fourteen (14) calendar days from the date of the meeting at this step shall be allowed for settlement. Within seven (7) calendar days after having concluded the Second Step by orally announcing its final position to the Union, the Company shall transmit to the International Representative of the Union or his designated representative, a written confirmation of its final position.

(c) By mutual agreement of the parties, the first and second step meetings in Section 3(a) and (b) above may be waived and the grievance presented directly to the Director - Labor Relations or his Labor Relations designee at the second step. The grievance shall be presented in writing and shall identify the aggrieved employee(s) involved, if any, set forth the act or occurrence complained of, the date(s) of said act(s) or occurrence(s), the contract provisions alleged to have been violated, if any, and the remedy requested. The meeting at this step shall be held within seven (7) calendar days of the presentation, and fourteen (14) calendar days from the date of the meeting shall be allowed for settlement. Within seven (7) calendar days after having concluded the Second Step by orally announcing its final position to the Union, the Company shall transmit to the International Representative of the Union, or his designated representative, a written confirmation of its final position.

**SECTION 4.** If the parties remain in disagreement at the conclusion of Step 2, the Union, within fourteen (14) calendar days following the receipt of the Company's written confirmation of its final position, may submit the grievance to arbitration upon written notice to the Company stating the issue to be decided, provided the grievance involves:

(a) The interpretation or application of any of the terms of this Agreement not specifically excluded from arbitration; or

(b) The dismissal (for just cause) of an employee who at the time of dismissal had six (6) or more months of completed net credited service; or

(c) The suspension (for just cause) of an employee who at the time of suspension had six (6) or more months of completed net credited service; or

(d) The demotion (for just cause, if disciplinary) of an employee
who at the time of demotion had been continuously in the job
from which demoted for at least six (6) months.

### Article 13. - Procedures for Regular and Expedited Arbitration

**SECTION 1.** The procedure for arbitration shall be as follows:

(a) Arbitration shall be conducted before an Impartial Arbitrator
selected by the Union and the Company in accordance with
the provisions of Section (b).

(b) As soon as possible, a master list of twelve (12) arbitrators
shall be selected by the parties. This master list shall be organized in alphabetical order. Each arbitrator shall serve until the
termination of this Agreement unless his services are terminated earlier by written notice from either party to the other.
The arbitrator shall be notified of his termination by a joint letter from the parties. The arbitrator shall conclude his services
by deciding any grievance previously heard. A successor arbitrator shall be selected by the parties. Any successor arbitrator shall be added to the master list in alphabetical order.

(c) Each case shall be assigned to the arbitrator at the top of the
master list in order of receipt. After an arbitrator is assigned a
case, he shall be placed at the bottom of the list. After the
grievances have been assigned arbitrators, the Union must,
within twenty-four (24) months from the date of the letter
appealing the grievance to arbitration, (thirty (30) months for
grievances appealed to arbitration prior to August 3, 2003),
notify the Company and the arbitrator of the Union's desire to
schedule the case for hearing. Failure to do so shall constitute
withdrawal of the grievance.

(d) Upon receipt of the Union's request to schedule a grievance
for hearing, the assigned arbitrator shall provide the parties
with four dates on which the arbitrator is available to hear the
grievance. These dates must be within one hundred and eighty
(180) days of the date on which the arbitrator is notified of the
Union's request to schedule the grievance for hearing. If the
arbitrator cannot provide the parties with four possible hearing
dates within this time period, either party may assign the grievance to the next arbitrator on the master list. Within four weeks

of the joint receipt of the arbitrator's proposed hearing dates, the parties will select one of the arbitrator's proposed dates or request additional hearing dates.

(e) Hearings shall be commenced and carried to a conclusion as expeditiously as possible. The hearings and decision of the arbitrator shall be confined to the issue or issues presented in the grievance procedure. The parties shall, prior to the hearings, jointly stipulate in writing such issue or issues if they can agree, and if they cannot agree, the arbitrator shall reduce such issue or issues to writing at or before the commencement of the hearings. The hearing shall be conducted in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association, and if possible, the arbitrator shall render a decision in writing within three weeks following the closing of the hearing.

(f) The arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement, and in no event shall a decision have retroactive effect more than thirty (30) calendar days prior to the initial presentation of the grievance. Both parties agree to participate in the arbitration proceedings and the decision of the arbitrator which shall contain a full statement of the grounds under which the issue or issues have been decided, shall be final and the Union, the Locals, their representatives, employees and the Company agree to abide thereby.

(g) Each party shall bear the expense of preparing and presenting its own case. The compensation and expenses of the arbitrator and any other expenses relative to the procedures shall be borne equally by the parties.

(h) The Company's Director of Labor Relations and the Union's Bargaining Chair shall meet quarterly to schedule any grievances reinstated as a result of the Union's internal appeal process.

**SECTION 2.** The procedure in this Section will apply only to grievances which are arbitrable under the provisions of Article 12, Section 4 (b), (c) and (d). In lieu of the procedure specified in Section 1 of this Article, any grievances involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration

under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which are specifically subject to arbitration under Article 12, Section 4, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided. The election shall be in writing and, when signed by authorized representatives of the parties, shall be irrevocable. If no such election is made within the foregoing time period, the arbitration procedure in Section 1 of this Article shall be followed.

(a) Arbitrators on the master list established pursuant to Section 1(b) of this Article shall be offered cases in rotating order without regard to their place on the master list based on application of Section 1(c). If an arbitrator does not commit to hearing a case within one hundred and twenty (120) calendar days, the case will be offered to the next arbitrator. If no arbitrator commits to hearing the case within one hundred and twenty (120) calendar days, the case will be assigned to the arbitrator who can hear the case on the earliest date.

The arbitrator selected shall be placed at the bottom of the list for purposes of selection pursuant to this Section.

(b) The procedures for expedited arbitration shall be as follows:

   (1) Within three (3) working days the parties shall notify the arbitrator in writing of his assignment to decide a grievance by expedited arbitration. The arbitrator shall confirm his acceptance of this assignment in writing within five (5) working days.

   (2) The parties may submit to the arbitrator prior to the hearing a written stipulation of all facts not in dispute.

   (3) The hearing shall be informal without formal rules of evidence and without a transcript. However, the arbitrator shall be satisfied that the evidence submitted is of a type on which he can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the arbitrator.

   (4) Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at

the hearing and arguments supporting its position. The arbitrator shall give his decision within five (5) working days after receiving the briefs. He shall provide the parties a brief written statement of the reasons supporting his decision.

(5) The arbitrator's decision shall apply only to the instant grievance, which shall be resolved thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the decision or a modification thereof is adopted by the written concurrence of the authorized representatives of the parties.

(6) The time limits in (1) and (4) of this Paragraph (b) may be extended by agreement of the parties or at the arbitrator's request, in either case only in emergency situations. Such extensions shall not circumvent the purpose of this procedure.

(7) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for back pay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(8) The arbitrator shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(9) The decision of the arbitrator will resolve the grievance, and the Company and the Union agree to abide by such decision. The compensation and expenses of the arbitrator and the general expenses of the arbitration shall be borne by the Company and the Union in equal parts. Each party shall bear the expense of its representatives and witnesses.

### Article 14. - Pension and Sickness and Accident Disability Benefit Plans

**SECTION 1.** Except as provided in this Article, there shall be no negotiations during the life of this Agreement upon changes in pensions or any other subject covered by the "Verizon Pension Plan for

Mid-Atlantic Associates" and/or the "Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates.

**SECTION 2.** In the event, during the life of this Agreement, the Company proposes to exercise the rights provided in the "Verizon Pension Plan for Mid-Atlantic Associates" or the "Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates" by action affecting the benefits or privileges of employees represented by the Union, it will before doing so notify the Union of its proposal and afford the Union a period of sixty (60) calendar days for bargaining on said proposal; provided, however, that no change may be made in any of the Plans which would reduce or diminish the benefits or privileges provided thereunder as they apply to employees represented by the Union without its consent.

**SECTION 3.** Any dispute involving the true intent and meaning of Section 2 of this Article may be submitted to the arbitration procedure of this Agreement. However, nothing herein shall be construed to subject any of the Plans or their administration or the terms of any proposed changes in said Plans to arbitration.

#### Article 15. - Federal or State Laws

**SECTION 1.** Should any Federal or State law or the final determination of any court of competent jurisdiction or any proclamation or order having the force of law at any time affect any provision of this Agreement, such provision shall be construed as having been changed to the extent necessary to conform to such law or decision. In the event that such law, determination or proclamation shall be repealed or held unconstitutional the provision of this contract affected thereby shall be read according to its original tenor.

#### Article 16. - Basic Wage Schedules

**SECTION 1.** The wage increase schedules and differential payments for the various job classifications and locations set forth in the Exhibit of wage schedules attached hereto shall be in effect for the term of this Agreement.

**SECTION 2.** The Company agrees to grant wage increases to the maximum wage rates specified in their appropriate schedules in accordance with the time intervals and amounts provided in said schedules. However, if, in the judgment of the Company, an employee's job performance merits such treatment, the Company

may accelerate a wage increase, but not for more than six (6) months on the applicable Wage Schedule or for employees who have less than eight (8) months of continuous service. Increase intervals and amount of increase for such employees shall be determined by applying the employee's current basic weekly wage rate to the wage schedule applicable to the employee's particular job classification.

**SECTION 3.** The increase interval for an employee who has not received a regular increase since employment shall be computed from the first of the month in which he or she is employed if employed prior to the sixteenth day of said month, or from the first of the calendar month following employment if employed on or after the sixteenth day of the month. Except as otherwise provided in this Agreement, all further wage increases under the schedules shall be computed from the effective date of the employee's immediately preceding regular increase. In the application of this Section, increases shall be granted on the first Sunday of the calendar month in which the increase falls due.

**SECTION 4.** The basic weekly wage rates and the maximum wage rates provided for the various job classifications in the Exhibit of wage schedules attached are based upon the hours comprising the present normal work week for full-time employees. It is agreed that, in the event of a reduction in the number of hours comprising the present normal work week, basic weekly wage rates and maximum rates may be reduced by the Company proportionately.

**SECTION 5.** In the event of absence for any reason continuing for more than one month (thirty days) during which the employee was scheduled to receive a progression increase, the employee shall receive his/her progression increase effective the Sunday after he/she returns to work. In addition, the accumulated absence, if over thirty (30) days (one month), will be added to extend the time until the employee's next scheduled progression increase in intervals of thirty (30) days.

### Article 16A. - Wage Start Rates

**SECTION 1.** - Definitions

(a) "Job related experience" shall mean twelve (12) or more months of experience, whether consecutive or cumulative, in the same or substantially similar job or job family.

23

(b) "Job related training" shall mean training which is work related and preparatory for the job or job family into which the individual is hired. "Job related training" may include a college degree. The amount of credit shall be at the Company's discretion.

(c) "Job related experience and/or job related training" may include military experience or training.

**SECTION 2.** This Agreement shall not be construed to prevent the Company from engaging employees at starting rates which in the Company's judgment are commensurate with their previous job related training, and/or job related experience.

**SECTION 3.** Employees may be hired into any titles at rates in excess of the minimum hiring rate at the Company's discretion. If an employee is hired into a title at a pay rate in excess of the minimum hiring rate for reasons other than job related experience and/or job related training, any employee in that title in the building into which the employee is hired who is at a lower rate of pay will be raised to the rate of the individual hired.

#### Article 16B. - New Job Titles and Job Classifications

**SECTION 1.** Whenever the Company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a) The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b) The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

(c) If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and the temporary designation removed.

(d) If agreement is reached between the parties within the sixty (60) days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e) If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

(f) The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days.

(g) The procedures set forth in this Article shall be the exclusive means by which the Union may contest the schedule of wage rates which the Company sets for any new, restructured, or redefined job title or classification.

(h) The cost of the neutral third party shall be borne one-half by the Company and one-half by the Union.

### Article 16C. - Team-Based Incentive Pay Plan

**SECTION 1.** From time to time, the Companies may implement team-based incentive pay linked to service, productivity and/or other business related standards set by Lines of Business or Business Units up to 10% of annual basic wage rates. These non-benefit-bearing payments may be paid monthly, quarterly, semi-annually, or annually. Teams may be at career level 03 (2nd tier manager level) or larger groups. The Company will meet with the Union to solicit input and review the details of any team-based incentive pay plan prior to its implementation. Neither this provision nor any team-based incentive pay plan will be subject to the grievance and arbitration procedures.

### Article 17. - Corporate Profit Sharing Plan (CPS)

**SECTION 1.** *Plan Purpose.* The Corporate Profit Sharing Plan ("CPS") is designed to encourage and reward employees for their contribution to Company profits.

**SECTION 2.** *Plan Years.* The Plan will provide awards for results in calendar years 2003, 2004, 2005, 2006 and 2007, with awards payable in 2004, 2005, 2006, 2007 and 2008.

**SECTION 3.** *Eligibility.*

(a) *Eligible Employees.* Full-time and part-time regular, term and temporary employees who are on the payroll for at least 90 days during an applicable Plan Year will be eligible to receive a CPS Distribution to the extent earned and payable. Employees who resign or are discharged for cause prior to December 31 of the Plan Year forfeit their eligibility to receive a CPS Distribution.

(b) *Proration for Partial Years.* For an employee who is employed more than 90 days, but less than 12 months, of the Plan Year, the employee's CPS Distribution will be prorated by twelfths to correspond to the number of months of participation during the Plan Year. For purposes of proration, a month will be taken into account if the employee is actively participating on the first day of the calendar month.

(c) *Proration for Part-Time Employees.* CPS Distribution for each eligible part-time employee will be prorated as a percent of the normal workweek for a full-time employee in the same title.

**SECTION 4.** *Time Worked and Leaves of Absence.* The following will count as time on the payroll for CPS Distributions:

(a) Absence attributable to approved sickness or accident disability up to accrued FMLA leave.

(b) Departmental leave (up to 30 days).

(c) Time that an employee is eligible to receive pay for Military Leave.

(d) Up to 30 days for Anticipated Disability Leave and Child Care leave combined.

(e) Up to 30 days for any other approved leave.

An employee shall not lose eligibility if, on December 31 of the applicable Plan Year, the employee is absent for one of the reasons stated in (a) through (e) above.

**SECTION 5.** Separations. An employee who is otherwise eligible for a CPS Distribution will not lose eligibility due to the following separations (so long as the employee has a period of at least 90 days of active participation during the Plan Year):

(a) Retirement

(b) Separation due to force surplus

(c) Transfer (or a quit/hire, with a break not exceeding 30 days) to another company that participates in this Plan or to an affiliated company with a collectively bargained corporate profit sharing plan that is substantially similar to this Plan, and the employee is on the payroll of such company on December 31 of the same year

(d) Death of the employee

(e) Promotion to management, and the employee is on the payroll of the company in which he or she is employed as a manager on December 31 of the same year

An employee who is separated from the active payroll for the above reasons will receive a CPS distribution that shall be prorated as described in Section 3

**SECTION 6.** *CPS Distribution Calculations.*

(a) *Standard Award.* The "Standard" CPS Distribution shall be as follows:

| Performance Year | Standard CPS Distributions | Year Payable |
|---|---|---|
| 2003 | $500 | 2004 |
| 2004 | $500 | 2005 |
| 2005 | $500 | 2006 |
| 2006 | $500 | 2007 |
| 2007 | $500 | 2008 |

(b) *Performance Percentage.* The actual CPS Distribution per eligible employee will be calculated by multiplying the "Standard" CPS Distribution by a "Performance Percentage" for the Plan Year that shall not be less than 0% and not more than 200%. The "Performance Percentage" shall be based on the performance percentage that is applicable to the financially driven component of the short-term annual cash incentive award (the "STIP" award) payable for that performance year to the Chief Executive Officer(s) of Verizon Communications (the "CEO"). The Performance Percentage for this Plan for a given year shall bear the same relationship to 200% as the performance percentage that is awarded to the CEO for financial results in that year bears to the maximum percentage available to the CEO for financial results under the STIP plan. For example, for any performance year in which the performance modifier for the CEO is based on a range from 0% to 200%, then the Performance Percentage under this Plan shall be equal to the performance modifier applicable to the CEO for the same performance year. For any performance year in which the performance modifier for the CEO is based on a range from 0% to 100%, then the Performance Percentage under this Plan shall be equal to the product of two times the performance modifier applicable to the CEO for the same performance year.

(c) *Minimum Payout.* Notwithstanding paragraphs (a) and (b) above, the minimum distribution for Performance Year 2003 will be $500, the minimum distribution for Performance Year 2004 will be $550, and the minimum distribution for Performance Year 2005 will be $600; the minimum distribution for Performance Year 2006 will be $650, and the minimum distribution for Performance Year 2007 will be $700, subject in all cases to prorating under Section 3.

**SECTION 7.** *Information Requests.* The Company agrees to provide to the Union upon request with publicly disclosed information about the STIP compensation of the CEO. With respect to information not publicly disclosed, the Company will only provide the Union with the following:

(a) A copy of the approved STIP achievement scale for the performance year, which sets out the financially driven performance modifiers that would be applicable to various financial results for the year. The unions will treat this information as confidential and proprietary information and will not disclose the information to any person for any purpose other than monitoring the administration of the CPS program.

(b) A report on the outcomes of the factors that affect the financially driven component of the CEO's STIP award for a performance year. This information will be provided as soon as practicable after the end of the performance year.

(c) A summary of the total CPS distribution payments which eligible employees received under the Plan. This information will be provided as soon as practicable following the end of the Plan Year.

**SECTION 8.** *Payment of CPS Distributions.* CPS Distributions, when earned, will be paid by separate payroll remittance (EFT or check) not later than March 15th of the year immediately following the Plan Year. For eligible employees who are no longer employed at the time of payment, the Company will be deemed to have satisfied its obligation to pay the CPS award if it sends payment to the eligible recipient's last known address. Each such payment shall be subject to the applicable federal withholding rate for non-recurring payments (currently, a 28% flat rate), and other applicable payroll taxes.

**SECTION 9.** *Benefit-Bearing Treatment of CPS Distribution.*

When paid, a CPS distribution will be treated as eligible benefit-bearing pay solely for the following purposes:

(a) The CPS distribution will be taken into account for purposes of the Supplemental Monthly Pension calculation under the qualified pension plan.

(b) The CPS distribution shall be treated as eligible benefit-bearing pay which may be contributed to the qualified Savings and Security Plan according to the same contribution percentage

(if any) as is in effect for regular wages at the time the CPS distribution is paid (and the same terms and conditions for pre-tax or after-tax treatment, and for qualifying for applicable company matching contributions).

(c) To the extent that an employee is eligible for the one-times-pay death benefit under the qualified pension plan (subject to applicable caps on such death benefit), the last CPS distribution paid to an employee prior to an employee's death shall be taken into account (to the extent it does not cause the death benefit to exceed the applicable cap).

(d) The last CPS distribution paid to an employee prior to an employee's death shall be taken into account under the terms of the group term life insurance plan for active employees.

(e) The CPS distribution may be taken into account for union dues to the extent determined appropriate by the union representing the employee.

CPS distributions will not be included in calculations for any other purposes.

**SECTION 10.** *Grievances and Arbitration.* The employee's employing company shall have the discretion to administer this Plan according to its terms. The employing company's interpretations and determinations under this Plan shall be final and binding. The employee's union representative may present grievances relating to matters covered by the Plan but neither the Plan nor its administration shall be subject to arbitration, except that the limited issue of an employee's eligibility to participate in a specific distribution under the Plan shall be arbitrable. Any "make-whole" arbitration award (which reinstates an employee with full back pay) shall include any applicable CPS distribution for the Plan Year in which the employee had been separated from employment if the employee was otherwise eligible and did not otherwise receive a distribution for the applicable Plan Year.

### Article 18. - Special City Allowance

**SECTION 1.** An employee whose assigned reporting location on a particular day is within the corporate city limits of Baltimore, Maryland or Washington, DC, will be paid a Special City Allowance of $2.00 for each day he works after reporting at such assigned reporting location.

**SECTION 2.** The Special City Allowance will enter into computations of overtime pay required by law but will not be part of the basic rate or basic weekly wages for any other purpose nor enter into the computation of any payments under the Plan for Employees' Pensions, Disability Benefits and Death Benefits or any other fringe benefits or differentials.

**SECTION 3.** An employee must work more than 50% of a regular full-time normal daily tour, after reporting to a qualified location, to receive a full daily allowance for that day. An employee who reports to work at a qualified location, but who works 50% or less of a regular full-time normal daily tour, will be paid one-half of a full daily allowance.

**SECTION 4.** Not more than one full daily allowance will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during that day.

#### Article 19. - Differentials

**SECTION 1.** Evening and Night Differential Payments - Category I, II, III, A and B Employees. A daily differential in the amount of ten percent of the employee's basic hourly rate multiplied by the number of hours in the employee's normal daily tour shall be paid to each Category I, II, III, A and B employee whose normal daily tour includes two or more hours between 5:00 P.M. and 8:00 A.M.

**SECTION 2.** Evening and Night Differential Payments - Category IV Employees. Employees in Category IV, who work evening or night tours, shall receive differential payments as shown below:

| Tour Length (Hours) | Tour Ending Times (Inclusive) | Daily Differential |
|---|---|---|
| 7 | 7:15p.m. to 8:00p.m. | $ 1.70 |
| 7 | 8:15p.m. to 8:30p.m. | 2.20 |
| 7 | 8:45p.m. to 10:15p.m. | 2.75 |
| 7 | 10:30p.m. to 11:00p.m. | 3.30 |
| 7 | 11:15p.m. and after* | 3.70 |
| 7 | All Night Tours | 4.05 |
| 6 | 10:30p.m. to 11:00p.m. | 1.00 |
| 6 | 11:15p.m. and after | 1.10 |

*Excluding all night tours

31

**SECTION 3.** Christmas Eve and New Year's Eve Differential Payments. Employees who work on Christmas Eve or New Years's Eve shall receive additional compensation\* in the amount of an additional hour's pay, computed at their basic hourly rate, for each hour worked after 7:00 p.m. on December 24 and after 7:00 p.m. on December 31 and up to 7:00 a.m. of the following day in each case.

**SECTION 4.** The provisions of this Article are applicable only to employees who are scheduled to work a tour which is equivalent to a normal daily tour for full-time employees. However, the provisions of Sections 1 and 3 of this Article shall not apply to part-time employees hired on or after January 1, l981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center operations.

## Article 20. - Union Representation

**SECTION 1.** At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, a Union representative may be present if the employee so requests.

**SECTION 2.** Pay for Union representation under this Article shall be limited to one representative and shall be at the Union representative's basic weekly wage and only for actual time spent within his normal daily tour.

## Article 21. - Promotional Wage Adjustments

**SECTION 1.** Promotional pay adjustments shall apply for employees who are promoted to another job title having a higher maximum rate, except that this Article shall not apply to employees transferred between equivalent jobs as defined in Article 23, Section 1(e).

**SECTION 2.** The employee shall be given a promotional pay

_____
\* The additional compensation provided for in this Section is in lieu of any daily overtime or premium payments which might otherwise be applicable, except as provided for under Article 24, Section 3 of this Agreement. (49th hour provision)

adjustment on the date of the promotion. The promotional pay adjustment shall be to the highest of the basic weekly wage rates resulting from the computation of the TYPE ONE, the TYPE TWO and TYPE THREE adjustments described in Sections 3, 4 and 5 below.

**SECTION 3.** The TYPE ONE adjustment shall be computed by applying the employee's wage experience credit to the wage schedule applicable to the assignment to which the employee is being promoted to determine the equivalent weekly wage; provided that:

(a) The resulting basic weekly wage rate shall not be less than the starting rate for the new assignment.

(b) An employee promoted from a job classification in Category II to another job classification in Category II shall not receive a basic weekly wage less than the basic weekly wage he was receiving in the old assignment.

(c) Except as required by paragraphs (a) and (b) above, a resulting adjustment shall not be more than ten dollars ($10) per week; provided that if the employee had been receiving the maximum rate for the job from which he is promoted for a period of six (6) months or more, the next regular increase on the new wage schedule shall be added to the adjustment so computed.

**SECTION 4.** The TYPE TWO adjustment shall be computed by applying the employee's wage experience credit to the wage schedule applicable to the new job classification to determine the equivalent basic weekly wage; provided that:

(a) The equivalent basic weekly wage so determined first shall be reduced in accordance with the provisions of Section 6 below if applicable; and then

(b) Increased in the amount of the next regular increase on the new wage schedule if the employee had been receiving the maximum rate for the job from which he is promoted for a period of six (6) months or more.

**SECTION 5.** The TYPE THREE adjustment shall be computed by applying the employee's net credited service to the wage schedule applicable to the new job classification and establishing the employee's new basic weekly wage rate on the closest lower full

step; provided that the new basic weekly wage so determined shall be reduced in accordance with the provisions of Section 6 below if applicable.

**SECTION 6.** If the promotion is from a job title in a different Job Title Group to a job title in Job Title Groups 5, 6, 7, 9, 10 or 11, the resulting basic weekly wage rate shall not exceed the step down rate for the new assignment, except for promotions from Job Title Group 6 to Job Title Group 7.

**SECTION 7.** The increase interval for the employee's first regular increase following the promotional pay adjustment shall be computed from the first of the month nearest the date of the promotional adjustment,

(a) and an employee who received a TYPE ONE or TYPE TWO adjustment and whose basic weekly wage was less than the maximum rate for the assignment from which he was promoted shall have his next regular increase interval adjusted on a pro rata basis. For example; if three-fourths of the employee's normal interval had expired on the schedule for his old assignment, credit shall be given for three-fourths of the interval on the schedule for his new assignment. The provisions of this paragraph (a) do not apply to promotions to Category IV job classifications or to employees whose promotional wage adjustment after the application of Section 6 above resulted in a basic weekly wage exactly on the step down point for their new assignment.

(b) and an employee who received a TYPE ONE or TYPE TWO adjustment and who had been receiving the maximum rate for his former job classification prior to promotion for a period of less than the next increase interval for the new assignment shall be granted the next regular increase after the regular increase period for the new assignment has elapsed with the interval computed from the date the employee was granted the maximum rate for the old assignment. The provisions of this paragraph (b) do not apply to promotions to Category IV job classifications.

(c) and an employee who received a TYPE THREE adjustment shall be granted as a credit against the next regular increase interval that net credited service (rounded to the nearest whole month) that is in excess of the closest lower full step on his new wage schedule. The provisions of this paragraph (c) do

not apply to employees whose promotional adjustment after the application of Section 6 above resulted in a basic weekly wage exactly on the step down point for their new assignment.

**SECTION 8.** If an employee is both assigned to a new location and promoted to another job classification having a higher maximum rate, the wage treatment specified in Article 23-Transfer and Reassignment, shall first be applied before computing the promotional pay adjustment.

**SECTION 9.** In the application of this Article, no employee shall receive any increase in an amount in excess of that required to reach the maximum wage rate specified under the wage schedule applicable to the employee's new job classification.

### Article 22. - Temporary Assignments

**SECTION 1.** On any day during which an employee in Categories II, III, IV or B is temporarily assigned by the Company to a position in the bargaining unit with a different maximum rate than his regular assignment, his normal daily tour shall be considered to be the normal daily tour for his regular assignment.

**SECTION 2.** On any day during which an employee in Categories II, III, IV or B is temporarily assigned by the Company to a position in the bargaining unit with a higher maximum rate than that of the employee's regular assignment and assumes full responsibility in and takes over all work associated with the position for at least the number of hours equal to a full session or half tour, the employee for that day shall receive one-fifth of the difference in maximum basic weekly rates between the two wage schedules involved; provided that in no case shall an individual employee be so assigned for more than sixty (60) calendar days for any one period or assignment.

**SECTION 3.** On any day during which an employee, pursuant to a temporary assignment, relieves a management employee for at least the number of hours equal to a full session or half-tour, such employee shall receive an additional $10 per day. A temporary assignment to management relief of sixty (60) calendar days for any one period or assignment must be followed by thirty (30) calendar days without temporary assignment to management relief.

**SECTION 4.** On any day during which an employee, other than a Category IV employee, is assigned to provide formal training to

another employee or employees and does so for at least the number of hours equal to a half tour, such employee shall receive an additional ten dollars ($10.00) for that day and for hours equal to a full tour of formal training, such employees shall receive fifteen dollars ($15.00) for that day. An employee is "assigned to provide formal training" when such employee is directed by the Company to give instruction, other than on-the-job coaching, using Company provided media designed exclusively for formal training purposes, such as course guides, work books, work samples and audio-visual aids. Such an assignment may also include a directive to report back to supervision the results of written tests or other formal measures of the trainee's(s') ability to learn and perform the work which is the subject of the formal instruction.

**SECTION 5.** During the period of any temporary assignment covered by the preceding sections of this Article, the employee shall be given wage progression treatment according to the schedule for his regularly assigned job and in computing this wage progression treatment, the payments provided for above shall be disregarded.

**SECTION 6.** The payments provided for in Sections 2, 3 and 4 of this Article shall be considered part of the employee's basic hourly rate only for the purpose of computing daily or weekly overtime payments where applicable under the provisions of this Agreement.

### Article 23. - Transfer and Reassignment

**SECTION 1.** An employee's basic wage shall be adjusted during the term of this Agreement in the event of a change (other than one of a temporary nature) in the employee's assignment or location, based upon the Company's determination that any one of the following conditions exists:

(a) Transfers of employees from one Locality Wage Group to another Locality Wage Group without a change in job title and from one job title to another job title with the same maximum rate.

(b) Demotions.

(c) Reductions in work requirements which result in reassignment of employees to a lower paid job classification.

(d) Return to original assignment by an employee who had

received an increase incident to a temporary transfer or a temporary promotion.

(e) Transfers of employees between equivalent jobs. "Equivalent jobs" are defined as:

    (1) Entry 1-B Clerk and Entry 1-III Clerk

    (2) Entry 3-B Clerk and Entry 3-III Clerk

    (3) Semi-Skilled 2-B Clerk, Semi-Skilled 2-III Clerk and Operator

    (4) Skilled 1-B Clerk, Skilled 1-III Clerk, Service Assistant, and Senior Traffic Office Clerk.

**SECTION 2.**

(a) If an employee is transferred to a new location without a change in job title or job classification or is transferred to an equivalent job in a different classification (with or without a change in work location), his basic weekly wage shall be adjusted on the date of transfer to the extent of any "wage rate differential" existing between the locations and/or the classifications involved in the transfer. The "wage rate differential" shall be computed as follows:

    (1) The employee's basic weekly wage at the time of transfer shall be applied to the wage schedule applicable to the old assignment and the cumulative number of months corresponding to such a basic weekly wage shall be determined.

    (2) The period so determined in (1) shall then be applied to the wage schedule applicable to the assignment to which the employee is being transferred, and the equivalent basic weekly wage shall be determined.

    (3) The "wage rate differential" shall then be determined by taking the basic weekly wage which the employee was receiving at the time of the transfer and the basic weekly wage determined in (2) above and subtracting the lower from the higher. The difference thus obtained shall be the "wage rate differential".

(b) If an employee is assigned to another job title with an associated wage schedule having the same or a lower maximum rate:

(1) The employee's basic weekly wage at the time of the reassignment shall be applied to the wage schedule applicable to the assignment from which he is being reassigned and the cumulative number of months corresponding to such basic weekly wage shall be determined. The period of time so determined shall then be applied to the wage schedule applicable to the assignment to which the employee is being reassigned, and the equivalent basic weekly wage shall be determined. However, if an employee, within six (6) months after having been assigned to a job title with an associated wage schedule higher than his former job title, elects to be returned or is returned to the former job title upon return to his former job title his basic weekly wage shall be the rate he would have been paid had he remained continuously in the former job title.

(2) An employee assigned to a Category IV job title with an associated wage schedule having a lower maximum rate, whose cumulative number of months, as determined in paragraph (b)(1) of this Section, does not correspond to an established wage schedule step applicable to the Category IV job, shall have his basic weekly wage adjusted to the next higher wage schedule step.

(3) However, in no case, in paragraphs (b)(1) and (b)(2), shall the basic weekly wage paid in the new assignment be greater than the maximum rate for that assignment except as may be provided in paragraph (c) of this Section 2. Nor shall the basic weekly wage be less than the rate paid if the employee had been engaged in and remained continuously in the new assignment after taking into consideration any previous starting rate adjustment and any previous accelerated wage increases.

(c) Where the wage adjustment specified in this SECTION 2 would result in a decrease in the basic weekly wage of an employee who is reassigned or transferred at the Company's initiative after having been in the job from which the transfer or reassignment is being effected for more than six (6) months, the Company shall elect either to:

(1) Defer subsequent regular increases in an aggregate amount equivalent to the amount of the adjustment, or

(2) Decrease the employee's basic weekly wage in reason-

able steps to the wage applicable to the new assignment; provided, however, that if the wage adjustment is ten percent (10%) or less (or, in the case of a transfer between equivalent jobs, seven dollars and fifty cents ($7.50) or less), the full adjustment shall be made on the date of the transfer or reassignment.

(d) The increase interval for the employee's first regular increase following the transfer or reassignment shall be computed as follows:

  (1) If the maximum wage rate for the new assignment is higher than that for the old assignment, and if

    a. the employee's basic wage rate was less than the maximum rate for the job classification (prior to the transfer or reassignment), the next regular increase interval shall be computed from the first of the month nearest the date of the transfer or reassignment, and in these cases the increase interval shall be adjusted on a pro rata basis. For example, if three-fourths of the employee's normal increase interval had expired on the schedule for his old assignment, credit shall be given for three-fourths of the interval on the schedule for his new assignment. The provisions of this paragraph a. do not apply to reassignments to Category IV job classifications.

    b. the employee had been receiving the maximum rate of the job classification (prior to the transfer or reassignment) for a period as long or longer than the next increase interval for the new assignment, the next regular increase shall be granted at the time of transfer or reassignment.

    c. the employee had been receiving the maximum rate for the job classification (prior to the transfer or reassignment) for a period of less than the next increase interval for the new assignment, the next regular increase shall be computed from the first of the month nearest the date of the transfer or reassignment. Such regular increase shall be granted after the regular increase period for the new assignment has elapsed, computed from the date the employee was granted the maximum rate for the old assignment. The provi-

sions of this paragraph c. do not apply to reassignments to Category IV job classifications.

(2) If the maximum wage rate for the new assignment is less than that for the old assignment, and if employee's basic wage rate is less than the maximum rate for the new assignment, the next regular increase interval shall be computed from the first of the month nearest the date of the transfer or reassignment and, in these cases, the increase interval shall be adjusted on a pro rata basis.

(e) The wage adjustments provided for in this Section may be deferred or withheld by the Company in individual cases if, in its judgment, the employee does not merit such increase or adjustment.

(f) An employee whose assigned reporting location on a particular day is within a Locality Wage Group with a higher maximum rate for his job title, shall be paid a daily "locality wage allowance" for each day he works after reporting at such assigned reporting location.

The "locality wage allowance" shall be one-fifth of the difference in maximum basic weekly rates between the two wage schedules involved.

The "locality wage allowance" shall be considered part of the employee's basic wage rate only for the purpose of computing daily or weekly overtime payments where applicable under provisions of this Agreement.

Not more than one "locality wage allowance" will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during that day.

**SECTION 3.** When an employee is reassigned (on other than a temporary basis) at the initiative of the Company to a work location which is at least thirty-five (35) miles farther from his residence than the distance between his residence and his former location, the employee may elect one of the following options:

(a) move his household within a period of twelve (12) months following the first day of reporting at the new location, and receive relocation reimbursement as specified in Section 4(b).

(b) commute daily from his household to the new location and receive commutation allowances as specified in Section 5.

**SECTION 4.** If the employee elects option (a) of Section 3 above, the following shall apply:

(a) The employee shall suffer no loss of regular pay for reasonable time off to arrange for the moving of household goods and personal effects and travel time to the new home location.

(b) The employee will be reimbursed by expense voucher up to a maximum aggregate amount of six thousand dollars ($6,000.00) for the following actual expenditures reasonably incurred by him in conjunction with such move:

   (1) Moving expenses incurred for household goods and personal effects.

   (2) Travel ($.09 per mile if personal vehicle is used), meals and lodging expenses incurred for self and members of immediate family in connection with the final trip from the former residence.

   (3) Travel ($.09 per mile if personal vehicle is used), meals and lodging expenses incurred in connection with pre-move househunting trip(s) and interim living for employee at new work location for meals and lodging only for up to thirty (30) consecutive days. Provided, however, that there shall be a limit of fifteen hundred dollars ($1,500.00) on expenditures reimbursed pursuant to this subparagraph (3).

   (4) Lease cancellation fees, selling and buying costs for housing. Provided, however, that there shall be a limit of fifteen hundred dollars ($1,500.00) plus any unused amount in subparagraph (3) above on expenditures reimbursed pursuant to this subparagraph (4).

**SECTION 5.** If the employee elects option (b) of Section 3 above, the employee shall be entitled to receive monthly commutation allowances as long as he commutes daily from his household to the new location, as follows:

(a) The Company shall determine the Commuting Mileage Factor ("CMF") by subtracting the road miles between the employee's residence and his former work location (using the most direct

commonly-traveled route) from the road miles between his residence and his new work location (using the most direct, commonly-traveled route).

(b) To determine the monthly allowance, the Company shall multiply the "CMF" by $2.00.

(c) An employee who ceases commuting to his household shall notify the Company immediately and monthly allowances shall be discontinued effective as of the termination of daily commutation.

(d) An employee who moves his household to a new location while receiving commutation allowances shall notify the Company no later than five (5) days following the move. The "CMF" will be adjusted using the formula specified in (a) above with the new residence substituted for his former residence. If the resulting "CMF" is greater, the monthly allowance will not be adjusted. If the resulting "CMF" is smaller, but at least 35, the monthly allowance will be reduced effective as of the date of the employee's move. If the resulting "CMF" is less than 35, commutation allowances will be discontinued effective as of the date of the employee's move.

(e) Monthly commutation allowances shall not exceed $300.

(f) No commutation allowances will be paid for months that extend beyond the second anniversary of the employee's report date at the new work location.

### Article 24. - Overtime and Sunday Practices

**SECTION 1.** *Weekly Overtime.* Employees shall be paid at the rate of one and one-half times their basic hourly rate for all time worked in excess of the normal work week for full-time employees.

**SECTION 2.** *Daily Overtime.* Employees shall be paid at the rate of one and one-half times their basic hourly rate for all time worked in excess of a normal daily tour for a full-time employee; provided that any such daily overtime payments shall be credited against any overtime payments required under Section 1 of this Article.

**SECTION 3.** *Premium for Work in Excess of 49 Hours.* Employees shall receive additional pay at the rate of one-half their basic hourly rate for all time worked in excess of 49 hours in a calendar week;

provided that the hourly rate for each hour worked after the 49th hour in a calendar week shall in no case be less than two times the employee's hourly rate of pay.

**SECTION 4.** For the purpose of computing overtime and premium payments in Sections 1, 2 and 3 of this Article, in a week in which a holiday is observed pursuant to Article 30 on Monday through Friday inclusive, employees excused from work on that day shall be considered to have worked a normal daily tour.

**SECTION 5.** *Sunday Premiums.* All work performed by employees within a normal daily tour, except while on Emergency Call-Out, Article 27, which begins on a Sunday (this being a Sunday tour) shall be paid for at the rate of one and one-half times the employee's basic hourly rate. Payments for Sunday work in excess of a normal daily tour, shall be as specified in the preceding Section 2 of this Article.

A Category IV employee assigned by the Company to work three or more consecutive Sunday tours, shall be paid for time worked on the third consecutive Sunday and each subsequent consecutive Sunday, additional compensation computed at one-half the employee's basic hourly rate (one-half the employee's straight-time rate). For the purpose of administering this latter provision, a Category IV employee who is assigned to work on a Sunday and who voluntarily effects a change with some other employee to work for her shall not be deemed to have interrupted the continuity of her assigned Sundays but that Sunday shall be considered as a Sunday off for the said other employee in determining the continuity of her assigned Sundays.

**SECTION 6.** *Holiday Overtime.* All employees shall be paid at the rate of two and one-half times their basic hourly rate for all time worked on a holiday observed pursuant to Article 30 in excess of a normal daily tour for a full-time employee; provided that any holiday overtime hours so compensated shall be credited against any hours for which overtime payments are required under Sections 1 and 2 of this Article.

**SECTION 7.** Except while on Emergency Call-Out, Article 27, work performed as part of an employee's normal daily tour which begins on one calendar day and extends into the next shall be paid for as part of the day on which the normal daily tour began.

**SECTION 8.** Any period of work time, except while on an

Emergency Call-Out, Article 27, which is not part of the employee's normal daily tour which begins on one calendar day and extends into the next day shall be paid for as part of the day on which such work began up to the usual starting time of the employee's regularly assigned daily tour regardless of whether the employee is or is not assigned to work on the particular day into which such period of work time extends.

**SECTION 9.** The provisions of Sections 5 and 6 of this Article shall not apply to part-time employees hired on or after January 1, 1981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center Operations.

### Article 25. - Work Schedules and Changes in Scheduled Work Time

**SECTION 1.** Work schedules shall be established by the Company for Category I, II, III, A and B employees. These schedules shall show the time the employee's normal tour starts and ends on each day of the normal work week, provided that such schedules may be changed by the Company at any time in order to meet work requirements and service conditions subject, however, to Sections 2 and 3 of this Article. Work schedules shall be posted by 6:00 P.M. of the Monday of the preceding week in advance of the first day of the employee's first normal work week shown on such schedules.

**SECTION 2.** When the Company assigns a Category I, II, III, A or B employee to work on a day on which no tour has previously been scheduled, the employee's scheduled work time on another day of the same normal work week may be reduced by a corresponding amount, provided he is notified of the change prior to 5:00 P.M. of the second calendar day preceding the day of the added assignment or the day of the decreased assignment whichever is earlier.

If the employee is not notified of the change by Company within the time prescribed in the preceding paragraph, he may, not later than the end of the added assignment, elect to work the day on which he was previously assigned to work in addition to the added assignment. If the employee so advises that he elects to work his previously scheduled day in addition to his added assignment, his previously scheduled normal work week will remain unchanged. However, in respect to the added assignment under such circum-

stances, only the hours actually worked will be paid for. If the employee elects not to work the hours specified in his previously scheduled normal work week in addition to the added assignment, his work time on one of the previously scheduled days in the same calendar week will be reduced to the extent of the additional assignment and the added assignment will be considered a part of his scheduled normal work week.

**SECTION 3.** When the Company changes the starting and quitting time of a Category I, II, III, A or B employee's previously scheduled tour without giving notification to the employee of such change before 5:00 P.M. of the second calendar day preceding the day on which the change is to be made, the employee may elect to work the hours of his previously scheduled normal daily tour (or half tour) in addition to the newly assigned hours.

If the employee's previously scheduled tour entitled him to an evening or night differential under Article 19, Section 1, and the employee, having elected to work all or part of his previously scheduled tour, does work between 5:00 P.M. and 8:00 A.M., he shall be paid the differential in accordance with Article 19, Section 1.

**SECTION 4.** The work time for employees called in to work a non-scheduled normal daily tour or half tour before the assigned starting time for such tour but on such short notice that they cannot report for work until after such assigned starting time shall be considered as beginning at the assigned starting time.

**SECTION 5.** Employees who by pre-arrangement are assigned to work non-scheduled time (which may be on a sixth day) which is less than half of a normal daily tour for full-time employees and which is not consecutive with a normal tour or half tour will receive the same treatment as herein provided for Emergency Call-Outs, except that work time shall be considered as starting when the employee leaves his residence to proceed by the most direct route to the work location. The provisions of this Section shall not apply to part-time employees hired on or after January 1, l981, and assigned to work in Phone-Center Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center operations.

**SECTION 6.** For employees in Category IV, the Company will establish work schedules showing the time the employee's normal daily tour starts and ends on each day of the normal work week, provided that such schedules may be changed by the Company at

any time in order to meet work requirements and service conditions. Category IV employees may request to be assigned off on any day of the calendar week including holidays as specified in Article 30.

Work schedules shall be posted by 2:00 P.M. of the Thursday of the preceding week in advance of the first day of the employee's first normal work week shown on such schedules.

### Article 26. - Inclement Weather

**SECTION 1.** Category I employees normally assigned to outdoor work will be provided with other assignments when the Company determines that on account of weather conditions they are unable to perform their regularly assigned duties during their regularly scheduled working time. When the Company determines that on account of weather conditions such employees are unable to perform their regularly assigned duties on a non-scheduled day, they may be excused or assigned other duties, after reporting to work, for all or part of their normal tours; provided, however, that in such case the employee shall receive a minimum of four (4) hours pay computed at his basic hourly rate.

### Article 27. - Emergency Call-Outs

**SECTION 1.** An "emergency call-out" is a request to report to work on a non-scheduled day or during non-scheduled hours to work an unspecified period of time provided the employee is requested to report to work as soon as possible after receiving the request. A request that an employee work a changed or additional normal tour (or half tour), or work in excess of a normal tour (or half tour), shall not be treated as an "emergency call-out."

**SECTION 2.** In cases where an employee receives an emergency call-out, work time shall be considered as starting when the employee is called and if he returns to his residence before starting his scheduled normal tour (or half tour), his work time shall be considered as ending upon his arrival at his residence. In cases where the employee starts his scheduled normal tour (or half tour), his emergency call-out shall end upon the starting of such tour.

#### SECTION 3.

(a) Time worked on emergency call-outs on weekdays shall be compensated for at one and one-half times the employee's

basic hourly rate; provided that any time which is compensated for at the rate of time and one-half (except Sunday time as covered in Sections 4, 5, 6 and 7 of this Article) shall be credited against any overtime payments required under Article 24.

(b) Time worked on emergency call-outs on holidays observed pursuant to Article 30, shall be compensated for at one and one-half times the employee's basic hourly rate for all hours worked up to the number of hours in a normal daily tour for a full-time employee. On such a holiday all time worked on emergency call-outs in excess of a normal daily tour for a full-time employee shall be compensated for at two and one-half times the employee's basic hourly rate; provided that any holiday hours in excess of a normal tour compensated for at two and one-half times the employee's basic hourly rate shall be credited against any hours for which overtime payments are required under Article 24.

**SECTION 4.** For time worked on emergency call-outs between 12 Midnight Saturday and 12 Midnight Sunday, an employee shall be paid at the rate of one and one-half times his basic hourly rate except that such time worked in excess of a normal daily tour for a full-time employee shall be compensated for as daily overtime in accordance with Article 24, Section 2.

**SECTION 5.** Time worked on emergency call-outs between 12 Midnight Saturday and 12 Midnight Sunday up to the number of hours in a normal daily tour for a full-time employee shall not be credited against any overtime payments for work in excess of a full-time employee's normal work week for the calendar week beginning on that day; provided, however, that no more than the number of hours in a normal daily tour for a full-time employee shall be paid for as Sunday time during any calendar week.

**SECTION 6.** Time worked on emergency call-outs starting on Saturday and extending into Sunday shall be paid for as Saturday time up to 12 Midnight Saturday and as Sunday time after Midnight Saturday (but not over the number of hours in a normal daily tour for a full-time employee is to be paid as Sunday time).

**SECTION 7.** Time worked on emergency call-outs starting on Sunday and extending into Monday shall be paid for as Sunday time up to 12 Midnight Sunday and time after Midnight Sunday as Monday time, provided that no more than the number of hours in a

normal daily tour for a full-time employee shall be paid for as Sunday time during any calendar week.

**SECTION 8.** An employee who received payments at time and one-half under provisions of this Article shall not be paid evening and night differential payments for such time.

**SECTION 9.** An employee called out on an emergency call-out to work time which is not consecutive with a scheduled tour (or half tour) will receive a minimum of four (4) hours pay computed at his basic hourly rate. In the application of this Section, the Company may assign an employee to work to the extent of the time actually paid for whenever under the circumstances it is reasonable to do so.

**SECTION 10.** In the event that an employee in route to, while on, or returning from an emergency call-out is involved in a motor vehicle accident while operating his personal vehicle under the provisions of this Article, the Company will reimburse the employee in an amount not to exceed $250 for the costs of repairs to the personal vehicle which are not otherwise compensated or compensable from another source, provided, that said vehicle must be covered by public liability and property damage insurance in amounts and under provisions which conform with the requirements of the state in which the vehicle is registered.

**SECTION 11.** The provisions of Sections 3, 4, 5, 6, 7 and 8 of this Article shall not apply to part-time employees hired on or after January 1, 1981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center operations.

### Article 28. - Travel Allowances, Travel Time and Expense Payments

**SECTION 1.** The normal reporting locations and the temporary reporting locations at which work time starts and stops shall be as designated by the supervisor.

**SECTION 2.** When an employee is temporarily assigned by the Company to work at a different location than the employee's normal reporting location, and commutes on a daily basis to the temporary reporting location, a travel allowance shall be paid for each

48

day so assigned and worked in accordance with the following schedule:

(a) Airline Distance from Normal
    Reporting Location to Temporary
    Reporting Location                     Daily Allowance

    0-1 Mile.............................................................$ .00
    Over 1 Mile to 3 Miles..........................................3.00
    Over 3 Miles to 5 Miles.........................................4.15
    Over 5 Miles to 10 Miles.......................................6.25
    Over 10 Miles to 15 Miles.....................................8.95
    Over 15 Miles to 20 Miles...................................12.50
    Over 20 Airline Miles to 25 Road Miles...............12.50

(b) For any distance from the normal reporting location to the temporary reporting location which is twenty-five (25) or more road miles measured one way on a standard map, the allowance per round trip road mile measured on the same map shall be the rate specified in Article 29, Section 3.

(c) Employees entitled to the allowances in paragraph (a) or (b) above shall be reimbursed for any toll charges actually incurred.

Provided, however:

(a) The employee's work time shall start or end (or both) at the temporary location;

(b) The travel allowance will not be paid when the employee is paid for travel time to and from the temporary location;

(c) The travel allowance will not be paid when the Company provides transportation or pays for transportation expense;

(d) The provisions of this Section shall not apply when Section 3 is applicable.

**SECTION 3.** When an employee is temporarily assigned by the Company to work at a location other than the employee's normal reporting location and the temporary reporting location is more than fifty (50) road miles measured one way on a standard map from the employee's normal reporting location; or when the Company, because of work requirements, travel time or travel conditions, specifies that the temporary reporting location is not within normal daily commuting distance, the provisions of this section shall apply.

49

(a) *Necessary Travel Time.* The Company shall treat necessary travel time to and from the temporary location at the beginning and end of the temporary assignment as work time only as required by law. The Company also shall pay for other necessary travel time to and from the temporary location at the beginning and end of the temporary assignment at the employee's basic hourly rate.

(b) *Transportation Expenses.* When transportation to and from the temporary reporting location is not provided by or arranged for by the Company, travel expenses, when approved by the supervisor in advance, shall be reimbursed by means of expense vouchers. The Company may, at its option, provide for reimbursement of these travel expenses by means of entries on the employee's personal time report in lieu of vouchers. An employee who with the approval of his supervisor obtained in advance of a trip actually furnishes private transportation shall be reimbursed in accordance with the provisions of Article 29, Section 3 for each round trip road mile as measured on a standard map between the employee's normal and temporary reporting location. An employee who rides with another employee who has been authorized to be reimbursed for private transportation shall be reimbursed one-half the mileage amount provided to the employee who furnishes the transportation.

(c) *Living Expenses.* The Company may make arrangements for necessary local transportation, living quarters and meals, or with prior agreement between the supervisor and the employee, the employee may make these arrangements. Payments may be made directly by the Company to the persons providing local transportation, living quarters or meals, or upon prior agreement between the supervisor and the employee, the employee may pay for his own necessary local transportation by public carrier, his lodging, or his meals.

When the employee makes and pays for these arrangements, he shall be reimbursed by means of expense vouchers for actual expenditures for lodging, necessary local transportation by public carrier, and for laundry, if the assignment extends beyond one week. Necessary private local transportation furnished by the employee shall be reimbursed in accordance with the provisions of Article 29, Section 3.

In lieu of reimbursement for meals not arranged and paid for by the Company, the employee shall be paid an allowance for each day on which travel to a temporary location within the geographic area of the bargaining unit keeps the employee away from home overnight, or on which the employee's work time starts or ends (or both) at such temporary location. The allowance will be thirty-three dollars and thirty cents ($33.30) per day. On any such day on which the Company arranges and pays for one or more meals, the daily allowance shall be reduced by one-third for each meal provided by the Company.

In no case will an employee be required to spend more than two (2) months away from the employee's normal reporting location unless advised by the Company before the assignment, that the assignment would be of longer duration.

When the conditions set forth in the first paragraph of this Section apply, Section 2 of this Article shall not apply.

**SECTION 4.** When an employee remains on a temporary assignment, under the conditions set forth in Section 3, for a period of more than two consecutive weeks, the following shall apply:

(a) The employee usually will be allowed to return to his normal reporting location at the end of each second week unless assigned to work on a sixth day in that week. The time consumed in traveling to the normal reporting location and in returning to the temporary location will not be compensated for; provided, however, that in cases where public transportation is not reasonably available for such travel outside of normal working time, any portion of such travel time that falls between the starting and quitting time of the employee's scheduled normal tour, will be paid for as a part of the employee's normal tour of duty for that particular day.

When transportation is not provided for or arranged for by the Company and when approved by the supervisor in advance, travel expenses between the temporary and normal reporting locations shall be reimbursed by means of expense vouchers. When such travel is not by public carrier, the employee shall, with prior supervisory approval, be paid an allowance in lieu of reimbursement not to exceed the equivalent cost of bus or railroad coach transportation between the employee's normal and temporary reporting locations. However, an employee who with the approval of his supervisor obtained in advance of a trip actually furnishes private trans-

51

portation shall be reimbursed in accordance with the provisions of Article 29, Section 3 for each round trip road mile as measured on a standard map between the employee's normal and temporary reporting location.

(b) In the event that an employee is not permitted to return to his normal reporting location at the end of each second week, and the employee is not otherwise assigned to work, the Company agrees that such employee shall be permitted to work one additional normal tour in excess of his normal work week at the end of each second week and during each week this period is extended.

**SECTION 5.** The payments provided in Section 2, Section 3, or Section 4 shall not be construed as part of the basic wages for any purpose under this Agreement.

#### Article 29. - Reimbursement of Incidental Expenses

**SECTION 1.** In the application of this Article, it is understood that the work assignments in connection with which the expenses are incurred must be authorized by the Company and all expenses are subject to the approval of the employee's supervisor.

**SECTION 2.** Employees shall be reimbursed for payments made by them for all incidental expenses actually incurred in the performance of work which they do not normally incur in the performance of their regularly assigned duties.

**SECTION 3.** When, with prior supervisory approval, private transportation is provided by an employee under the circumstances set forth in Sections 1 and 2 of this Article or under the provisions of Sections 3(b), (c), and 4(a) of Article 28, the employee will be reimbursed consistent with the Internal Revenue Service's (IRS) standard mileage rate allowable as a business use deduction from gross income. In the event the IRS increases the standard mileage rate allowable as a business use deduction from gross income during the term of this Agreement, the Company will change the amount of the reimbursement accordingly effective on the first of the second month following publication of the change by the IRS, but in no event prior to the effective date of the IRS increase. Such reimbursement shall be in lieu of all expenses, costs, and losses incurred by the employee who furnishes such transportation; provided, however, that the Company will:

(a) Pay the cost of parking and toll fees incurred by the employee incident to such usage of private transportation.

(b) In the event that an employee is involved in a motor vehicle accident while operating his personal vehicle under the provisions of this Article, reimburse the employee in an amount not to exceed $250 for the costs of repair to the personal vehicle which are not otherwise compensated or compensable from another source.

Any vehicle used by an employee to provide transportation under this Article must be covered by public liability and property damage insurance in amounts and under provisions which conform with the requirements of the state in which the vehicle is registered.

### Article 30. - Holidays

**SECTION 1.** The following days are designated as holidays:

| | |
|---|---|
| New Year's Day | January 1 |
| George Washington's Birthday | Third Monday in February |
| Floating Day* | |
| Memorial Day | Last Monday in May |
| Independence Day | July 4 |
| Labor Day | First Monday in September |
| Veteran's Day | November 11 |
| Thanksgiving Day | Designated Thursday in November |
| Day after Thanksgiving Day | Friday immediately following Thanksgiving Day |
| Christmas Day | December 25 |
| Inauguration Day** | January 20 of year following Presidential Election |

---

*An employee may select any one day in the current calendar year, other than a Sunday, a Holiday designated in this Section or an Excused Work Day designated pursuant to Article 38, Section 3, as a "Floating" Holiday; provided, however, that the employee must have notified his supervisor at least 30 days prior to the day on which the "Floating" holiday occurs unless the Company determines that service and force conditions are such that shorter notice is acceptable. An employee hired after April 30 is not entitled to, and may not select a "Floating" holiday for the calendar year in which he was hired. "Floating" holidays not scheduled by October 1 of each calendar year must be selected and scheduled at that time. An employee may be required to work on the day selected as his "Floating" holiday but would receive holiday pay for such day as provided in this Agreement.

**Washington Area only.

If a holiday falls on Sunday, the following Monday shall be observed as the holiday, and the practices herein provided shall apply to Monday only. Any tour which begins on a holiday shall be known as a holiday tour (or a holiday part tour).

**SECTION 2.**

(a) Regular and temporary full-time employees shall receive for the day on which a holiday is observed pay for a normal daily tour. The holiday may be included as part of the employee's normal work week schedule, whether excused or assigned to work.

(b) Regular and temporary employees who work on a holiday shall, in addition to the pay in paragraph (a) of this Section or the pay in Section 4 below be paid a HOLIDAY PREMIUM at the rate of one and one-half times their basic hourly rate for all time worked within a normal daily tour. However, this premium provision shall not be applicable to part-time employees hired on or after January 1, 1981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center operations.

(c) If an employee is scheduled to work a normal daily tour, half-tour or session on a holiday and, after reporting to work, is excused later at the Company's initiative, the employee shall be paid his straight time rate for the remainder of the full normal daily tour, half tour or session scheduled on the holiday.

(d) Payment for time worked on a holiday in excess of a normal daily tour shall be as provided in Article 24 of this Agreement.

(e) Regular and temporary employees who do not work on a holiday shall receive for the holiday any evening and night differential payments received for their normal work week (excluding the holiday) in the week in which the holiday is observed.

(f) An employee who works a holiday tour shall receive the larger of the following: (1) the daily average of any evening and night differential payments received for his normal work week (excluding the holiday) in which the holiday is observed, or (2) the evening and night differential payments, if any, to which the employee would be entitled under Article 19 for the holiday tour worked.

**SECTION 3.** An occasional employee shall not receive the payments provided for in Sections 2(a), (b), or (e), but shall be paid at his basic hourly rate for time worked on holidays plus the evening and night differentials, if any, to which he would be entitled under Article 19 for the holiday tour worked.

**SECTION 4.** All regular and temporary part-time employees shall receive for the day on which a holiday is observed pay for a normal daily tour of a comparable full-time employee multiplied by the part-time employee's "Part Time Factor" as defined in Article 40, Section 7B.

**SECTION 5.** Company agrees to post holiday work schedules for Category I, II, III and IV employees and otherwise notify employees in Categories A and B, seven days in advance of the holiday, provided that such posting may be changed at any time up to the holiday in order to meet work requirements and service conditions.

**SECTION 6.** No payments will be made under this Article under any of the following conditions:

(a) to an employee who is absent for any reason on a holiday if payments are made to him for that day under another provision of this Agreement or are otherwise paid to him, or

(b) to an employee who is scheduled to work on the holiday and absents himself without permission on all or part of that day, or in the event that he is not scheduled to work on that holiday, absents himself without permission on all or part of the assigned day before or the assigned day after the holiday, or

(c) for any holiday observed during a period beyond the first seven calendar days of absence for any reason, or

(d) for any holiday observed during the first seven calendar days of a period of absence for any reason, except that if the period of absence begins or ends in a week in which the employee is scheduled to work a normal work week holiday payment shall be made if the employee is absent excused under Article 9, absent excused with pay under Article 33, or is absent due to sickness but is not eligible for payment under Article 32.

In the administration of Paragraphs (c) and (d), if the assigned day before or the assigned day after a holiday, or both, are granted by the Company as excused time off because of a force surplus, such absence of itself shall not make the employee ineligible for holiday pay.

### Article 31. - Vacations

**SECTION 1.** Except as hereinafter provided, the eligibility of full-time employees to receive a vacation with pay within the current calendar year shall be determined in accordance with the following schedule. Part-time employees shall not be eligible to receive a vacation with pay until they have completed six (6) months of net credited service, after which time their eligibility for full weeks of vacation shall be the same as for full-time employees.

| Net Credited Service as of December 31 of Current Calendar Year* | Vacation | Notes |
|---|---|---|
| a. Less than 5 months | None | |
| b. 5 months but less than 6 months | 2 days after Oct. 1 | |
| c. 6 months but less than 12 months | I week | See (1) |
| d. 1 year or more but less than 7 years | 2 weeks | See (2) |
| e. 7 years or more but less than 15 years | 3 weeks | |
| f. 15 years or more but less than 25 years | 4 weeks | |
| g. 25 years or more | 5 weeks | See (3) |

\*Net credited service for determining vacation eligibility shall include service to be bridged during the current calendar year.

**NOTES:**

(1) Eligible for one week upon completion of six months NCS; however, employees hired May 1-May 31 may take three days after four months NCS; and hired April 1-April 30 may take four days after five months NCS; provided any of these days so taken shall be deducted from the full week.

(2) Eligible for a maximum of two weeks in a calendar year, the first of which may be taken in accordance with note (1) above and the second may be taken upon completion of twelve months NCS.

(3) In order to be eligible for five weeks of vacation, the employee

must take one week of his vacation between January 1st and April 30th and/or November 1st and December 31st of the current year.

#### SECTION 2.

(a) A full-time employee's weekly wage for vacation payments shall consist of the employee's basic weekly wage, plus the weekly average of evening and night differential payments received for the normal work week during the first four (4) of the five (5) calendar weeks worked immediately preceding the vacation period.

(b) A part-time employee's weekly wage for vacation payments shall consist of the basic weekly wage of a comparable full-time employee, multiplied by the part-time employee's "Part-Time Factor," as defined in Article 40, Section 7B, plus the weekly average of any evening and night differential payments received for the normal work week during the first four (4) of the five (5) calendar weeks worked immediately preceding the vacation period.

(c) In the event that a part-time employee is granted vacation for any period of less than a calendar week, the vacation granted shall be in increments of full calendar days and the pay for each such calendar day of vacation shall be one-fifth of the amount of pay to which the employee would be entitled for a full week of vacation in that calendar week pursuant to paragraph (b) of this Section.

**SECTION 3.** If a holiday is observed within an employee's vacation period, that day shall be rescheduled pursuant to the provisions of Section 10(c) of this Article.

**SECTION 4.** An employee who is absent for one or more full days on account of sickness or disability, contagious disease quarantine, death in immediate family, jury duty summons, or witness service subpoena, during the week or weeks of his scheduled vacation shall have that part of his vacation rescheduled; provided that in such cases it shall not be rescheduled after or extend beyond December 31st of that year unless circumstances prohibit, in which case it shall be taken no later than the last full week in March of the following calendar year.

**SECTION 5.** Employees who are absent on leave of absence dur-

ing the current year for more than six (6) months shall not be enti-
tled to a vacation in that year; provided, however, that this provision
shall not operate to the prejudice of employees who receive their
scheduled vacation in the current year before their leaves of
absence begin. It is understood that the provisions of this para-
graph shall not apply to employees returning from military leaves
of absence.

**SECTION 6.** Employees absent on leave of absence for three (3)
months or more extending from one year into the next shall not be
eligible to receive a vacation until they have returned to duty and
worked for at least three (3) months. It is understood that the pro-
visions of this paragraph shall not apply to employees returning
from military leaves of absence.

**SECTION 7.** Employees who resign, retire or are dismissed, and
who have not received vacations to which they are entitled by the
effective date of their resignations, retirements or dismissals shall
receive lump sum payments in lieu of the vacations or unused por-
tions thereof. If an employee dies prior to receiving vacation to
which he is entitled, payment in lieu of such vacation shall be paid
in the same manner as any unpaid wages are paid or would have
been paid.

**SECTION 8.** Employees who request and who are granted per-
sonal leaves of absence of more than thirty (30) calendar days
other than leaves of absence for Union business under Article 9,
and who have not received vacation to which they are entitled by
the effective date of the leave of absence, shall receive lump sum
payment in lieu of the vacations or unused portions thereof; pro-
vided, however, that if an employee advises the Company within
seven (7) calendar days following his return from a personal leave
of absence that he wishes to take time off without pay equivalent
to no more than the number of unused vacation days for which
lump sum payment was received, such time off shall be scheduled
and taken as follows:

(a) If all or a portion of the unused vacation had been previously
    scheduled to be taken in a period after the end of the leave of
    absence, the time off shall be taken as originally scheduled;
    or

(b) If the unused vacation had been previously scheduled to be
    taken during the period covered by the leave of absence, the
    time off shall be rescheduled to be taken if service and force

conditions permit, but no later than the end of the last full week in March of the calendar year following the year in which the vacation entitlement was established.

**SECTION 9.** An employee who is engaged (or reengaged) by the Company with service credited based on prior employment will not be entitled to vacation or pay in lieu thereof during the same calendar year that vacation was granted or paid in lieu thereof by a former employer where any service credit was earned. However, if the employee advises the Company within seven (7) calendar days of his engagement that he wishes to take time off without pay equivalent to no more than the number of vacation days he would otherwise be entitled to receive, such time off shall be scheduled if service and force conditions permit.

**SECTION 10.** *Scheduling and Selection of Vacation Periods and Other Time Off.* Employees in each work group shall select vacation periods, and other specified time off, as follows:

(a) Selections shall be commenced prior to the beginning of the calendar year and completed no later than the last day of March in the relevant calendar year from a schedule of available dates prepared by the Company. There shall be two consecutive rounds of selection, each made in accordance with Article 34-Seniority. In no case shall an eligible employee schedule less than one full week of vacation in any calendar year, except that employees who have completed six (6) months of net credited service or twelve (12) months of net credited service on or after December 1 and are at that time still entitled to one or two full weeks of vacation in the current calendar year will have their vacation scheduled and taken no later than the last full week in March of the following year, provided, however, that such employees may schedule the full week(s) in the following year subject to the provisions of paragraph (b) below.

(b) *Full Weeks of Vacation.* In the first round of selections, vacations will be selected in full weeks and the weeks so selected must be taken as full weeks. For purposes of selection only, the last week in December will be considered a full week in the current year if four (4) or more of the calendar days in that week are in the current year. It will be considered a full week in the following year if four (4) or more of the calendar days in that week are in the following year. Employees who do not

elect to "carry over" a part of their vacation to which they are entitled in the current calendar year into the following calendar year and want to schedule all or part of their following year's vacation in the period of January 1 through the last full calendar week of May, inclusive, of the following calendar year, will have the option of scheduling their vacations in the following calendar year during this round of selections. Employees who are eligible for two (2) weeks or more of vacation in any calendar year may schedule in the following year, by full weeks or multiples thereof, a part of the vacation for which they are eligible in the current calendar year, subject to the following terms:

(1) Any week or weeks of vacation "carried over" from one calendar year into the next must be scheduled and taken no later than the last full calendar week of May of the year into which the week or weeks are carried over.

(2) For all weeks of vacation "carried over" from one calendar year to the next, at least a like number of weeks of vacation for the calendar year into which the "carry over" is shifted must also be scheduled and taken no later than the last full calendar week of May of the same year.

(c) *Day-at-a-Time Selection.* In the second and final round of selections, employees may select paid and unpaid Excused Work Days (except Excused Work Days designated by the Company), and time off for holidays and designated Excused Work Days which will be observed during their previously selected vacation weeks (see Section 3 above), and employees who are eligible for two or more weeks of vacation in the current calendar year and who wish to use one week (or two weeks if eligible) to be taken on a day-at-a-time basis may select their day-at-a-time vacation days.

Specific dates may be selected in this round only from available dates on the original schedule in the current calendar year which remain unselected after the first round of selection. In the event that an employee does not choose during this round to select specific dates for all of the remaining days for which he is eligible, he shall instead select "reserved time" equivalent to the total number of such days not selected. "Reserved time" shall be selected and reserved in blocks of consecutive work days (based on the employee's work sched-

ule at the time the selection is made) through the last day of March of the following year, but only from the available dates on the original schedule which remain unselected after the first round of selection. "Reserved time" shall equate to all time off not already scheduled pursuant to this paragraph (c).

Subject to the needs of the business and force requirements of the work group, days prior to the "reserved time" may be selected by an employee on the basis of the earliest request to the employee's immediate supervisor. The days which have not been used on a day-at-a-time basis by the time the "reserved time" occurs must be taken during the "reserved time" as scheduled. Vacation so scheduled shall not be subject to "carry-over" under the provisions of paragraph (b) above. With the consent of the Company, additional vacation time may be scheduled in days in accordance with this paragraph.

(d) It is the intent of the parties that the employees' selections will be granted to the extent practicable consistent with force requirements and the needs of the business.

**SECTION 11.** Notwithstanding the provisions of Section 8 of this Article an employee who is granted an Anticipated Disability Leave of Absence will be afforded the opportunity to schedule and receive his remaining vacation prior to the beginning of his leave. If the employee does not receive all vacation prior to beginning of such leave, the provisions of Section 8 of this Article shall apply to any portion of the employee's vacation not taken.

### Article 32. - Payments During First Seven Days of Sickness Absence

**SECTION 1.** Employees with two or more years of net credited service who, due to sickness, are absent from work during their normal daily tours, half tours or sessions they were scheduled to work within their normal work week shall, after the waiting period outlined below, receive payment for all such further absent time which does not extend beyond the seventh consecutive calendar day beginning with the first day on which they failed to report for duty. The total of all payments for absence made to an employee under this Article, under any other provisions of this Agreement, or which are otherwise paid to him, shall not exceed payment for five days of absence in any one calendar week. If the employee returns to work and is again

absent due to sickness during a period which does not extend beyond the seventh consecutive calendar day beginning with first day on which he failed to report for duty, the waiting period outlined in Section 5 shall be waived for all cases except the first case if the subsequent cases of sickness absence relate to the same sickness.

**SECTION 2.** Any employee who, after reporting for duty for a regularly scheduled tour, becomes ill and is excused from duty shall be paid at his basic hourly rate for the remainder of the half-tour or session in which the absence begins.

**SECTION 3.** Employees directed by their physician to visit a hospital or other medical facility on an outpatient basis in order to have a pre-admission medical test(s)(in connection with either in-patient or out-patient surgery) administered in lieu of similar services rendered on an inpatient basis, will be excused and will be paid for the necessary absent time on the same basis as for absence due to sickness. A copy of the physician's written directive for such tests must be presented to the employee's supervisor prior to the day of the tests. Such time off shall not be chargeable.

**SECTION 4.** The payments referred to above shall be at the employee's basic hourly rate plus any evening and night differential for which the employee is eligible under Article 19.

**SECTION 5.** The waiting period referred to in Section 1 of this Article shall be applied as follows:

| Employees With Net Credited Service of: | Waiting Period |
| --- | --- |
| Two Years But Less Than Five | One Normal Daily Tour |
| Five Years and Over | No Waiting Period |

**SECTION 6.** In the administration of Section 5 of this Article, it is understood that a normal daily tour for full-time employees may consist of two half tours or two sessions. The normal daily tour for a part-time employee shall be the calendar day on which the employee is scheduled and is absent.

### Article 33. - Excused Time

**SECTION 1.** Employees shall be excused by the Company with pay under the following conditions:

(a) *Absence Due to Contagious Disease Quarantine*. Unavoidable absence due to contagious disease quarantine, which is

approved by the Medical Department of the Company, shall be paid for on the same basis as though the absence were due to the employee's personal sickness disability.

(b) *Absence Due to Death in the Immediate Family.* An employee excused because of death in his immediate family shall be paid for necessary absent time but not more than the number of tours he is scheduled to work as part of his normal work week during the five calendar days immediately following the death. "Immediate family" as used in this Article means the employee's parents, grandparents, children, grandchildren, brothers, sisters, husband, wife, mother-in-law, or father-in-law. This term may also include other persons who live in the same house with the employee.

(c) *Absence for Jury Duty, Witness Service Subpoena or Election Official.* An employee who is absent because of jury duty summons, witness service in response to a subpoena in a case before a lawfully constituted authority to which he is not a party or because of service as an Election Official (municipal, county, state or federal) will be paid for such absence; provided, however, the employee must notify the Company that he has been summoned for any of the above reasons, and for jury duty or service as an Election Official he must furnish certification of the dates and hours of service from a duly authorized Court or Election representative. If the employee is excused from serving as a juror, witness or Election Official for the entire day, he shall report for work as scheduled or as soon thereafter as is possible. If the employee is excused from serving as a juror, witness or Election Official for any portion of the day, he shall communicate with supervision for an assignment that is reasonable under the circumstances.

(d) *Absence to Vote.* Employees who are qualified to vote and who are unable to do so outside of their scheduled tours of duty shall be excused with pay for the necessary time not to exceed two hours or to the extent required by law, for the purpose of voting in a municipal, county, state, or national election.

(e) *Absence on Account of "Other Reasons."* Absence on account of other reasons may be granted with or without pay at the discretion of the Company. Absences for reasons not enumerated in this Agreement shall be interpreted to mean absences on account of "other reasons."

**SECTION 2.** Except as otherwise provided in Section 1 of this Article, payments made under any of the above provisions shall be at the employee's basic hourly rate and shall be limited to scheduled normal daily tours within the employee's normal work week. Absent time and excused time granted or paid for under this Article shall not be considered as time worked for any purpose under this Agreement.

It is understood that Company in its discretion may, in any of the circumstances enumerated in Section 1 of this Article, excuse employees with or without pay for periods longer than those provided for in this Article.

### Article 34. - Seniority

**SECTION 1.** Seniority shall be based on net credited service except that during any period of part-time employment, seniority shall be accrued on a pro rata basis; that is, hours of work for part-time employment up to the number of hours per day or per week which constitute respectively a normal daily tour or a normal work week for a comparable full-time employee in the same job title, classification and work group shall be accumulated, and for each accumulation of 150 such hours actually worked, the seniority shall be increased by one month. For purposes of accruing seniority but not net credited service, "hours of work" for part-time employees shall include paid hours classified as vacation, excused or absence time and shall be accumulated and updated on Company records in April and October of each year.*

**SECTION 2.** The Company, in selecting employees for promotions to bargained-for positions with a higher maximum rate, agrees to adhere to the principle that the primary factors governing such selections will be the qualifications of the candidates being considered, provided; that the reclassification of employees to equivalent jobs with higher maximum rates shall not be considered promotions within the meaning of this Section. The employee whom Company finds is best qualified for a given position in the light of these factors will be selected; however, where the Company finds the qualifications of two or more employees substantially the same, it will select from among them the employee with the greatest amount of seniority. Nothing in this paragraph shall be construed to

---

*Effective April 1, 1996.

prevent Company from promoting employees for unusually meritorious service or exceptional ability.

**SECTION 3.** In requiring the transfer of employees to "equivalent jobs" as defined in Article 23, Section 1(e), the Company shall adhere to the principle of seniority based on net credited service and shall require such transfers of employees in the relevant work group, as designated by the Company, to be made in inverse order of seniority, subject to the Company's determination of qualifications of individual employees to perform the assignment.

**SECTION 4.** To the extent permitted by work requirements, service conditions and the ability of the employee, seniority shall be the controlling factor in the selection of vacation periods by all employees, except Category IV, within each work group as determined by the Company.

**SECTION 5.** To the extent permitted by work requirements, service conditions and the ability of the employee, seniority shall be the controlling factor in the selection of tours for employees in Categories I, II, III, A and B within each work group. The work group shall be as determined by the Company. Assignment of tours may also be made based on arrangements other than seniority, with agreement of employees within the work group to be assigned; provided that in so doing, no employee's seniority rights shall be abridged. Seniority shall be the controlling factor in the selection of part-time tours by part-time employees in the work group.

**SECTION 6.** It is agreed that employees in Categories I, II, III, A and B, subject to tour selection, shall normally be allowed to select tours, generally not less than every four weeks nor more than six weeks; provided, however, that such selections may be made more or less frequently when Company determines that force and service conditions require. When the Company determines that service and force conditions in a work group require the posting of work schedules on a weekly basis, the Company shall employ open scheduling and affected employees shall be entitled to change their recorded tour preferences at any time prior to the commencement of the weekly cycle of schedule preparation; provided, however, that the Company will not schedule Category I employees on a weekly basis.

**SECTION 7.** Employees in Categories I, II, III, A and B, subject to tour selection, who are hired, promoted, transferred in, returning

from leave of absence, or otherwise added to the work group shall at the time of addition be assigned to an available tour in the schedule of the work group. When a new choice of tours is selected by the work group, these employees shall be allowed to select their tours in accordance with the provisions of Sections 4 and 5 of this Article.

**SECTION 8.** To the extent permitted by work requirements and service conditions, seniority based on net credited service shall govern the selection or assignment of tours and vacations within each job classification in each central office unit for all employees in Category IV. Seniority shall be the controlling factor in the selection of part-time tours by part-time employees in the work group.

**SECTION 9.** The Company shall employ open scheduling in assigning Category IV employees to tours on a weekly basis and central office employees in this category shall be entitled to change their recorded tour preferences at any time prior to the commencement of the weekly cycle of schedule preparation.

**SECTION 10.** Category IV employees who are transferred into central office operating job classifications, shall be assigned whatever vacant tours remain on the schedule at the time of transfer without depriving any present employee of the tour that employee then is entitled to. As vacancies occur through resignation, promotions, transfers out, or other causes, the employees shall step into such vacancies on the seniority list until they have attained their proper place in the schedule in accordance with their seniority, but not later than the starting date for the first selection of tours on the basic schedule after the transfer to the office involved.

**SECTION 11.** The term "Tour" in this Article refers only to the hours assigned by the Company for the normal daily tours comprising the normal work weeks on the posted schedule.

**SECTION 12.** Numerous considerations are involved in the Company's determination of which employees should be selected for job related training. Included among those factors are the seniority, ability and job performance of the employees as well as the force and service conditions of the business.

**SECTION 13.** It is agreed that questions of seniority may be referred to the grievance procedure, but neither the provisions of this Article nor its interpretation or application shall be subject to arbitration, with the sole exception that the provisions of Section 2

may be arbitrated only on the issue of whether the Company has acted reasonably in its selection of an employee for promotion. Notwithstanding the time provisions of Article 13, Section 1(e), no arbitral determination pursuant to this Section shall have retroactive back pay effect more than ninety (90) days prior to the date of the Arbitrator's decision.

### Article 35. - Force Adjustment, Layoff, Part-timing and Rehiring After Layoff

**SECTION 1.** Whenever, in the judgment of the Company, there exists an occasion to adjust force because of technological change (defined as changes in equipment or methods of operation), or for reasons other than technological change, the Company shall determine the extent of the adjustment required, the effective date or dates thereof, and the job titles, work groups and localities affected.

**SECTION 2.** Prior to taking any steps under this Article which may require part-timing, reassignment to lower paid job titles or classifications, involuntary transfer which necessitates a change in residence (i.e., to a work location which is at least thirty-five (35) miles farther from his residence than the distance from his residence to his existing work location), termination or layoff of regular employees, except regular term employees, the Company, where Article 36A applies, shall offer the benefits provided by such Article pursuant to the terms of, and to the extent authorized by, said Article to eligible employees in the work groups and localities affected.

**SECTION 3.** If, in the judgment of the Company, additional force adjustments are required that may require part-timing, reassignment to lower paid job titles or classifications, involuntary transfer which necessitates a change in residence, termination or layoff of regular employees, except regular term employees, the Company shall give at least ninety (90) days notice to the Union of its intention to make force adjustments and negotiate with the Union about the method or methods to be used. If an agreement as to the method or methods to be used is not reached by the Company and the Union within thirty (30) days from the date that the Company notified the Union, the Company may then proceed as hereinafter outlined in this Article.

**SECTION 4.** Sixty (60) days prior to the effective date or dates of the force adjustment the Company shall inform the Union of any

job vacancies which it determines are available to employees in the affected job titles, work groups and localities.

The Company shall offer those vacancies which it determines are available to the affected regular employees, except regular term employees, (excluding those vacancies in jobs which would result in promotions for the affected employees) in seniority order, subject to the Company's determination of an employee's ability to perform satisfactorily the work in the vacancy of his choice. An employee shall have a maximum of seven (7) calendar days following the Company's offer in which to indicate his choice with respect to the available vacancy(ies).

(a) If pursuant to this Section an affected employee is reassigned to an available job vacancy which requires a change in residence the Company shall offer the employee the options provided in Article 23, Section 3.

(b) If pursuant to Article 34, Section 2 an affected employee is selected for and accepts a promotion to a job classification with a higher maximum rate at a work location which requires a change in residence the Company shall offer the employee the options provided in Article 23, Section 3, provided the Company determines that such promotion will reduce the need to take any of the steps set out in Section 5(a), (b) and (c) of this Article.

(c) If pursuant to this Section an affected employee is limited in his choice of an available job to either: (1) a work location which requires a change in residence; or (2) a lower paid job title or classification, except a job title in an equivalent job classification as defined in Article 23, Section 1(e), the employee may elect not to accept such reassignment and shall be paid a termination allowance pursuant to Section 7 of this Article. Provided, however, that if such employee has five (5) or more years of net credited service, he may also elect, within seven (7) days prior to the force effective date, to claim the job of the employee having the least seniority of all employees in all work locations within a thirty-five (35) mile radius of the claimant's existing work location in the claimant's job title, or any other job title in the claimant's classification which the claimant has previously held. Provided further, however, that the claimant may not claim a job unless the Company determines that he is able

to perform it satisfactorily and he is senior to the employee whose job is claimed.

(d) If an affected employee refuses or fails to accept a transfer in the same job classification or in an equivalent job classification as defined in Article 23, Section 1(e) at a work location which does not require a change in residence he shall receive no termination allowance.

**SECTION 5.** If, after making the offers provided in Section 4 of this Article, the Company determines that further force reductions are needed in the job titles, work groups and localities affected, the Company will proceed, in a sequence to be determined by the Company to:

(a) Terminate all contracts providing for service to be furnished within the locality affected by plant construction, line and tree trimming crews under independent contractor relationships before any Category I employees within such locality are laid off. This provision shall not be construed to require the Company to terminate any such contract contrary to its termination provision or otherwise to require the Company to breach its contract. Where such contracts require notice before termination, the Company shall not be prevented from proceeding with the other steps hereinafter set forth during the notification period. The Company may also retain contract labor while proceeding with the steps hereinafter set forth (1) unless the Company's employees can safely, properly and economically perform those types of operations, or (2) where the Company's employees are not properly qualified for such work either under the law or under regulations of governmental authorities prescribing the qualifications therefor.

(b) Lay off all temporary and occasional employees and terminate all regular term employees engaged within the job titles, work groups and localities affected.

(c) After (b) above, lay off all regular employees engaged in the affected job titles, work groups and localities, said employees to be selected by length of service groups and in the sequence outlined below, provided that all employees shall be laid off in the inverse order of their seniority:

    (1) Employees with less than five (5) years of net credited service, but to avoid such layoffs the Company may sub-

stitute part-timing of full-time employees with less than five (5) years of net credited service or combine such part-timing with layoffs as it deems appropriate. However, an employee who is part-timed under this provision shall be scheduled to work no less than five (5) normal daily tours in any two (2) calendar weeks.

(2) Each subsequent group thereafter shall be composed of employees in the next successive year of net credited service.

**SECTION 6.** An employee who is notified by the Company that he is to be laid off pursuant to Section 5(c) and who has more than five (5) years of net credited service shall have seven (7) calendar days to exercise one of the following options:

(a) Claim the job of the employee having the least seniority of all employees in all work locations within a thirty-five (35) mile radius of the claimant's existing work location in:

    (1) the claimant's job title, or

    (2) any other job title in the claimant's classification which the claimant has previously held; or

(b) Claim the job of the employee having the least seniority of all employees in all work locations within the Area in:

    (1) the claimant's job title, or

    (2) any other job title in the claimant's classification which the claimant has previously held; or

(c) Claim the job of the employee having the least seniority of all employees in any job classification having a lower maximum basic weekly wage (other than an equivalent job classification as defined in Article 23, Section 1(e)) in the Area in which the claimant is being laid off. Provided, however, that if the claimant is junior to all employees in the Area in all job classifications having a lower maximum basic weekly wage (other than an equivalent job classification as defined in Article 23, Section 1(e)), he may claim the job of the employee in the bargaining unit having the least seniority in any such classification.

An employee may not claim a job unless the Company determines that he is able to perform it satisfactorily and he is senior to the

employee whose job is claimed. A claimant shall be eligible for moving expenses in accordance with Section 4(a) of this Article.

An employee whose job is claimed shall be offered job vacancies in accordance with Section 4 of this Article. If no vacancy is available under Section 4, the employee whose job is claimed will be laid off unless he is eligible and able to avoid such lay off by exercise of the options specified in this Section. Employees whose jobs are claimed and who are terminated or laid off pursuant to Section 4(c) or 5(c) of this Article shall, depending on eligibility, be given the ISP benefits specified in Article 36A, Sections 2 through 4.

#### SECTION 7.

(a) The provisions of Article 37 shall not be applicable to terminations or layoffs resulting from force adjustments.

(b) If during a force adjustment, an employee who declines ISP is terminated or laid-off (pursuant to Section 4(c) or 5(c) of this Article), the employee will be paid as a termination allowance the ISP benefits specified in Article 36A, Sections 2 through 4 he would have been eligible to receive at the time of the ISP offer.

(c) If an employee receives a layoff, termination or similar allowance from the Company or from an affiliate or subsidiary company within the former Bell Atlantic Network Services Group, and is subsequently employed by the Company, and the number of weeks since the date of his separation is less than the number of weeks' basic pay (or an amount equivalent thereto) received as a layoff, termination or similar allowance, the amount paid to the employee for the excess number of weeks shall be refunded to the Company through payroll deduction in each payroll period at the rate of ten percent (10%) of the employee's basic weekly wage.

(d) An employee who is engaged (or reengaged) by the Company and again separated from the payroll after having former service credited shall upon his layoff or termination be paid the difference between the amount of the layoff or termination allowance to which he is entitled pursuant to Article 36A, and any former layoff, termination or similar allowance received from, and not refunded to, an employer where service credit was earned.

(e) Employees who elect ISP or who are terminated or laid-off in conjunction with a force adjustment shall also be paid for any unused vacation to which they are entitled.

**SECTION 8.** If the Company desires to hire regular non-supervisory employees within a job title, work group and Area in which there has been a layoff or termination under this Article, the Company agrees to offer reemployment under the conditions hereinafter provided in this Article to former regular employees previously engaged in such jobs.

Reemployment shall be offered to former regular employees, except regular term employees, in the order of seniority among those laid off or terminated pursuant to Section 5(c) or 4(c) of this Article, under the following conditions:

(a) The former employee had one year or more of net credited service at the time he was laid off or terminated.

(b) The period of time elapsing since the layoff or termination of the former employee has not exceeded three (3) years.

(c) The former employee is qualified in the judgment of the Company to perform available work at the time the offer of reemployment is made.

(d) The former employee shall accept and be available for reemployment within fourteen (14) calendar days after the date of the offer to reemployment. It shall be the obligation of former employees to keep the Company advised of their home addresses, and the Company shall be deemed to have complied with the provisions of this Section upon mailing the offer of reemployment to the last known address of the former employee.

**SECTION 9.** The provisions of this Article shall not be construed to prevent the Company from:

(a) Transferring employees from one job classification to another (either at the same location or in another location) or transferring employees from one location to another without change in job title.

(b) Making layoffs or part-timing in any job title, work group and locality on account of normal fluctuations of the business,

because of minor force adjustments or because of changes in practices, types of equipment or methods of operations.

(c) Engaging line, construction, or tree trimming crews on an independent contractor relationship or engaging any person on a temporary or occasional basis.

(d) Making layoffs or part-timing within any job title, working force, or locality because of reductions in work volume or force requirements caused directly or indirectly by conditions resulting from a labor dispute.

(e) Retaining necessary employees, as determined by the Company, up to ten percent in each job title, locality and affected work group and retaining necessary employees in those jobs requiring "specialized training."

### Article 36A. - Income Security Plan (ISP)

**SECTION 1.** If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in any job title in a work location which will necessitate layoffs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work locations requiring a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees who have at least one (1) year of net credited service may elect, in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Security Plan (ISP) benefits described in this Article, subject to the following conditions:

(a) The Company shall determine the job titles and work locations in which a surplus exists, the number of employees in such titles and locations who are considered to be surplus, and the period during which the employee may, if he or she so elects, leave the service of the Company pursuant to this Article. Neither such determinations by the Company nor any other part of this Article shall be subject to arbitration.

(b) The number of employees who may make such election shall not exceed the number of employees determined by the Company to be surplus.

(c) An employee's election to leave the service of the Company and receive ISP payments must be in writing and transmitted to the Company within thirty (30) calendar days from the date of the Company's offer in order to be effective and it may not be revoked after such (30) calendar day period.

**SECTION 2.**

(a) For an employee who so elects in accordance with this Article, the Company will pay an ISP Termination Allowance or One Thousand One Hundred Dollars ($1,100.00), less withholding taxes, for each completed year of net credited service up to and including thirty (30) years, for a maximum of Thirty Three Thousand Dollars ($33,000.00) prior to withholding taxes.

(b) If the total amount of the ISP Termination Allowance prior to deductions for taxes does not exceed Ten Thousand Dollars ($10,000.00), that allowance shall be paid in a single lump sum within thirty (30) calendar days after the employee has left the service of the Company.

(c) Except when (b) above applies, an employee may select one of the following irrevocable payment options:

   (i) Forty-eight (48) monthly payments beginning the month following the month in which the employee leaves the service of the Company. Employees who elect this option and are within forty-eight (48) months of their sixty-seventh (67th) birthday will be paid their monthly payments over the months remaining up to their sixty-seventh (67th) birthday.

   (ii) Half of the ISP Termination Allowance prior to deductions for taxes, in a lump sum, with the remaining half paid in forty-eight (48) monthly payments as described in (i) above. Such lump sun payments shall be paid within thirty (30) calendar days after the employee has left the service of the Company.

**SECTION 3.** In addition to the ISP Termination Allowance, for an employee who so elects to leave the service of the Company in accordance with Section 1 above, the Company, as an ISP Expense Allowance, will reimburse the employee for the actual expenses incurred for relocation costs, tuition or training costs, or job placement expenses related to seeking other employment, or

any combination thereof, up to an amount not to exceed Seven Hundred Fifty Dollars ($750.00) for each year of net credited service (prorated for any partial year of service) to a maximum of Three Thousand Seven Hundred Fifty Dollars ($3,750.00). Any such expenses for which reimbursement will be made must be approved by the Company prior to being incurred and must be incurred within one (1) year from the date of termination of employment except that reimbursement for tuition or training costs will be made for such expenses incurred within two (2) years from the date of termination of employment.

**SECTION 4.** The years of net credited service in determining the ISP Termination Allowance and the ISP Expense Allowance shall be prorated for any period of time during which an employee is (was) employed on a part-time basis in the same manner as net credited service is prorated based on part-time hours pursuant to the Verizon Pension Plan for Mid-Atlantic Associates.

**SECTION 5.** If the recipient of an ISP Termination Allowance is reemployed within forty-eight (48) months by the Company or by an affiliate or subsidiary company within the former Bell Atlantic Network Services Group, ISP termination allowance payments will cease. If the termination allowance was being paid in forty-eight (48) monthly payments (with no lump sum), no repayments is required. If the employee received a lump sum, or a partial lump sum and monthly payments, the employee will repay the excess over what he or she would have received if payments had been made under the forty-eight (48) monthly payment schedule. Such repayment will be made through payroll deduction in each payroll period at the rate of ten percent (10%) of the employee's basic weekly wage.

### Article 36B. - Employment Security Training

**SECTION 1.** *Personal or Career Development Training.* Personal or career development training programs will be designed as an educational self-development aid to assist employees in their personal development or preparing them for career progression opportunities or job changes within the Company.

(a) Training under such program will be generic in nature as opposed to job specific and will cover technical, sales, clerical and other fundamental skills.

75

(b) Any regular employee, except a regular term employee, with at least one year of net credited service will be eligible to participate in such training program under the terms of such program.

(c) Participation by employees in the personal or career development training program will be voluntary, and time spent by employees in such training will be outside scheduled working hours and not paid or considered as time worked for any purpose.

(d) Successful completion by an employee of any training or courses offered pursuant to such program will be taken into account by the Company when considering the employee for an upgrade or transfer.

**SECTION 2.** *Job Displacement Training.* Job displacement training opportunities will be offered to prepare employees whose jobs are being displaced, or whose jobs are being restructured or redefined to a wage schedule with a lower maximum wage rate, to enhance their ability to qualify for anticipated job vacancies within the Company or for job opportunities external to the Company.

(a) *Internal Job Vacancies.* Employees will be informed of potential displacements as soon as possible and, depending on the number of any anticipated job openings, will be offered training, if necessary, which is intended to enable them to qualify for such job openings in the Company.

(b) *External Job Opportunities.* For any such employees (those being displaced) interested in seeking employment external to the Company, the Company will reimburse the employee for actual expenses incurred for job specific tuition, training, or counseling not covered by the Tuition Aid Plan, related to seeking such other employment. Reimbursement for such expenses shall be made up to an amount not to exceed $500 for each year of net credited service (prorated for any partial year of service) to a maximum of $2,500.00. Any such expenses for which reimbursement will be made must be approved by the Company prior to being incurred and while the employee is still on the active payroll of the Company.

(c) Only regular employees, except regular term employees, who are notified of potential displacement from their current job or

restructuring of that job to a lower maximum wage rate will be eligible to participate in such training as covered in (a) and (b).

(d) Participation by employees in job displacement training programs will be voluntary, and time spent by employees in such training will be outside scheduled working hours and not paid or considered as time worked for any purpose unless the Company determines it appropriate in specific instances to permit employees to receive such training during working hours.

**SECTION 3.** *Training Advisory Board.* There will be a Training Advisory Board consisting of three Union representatives, three Management representatives and a professional educational counselor selected by the Training Advisory Board from the academic community. The Board will meet periodically and have responsibility for:

(a) furnishing advice to the Company on personal or career development and job displacement training courses and curricula:

(b) reviewing and making recommendations regarding training delivery systems (e.g., technical schools, community colleges, home study programs, etc.) available to be used by the Company.

(c) evaluating the effectiveness of such training programs and courses and the delivery systems utilized;

(d) encouraging employees to participate in and successfully complete the available training courses; and

(e) researching and recommending through the educational counselor, appropriate educational counseling programs to be made available to those employees interested in seeking employment outside the Company.

The Union and the Company will each be responsible for the respective costs and expenses of their representatives' participation on the Training Advisory Board and will share equally in the joint costs and expenses incurred by the Board. The Company will be responsible for the costs and expenses of the professional educational counselor.

Nothing in this program will supersede the applicable promotion or transfer provisions of the contract.

### Article 36C. - Reassignment Pay Protection Program (RPPP)

**SECTION 1.** If the Company notifies the Union that a need exists to adjust force and employees are reassigned or voluntarily transferred in lieu of others being reassigned to vacancies where the rate of pay for the new job is less than the current rate for the employee's former job, then, notwithstanding the provisions of Article 23, Section 2(c), the rate of pay will be reduced over a period of time based on the employee's length of service. The reductions in pay are effective at periods following reassignment as shown below and are based on the difference in rates for the old and new jobs:

#### 0-5 Years

| | |
|---|---|
| Weeks 1 thru 4 | -No reduction |
| Weeks 5 thru 8 | -1/3 reduction |
| Weeks 9 thru 12 | -2/3 reduction |
| Weeks 13 and thereafter | -Full reduction |

#### 5+ Years

| | |
|---|---|
| Weeks 1 thru 56 | -No reduction |
| Weeks 57 thru 60 | -1/3 reduction |
| Weeks 61 thru 64 | -2/3 reduction |
| Weeks 65 and thereafter | -Full reduction |

**SECTION 2.** However, notwithstanding the foregoing schedule, an employee with fifteen (15) years or more of net credited service who, due to technological change, is assigned to a vacancy with a lower rate of pay than the then current rate of the employee's regular job shall continue to be paid in the lower paid job an amount equivalent to the rate of pay of the higher paid job in effect at the time of the downgrade for a period of thirty-six (36) months following the effective date of such downgrade. Thereafter, the following schedule in reduction shall apply:

| | |
|---|---|
| Weeks 1 thru 4 | -No reduction |
| Weeks 5 thru 8 | -1/3 reduction |
| Weeks 9 thru 12 | -2/3 reduction |
| Weeks 13 and thereafter | -Full reduction |

**SECTION 3.** The employee, however, shall receive any increases in pay in amounts which are applicable for a comparable employee in the lower rated job to which downgraded.

**Article 37. - Termination Allowances**

**SECTION 1.** Termination allowances in amounts computed in accordance with Section 3 of this Article will be paid to:

(a) Regular full-time employees whose service is terminated by the Company under any of the following conditions as determined by the Company:

    (1) Dismissal (except for misconduct); provided that the regular full-time employee has completed one (1) or more years of continuous service at the time of dismissal.

    (2) Retired at the age of seventy (70) without a service pension; provided that the regular full-time employee has completed one (1) or more years of continuous service.

**SECTION 2.** Termination allowances will not be paid to employees who are dismissed for misconduct, resign, voluntarily retire or who otherwise leave the service of the Company under conditions not specified in Section 1 of this Article.

**SECTION 3.** The amount of the termination allowance paid in accordance with this Article shall be computed at the employee's basic weekly wage in accordance with the following schedule:

| Number of Years Net Credited Service: | Number of Weeks Pay: |
|---|---|
| (a) Less than 4 years | 1 |
| (b) 4 years but less than 6 years | 3 |
| (c) 6 years but less than 8 years | 5 |
| (d) 8 years but less than 10 years | 8 |
| (e) 10 years but less than 16 years | 10 |
| (f) 16 years but less than 20 years | 20 |
| (g) 20 years but less than 25 years | 25 |
| (h) 25 years but less than 30 years | 35 |
| (i) 30 years and over | 40 |

An employee qualified to receive a termination allowance under this Article who leaves the service of the Company before receiving a vacation which he is eligible to receive at the time of his separation shall receive vacation pay in addition to the termination allowance.

The Company may in its discretion pay termination allowances

amounts greater than those provided in this Section, such amounts to be determined by Company on an individual basis.

**SECTION 4.**

(a) If an employee received a termination or similar allowance from the Company or from an affiliate or subsidiary company within the former Bell Atlantic Network Services Group and is subsequently employed by the Company, and the number of weeks since the date of his separation is less than the number of weeks' basic weekly wage received as a termination or similar allowance, the amount paid to the employee for the excess number of weeks shall be refunded to the company through payroll deduction in each payroll period at the rate of ten percent (10%) of the employee's basic weekly wage.

(b) An employee who is engaged (or re-engaged) by the Company and again separated from the payroll after having former service credited shall, upon his termination be paid the difference between the amount of termination allowance computed in accordance with the provisions of this Article and any former termination or similar allowance received from, and not refunded to, an employer where service credit was earned.

#### Article 38. - Excused Work Days

**SECTION 1.** Each regular employee who has at least six (6) months net credited service on January 1 of the current year shall be eligible for four (4) Excused Work Days with pay and one (1) Excused Work Day without pay during the year.

**SECTION 2.** Employees who do not work on their paid Excused Work Day shall be paid for the day as if for a normal or standard day worked (excluding any wage incentive or productivity payments) provided they are on the active payroll of the Company on that Excused Work Day; except that the pay for a part-time employee shall be based upon the normal daily tour of a full-time employee multiplied by the part-time employee's "Part-Time Factor," as defined in Article 40, Section 7B.

**SECTION 3.** One paid Excused Work Day in each calendar year may be designated by the Company for employees in an administrative work group (as designated by the Company) or in any larger group, including the entire Company. Employees (except occasional employees) in any such group for which an Excused Work

Day is designated by the Company and who are not otherwise eligible for a paid Excused Work Day shall be excused and paid for such designated day as set forth in Sections 1 and 2 provided they are on the active payroll of the Company on the designated Excused Work Day.

**SECTION 4.** Employees who are on vacation or absent with pay on their paid Excused Work Day for reasons other than having observed it as an Excused Work Day shall have their paid Excused Work Day rescheduled if a vacation day would have been rescheduled under the same circumstances.

**SECTION 5.** If employees agree to work on their paid Excused Work day and the Company determines that the day cannot be rescheduled, they shall be paid as applicable in accordance with the following paragraphs:

(a) Employees who agree to work before the work schedule is established pursuant to Article 25, Sections 1 and 6 shall receive one day's pay as set forth in Section 2 of this Article in lieu of their Excused Work Day and shall in addition be paid for the tour actually worked.

(b) Employees who agree to work after the work schedule is established pursuant to Article 25, Sections 1 and 6 shall receive one day's pay as set forth in Section 2 of this Article in lieu of their Excused Work Day and shall in addition be paid for the tour actually worked and given any additional options which may be available to them pursuant to Article 25, Section 2.

(c) Time worked by an employee on his or her Excused Work Day shall be considered time worked on a regularly scheduled day of work for all purposes, except as is otherwise expressly provided in this Article.

#### Article 39. - Contract Labor

**SECTION 1.** The Company will endeavor to maintain its established policies as to the assignment of work in connection with the installation and maintenance of communication facilities owned, maintained and operated by the Company.

**SECTION 2.** The Company will give the Union notice before it enters into any contract with any change in arrangements to do work normally done by the Company's employees.

**Article 40. - Definitions**

**SECTION 1.** The definition of "employee" or "employees" shall be individual to each Area as follows:

(a) *In Washington Area.* "Employee" or "employees" shall be deemed to mean all non-supervisory employees (except confidential) employed in the job classifications listed in Exhibit A; such non-supervisory employees shall include regular, temporary, regular term, and occasional employees.

(b) *In Maryland Area*. "Employee" or "employees" shall be deemed to mean all non-supervisory employees (except confidential) in the job classifications listed in Exhibit A; such non-supervisory employees shall include regular, temporary, regular term, and occasional employees.

(c) *In Virginia Area*. "Employee" or "employees" shall be deemed to mean all non-supervisory employees (except confidential) employed in the job classifications listed in Exhibit A; such non-supervisory employees shall include regular, temporary, and regular term employees.

(d) *In West Virginia Area*. "Employee" or "employees" shall be deemed to mean all non-supervisory employees (except confidential) employed in the job classifications listed in Exhibit A; such non-supervisory employees shall include regular, temporary, regular term, and occasional employees.

**SECTION 2.** "Regular employees" are employees whose employment is reasonably expected to be permanent at the time they are engaged although it may be terminated subsequently by action on the part of the Company or the employee.

**SECTION 3.** "Temporary employees" are employees whose employment is intended to last more than three (3) weeks, but not more than six (6) months. Such employees shall be reclassified as "regular" or "regular term" employees, as appropriate, if their employment exceeds six (6) months continuous service since the date of last engagement.

**SECTION 4.** "Regular term employees" are employees whose employment is intended to last more than six (6) months, but not more than thirty (30) months. Regular term employees are engaged with the definite understanding that their employment is to terminate upon the completion of a specific project and that they

will remain in the same occupation for the duration of their term of employment. Regular term employees shall receive all the benefits to which regular employees are entitled except that the contract provisions dealing with layoffs and termination allowances shall not be applicable. Before the Company hires a regular full-time employee to fill a vacancy, the Company will give first preference to any qualified term employee who is performing at a satisfactory level in the job title, work group, and geographic location in which the vacancy exists.

**SECTION 5.** "Occasional employees" are employees who are engaged for a period of not more than three (3) consecutive weeks, or for a cumulative total of not more than thirty (30) days, in any calendar year, regardless of the length of daily or weekly assignments. Occasional employees who actually work or are engaged to work in excess of three (3) consecutive weeks or thirty (30) days in a calendar year shall be reclassified to: regular, regular term, or temporary, and to full-time or part-time status, as appropriate.

**SECTION 6.** "Full-time employees" are employees whose employment contemplates their working in each calendar week a normal work week as defined in Section 9, Paragraph (d) of this Article.

**SECTION 7.** "Part-time employees" are regular, regular term, temporary or occasional employees who are employed and normally scheduled to work less hours per average month than comparable full-time employees in the same job title, classification and work group working the same normal daily tour.

**SECTION 7A.** "Part-Time Equivalent Work Week" is the number of normally scheduled hours per month for a part-time employee divided by 4.35 and rounded to the next higher whole number. (Illustration: 60 hours per month divided by 4.35 equals 13.8 rounded to 14.) The number of normally scheduled hours shall not include overtime hours. In April and October of each year, the part-time equivalent work week shall be adjusted, if appropriate, on a prospective basis following a retrospective analysis of the employee's "hours actually worked" per month for the preceding six (6) months. For new employees the normally scheduled hours shall be estimated prospectively.

**SECTION 7B.** "Part-Time Factor" is the ratio of a part-time employee's "Part-Time Equivalent Work Week" to the normal work week of a full-time employee in the same job title, classification and work group working a comparable tour. (Illustration: A part-time employ-

ee normally scheduled 60 hours per month has a "Part-Time Equivalent Work Week" of 14. The comparable tour of a full-time employee is 40 hours per week. The "Part-Time Factor" for the part-time employee would be 14 divided by 40 equals .35.)

**SECTION 8.** The terms "Job Category" or "Job Categories" as used herein are as shown in the appropriate Exhibit. An employee shall be deemed to be in that Job Category in which his Job Title is listed in accordance with the following:

    I. (Craft, 40 Hour)
    II. (Non-Craft, 40 Hour)
    III. (Clerical, 40 Hour)
    IV. (Traffic Central Office, 37 1/2 Hour)
    A. (Non-Clerical, 37 1/2 Hour)
    B. (Clerical, 37 1/2 Hour)

**SECTION 9.** Work Session, Normal Daily Tours and Normal Work Weeks.

(a) A "normal daily tour" for Category I, II and III full-time employees shall be eight working hours.

(b) (1) A "normal daily tour" for Category IV full-time employees shall be seven and one-half (7 1/2) working hours except as shown below:

|  | Washington Area | Maryland Area | Virginia Area | West Virginia Area |
|---|---|---|---|---|
| Short Hour Evening | 6 hours(1) | 6 hours(4) | 6 hours(2) | _____ |
| Morning-Evening | 7 hours(3) | 7 hours(5) | 7 hours | 7 hours |
| Afternoon-Evening | 7 hours(3) | 7 hours(5) | 7 hours | 7 hours |
| All Night | 7 hours | 7 hours | 7 hours | 7 hours |

    (1) Ending at or after 10:30 P.M.

    (2) Applicable only to Richmond Toll or Norfolk Toll Offices for tours ending at or after 10:30 P.M.

    (3) Such tours extending beyond 7 P.M. but ending before 10:30 P.M.

    (4) Applicable only to Locality Wage Group B offices for tours ending after 10:00 P.M.

    (5) Such tours extending beyond 7:00 P.M.

        (1) A "normal daily tour" for Category IV full-time employees shall consist of two work sessions. For seven and seven and one-half hour tours, the first session shall be that portion of the normal daily tour which is scheduled before the assigned lunch period or shall be the hours of work assigned in the first portion of a morning-evening tour; and the second session shall be that portion of the normal daily tour which is scheduled after the assigned lunch or supper period or the hours of work assigned in the last portion of the morning-evening tour. For "short hour evening tours" the first three hours of the tour shall be the first session and the last three hours shall be the second session.

        (2) A Category IV employee shall be given one fifteen (15) minute relief period in each session, except that for those employees working a Short Hour Evening Tour a one-half hour relief period shall be given in lieu of two fifteen (15) minute relief periods. It is understood that the granting of relief periods shall be contingent upon service and force conditions.

(c) A "normal daily tour" for Category A and B full-time employees shall be 7 1/2 working hours.

(d) A "normal work week" for Category I, II, III, IV, A and B full-time employees shall consist of five normal daily tours except for Building Attendants, and Guards whose normal work week may consist of four such tours and two part tours (equaling one normal daily tour) which may be scheduled on any of the seven days of the calendar week. This normal work week shall not be deemed to include additional time worked or additional hours assigned.

**SECTION 10.** "Basic weekly wages" shall mean the basic wages paid for a normal work week. The term "basic weekly wages" shall not be deemed to include differential payments, premium payments for Sunday or holiday work, overtime payments or temporary assignment payments, except as provided in Article 22, Section 6 of this Agreement.

**SECTION 11.** An employee's "basic hourly rate" shall be determined by dividing the employee's basic weekly wage by the number of hours in the employee's normal work week, except that the "basic hourly rate" of a Category IV full-time employee on a particular day shall be determined by dividing his basic weekly wage by either 30, 35 or 37 1/2 hours depending on whether he is working a 6, 7 or 7 1/2 hour tour on that day; provided, however, the "basic hourly rate" of a Category IV part-time employee who is not assigned a full normal daily tour as defined in Section 9(b) of this Article shall be determined by dividing his basic weekly wage by 37 1/2 hours.

**SECTION 12.** The term "increase interval," as used in this Agreement in determining the dates on which increases shall be granted, represents the normal interval between two wage increases. In the event of absence for any reason continuing for more than one month, one month for each whole month of continuous absence, including the first month, shall be added to the increase interval.

**SECTION 13.** The term "net credited service" shall mean "term of employment" as defined in the Verizon Pension Plan for Mid-Atlantic Associates.

**SECTION 14.** The term "continuous service," as used in this Agreement, shall mean the accumulated service since date of last engagement less deductions due to leaves of absence.

**SECTION 15.** The term "job classifications," as used herein, shall mean those individual job classifications specified by titles and associated wage schedules attached to this Agreement.

**SECTION 16.** The term "Union Representative" shall refer to an employee of the Union who is designated by the Union to represent the bargaining unit. The term "Local Representative" shall refer to an elected officer of a Local or a person designated by the Local as a steward.

**SECTION 17.** The term "weekday," as used in this Agreement, shall be deemed to mean any day of the calendar week other than Sunday.

**SECTION 18.** "Non-supervisory employees" as used in this Agreement, shall be deemed to mean those employees engaged within the job classifications included in this Agreement.

**SECTION 19.** "Wage experience credit" as used in this Agreement shall mean the cumulative number of months corresponding to the employee's basic weekly wage on the wage schedule applicable to the assignment from which the employee is being promoted.

**SECTION 20.** "Job Title Groups." Job titles contained in this Agreement are assigned to Job Title Groups as set forth in Exhibit A.

**SECTION 21.** "Step down point" and "step down rate." The step down point is defined as the cumulative number of months which on any wage schedule applicable to job titles in Job Title Groups 9, 10 and 11 correspond to the basic weekly wage step six (6) months below the maximum wage, and which on any wage schedule applicable to job titles in Job Title Groups 5, 6 and 7 correspond to the basic weekly wage step twelve (12) months below the maximum wage. The basic weekly wage corresponding to the step down point is defined as the step down rate.

### Article 41. - Cancellation and Duration

**SECTION 1.** This Agreement sets forth all of the understandings and commitments existing between the parties, and it is agreed that the parties shall not be bound by any understandings or commitments not included herein, except that written Agreements modifying the provisions of this Agreement, or covering conditions not contained in this Agreement, shall be binding on the parties, but only if such Agreements are signed by the authorized representatives of the parties.

**SECTION 2.** Nothing in Section 1 of this Article shall be construed to relieve either the Company or the Union from obligations assumed in the settlement of a grievance; however, no grievance settlement shall have any binding application beyond the particular employee or employees for whom the grievance is presented unless the settlement is adopted by the parties through collective bargaining and reduced to writing in the form of an addition or an amendment to this Agreement.

**SECTION 3.** This Agreement shall be effective as of August 3, 2003, and shall continue in full force and effect until its termination at 11:59 P.M. on August 2, 2008.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their names by their duly authorized representatives the day and year first above written.

Verizon Washington, DC Inc.   Communications Workers
Verizon Maryland Inc.      of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. – Virginia
Verizon Corporate Services Corp.

By _____  By _____

 Company Bargaining Chair   Union Bargaining Chair

         Approved:

       _____

       President C.W.A

**EXHIBIT I**

_____    _____
(Last Name) (First Name and Initials)          (Social Security No)

(Please Print Above Information)

**AUTHORIZATION FOR PAYROLL DEDUCTION
OF AMOUNTS EQUAL TO UNION DUES**

To:

Verizon Services Corp.
Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. – (Virginia)
Verizon Corporate Services Corp.

Following your receipt of this authorization, I, the undersigned, hereby authorize you to deduct from my pay (including sickness or accident disability payments) amounts equal to regular monthly union dues. This authorization is being made voluntarily and is not conditioned on, or in exchange for, my present or future membership in any union.

The intervals and amounts to be deducted are those which are certified in writing by the Secretary-Treasurer of CWA. I authorize the amounts so deducted to be paid by my employer to the Secretary-Treasurer of CWA.

If after all other authorized or required deductions my pay (including sickness or accident disability payments) is not sufficient to permit the applicable deduction, it is understood that such amounts owed will be deducted by an accumulated deduction in any succeeding deduction period in which my pay is sufficient, during the four consecutive weeks (or month) immediately following; provided, however, that in no event shall deduction of more than four weeks (or one month) dues or amounts equivalent thereto, be so made up.

Deductions under this authorization shall not be made while I am on leave of absence, but such deductions shall be resumed beginning with the first regular dues deduction period following my return to active duty unless this authorization has been canceled.

If however, my leave of absence is less than one month, dues or amounts equivalent thereto not deducted during that absence will also be deducted in the first regular dues deduction period following my return to duty.

I understand that my employer assumes no responsibility in connection with the above deduction except that of forwarding amounts deducted from my pay to the Secretary-Treasurer of CWA.

This authorization shall automatically be canceled when I cease to be a CWA-represented employee in any of the Companies specifically identified at the top of this form. In addition, I understand that I may cancel this authorization by sending to my employer by mail a written notice signed by me and postmarked during the fourteen (14) day period prior to each anniversary date of the current or any subsequent collective bargaining agreement, or during the fourteen (14) day period prior to the termination date of the current or any subsequent collective bargaining agreement, or during the fourteen (14) day period following a change in my normal reporting location from one State (or the District of Columbia) to another State (or the District of Columbia).

Union membership dues and agency fees are not deductible as charitable contributions for Federal Income Tax purposes. Dues and agency fees, however, may be deductible in limited circumstances subject to various restrictions imposed by the Internal Revenue Code.

This authorization cancels as of its effective date any previous authorization for payroll deduction of dues which I have heretofore given.

_____    _____
(Date)                              (Signature of Employee)

In addition, I voluntarily authorize the deduction from my pay an amount of $_____ in payment of my initiation fee.

_____    _____
(Date)                              (Signature of Employee)

## NEGOTIATED AGREEMENT ON JOB DUTIES

I. **Communications Representatives And Management Sales Persons (8-10-86)**

   A. The division of responsibility between the bargaining unit job of Communications Representative and the jobs of management salespersons shall be as follows:

   **Communications Representative**

   In those cases assigned to them, Communications Representatives will respond to client sales and servicing demands, provide pre and post-sales support, and post installation servicing support activity on marketing assigned accounts. This position requires routine client premise interface and is responsible for ensuring client satisfaction for the provision of data, networking, and voice communications systems.

   The Communications Representative will handle servicing activities on all sales when required. Servicing activities include, but are not limited to, pre sale contract preparation, usage prospecting, station reviews, preparation of proposals, presentation of recommendations, and implementation of sale.

   However, in cases where it is determined that a complex analysis of and recommendation for a communications system is required, selling and sales support activities will be handled and/or directed by a management sales person.

   **Management Salesperson**

   Management salespersons will handle complex selling activities such as the design and recommendation of data and voice communications systems as well as networking configurations as solutions to telecommunications and business function problems on business accounts. To accomplish this, the management salesperson establishes an overall market sales plan for the account with specific objectives and is responsible and accountable for making the ultimate decision as to what will be recommended in client sales situations. They are responsible for

the supervision and direction of pre-sale functions and post-sale implementation activities associated with complex sales. The management salesperson's performance will be evaluated in light of increase or decrease in annual billing of the accounts assigned to them in relation to the objectives for their assigned accounts module.

B. The parties further agree that:

1. The Communications Representatives will report to first level supervisors in the administrative organization and will be assigned in work groups responsible for marketing servicing activities.

2. Communications Representatives will perform all servicing activities of a non-supervisory nature including all implementation functions, such as, but not limited to: order memo preparation; station reviews, vertical service selling; and floor plan documentation. It is understood that in the case of sales implementation, the activities, of Communications Representatives may be coordinated under the direction of management salespersons responsible for the sales.

3. Communications Representatives will be responsible for negotiating customer demand requests in cases which do not require complete analytical activities.

## II. Services Technician and System Technician (8-13-77)

A. The division of work assignments between the bargaining unit jobs of Services Technician and Systems Technician shall be as follows:

**Services Technician**

1. The installation, repair and removal of:

a. All residence types of service including associated auxiliary equipment such as: speaker phones, manual transfer switches, manual signaling systems, ADAS, secretarial and home interphones; but excluding multi-button key system installations which may be installed in a residence.

b. Straight line business and residence services including: two line pickups, turn key and auxiliary equipment of the type listed in (a) above.

    c.  PBX stations including the tip and ring wiring of PBX frames and/or cross connector points external to PBX units.

    d.  Coin telephones.

    e.  Subscriber line carrier-subscriber channel units.

    f.  Interconnect devices on all services described herein.

    g.  Residence types of data services using voice grade facilities.

2.  Prewiring, rewiring of terminals, line and station transfers and providing inside wire and drop wiring for: data, teletypewriter, radio, TV, etc.

3.  The installation, repair and removal of multibutton key telephone sets (all sizes), electronic telephone sets, and station cables to include the termination of such cables at the key telephone location.

4.  The use of meters required for the installation and maintenance of the above services.

**Systems Technician**

1.  The installation, repair and removal of:

    a.  PBX switching systems.

    b.  Data transmitting and receiving systems.

    c.  Teletypewriter systems.

    d.  Manual switchboards.

    e.  Centrex consoles with associated equipment such as wet cell power plants and other console-associated equipment.

    f.  Four wire terminations sets and associated equipment.

    g.  Radio and television services.

    h.  Subscriber line carrier systems.

    i.  Key telephone equipment including the cabling

and/or cross connections required to terminate the lines and features at distribution points.

    j. Dial intercom systems.

    k. Power plant interconnect devices associated with (a) through (j) above.

  2. The use of meters and test equipment required for the installation and maintenance of the above systems and services.

B. The parties further agree that:

  1. The Company reserves the sole right to determine the number of Systems Technicians and Services Technicians required in any work group.

  2. The Company agrees that its practice will be to dispatch on troubles an employee in the proper classification (Systems Technician or Services Technician) as indicated by the trouble. However, if a Services Technician is dispatched on a trouble which is in the equipment under the Systems Technician job description above, he will be expected to clear the trouble if he is able to do so.

  3. The Company agrees that in any half tour, or in any period of assigned work time which falls outside of a normal daily tour (including a tour for training) in which a qualified Services Technician is assigned and does perform work included in the job description for the Systems Technician, he will be paid a differential equal to one-tenth of the difference in the maximum basic weekly wage rates of the Systems Technician and the Services Technician. Services Technicians shall be paid no more than two (2) such differentials for work performed during any calendar day.

  4. The Company reserves the right to assign installation and maintenance work on key telephone systems which may be a part of the Systems Technician job description to Services Technicians when such work is performed by Services Technicians under the direction of a Systems Technician. The provisions of paragraph II.B.3 above shall not apply to work assigned and performed under these circumstances.

### III. Coin Telephone Collector (8-27-89)

A. The job duties of Coin Telephone Collectors in all Areas shall include but not be limited to:

1. Collect and transport money from coin telephones.

2. Replace directory and/or cover.

3. Place and remove lower housing fasteners.

4. Clean enclosures and phones; remove foreign material.

5. Change locks.

6. Maintain and replace instruction cards.

7. Place and maintain signs.

8. Replace door plates.

9. Visual and coin tests to determine proper grounding.

10. Clear minor station troubles including:

   a. Dial tone testing.

   b. Clear jams; replace defective coin chutes.

   c. Replace broken finger wheels.

   d. Replace lights and/or light bulbs.

   e. Replace handsets or broken cords.

### IV. Service Representative (8-10-86)

A. The job duties of Service Representatives shall include but not be limited to the following:

1. Represents Company policy to the public in virtually all matters. Acts as customer's representative in activities with other departments to resolve customer disputes and problems. Makes many independent decisions and has a great deal of authority.

2. Negotiates service order requests from existing and new customers for installation, removal or changes of Company provided and/or customer provided telephone service. Discusses order inquiries about pend-

ing orders. May also transmit the order via a comput-
erized terminal.

3. Determines appropriate requirements from among
the many product and service options, recommends
and attempts to sell the product and/or service to cus-
tomers using appropriate sales techniques.

4. Responsible for accurately computing and quoting to
customers adjustments, balances and rates.
Computations involve addition, subtraction, multiplica-
tion and division.

5. Discusses, investigates, and resolves local service
and long distance billing inquiries, other inquiries and
complaints pertaining to exchange and access serv-
ice. Includes such things as justifying billing, granting
or refusing adjustments, handling annoying call com-
plaints, etc.

6. Handles telephone and, in some cases, face-to-face
customer contacts but not to include customer prem-
ise sales visits. All involve minute-by-minute decisions
that involve customer satisfaction.

7. Obtains, assesses and establishes customer credit
information. Collects delinquent bills mainly by contact
with customer, usually by telephone. Decides on
appropriate collection action to be taken. Obtains and
maintains proper security on accounts; e.g., deposits
and advance payments. Gathers data for appeals.
Handles bankruptcies. Makes judgments on customer
requests for extensions of time and amount to pay on
bills.

8. Determines appropriate action to be taken and makes
appropriate notations on records of customers'
accounts and other forms while talking to customers.
These notations may be input into Company data files
via a computerized terminal.

9. Handles large volume of detailed, complex documen-
tation of work requiring a high degree of accuracy,
such as coding and decoding and block printing in
small spaces on order forms or vouchers. May also
input codes relative to the customer's order via a com-
puterized terminal while talking to the customer.

Adjustments to customer accounts for amounts within the Service Representative level of authority may be directly input to the Company's data file via a computerized terminal.

10. Dictates and/or writes self-composed letters to customer.

11. Works to meet sales and service objectives and deadlines designed to meet customers' needs promptly, accurately and pleasantly.

12. Subject to numerous measurements relating to performance and accuracy.

13. Handles discussions with customers involving matters such as attestation, conformance, certification and registration programs. Acts as a consultant to the customer for appropriate referrals in order to meet customers' total communication needs.

14. In the performance of the Service Representative job, may also use keyboards or similar devices to obtain and establish data. Such data may be in various formats such as printouts, microfilm, microfiche, cathode ray tubes, or similar forms of capturing or transmitting data. Does filing as necessary.

## V. Engineering Assistant (8-10-86)

A. The following paragraphs define the principal job duties of Engineering Assistants in circuit provision bureaus and outside plant Engineering organizations respectively.

1. The Engineering Assistant in the circuit provision bureau uses standard design techniques (including computerized tools), planning documents and other Company records to perform work (other than that of a clerical nature) required to analyze service and trunk orders, design and lay out trunk and special service circuits (including the calculation of transmission levels and the specification of equipment settings) and to prepare or direct the preparation of Circuit Orders and Circuit Layout Records for field forces. The Engineering Assistant also provides technical consultation with field forces in connection with trunk and special circuit design matters.

2. The Engineering Assistant in the distribution services design center performs engineering work (other than that of a clerical nature) required to plan and design the distribution plant network. Using standard design techniques (including computerized tools), planning documents and other Company records and self-prepared field notes, the Engineering Assistant prepares detailed engineering work orders and associated work prints for projects defined in outside plant plans; allocates forecasted unidentified growth by geographical area and prepares field notes associated with the design of feeder plant network. The Engineering Assistant also negotiates and coordinates on outside plant engineering matters, including rights of way, with field forces, private owners, customers and third party representatives in the building industry, other utilities and governmental agencies.

B. The parties further agree that Engineering work (other than that of a clerical nature) required to do job scheduling; develop, prepare and document long and short range plans for feeder relief and rehabilitation strategies by use of design techniques including computerized tools; spread identified growth by geographic areas; and develop construction budgets for specified geographical areas which are based on such plans and growth spreads, involves managerial responsibilities and is not part of the duties of the Engineering Assistant.

**VI. Collector (8-27-89)**

A. The job duties of Collector shall include but not be limited to the following:

1. Deals with customers via telephone or written correspondence in order to obtain securities or collect bills due to the Company.

2. Negotiates payment arrangements as prescribed by Company reference material and documented local practices.

3. Prepares and types temporary interruptions, restorals and disconnects for nonpayment into a mechanized Service Order System.

4. Completes clerical activities associated with referrals

of accounts to collection agents. Represents the Company in court as appropriate when the Company files legal claims on customer accounts.

5. Contacts customers and departments within the Company to secure credit and/or billing information as required.

6. Handles a limited number of miscellaneous customer billing contacts associated with the collection of over-due bills.

7. Utilizes a terminal device for input and retrieval of data from a computerized file.

8. Performs other work as assigned in accordance with local practice and the current needs of the business.

**EXHIBIT III**

## Mid Atlantic Associate Pension Band Amount Table

| PB | Current | Temporary Q4 2003 | 1/1/2004 - 10/31/2004 | November 1 2004 | October 1 2005 | October 1 2006 | October 1 2007 |
|-----|---------|-----------|-----------|---------|---------|---------|---------|
| 101 | $31.36 | $32.93 | $31.36 | $31.99 | $32.95 | $33.94 | $34.96 |
| 102 | $32.66 | $34.29 | $32.66 | $33.31 | $34.31 | $35.34 | $36.40 |
| 103 | $33.98 | $35.68 | $33.98 | $34.66 | $35.70 | $36.77 | $37.87 |
| 104 | $35.31 | $37.08 | $35.31 | $36.02 | $37.10 | $38.21 | $39.36 |
| 105 | $36.63 | $38.46 | $36.63 | $37.36 | $38.48 | $39.63 | $40.82 |
| 106 | $37.97 | $39.87 | $37.97 | $38.73 | $39.89 | $41.09 | $42.32 |
| 107 | $39.28 | $41.24 | $39.28 | $40.07 | $41.27 | $42.51 | $43.79 |
| 108 | $40.59 | $42.62 | $40.59 | $41.40 | $42.64 | $43.92 | $45.24 |
| 109 | $41.96 | $44.06 | $41.96 | $42.80 | $44.08 | $45.40 | $46.76 |
| 110 | $43.25 | $45.41 | $43.25 | $44.12 | $45.44 | $46.80 | $48.20 |
| 111 | $44.58 | $46.81 | $44.58 | $45.47 | $46.83 | $48.23 | $49.68 |
| 112 | $45.88 | $48.17 | $45.88 | $46.80 | $48.20 | $49.65 | $51.14 |
| 113 | $47.22 | $49.58 | $47.22 | $48.16 | $49.60 | $51.09 | $52.62 |
| 114 | $48.55 | $50.98 | $48.55 | $49.52 | $51.01 | $52.54 | $54.12 |
| 115 | $49.85 | $52.34 | $49.85 | $50.85 | $52.38 | $53.95 | $55.57 |
| 116 | $51.19 | $53.75 | $51.19 | $52.21 | $53.78 | $55.39 | $57.05 |
| 117 | $52.48 | $55.10 | $52.48 | $53.53 | $55.14 | $56.79 | $58.49 |
| 118 | $53.84 | $56.53 | $53.84 | $54.92 | $56.57 | $58.27 | $60.02 |
| 119 | $55.17 | $57.93 | $55.17 | $56.27 | $57.96 | $59.70 | $61.49 |
| 120 | $56.47 | $59.29 | $56.47 | $57.60 | $59.33 | $61.11 | $62.94 |
| 121 | $57.78 | $60.67 | $57.78 | $58.94 | $60.71 | $62.53 | $64.41 |
| 122 | $59.13 | $62.09 | $59.13 | $60.31 | $62.12 | $63.98 | $65.90 |
| 123 | $60.44 | $63.46 | $60.44 | $61.65 | $63.50 | $65.41 | $67.37 |
| 124 | $61.76 | $64.85 | $61.76 | $63.00 | $64.89 | $66.84 | $68.85 |
| 125 | $63.08 | $66.23 | $63.08 | $64.34 | $66.27 | $68.26 | $70.31 |
| 126 | $64.40 | $67.62 | $64.40 | $65.69 | $67.66 | $69.69 | $71.78 |
| 127 | $65.74 | $69.03 | $65.74 | $67.05 | $69.06 | $71.13 | $73.26 |
| 128 | $67.03 | $70.38 | $67.03 | $68.37 | $70.42 | $72.53 | $74.71 |
| 129 | $68.38 | $71.80 | $68.38 | $69.75 | $71.84 | $74.00 | $76.22 |
| 130 | $69.67 | $73.15 | $69.67 | $71.06 | $73.19 | $75.39 | $77.65 |
| 131 | $71.03 | $74.58 | $71.03 | $72.45 | $74.62 | $76.86 | $79.17 |
| 132 | $72.36 | $75.98 | $72.36 | $73.81 | $76.02 | $78.30 | $80.65 |
| 133 | $73.66 | $77.34 | $73.66 | $75.13 | $77.38 | $79.70 | $82.09 |
| 134 | $75.00 | $78.75 | $75.00 | $76.50 | $78.80 | $81.16 | $83.59 |
| 135 | $76.28 | $80.09 | $76.28 | $77.81 | $80.14 | $82.54 | $85.02 |

**EXHIBIT IV**

**TRANSFER PLAN AND INTERCOMPANY JOB BANK**

Effective January 1, 1993, the parties agree to the following terms and conditions of the Verizon Services Corp. Transfer Plan (hereinafter Transfer Plan, or Plan).

Parties to this Agreement are Verizon Services Corp., Verizon Pennsylvania Inc., Verizon Delaware Inc., Verizon Washington, DC Inc., Verizon Maryland Inc., Verizon Virginia Inc., Verizon West Virginia Inc., Verizon New Jersey Inc., Verizon Advanced Data Inc. (hereinafter referred to as "Sponsoring Employers") and the Unions currently representing employees of the Sponsoring Employers (hereinafter referred to as "Participating Unions").

Eligibility for participation in the Transfer Plan shall be limited to active, regular full time employees of the Sponsoring Employers who are represented for purposes of collective bargaining by one of the Participating Unions.

When an employee, satisfactorily rated overall, is in a work group which has been declared surplus by the Sponsoring Employer in accordance with the terms of the labor agreement applicable to the bargaining unit, the Sponsoring Employer shall furnish the employee's name and relevant data concerning the employee to the Intercompany Job Bank Program in which all Sponsoring Employers shall participate. The employee will be given a toll free telephone number should he or she desire to make direct contact with the Intercompany Job Bank.

The Intercompany Job Bank will have as its goal the matching of force surplus in any of the Sponsoring Employers with the employment needs of other Sponsoring Employers. All movement of personnel within a Sponsoring Employer (laterals, promotions, downgrades, or others) and obligations, if any, to recall former employees of that Sponsoring Employer shall take priority over any moves under the Intercompany Job Bank.

The Intercompany Job Bank shall maintain a centralized file containing the names, job titles and locations of registered employees. This file shall be utilized by the Sponsoring Employers prior to hiring new employees into jobs for which registered surplus employees are qualified and willing to relocate. Qualified employees in the surplus groups shall have the opportunity to voluntarily transfer to job openings for which they are qualified at any of the other Sponsoring Employers. Consideration will be given in seniority

order to employees in the same title as the job opening and then to other qualified employees.

Upon notification of an opportunity, an eligible employee volunteering to transfer shall have ten (10) work days to respond and must be available to report to the job in the receiving unit within fourteen (14) calendar days from the date of response if within commuting distance and thirty (30) calendar days from the date of response if a change of residence (i.e., transfer to a work location which is at least thirty-five miles farther from the employee's residence than the distance from the employee's residence to his or her existing work location) is required.

An eligible employee who transfers to a different bargaining unit under the above provisions shall become eligible for all benefits provided under the labor agreement applicable to the receiving unit; provided, however, that vacations, floating holidays and excused work days taken by the employee prior to the transfer will be offset against any such benefits to which the employee shall become eligible under the collective bargaining agreement applicable to the receiving unit. The eligible employee's seniority in the receiving unit shall be computed as if he or she had been employed in the receiving unit during the period while employed in the sending unit. An employee who opts to transfer to a job in a different bargaining unit requiring a change in residence, as defined above, will be entitled to the relocation benefits under the applicable Company-Union collective bargaining agreement in the sending unit or the benefits provided in the Interbargaining Unit Relocation Benefits Plan (Attachment A).

On the effective date of the transfer, the employee will be moved from his or her present dollar rate to the nearest step on the wage schedule in the receiving unit assuring no loss of pay, if possible. If the highest step on the wage schedule is insufficient to prevent a loss of pay, the employee will be placed on the highest step of the wage schedule and will become eligible for benefits under the Interbargaining Unit Income Protection Plan (Attachment B).

The provisions of this Agreement shall supersede conflicting or inconsistent provisions contained in any individual labor agreements or practices of the parties. It also supersedes any previous agreements concerning the Intercompany Job Bank. Disputes concerning the proper interpretation or application of the Interbargaining Unit Relocation Benefits Plan and the Interbargaining Unit Income Protection Plan shall be resolved through the grievance and arbitration provisions of the labor agree-

ment applicable to the receiving bargaining unit. Determinations as to what openings shall be available through the Intercompany Job Bank, proper staffing levels for transferred work and the number of employees eligible for transfer shall not be subject to arbitration provisions under the labor agreements of either the sending or receiving units.

**ATTACHMENT A - TRANSFER PLAN AND INTERCOMPANY**
**JOB BANK**

### INTERBARGAINING UNIT RELOCATION BENEFITS PLAN

Employees eligible under the terms of the Transfer Plan shall be entitled to the following benefits:

### MOVING EXPENSES -

o  Time of temporary living (up to six weeks)

| | |
|---|---|
| - Meal expense | Contractual rate * |
| - Lodging (accommodations to be authorized by Director Level) | Actual reasonable expense |
| - Return trips home (up to 2 round trips) | Actual reasonable expense |
| - Final trip - transportation, meals and lodging for 3 days for employee and family (accommodations to be authorized by Director Level) | Actual reasonable expense |

o  Moving household goods          As arranged and
                                                          paid for by
                                                          Sponsoring Employer

### HOUSING EXPENSES -

o  Renter

- Reimburse lease cancellation costs as a result of the transfer

o  Homeowner

- Reimburse actual real estate commission paid for the sale of the employee's former residence up to 3% of sale price
- Reimburse actual normal and customary closing costs on the purchase of new residence up to 3% of purchase price

**MISCELLANEOUS ALLOWANCE** - 5% of the annualized basic weekly wage earned by the employee immediately prior to the transfer (contributes to miscellaneous costs such as utility disconnection and connection, mortgage interest differentials, etc.)

---

* NJB-CWA Commercial/Marketing - reimburse actual reasonable expense incurred.

**TAX GROSS UP** - Provides a tax gross up of 20% of non-deductible reimbursements

**TOTAL RELOCATION EXPENSE REIMBURSEMENTS SHALL NOT EXCEED $12,000**

### ATTACHMENT B - TRANSFER PLAN AND INTERCOMPANY JOB BANK

#### INTERBARGAINING UNIT INCOME PROTECTION PLAN

Employees eligible under the terms of the Transfer Plan shall be entitled to the following benefits:

Within thirty (30) days following completion of one (1) year of continuous employment in the receiving bargaining unit the employee shall be given a lump sum payment determined as follows:

(1) The percentage by which the employee's basic weekly wage was reduced as a result of the transfer shall be multiplied by the total wages the employee has received in the year following the date of the transfer, including overtime premiums and differentials.

(2) The lump sum payments made under this Plan shall not be used in the computation of overtime, differentials, or any other premium payments, as the effect of such premiums has been included in the lump sum. Nor shall this payment be included in the determination of any benefits calculated on the basis of wages or other earnings.

### BROADBAND NETWORK EMPLOYMENT
### SECURITY PROVISIONS

1. Effective ninety (90) days following ratification of the 1995-98 General Agreement, the following work security protection shall apply to the below described work operations which are performed in Maryland, Virginia, Washington, DC, and West Virginia by the Companies in the Network Operations Line of Business, whether or not the Companies operate the Network Operations Line of Business as a separate Line of Business and whether or not these work operations are transferred to another organization or entity within the Companies:

   A) With regard to that portion of the Broadband Network which is defined in subsection 1(B) as Broadband Facilities, the placement (except for the continued use of Flow Mole or other burying/trenching methods), transfer, splicing and repair of such Broadband Facilities will be assigned exclusively to employees of the Companies represented by CWA. The only exception will be in the event of an emergency or in a situation where a Company determines that there are extraordinary circumstances that require outside assistance.

   B) Broadband Facility is defined as any fiber optic cable and associated electronics, coaxial cable and associated electronics, or any other newly developed wire or cable material and associated electronics actually used in the deployment of the Broadband Network to deliver a broad range of voice, data, imaging and video service applications not located within a Company central office which is or will be maintained, operated and majority or wholly owned by one of the Companies and which is or will be located between the vaults of any two Company central offices, or between a customer serving terminal/TAP/ONU and the vault of the "end office" Company central office. These facilities are commonly referred to as inter-office, feeder and distribution outside plant facilities. Broadband Facility does not include traditional copper wire facilities.

2. These provisions concerning Broadband Network shall not apply to support or routing structures, poles, strand, anchors, guys, trees, huts, vaults, conduit, innerduct, rods, trenches or

other structures used to support, route or enclose Broadband Facilities or to cable locating activities.

3. All video and telephony work on the remaining portion of the Broadband Network from the serving terminal/TAP/ONU to and including the customer's premises (e.g., drop, inside wire, set top or other equipment) can be performed by Bell Atlantic Communications and Construction Services, Inc. (BACCSI). BACCSI and CWA have reached agreement on a prehire agreement (setting forth competitive wages, benefits and working conditions) that is being signed by those parties simultaneous with this Memorandum of Understanding and is based on the following work jurisdiction and job security provisions:

   A) BACCSI can perform all work from the serving terminal/TAP/ONU toward the customer, including but not limited to installation and maintenance on drop and inside wire, telephony and video and set tops or other equipment.

   B) In all General Manager areas (districts) where BACCSI is operating, all regular full-time Network Operations employees of the Companies hired on or before January 25, 1996 and holding the title of Splicing Technician, Cable Splicing Technician, Systems Technician, Services Technician and Outside Plant Technician will not be subject to layoff. In the event any of these employees' titles are changed but their duties remain essentially unchanged, such employees will continue to have this layoff protection. If BACCSI is not operating in a General Manager area, this layoff protection will not apply.

   C) In General Manager areas where BACCSI is not operating, the rights of the Companies and CWA regarding the assignment of telephone work described in Section 3(A) are unaffected by these Broadband Network/Employment Security Provisions. However, in the event of a force adjustment which would result in the layoff, in a General Manager area where BACCSI is not operating, of a regular full-time Network Operations employee who:

      (1) is hired on or before January 25, 1996,

      (2) holds the title of Splicing Technician, Cable Splicing Technician, Systems Technician, Services Technician or Outside Plant Technician, and

      (3)  would normally have rights to "bump" a less senior employee who is protected by Section 3(B) above, such employee may elect to transfer into the title and location of the less senior protected employee provided that:

         a)  such senior employee shall be responsible for all relocation expenses, if any, and will not be eligible for relocation reimbursement or commutation expense in lieu of relocation under any applicable provisions of the collective bargaining agreement, and

         b)  no General Manager area will, in any calendar year, have to absorb such transfers if they exceed two percent (2%) of the average total number of employees in the affected title within the General Manager area during the last three (3) months of the preceding calendar year.

    D)  The provisions of this Section 3 will supersede any contrary provisions of the applicable collective bargaining agreement.

4. Regarding future work assignments after this Broadband Network agreement expires and regarding work operations not covered by paragraph one (1) or three (3), these provisions on Broadband Network do not modify, increase or diminish, and shall not be construed to modify, increase or diminish the rights of either CWA or the Companies under other provisions of their collective bargaining agreements.

5. Sales of video information and programming will be handled by Bell Atlantic Video Services, Inc. (BVS) and other Video Information Providers (VIPs). It is the Companies' understanding that BVS currently plans to use multiple sales channels. While BVS is a separate company which makes its own labor policy, it is the Companies' intent to aggressively pursue with BVS (if legally permissible) sales opportunities for the Consumer LOB to become an additional in-bound and out-bound sales channel for BVS utilizing the Telephone Canvasser, Telemarketing Representative and other titles.

6. These provisions concerning Broadband Network/Employment Security will be implemented ninety (90) days following ratification of the 1995-98 General Agreement. The use of contractors performing the work covered by paragraph one (1) will be

phased out during that ninety (90) day period, subject to any existing contractual arrangements with contractors which cannot be terminated within that period. Any such requirement will be terminated at the first possible date permitted under the agreement with the vendor. These provisions expire on August 5, 2000.

### Broadband Network/Employment Security Provisions (Amended As of August 6, 2000)

The Broadband Network/Employment Security Provisions are renewed, as amended below, for the life of the new collective bargaining agreements of the covered Verizon operating telephone companies. The following amendments supersede any contrary or conflicting provisions in the current Broadband Network/Employment Security Provisions. The Broadband Network/Employment Security Provisions, as amended herein, expire on August 2, 2008.

1. Commencing no later than August 1, 2001, Verizon Connected Solutions Inc. (VCS) will no longer perform repair work between the serving terminal/TAP/ONU and the Companies' side of the network interface device ("drop repair work"). Except as provided for below, "drop repair work" will be dispatched exclusively to CWA-represented employees of the Companies ("core" employees). Staffing associated with the return of this work will take place over the period January 1, 2001 through August 1, 2001.

   The exclusions to the above commitments are as follows:

   • Repair, replacement, and/or connection of buried drops, or "C" wire, after service has been restored or corrected by temporary means, and

   • In an emergency ("event of national importance, fire, explosion, or other catastrophe or severe weather conditions, e.g., Hurricane, Tornado, Blizzard, severe ice damage, or Major Flood").

2. Commencing no later than October 1, 2000, when a "core" employee is dispatched on "drop repair work", and the trouble on that job is at or beyond the customer's side of the network interface device ("inside repair work"), the "inside repair work" will be performed by the "core" employee if the customer is present to provide access at the time of the visit.

3. The foregoing commitments will not affect the ability of VCS technicians to perform repair work involving the network interface device when dispatched to a repair job involving "inside repair work".

4. Existing VCS technicians will receive full consideration for "core" vacancies created as a result of the implementation of these provisions. VCS technicians hired as "core" employees will not be counted in the 50/50 Internal vs. External Staffing Commitment. Their impact will be fully neutral.

5. These commitments apply only to repair jobs necessary to restore or correct service in response to a specific trouble report.

**EXHIBIT VI**

**ENHANCED INCOME SECURITY PLAN**

Effective August 3, 2003, the following special Enhanced ISP program will apply during the term of this agreement scheduled to expire August 2, 2008:

Prior to proceeding to a layoff resulting from a surplus in any particular title, location, and work group the Companies will offer an enhanced ISP Termination Allowance equal to 2 times the normal ISP Termination Allowance (e.g., up to a maximum of $66,000) in the surplus title and location. The Companies may also offer Enhanced ISP where the Income Security Plan may be offered. The Companies may limit acceptances to the number of surplus and this Enhanced ISP offer would be in lieu of obligations, if any, the Companies may have to offer regular ISP.

Other conditions generally applicable to ISP - the 30 day election period, lump sum payment provisions, the 48 monthly payment schedule, the ISP Expense Allowance, proration provisions, repayment upon reemployment and lack of arbitrability - will also apply to Enhanced ISP.

**Voluntary Termination Bonus**

Any employee who makes a voluntary election to leave the service of the Company pursuant to any Income Security Plan or Enhanced ISP offer made during the term of the 2003 MOU, and who does separate from the Company pursuant to that offer shall receive, as applicable:

1. A lump-sum payment of $10,000, less taxes and withholdings, in addition to any ISP/EISP for which the employee is otherwise eligible, and

2. For those not otherwise eligible, six months of continuation medical coverage under the terms of the plan and the employee's coverage in effect at the time of separation.

# Letters of Understanding

**INDEX**

| | Page |
|---|---|
| Agreement Continuation | 114 |
| Advertising and Classifying Job Vacancies | 116 |
| Assistant Technician | 117 |
| Available for Reassignment | 118 |
| BANDI | 119 |
| BANI Customer Bid Work | 121 |
| Bi-Lingual Differential | 123 |
| Christmas for Category IV Employees | 124 |
| Closed Time | 125 |
| Consultant Agreement | 126 |
| Contract Labor | 128 |
| Contracting Initiatives | 129 |
| Copy of Disciplinary Record | 130 |
| Direct Billing for Relocation Expenses | 131 |
| DSL Demand Sales | 133 |
| Equivalent Jobs | 135 |
| Evaluative Observations | 136 |
| Flex Time | 138 |
| Four Day Work Week Trial | 140 |
| Force Adjustment Negotiations | 142 |
| Grievance Trial | 143 |
| Home Garaging Trial | 144 |
| Inter-area Recall of Laid Off Employees | 146 |
| Inter-Company Transfers | 147 |
| ISP/EISP - Limitations on Contracting Out | 149 |

Job Title Review Committee ...................................................150

Joint Committees ..................................................................152

Joint Time for Participation In Joint Committees .....................153

Manhole Letter.....................................................................154

Materials Management ..........................................................155

Operator Services (AWT) ......................................................156

Operator Services Monitoring................................................157

Outside Plant Copper Cable Splicing .....................................158

Overtime Administration .......................................................159

Limitations and Notice for Mandatory Overtime ......................161

Procedure to Resolve Claims Regarding
    Hiring Wage Rates...........................................................163

Sales Prorate Commitment ....................................................165

Sales and Referral Incentive Programs....................................167

Service Monitoring................................................................168

Service Quality Observing......................................................169

Service Representatives/Consultants Downgrades,
    Transfers, Promotions ......................................................171

Short Notice Excused Work Days ...........................................172

Stress Relief Committee.........................................................174

Technological Change ...........................................................175

Termination of Outside Contractors........................................177

Top Secret Security Clearance................................................178

Treatment of Grievances Settled or Arbitration Awards.............180

Union Business in FMLA and Overtime Build ..........................183

Vacation Buy-Back................................................................184

Vacation Scheduling Percentages...........................................186

Video Display Terminals ........................................................187

**Agreement Continuation**

The following Common Issues MOU provisions with an expiration date of August 2, 2003 (unless otherwise noted) are hereby extended for the life of the new collective bargaining agreements, with no change in their terms and will be included in the applicable collective bargaining agreement(s):

- Outside Copper Cable Splicing
- Internal v. External Staffing Commitment
- IME Program
- Stress Letter of Understanding
- 1991 Memorandum of Understanding ("PA Information Age Agreement")
- BANI Customer Bid Work Letter
- Letter Agreement on Termination of Outside Contractors
- Letter Agreement on Service Quality Observing
- Letter Agreement on Service Monitoring
- FMLA - Absence for Union Business
- Provisions on Vacation Scheduling Percentage (Percentage is 18%)
- Short Notice Excused Work Days

Any Memorandum of Understanding provision that was in effect during the period of the 2000 collective bargaining agreements which has not been altered, changed, or removed, but which may have been inadvertently omitted from the above list, will speak for itself.

The status of MOU provisions with an expiration date of August 2, 2003 which have been modified by the parties during 2003 negotiations will speak for themselves.

All Local, District and International agreements that were valid and enforceable under the 2000 collective bargaining agreements, and which have not been separately renegotiated by the parties in 2003 negotiations, will continue in effect for the life of the new agreements.

The status of all Local, District and International agreements that have been renegotiated during 2003 negotiations will speak for themselves.

In the event a letter agreement has been inadvertently omitted, it will be treated in accord with the above provisions.

On the subject of oral agreements, there is no intention on the

Companies' part to change the status of any oral agreement — whatever contractual status any oral agreement had during the term of the 2000 contracts will remain unchanged unless a change is made subsequent to collective bargaining.

If there are particular oral agreements that the Union wishes to discuss or which become the subject of a dispute after the contract, the Union may bring them to the attention of Labor Relations. If we are unable to resolve the situation, the dispute can be submitted to arbitration under the usual procedures.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                          of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
     Company Bargaining Chair          Union Bargaining Chair

115

**Advertising and Classifying Job Vacancies**

This will confirm our understanding of August 3, 2003, that effective January 1, 2001, all regular full-time, regular part-time, and temporary Associate Vacancy Requests (AVRs) submitted to the Associate Staffing Center will be advertised for ten (10) business days via STAR (or any future system which replaces or complements STAR). This replaces the 8/11/98 job advertising commitment in New Jersey.

The Company also reaffirms that the designations "internal" and "external" will not be placed on Associate Vacancy Requests (AVR). In addition, the Company reaffirms that the best-qualified candidate, whether internal or external, will be selected to fill a job vacancy. With regard to internal candidates, seniority will continue to be considered in accordance with existing contractual provisions.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____        By _____

   Company Bargaining Chair              Union Bargaining Chair

**Assistant Technician**

This will confirm our understanding of August 3, 2003, regarding the job title of Assistant Technician. The primary intent of this title is to perform work on the customer premises side of the point where the network (c.o. feeder) cable is terminated and in Company Assembly facilities.

The duties of an Assistant Technician will include the following:

1. Performs work in connection with placement, rearrangement and removal of wire and cable, and associated equipment in or on customers' buildings and in Company Assembly facilities. In connection with these duties:

    a. Connects wire and cables to terminals and attaches various kinds of hardware to wires, cables or buildings.

    b. Performs verification tests for basic line status (such as presence of dial tone).

    c. Erects and removes framework.

    d. Transports, uncrates and inventories equipment.

2. Provides assistance to other job titles as they perform their required job tasks (such as manhole guard, flagman, rider for security).

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____     By _____

Company Bargaining Chair         Union Bargaining Chair

**Available for Reassignment**

This will confirm our understanding of August 3, 2003, regarding the placement of employees in anticipation of surplus.

Whenever employees are subject to reassignment by the Company to prevent the need to invoke the force adjustment procedures of the General Agreement, the Company will furnish the Union the Name, Social Security Number, Work Location and Net Credited Service Date of each affected employee.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.                 Communications Workers
Verizon Maryland Inc.                                of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____     By _____
    Company Bargaining Chair              Union Bargaining Chair

**Letter of Understanding - "BANDI"**

This confirms our understanding August 3, 2003 that a condition of the Federal Communications Commission's approval of the merger between Bell Atlantic and GTE is the creation of a separate data affiliate ("SDA") to provide certain data services. The parties understand that the SDA, Bell Atlantic Network Data, Inc. ("BANDI") will need to employ employees who are currently employed by some former Bell Atlantic Network Services Companies in bargaining units represented by the CWA ("Union"). The Network Services Companies and the Union hereby agree that bargaining unit employees of the Network Services Companies may be transferred, on a voluntary basis, to employment at BANDI, which shall be treated as a transfer between employers within the same bargaining unit. Simultaneous with such transfers, BANDI will recognize the Union as the exclusive bargaining representative of the transferred employees, and the collective bargaining agreement that governed employees' terms and conditions of employment immediately prior to the change in employer will be amended to add BANDI as a party to the agreement effective as of the date of the first employee's transfer. (If BANDI's corporate name is changed, the new name will be substituted for BANDI.)

BANDI employees will continue to be covered by any promotion, lateral or downgrade plans (as well as all other rights) available to employees of the former Network Services Companies and may continue to avail themselves of the use of these plans.

The parties further understand that as a result of regulatory requirements, BANDI will not be able to provide local concession telephone service to its employees. Instead, bargaining unit employees shall receive $35 per month to be included in payroll compensation that will be effective upon the first month that a bargaining unit employee becomes employed by BANDI. BANDI employees who retire during the life of the current agreement will receive a lump sum payment of $2,600, less applicable deductions.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

Communications Workers
of America

By _____
Company Bargaining Chair

By _____
Union Bargaining Chair

**BANI CUSTOMER BID WORK**

This confirms our understanding of August 3, 2003 regarding BANI Customer Bid Work.

1. This Agreement applies to customer service contracts bid-on by BANI after October 5, 1998 (the "Work").

2. For the part of the Work which is currently or has been historically performed by CWA bargaining unit employees, BANI shall designate the appropriate operating telephone company ("OTC") employing CWA bargaining unit members as its sole contractor and its bargaining unit employees shall perform the Work.

3. As appropriate, BANI may obtain the assistance and participation of bargaining unit employees and the CWA and its leadership in connection with the process of bidding on customer work.

4. Recognizing the exceptionally competitive market in which BANI operates, which demands the highest standards of quality, productivity and customer care, the parties agree that specific employees may be assigned to specific accounts.

5. Recognizing the nature of the Work as described in paragraph 4 and the commitments of BANI to assign Work to CWA represented employees as described herein, the parties agree to cooperate with each other in the implementation of this Agreement in order to insure its success as integral to the success of BANI. To that end, the parties agree that as a fundamental requirement the quality and productivity standards on which bids are based must be met. Accordingly, the parties will creatively address such issues as work rules, work schedules, productivity, customer pricing sensitivity, and quality standards in order to create the conditions conducive to having customer focused high performance employees.

6. Representatives of the Union (including the International Union) and the Company will meet periodically to review the progress of the above efforts and to resolve any difficulties that may have arisen.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

Communications Workers
of America

By _____
Company Bargaining Chair

By _____
Union Bargaining Chair

**Bi-Lingual Differential (All Titles)**

### Differential for Use of Bi-lingual Skills

This will confirm our understanding of August 3, 2003 that an employee will be paid an hourly differential in the amount of 3.5% of the employee's basic hourly wage rate for all scheduled or non-scheduled hours or partial hours (including overtime) during which the employee is assigned to provide bi-lingual services to customers or to provide translation services for the Company. Only employees who qualify as proficient on the appropriate test for the language being used will be eligible to be assigned such work, and to receive this differential. Employees who were assigned such duties during the term of the 1998 contracts, but who have not qualified as proficient on the appropriate test, will be grand-fathered until September 1, 2003, to become test-qualified, during which time they may continue to be assigned such duties.

The bi-lingual differential will enter into computations of overtime pay in accordance with applicable law on overtime on differentials.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                         of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____

    Company Bargaining Chair              Union Bargaining Chair

**Christmas for Category IV Employees**

This will confirm our understanding of August 3, 2003, regarding the last workday before Christmas for Category IV employees.

During the term of the 2003 General Agreement, should the Company elect to allow the early release of nonessential employees on the last workday before Christmas, any Category IV employee who is scheduled to work a full tour on that day shall receive the equivalent time off not to exceed a half tour during such time as service and force conditions permit; provided, however, such excused time with pay must be scheduled and taken no later than March 31 of the following calendar year.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____    By _____

    Company Bargaining Chair      Union Bargaining Chair

**Closed Time**

This will confirm our agreement on August 3, 2003 with respect to providing off-line time to Consultants in all lines of business. This agreement will be effective March 1, 2001, and remain in effect for the life of the 2003 collective bargaining agreement.

Effective March 1, 2001, on Tuesdays through Saturdays, excluding the first business day after a holiday, the Company will provide 15 minutes of closed time per day per scheduled Consultant. Effective July 1, 2001, on Tuesdays through Saturdays, excluding the first business day after a holiday, the Company will provide an additional 15 minutes of closed time per day per scheduled Consultant. Closed time does not constitute a break, but rather is provided to the Consultant for purposes of performing productive work dealing with customer related issues. It does not, however, include training time. If an emergency condition as defined in the applicable collective bargaining agreement exists on any given day, the supervisor shall notify the Union steward that closed time is not available that day.

Any question arising in connection with this letter is specifically excluded from the arbitration provisions of the collective bargaining agreement.

Verizon Washington, DC Inc.              Communications Workers
Verizon Maryland Inc.                         of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____     By _____
    Company Bargaining Chair               Union Bargaining Chair

**Consultant Agreement**

This will confirm our understanding of August 3, 2003, regarding Consultants. Except as modified by this Letter of Understanding, all collective bargaining agreement provisions applicable to Service Representatives will continue to apply to Consultants. The Companies may describe the Consultant title as appropriate to designate the specialized functions of various Consultant jobs (e.g., Consumer Consultant, Credit Consultant, Small Business Consultant).

The duties of the various specialized Consultant jobs may include any or all of the duties previously assigned to Service Representatives, Collectors and/or Collection Representatives. Achievement of sales results will be a job requirement for the Consultant jobs which specialize in sales, provided that sales results will not be the sole basis for discipline. In determining whether a Consultant's sales results are satisfactory, the reasons for failing to meet sales objectives (such as local economic downturns, product or service failures, etc.) always will be taken into consideration. The introduction of new equipment, new technology and/or support systems to be used by Consultants in the workplace (such as software, personal computers and/or SaleService Negotiation System (SSNS)) does not constitute a restructuring of the Consultant job or the creation of a new job from existing Consultant job duties.

Subject to any applicable collective bargaining agreement provisions, Consultants will receive such training as the Companies determine from time to time to be appropriate. Not all Consultants will necessarily receive the same type or degree of training; for example, a Consultant may receive specific collection-related training or only sales-and-service training.

The work performed by Consultants may be transferred between and among the Companies as the Companies deem appropriate, provided that no such transfer will directly result in the layoff, downgrade or part-timing of any Consultant.

Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

Communications Workers
of America

By _____

Company Bargaining Chair

By _____

Union Bargaining Chair

**Contract Labor**

This is to confirm our understanding of August 3, 2003, that in making decisions regarding contracting out of work, it is management's objective to consider carefully the interests of customers and the concern of employees as to its effect on them along with all other considerations essential to the management of the business.

Except when it has no other reasonable alternative, the Company will not contract out work if it would otherwise be performed by regular employees within job titles, work groups and localities where a layoff or part timing of such employees would be the direct result of such contracting out, where a layoff of such employees is pending, or where a layoff has already occurred and such laid off former regular employees retain recall rights and are available and qualified in the judgment of the Company to perform such work. If the Company determines that it has no reasonable alternative, it shall discuss its decision with the Union.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| Verizon Washington, DC Inc. | Communications Workers |
|---|---|
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____    By _____

    Company Bargaining Chair       Union Bargaining Chair

**Contracting Initiatives**

Mr. Doug Thompson
Administrative Assistant to Vice President
CWA, District 2, AFL-CIO
962 Wayne Avenue
Silver Spring, MD 20910

Dear Mr. Thompson:

This will confirm our August 6, 2000 agreement regarding contracting initiatives.

The Company agrees, subject to certain conditions described below, that through 12-31-02, it will not contract out work of a type that it has not contracted out during the three years preceding the effective date of the agreement. This restriction shall not preclude contracting out work to deal with emergency situations including severe weather conditions.

The parties further agree to create a Contracting Initiatives Committee, which will be co-chaired by the CWA District Vice President and a company Senior Operations Manager (or their designee). The CEO of the Verizon and the President of CWA shall be ex-officio members of the Committee. Each party may appoint up to two additional members.

The purpose of this Committee is to find ways by which the levels of contracting can be reduced within the Verizon (Mid-Atlantic) Operating companies. The objective is for company employees to do more work in a more productive and efficient manner than that performed by contractors. The company will provide all necessary resources needed by the Committee to carry out its purpose.

In addition, the Company will notify the Union at least six months in advance of planned new, major, contracting initiatives that are to be implemented on or after January 1, 2003, and which affect employees represented by the Union. The Contracting Initiatives Committee will then have the opportunity to discuss such new major initiatives. It is understood, however, that after the end of the six month period, the Company is free to implement planned, new, major initiatives that do not otherwise violate the collective bargaining agreement.

AGREED:

(s) _____
Bargaining Agent
Communications Workers of America

Very Truly Yours,

129

**Copy Of Disciplinary Record**

This is to confirm our understanding of August 3, 2003, that an employee may obtain a copy of any disciplinary record placed in his personnel file by making a request within ten (10) days of the announcement of discipline. A copy shall be provided within thirty (30) days of the announcement of discipline. An alleged failure to provide a copy of such a record may be grieved to obtain the record or to verify that no record has been placed in the personnel file. An alleged failure to provide a discipline record may not be the basis for challenging the validity of any disciplinary action.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.            Communications Workers
Verizon Maryland Inc.                            of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
    Company Bargaining Chair                Union Bargaining Chair

130

**Direct Billing For Relocation Expenses**

This will confirm our understanding of August 3, 2003, regarding direct billing for certain moving expenses incurred under Article 23, Section 4(b). Within 30 days of the execution of this Agreement, the Company will provide the Union with a list of movers that have contracts with the Company providing for direct billing of moving costs, hereafter referred to as "Approved Movers." This list of Approved Movers may be modified by the Company at any time.

If an employee is being moved to a new location pursuant to Article 23, Section 3(a), he may obtain an estimate of his moving costs from an Approved Mover. The Company will agree to be billed directly by the Approved Mover under the following conditions:

1. The estimate, combined with any other relocation expenses already reimbursed (including gross-up), does not exceed $5,000.

2. Prior to the Company's receipt of the Approved Mover's actual billing invoice, the Company will only reimburse other relocation expenses (including gross-up) equal to the difference between the Approved Mover's estimate and $5,000.

3. After the Company receives the Approved Mover's actual billing invoice, it will pay the mover directly for the actual billing expense. The employee will be responsible for obtaining reimbursement of all other relocation expenses by voucher up to the $6,000 limit.

4. If the Company's payment to the Approved Mover together with its reimbursement of other relocation expenses exceeds the $6,000 relocation allowance, the employee shall reimburse the Company for this excess within three (3) months from the date the employee is notified that the moving allowance was exceeded.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

Communications Workers
of America

By _____
    Company Bargaining Chair

By _____
    Union Bargaining Chair

**DSL Demand Sales**

This will confirm our agreement of August 3, 2003, as follows:

1. The Company's Residence Sales and Service Organization (Consumer) will, by the end of the current contract, train its Consultants to handle customer incoming calls for Verizon-On-Line DSL requests in DC, DE, MD, NJ, PA, VA, WV ("Mid-Atlantic Region"). At least 50 Consultants in PA/DE, 50 Consultants/CSRs in NJ, and 100 Consultants in the combined DC, MD, VA, and WV will be trained before June 1, 2001.

2. The Company's General Business Sales Organization (GBS) will, before June 1, 2001, train a total of at least 10 bargaining unit Consultants in the Mid-Atlantic Region to handle customer incoming calls for Verizon-On-Line DSL requests.

3. GBS and Consumer Consultants will become the primary channel for incoming sales demand calls to business offices in the Mid-Atlantic Region requesting Verizon-On-Line DSL service for the types of customers handled by GBS and Consumer, except that complex Verizon-On-Line DSL calls will continue to be handled by the Company's High Speed Solution Center until the Company is satisfied that the technology is in place in business offices for GBS and Consumer Consultants to handle such complex calls, and until they are trained to do so. The Company expects this technology to be developed and such training to be completed by June 1, 2001, and will use its best efforts to meet this target.

4. Further, nothing herein shall limit the Company from assigning non-demand DSL sales work of any kind to any sales channel such as, for example, telemarketers or Internet based ordering.

5. Except for the specific commitments set forth above, nothing in this letter of agreement shall be construed to affect any existing rights or obligations under the collective bargaining agreement.

| Verizon Washington, DC Inc. | Communications Workers |
|---|---|
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____        By _____

   Company Bargaining Chair             Union Bargaining Chair

**Equivalent Jobs**

This will confirm our understanding of August 3, 2003, that in the application of Article 23, Section 1(e) dealing with "equivalent jobs," for the duration of the 2003 General Agreement the Company will not reclassify entire work groups consisting of Category III employees to Categories B or IV, or reclassify entire work groups consisting of Category B or IV employees to Category III for the purpose of adjusting force to meet changing work volumes which are unrelated to technological change.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.               Communications Workers
Verizon Maryland Inc.                                of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
     Company Bargaining Chair              Union Bargaining Chair

**Evaluative Observations**

   This letter will confirm our agreement of August 3, 2003 to modify evaluative observation practices for certain Consultants in all lines of business for the life of the 2003 collective bargaining agreement, and to conduct a trial moratorium on evaluative observations for certain Consultants.

   Effective January 1, 2001, the modifications to evaluative observation practices for Consultants in all lines of business are as follows:

1) Consultants will receive advance notification of evaluative observations except for Consultants who received an overall rating of "Needs Improvement", "Does Not Meet Requirements", or "Not Rated" on their most recent annual evaluation under the Associate Appraisal Plan in performance only.

2) The Company will utilize results from diagnostic observations and other criteria such as CCI results to measure the performance of each office and compare the office's performance and results during the trial with those before the trial. This will occur during the first six months of the trial. Before a decision is made on whether or not to continue the trials, the results will be discussed with the Union. After the notification requirement contained in paragraph one (1) above has been in use for a six (6) month period, the Company and the Union will determine whether to continue it for an additional period of time.

3) The Company will endeavor to provide face-to-face feedback on observations by the close of the day on which the observation was taken but in no event later than the close of the next business day on which both the Consultant and the Team Leader who conducted the observation are on the job and are working at a common work location for their full tours.

4) Evaluative observing will take place only during the first 7 paid hours of a scheduled work day for employees with a 35 hour basic work week, or during the first 7.5 paid hours of a scheduled work day for employees with a 37.5 hour basic work week. If the Company determines that a Consultant's performance is substantially different during periods of diagnostic evaluation, as compared to periods of evaluative observation, evaluative observations may be conducted on that Consultant beyond the first 7 hours or 7.5 hours, whichever applies.

5) On an annual basis, evaluative observations will be limited in frequency as follows:

- 20 observations for Consultants who received an overall rating of "Exceeds Requirements" on their most recent annual evaluation under the Associate Appraisal Plan;

- 30 observations for Consultants who received an overall rating of "Meets All" on their most recent annual evaluation under the Associate Appraisal Plan; and

- 40 observations for Consultants who received an overall rating of "Needs Improvement", "Does Not Meet", or "Not Rated" on their most recent annual evaluation under the Associate Appraisal Plan.

6) It is expressly understood that these modifications do not apply to diagnostic evaluations, which are not appraisal-impacting.

The Company further agrees to conduct a trial moratorium on evaluative observations in one Consumer organization RSSC in each CWA Local for a three (3) month period during the term of the new contract. Consultants will be eligible to participate in this trial if they are rated "Exceeds Requirements" or "Meets All Requirements" on their most recent evaluation under the Associate Appraisal Plan. If the Company determines that overall office performance as it relates to sales, customer satisfaction or customer quality declines as a result of this trial, the Company and the Union will meet to review the information and to make a determination to continue the contact freedom trial.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____     By _____
  Company Bargaining Chair           Union Bargaining Chair

**Flex-Time**

The Union and the Company recognize that in certain work groups Flex-Time scheduling could be implemented without detriment to good customer service. Accordingly, in work groups where the Company and the Union agree, Flex-Time scheduling will be utilized.

Under Flex-Time scheduling, the Company will decide the following:

**Core Hours** - Those hours during which all employees must work during a normal daily tour. Employees are late if they have not arrived by the beginning of the core hours.

**Flex Hours -** Those hours at the beginning and end of the tour during which employees may vary their start and stop hours for their daily tour.

Core and Flex Hours may be changed by the Company with 48 hours notice.

**Minimum Staffing** - The minimum number of employees who must be present for telephone coverage, system requirements, etc., during certain hours.

All employees subject to Flex-Time scheduling will work a full normal daily tour. Should the hours selected by employees otherwise entitle them to a differential payment under Article 19, no such payment will be made. The requirements of Article 25 shall be deemed inapplicable to Flex-Time employees because they may vary their start and stop times for their daily tour.

If the Company establishes different core hours within a work group, the core hours shall be selected by seniority within the work group.

Either party may terminate Flex-Time scheduling in specific groups with sixty (60) days notice to the other party, when in its judgment, such scheduling is not workable.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____          By _____

   Company Bargaining Chair             Union Bargaining Chair

**Four Day Work Week Trial**

This confirms our understanding of August 3, 2003 that for six (6) months following the ratification of this Agreement, Four-Day Work Week Trials will be implemented in Company jurisdictions under the following terms:

The Company and the Union mutually recognize that, in certain administrative groups, it may be beneficial to the employees and in the best interests of the business to establish four-day work week trials as a normal week. In such cases, the total number of hours presently constituting a five-day normal work week will be scheduled over four days of the calendar week. Four-day work weeks will be scheduled on four consecutive days.

Individual tours scheduled during a four day normal work week may or may not be of equal length, but will not be shorter than 7.5 hours or longer than 10 hours. When a four-day schedule is in effect, the duration of tours specified in the Local Agreements will be considered to be expanded accordingly.

The Company, with the Union's input, may institute four-day trials in administrative groups. The Company or the Union may discontinue four-day trials upon fourteen (14) Days notice to the other party.

In administering four-day trials, the Company will offer four-day work weeks to employees on a voluntary basis in seniority order. If there are insufficient volunteers, four-day work week trials will not be instituted. Night differential payments shall be paid pursuant to the applicable differential provision in the local collective bargaining agreements.

When a four-day schedule is in effect as a normal work week overtime payments shall apply to time worked in excess of the new normal daily tour.

Pay allowances for absent time (including sickness absence) occurring during four-day trials will be subject to the conditions specified in this Agreement. When pay treatment is calculated on a daily (as opposed to hourly or weekly) basis, a scheduled day of a four-day trial and a scheduled day of a five-day normal work week will each count as one full day, except with respect to vacations and employee designated excused work day calculations.

Vacation and employee designated excused work days will be assessed in proportion to the ratio between the hours actually scheduled on the tour in question and the hours scheduled on

each tour of a five day normal work week for the employee's administrative group. For example, if a 37.5-hour employee scheduled to work three 10-hour days and one 7.5 hour day takes a vacation day on a 10 hour day, all 10 hours (or 1.33 vacation days) will be charged. If that same employee takes a vacation day on the 7.5-hour day, 7.5 hours (or one vacation day) will be charged.

For calendar weeks containing holidays recognized under the Agreement (including floating holidays) or Company designated excused work days, the Company will revert to a five-day schedule.

Subject to the above, four-day trials will be administered in accordance with the applicable provisions of the Local Agreements. The parties may meet locally and discuss other administrative issues raised with respect to the four-day work week. These provisions will become effective upon ratification.

Unless renewed or amended by mutual agreement, these four day work week trials will terminate six (6) months following ratification of this Agreement .

Verizon Washington, DC Inc.      Communications Workers
Verizon Maryland Inc.              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____    By _____
    Company Bargaining Chair      Union Bargaining Chair

**Force Adjustment Negotiations**

A Company Labor Relations Director or his designee, and a management representative of the affected work group, shall participate in the negotiations described at Article 35, Section 3.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.                    Communications Workers
Verizon Maryland Inc.                                          of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
    Company Bargaining Chair              Union Bargaining Chair

**Grievance Trial**

This is to confirm our understanding of August 3, 2003, that the parties agree to establish a trial procedure to address concerns regarding the grievance procedure for employees in Categories I, II, III, A and B.

The Union may elect to present single issue grievances regarding local policies created by Managers or Directors, and grievances involving suspensions, excluding suspensions that involve the Regional Attendance Plan (RAP), directly to the Manager of the aggrieved employee(s) at the first step. Managers must hear the grievance at the first step or delegate the appropriate Manager of Labor Relations to hear the grievance. If the grievance is appealed to the second step it will be heard by the aggrieved employee's Director or that Director may delegate the Director of Labor Relations to hear the grievance.

The parties will meet quarterly to evaluate the effectiveness of this trial. They may jointly agree to discontinue the trial or add to its scope.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.              Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
   Company Bargaining Chair              Union Bargaining Chair

**Home Garaging Trial**

This confirms our understanding of August 3, 2003 that the Home Garaging Trial will be continued in administrative work units whereby employees will be assigned a motor vehicle for use in their work, for traveling between their work locations and area of residence or other designated places where the vehicle is stored. The Home Garaging Trial will be implemented only within administrative work units where some or all of the employees normally use a Company-provided motor vehicle in order to perform their work. The decision to implement a trial of this program will be within management's discretion. However, only volunteers will be utilized.

When Home Garaging is introduced within an administrative work unit, all employees within that unit who normally use a Company-provided motor vehicle in the performance of their work assignment will be eligible to participate.

Since participation is voluntary if an employee elects not to participate, management will determine where the motor vehicle assigned to that employee is to be stored and that location will become the employee's work reporting location, but not for purposes of locality wage zones, special city allowances or union local affiliation. All employees, including those who do not participate in home garaging trials in administrative work units, will report to a company designated work center (as described above) at least once a week.

Employees who participate in the program will be expected to provide normally secure and legal storage for the vehicle at their places of residence. If the vehicle cannot be properly stored at an employee's place of residence, the Company may arrange for appropriate storage at its expense.

Operating and maintenance costs will be at the Company's expense. The Company will make arrangements for maintenance of the vehicle; however, it will be the responsibility of the employee to whom the vehicle is assigned to assure that the vehicle is properly maintained.

For employees who participate in the Home Garaging Trial, a work reporting area will be established on a local basis before implementation. The work reporting area normally will be a circular geographic area. In large congested metropolitan locations or where natural barriers render a circular work reporting area impractical, other mutually suitable parameters will be established.

Each participating employee will be expected to begin and end the work tour at any assigned location within the established work reporting area.

Employees who are assigned to a job location at the beginning or end of a work tour which is outside an established work reporting area will be paid for necessary travel time to or from their homes at the beginning or end of their tours.

As specified above, at least one (1) tour per week will begin at a Company designated work center. If requested by the Local Union representative or steward, on a voluntary basis, participants will be permitted sixty (60) Company paid minutes of union meeting time each month on those days when the participant reports to work at the Company designated work center.

Unless renewed or amended by mutual agreement, this trial will be terminated six (6) months following ratification of this agreement.

Verizon Washington, DC Inc.               Communications Workers
Verizon Maryland Inc.                             of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____

   Company Bargaining Chair                 Union Bargaining Chair

**Inter-area Recall Of Laid Off Employees**

This is to confirm our understanding of August 3, 2003, concerning employees who are laid off by the Company. Nothing herein shall be construed as a circumvention of the recall rights provided former employees in Article 35, Section 8 of the General Agreement which shall take priority over the provisions hereof.

The Company agrees to poll former employees who are laid off to determine their interest in being considered for reemployment in their former job title in specific localities outside the Area in which they were laid off. Once such interest is expressed, offers of available jobs, as determined by the Company, will be made only in the localities of interest, subject to the Company's determination that the laid off former employees are qualified and able to perform the available work.

Any former employee offered reemployment pursuant to this letter of understanding must accept and be available for reemployment within fourteen (14) calendar days after the offer is mailed.

Should a laid off former employee reject the offer of reemployment outside the Area of his layoff, his recall rights within the Area of the layoff will not be affected. However, the Company will have complied with the provisions of this letter by offering one opportunity, for reemployment outside the Area of layoff.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.       Communications Workers
Verizon Maryland Inc.                of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____   By _____

    Company Bargaining Chair       Union Bargaining Chair

**Inter-Company Transfers**

This confirms our understanding of August 3, 2003 that commencing January 1, 2001, the Company will implement a process which will allow employees to request lateral transfers or downgrades between positions in NY/NE Companies and Mid-Atlantic Companies.

For the purposes of this agreement NY/NE Companies will include:

Verizon New England Inc,
Verizon New York Inc.
Empire City Subway Company (Limited)
    Telesector Resources Group, Inc.

For the purposes of this agreement Mid-Atlantic Companies will include:

Verizon Pennsylvania Inc.
Verizon New Jersey Inc.
Verizon Delaware Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon Washington, DC Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.

This agreement does not apply to requests for upgrades. This agreement does not apply to employee requests for lateral transfers or downgrades within these companies, among the NY/NE Companies, among the Mid-Atlantic Companies, or to any other employee movements covered by other provisions of the collective bargaining agreements, if any. This agreement will not affect existing staffing procedures in any of the NY/NE or Mid-Atlantic Companies.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |

Verizon Washington, DC Inc.        Communications Workers
Verizon Maryland Inc.                           of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
    Company Bargaining Chair              Union Bargaining Chair

**ISP/EISP - Limitations on Contracting Out**

August 3, 2003

Mr. Doug Thompson
Administrative Assistant to Vice President
CWA District 2, AFL-CIO
962 Wayne Avenue
Silver Spring, MD 20910

Dear Mr. Thompson:

This letter will confirm that for the life of the collective bargaining agreements specified below, for the employees specified below, work performed exclusively by employees in a particular job title or titles at a work location will not be contracted in the geographic area covered by that location for 6 months after any employee(s) in that job title (or titles) and work location have accepted an ISP/EISP offer. During that 6 month period, if a need arises for personnel to perform such work, the work will be performed by existing employees or an employee(s) added to the group. Thereafter, the Company's rights to contract work shall be whatever they were before the ISP/EISP offer in question was accepted.

The terms of this letter apply to the following employees:

• DC, MD, VA, WV, VSC, VADI: "Category 1 Employees" under Article 40, Section 8.

Nothing in this letter is intended to enlarge the Company's rights to contract work.

Very Truly Yours,

AGREED:

(s) _____

Bargaining Agent
Communications Workers of America

**Job Title Review Committee**

This confirms our understanding of August 3, 2003 that within three (3) months after ratification of this Memorandum of Understanding, a joint Union-Company Job Title Review Committee will be established. The objectives of this committee will be (1) to identify job classifications which perform substantially the same or very similar duties, but which carry different designations, and (2) to attempt to reach agreement on a single designation for each such job title to be recommended to the Company and Union bargaining committee(s) for the affected bargaining unit(s). A non-exclusive list of examples of titles which may qualify for this consideration appears on "Attachment A".

The Committee will be composed of five (5) representatives from the Company and its affiliates and a total of five (5) from the Unions. There will be one (1) representative from each of the three affected CWA Districts; to the extent that job titles represented by a Local of the IBEW are involved, the parties agree to invite one (1) representative from each such Local to discuss the re-designation of those titles. The Committee will meet a total of at least five (5) times during the years 2000 and 2001 combined.

Any recommendation to use a common designation will not change or otherwise affect the job content or wage rate of any of the involved titles.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.      Communications Workers
Verizon Maryland Inc.              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____   By _____
   Company Bargaining Chair      Union Bargaining Chair

**JOB TITLE REVIEW - ATTACHMENT A**

| TITLE | DC | MD | VA | WV | DE | PA | NJ |
|---|---|---|---|---|---|---|---|
| Assignment Technician | | | | | | X | |
| Exchange Layout Assigner | | | | | | | X |
| | | | | | | | |
| Apprentice Technician | | | | | | | X |
| Assistant Technician | X | X | X | X | | X | |
| | | | | | | | |
| Cable Splicing Technician | X | X | X | X | | | |
| Facilities Technician | | | | | | | X |
| Splicing Technician | | | | | X | X | |
| | | | | | | | |
| Central Office Technician | X | X | X | X | | | |
| Network Technician | | | | | | | X |
| Switching Equipment Technician | | | | | X | X | |
| | | | | | | | |
| Coin Box Collector | | | | | | | X |
| Coin Telephone Collector | X | X | X | X | X | X | |
| | | | | | | | |
| Maintenance Administrator | X | X | X | X | X | X | |
| Repair Service Clerk | | | | | | | X |
| | | | | | | | |
| RCMAC Clerk | X | X | X | X | | | X |
| Translations Administrator | | | | | X | X | |
| | | | | | | | |
| Telephone Canvasser - Business | | | | | X | X | |
| Telemarketing Representative | X | X | X | X | | | X |
| | | | | | | | |
| Systems Technician - Operations | | | | | | | X |
| Systems Technician - All Others | X | X | X | X | X | X | |
| | | | | | | | |
| Communications Representative | X | X | X | X | | | |
| Customer Sales Representative | | | | | | | X |
| | | | | | | | |
| Automotive Equipment Technician | X | X | X | X | X | | |
| Automotive Mechanic | | | | | | X | |
| | | | | | | | |
| Senior Clerk | | | | | X | X | |
| General Field Clerk | | | | | X | X | |
| General Clerk | X | X | X | X | | | |
| Service Analyst | | | | | | | X |
| | | | | | | | |
| Senior Field Clerk | | | | | X | X | |
| Staff Clerk | | | | | X | X | X |
| Senior Service Analyst | | | | | | | X |
| Special Clerk | X | X | X | X | | | |

**Joint Committees**

This will confirm our understanding of August 3, 2003, regarding Joint Committees.

"In light of the large increase in the number of grievances which have been appealed to arbitration in recent years, the parties are hereby committed to finding better ways for resolving disputes. Accordingly, and in addition to other measures agreed upon in the parties' 1998 Common Issues Memorandum of Understanding, a joint committee comprised of two union and two management representatives will be formed in each union District to propose ways to reduce the number of cases coming to arbitration and to resolve cases more quickly with a view toward reducing the overall number of pending cases. In addition to exploring the applicable arbitration and mediation provisions for possible improvements, it is the intent of the parties to examine arbitration processing alternatives with the objective of achieving speedier resolutions. These committees will present their recommendations to the Vice President Labor Relations - South and to the applicable CWA District Vice President by November 1, 1998 for possible implementation in 1999. Further, it is the parties' intent to maintain an open and ongoing dialogue through the Bargaining Agents relative to progress in this critical area, with the express intent of reducing the overall volume of cases as well as hearing cases more expeditiously.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008."

Verizon Washington, DC Inc.  
Verizon Maryland Inc.  
Verizon Virginia Inc.  
Verizon West Virginia Inc.  
Verizon Services Corp.  
Verizon Advanced Data Inc.  
Verizon Avenue Corp.  
Verizon South Inc. (Virginia)  
Verizon Corporate Services Corp.  

Communications Workers  
of America

By _____  
   Company Bargaining Chair

By _____  
   Union Bargaining Chair

**Joint Time For Participation In Joint Committees**

This will confirm our understanding of August 3, 2003 that for the life of the new agreement, the Company will pay for joint time spent in the following committees, all of which are also continued for the life of the agreement:

• Advisory Committee on Health Care

• Advisory Committee on Family Care

• National Health Reform Committee

• Safety Executive Council

• Training Advisory Board Executive Council

• Joint Title Review Committee

• Stress Relief Committee (Commercial)

• Operator Services Monitoring

This list is intended to include all regional joint committees for which joint time is paid; if any were inadvertently omitted, they are eligible for the same treatment.

Verizon Washington, DC Inc.            Communications Workers
Verizon Maryland Inc.                        of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____      By _____
    Company Bargaining Chair                  Union Bargaining Chair

**Manhole Letter**

This will confirm our understanding of August 3, 2003, regarding work assignments in certain manholes in the West Virginia Area only.

Any employee who is assigned to perform construction splicing in a manhole who expresses a concern for the safe performance of the job based on the condition or location of the manhole or the nature of the work to be performed therein may request that a second person be assigned to work in the immediate vicinity and such requests will be granted. The Company will determine the functions to be performed by the second person. The parties agree that such requests will not be made or granted in cases where no special safety concerns are expressed and the basis of the request is merely a preference for a companion at the site.

The Company agrees to continue this practice for the duration of this Agreement based on the limited manhole activity in the West Virginia area. However, it may be canceled with 30 days notice by either the Company or the Union.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                       of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____     By _____
    Company Bargaining Chair              Union Bargaining Chair

**Materials Management**

This will confirm our understanding of August 3, 2003, regarding the establishment of three driving titles within the Materials Management Organization.

| Title | GVW of Vehicle Normally Driven |
| --- | --- |
| Driver - Light Truck | Under 10,001 lb. |
| Driver - Medium Truck | 10,001 - 26,000 lb. |
| Driver - Heavy Truck | Over 26,000 lb. (straight truck) |

Employees in the titles Driver-Medium Truck and Driver-Heavy Truck also may be assigned to operate vehicles of lesser weight.

Employees in any of these titles will:

a. perform work associated with the loading, unloading, pickup, transport and delivery of correspondence, mail, material, tools, supplies, etc.;

b. use various types of material handling equipment such as two-wheel hand carts, dollies, pallet jacks, etc.

c. prepare associated documents and check same for accuracy; and

d. follow established safety practices and procedures.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.               Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____

   Company Bargaining Chair                Union Bargaining Chair

**Operator Services (AWT)**

This will confirm our understanding of August 3, 2003, that individual operator performance for appraisal purposes will be based on the Operator's performance in achieving the appropriate level and balance of customer satisfaction, revenue generation (where appropriate), cost performance and dependability.

The Company agrees that it will not discipline any experienced Operator solely on the basis of that Operator's average work time (AWT) per call performance.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
     Company Bargaining Chair              Union Bargaining Chair

**Operator Services Monitoring**

This will confirm our understanding of August 3, 2003, that effective January 1, 2001, Operator Services will implement paragraphs (3) and (4), (6) and the unnumbered paragraph following paragraph (6) of the Commercial Evaluative Observations provisions of this Agreement, changing "Consultant" to "Operator" and "one Consumer organization RSSC in each CWA Local" to "one Operator Services office in NJ and one Operator Services office in DC, MD, VA or WV."

The parties agree to create a joint Mid-Atlantic Company-Union Operator Services Monitoring Committee, comprised of three representatives of the Companies, and three representatives of the Union (one from NJ, one from DE, and one from DC, MD, VA, WV).

The purpose of this Committee is to determine how to revise Paragraphs (1), (2) and (5) of the Commercial Evaluative Observations provisions of this Agreement to apply in the Operator Services work environment and work operations. The Committee will take into account the substantial differences between RSSCs and GBS business offices on the one hand, and Operator Services offices, on the other, including but not limited to, the competitive pressures affecting Operator Services, the significantly shorter contact time in Operator Services, and the lack of methods other than monitoring to measure individual or office service results.

The committee will meet at mutually agreeable times, commencing no later than 60 days after ratification of the collective bargaining agreements. A mutually agreed Monitoring Policy will be developed and implemented no later than March 1, 2001.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.              Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
     Company Bargaining Chair              Union Bargaining Chair

**Outside Plant Copper Cable Splicing**

This will confirm our understanding that effective on August 3, 2003, that the Verizon telephone companies in Maryland, Virginia, Washington, D.C. and West Virginia agree that all splicing of out-side copper cable which is owned, maintained, and operated by them and located between two central offices or between the cus-tomer serving TAP/Terminal/ONU and the central office is guaran-teed to be assigned to Company employees represented by the Union through August 2, 2008.

This guarantee will be implemented 90 days following ratifica-tion. The use of contractors performing this work will be phased out during that 90-day period, subject to any existing contractual arrangements with vendors which cannot be terminated within that period. Any such requirement will be terminated at the first possi-ble date thereafter permitted under the agreement with the vendor.

Regarding future assignment of this work after this letter agreement expires and regarding work operations not covered by this letter, the provisions of this letter agreement do not modify, increase, or diminish, and shall not be construed to modify, increase, or diminish the rights of either CWA or the Companies under other provisions of their collective bargaining agreements.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                          of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____
    Company Bargaining Chair              Union Bargaining Chair

**Overtime Administration**

This confirms our understanding of August 3, 2003 that the Company's right to assign overtime to meet the needs of the business includes but is not limited to meeting operational needs to meet customer service requirements in a timely manner, or for safety reasons.

Management will first attempt to use volunteers to meet overtime needs. When there are not enough volunteers, and overtime is assigned, management will review an employee's request to be excused if timely presented, and will accept excuses that are reasonable after considering the circumstances of the employee and the needs of the business. The above principles apply throughout the entire bargaining unit.

In seeking volunteers, the following guidelines will apply:

1) Before requiring employees to work overtime, the Company will first seek available, qualified volunteers (who are on the job) from within the group normally used for administering overtime under existing practices.

2) Before requiring any residential or business installation or repair technician within National Operations to perform work on an overtime basis, the Companies will seek available, qualified volunteers (who are on the job) in the Proactive Preventive Maintenance (PPM) organization, Wholesale, and then in the Construction organization. This commitment applies only to technicians who normally perform work in the geography where the work in question will be performed.

3) Notification: Where the Company needs to have work performed on an overtime basis on a given day, and it may be necessary to require employees to perform work on an overtime basis on the same day, the Companies will notify affected employees (who are on the job) no later than two-and one-half (2.5) hours before the end of the employee's scheduled tour that day ("the 2.5 hour point"). (This will not apply in situations where an employee must work overtime to complete a job or work in progress.) For applicable titles, notification may consist of paging the employee before the 2.5 hour point, with the employee responsible to return the page in order to receive notification, or requiring employees to call in to pre-designated telephone number(s) before the 2.5 hour point.

Commencing September 1, 2000, the limitation on forced

overtime ("cap") for the remainder of 2000 shall be 10 hours per employee per payroll week. Commencing January 1, 2001, this cap on forced overtime shall be 8 hours per employee per payroll week. Voluntary overtime worked will be counted toward the overtime cap, except for the period from January 1, 2001 to September 1, 2001. Upon request, the Union will assist in securing volunteers. These overtime limitations will not apply in the case of emergency, long term service difficulties or if an employee consents to additional overtime. Except in emergencies, no employee will be involuntarily scheduled or assigned to work six days in a week in consecutive weeks. For purposes of this paragraph only, an emergency is defined as an event of national importance, fire, explosion, or other catastrophe, or severe weather conditions, e.g., hurricane, tornado, blizzard, severe ice damage or major flood. In addition, the Union will assume responsibility to make every effort to obtain sufficient volunteers in any condition of sustained bad weather. For Commercial employees, the cap on overtime for purposes of this paragraph is 7.5 hours.

During the final year of the 2000 collective bargaining agreement, employees requesting weekly vacation during the summer vacation period (May, June, July, August, September) will provide a minimum of one week advance notice for any such request.

A committee consisting of the Company and Union authorized bargaining representatives and an additional representative designated by each party will be established to review Union concerns regarding overtime administration. The Committee will meet quarterly, if requested by the Union.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____     By _____

Company Bargaining Chair          Union Bargaining Chair

**Limitations on Mandatory Overtime**
**(Applicable to Commercial Employees Only)**

This will confirm our understanding of August 3, 2003 that the overtime limits ("caps") of 10 or 15 hours specified in the existing overtime administration provision in the DC, MD, VA, WV, VSC, VADI collective bargaining agreement shall both be reduced to seven and one-half (7.5) hours. In addition, the following provision will apply:

The Company will give reasonable consideration to an employee's timely request to be excused.

1. An employee will not be required to work more than a total of seven and one-half (7.5) hours overtime in any payroll week except in case of emergency (as referenced in the overtime administration letter of understanding), long term service difficulties or employee consent to such overtime. For purposes of computing the 7.5 hour limits, both voluntary and mandatory overtime will count towards those limits. Upon request, the Union will assist in securing volunteers to work overtime.

2. The Company will give reasonable consideration to an employee's timely request to be excused.

3. The parties recognize that long term service difficulties for an extended period may develop from time to time during which suspension of the above overtime limitations would be appropriate. In the event such service difficulties develop, the Company and the Union will meet to discuss the problem and determine how to best deal with the situation.

**Notice for Mandatory Overtime**

No mandatory overtime will be assigned to Service Representatives/Consultants with less than 24 hours notice before the start of the tour in which the overtime is to be worked to the affected employee, except for the following situations:

1. To complete calls and/or clear calls in queue at the end of a tour, or

2. Extenuating service conditions, in which case the Company will contact the Union in advance to explain the situation.

3. Emergency conditions as defined in the existing contract provisions on overtime "caps".

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____          By _____

    Company Bargaining Chair                    Union Bargaining Chair

**Procedure to Resolve Claims Regarding Hiring Wage Rates**

This will confirm our understanding of August 3, 2003, that the parties agree to establish a new procedure to resolve claims regarding employees' hiring wage rates. This procedure shall be independent of the grievance-arbitration procedure and shall provide the exclusive remedy for any claim regarding an employee's hiring wage rate.

If an employee or the Union has an issue regarding an employee's hiring wage rate, the International Representative of the Union shall submit a written statement (by e-mail) to the Labor Relations Manager for the appropriate geographic area explaining this claim. The Company shall review this written statement and provide a written answer (by e-mail) within thirty (30) days. If the Union is not satisfied by this answer, it can submit the dispute to a neutral third party for resolution within thirty (30) days of the Company's answer. The third party neutral shall be appointed in accordance with the procedures established by the Federal Mediation and Conciliation Service.

The only issue that the Union may raise or that a neutral third party can determine regarding an employee's hiring wage rate is whether the Company properly considered all information provided during the employment interview in accordance with the Company's wage credit guidelines. Any remedy issued by the third party neutral shall have prospective effect only and shall not result in any wage reductions.

All claims under this procedure must be filed within sixty (60) days of the new employee's hiring date. Any claim filed more than sixty (60) days after an employee's hiring date shall be time-barred in all respects.

Article 16A, Section 3 is not applicable to any remedies issued under this procedure. No claims arising under this procedure can be submitted to the grievance-arbitration procedure.

Within thirty (30) days of the effective date of this agreement, the parties will meet and mutually agree upon a neutral third party. The Company will notify the Union of any adjustments in its wage credit guidelines at least thirty (30) days prior to implementation.

Either party may terminate this procedure for resolving claims regarding hiring wage rates with sixty (60) days notice to the other party, when in its judgment, the procedure is not workable.

| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____
    Company Bargaining Chair

By _____
    Union Bargaining Chair

**VA, DC, MD, WV Sales Prorate Commitment**

August, 2003

This letter is to advise the Union of the Company's intention to pro-rate the sales revenues for associates in the Consumer and General Business LOB through August 2, 2008, for the following reasons:

1. Temporary Management Replacement per Article 22, Section 3;

2. Associates who are training other associates in accordance with Article 22, Section4;

3. Associates who are assigned as New employee development coaching;

4. Associates who are assigned to follow-up on customer commitments for the office (i.e down-desk);

5. Absence from work due to a court appearance on behalf of the Company;

6. Absence for Union Business in accordance with Article 9;

7. FMLA-certified absence;

8. Vacations in accordance with Article 31;

9. Disability Absence approved by CORE;

10. Absence when subpoenaed to appear in court;

11. Absence due to Jury Duty;

12. Absence due to Death in Family in accordance with Article 33, Section 1 (b);

13. Absence due to Military Duty;

14. Absence due to Election Service;

15. Loaned to other departments;

16. Absence while involved with formal, job related training;

17. Absence while on a job visit;

18. Any necessary Joint Conference Time;

19. Student takeovers;

20. TBO activities;

21. Winners' Circle;

22. President's Club.

Nothing in this letter is intended to limit the Company's right to establish and implement all appraisal objectives and requirements, including sales revenue requirements.

Sincerely,

Director - Labor Relations

AGREED:

_____
CWA Representative

**Sales And Referral Incentive Programs**

This will confirm our understanding of August 3, 2003, regarding sales and referral incentive programs reached in 2003 Bargaining.

The Company may develop and implement sales and referral incentive programs which will provide employees in any title who participate the opportunity to earn merchandise, cash, meals, recognition, and other awards of value based on individual and/or collective performance in achieving standards developed and administered solely by the Company.

Except for attending informational meetings, the decision of whether or not to participate in sales and referral incentive programs shall be wholly voluntary. Sales employees are expected to continue their sales activities and other job responsibilities whether or not they participate in these incentive programs.

A Company representative will notify the Union of any sales and referral incentive programs prior to implementation. The development, design, size, frequency, and/or administration of sales and referral incentive programs, including the amount of merchandise, cash or other awards earned by participating employees, are wholly within the discretion of the Company and are not subject to the grievance or arbitration provisions of the collective bargaining agreement, except that alleged violations of the provisions of this letter may be grieved and arbitrated.

This Letter of Understanding shall expire at 11:59 PM on August 2, 2008.

Verizon Washington, DC Inc.          Communications Workers
Verizon Maryland Inc.                          of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
    Company Bargaining Chair              Union Bargaining Chair

**Service Monitoring**

This will confirm our understanding of August 3, 2003, that service management observation programs are oriented toward service provided by the Operator Service Center, and will be taken only for the purpose of evaluating new or changes practices and procedures, customer acceptance, problems in providing service, etc. Service management observation programs are not designed to measure individual operator performance and will not be used for routine observation of individuals. No employee will be discharged or terminated as a result of these observations except for gross customer abuse, fraud or violation of secrecy of communications.

Our approach to monitoring and productivity measurements are based on a premise that fosters a work environment that builds on mutual trust and respect and that enhances job satisfaction. Our program for observations are tailored to the needs of each operator and Center, and the number of diagnostic observations will be consistent with that approach. Make-up observations will be taken only where necessary to insure reasonable statistical reliability of performance measurements. If possible, feedback will take place on the same day as the observations are taken.

Good service to the customers and enhancing revenues are of equal importance to productivity. The AWT measurement practices will continue to be evaluated and revised as required to maximize the objectives of good service and revenue enhancement. It is the Company's intent to develop operator's overall performance in such a manner as to provide operator services to the customer in an efficient, courteous and responsive way.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.               Communications Workers
Verizon Maryland Inc.                                     of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____     By _____
   Company Bargaining Chair          Union Bargaining Chair

**Service Quality Observing**

The following is our understanding of August 3, 2003, regarding Service Quality Observing:

It is the policy of the Company to conduct Service Quality Observations in full compliance with Federal and State laws. Service Quality Observing includes Service Observing and Supervisory Observing.

Service Observing measures the overall speed, accuracy and efficiency of our telecommunications network and work forces. It is not used for evaluating individual employee performance.

Supervisory Observing involves observations of employee contacts with customers or service-related contacts with other employees. It is used in determining individual employee performance and as an aid to training and development.

Supervisory observations are limited to the handling of customer contacts and contacts between employees involved in the provision of customer service. Employees who may be observed will be made aware of such fact on a quarterly basis and of the general frequency of such observations. Employees' conversations will not be electronically recorded.

Records of supervisory observations will be limited to Company-related matters. They will not be disclosed except to authorized personnel for Company-related reasons. Results of observations will be periodically reviewed with employees and adverse notations, which are intended to be used against an employee for the purpose of justifying discipline, will be reviewed promptly with such employee.

Telephones which are not subject to Supervisory Observing will be provided by the Company for employees' personal calls. In addition, Supervisors will not listen in on personal conversations of employees on any telephone.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| Verizon Washington, DC Inc. | Communications Workers |
|---|---|
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By ___J.R.D___          By _____

   Company Bargaining Chair          Union Bargaining Chair

**Service Representatives/Consultants —**
**Downgrades, Transfers, Promotions**

This will confirm our understanding of August 3, 2003 that for the life of the 2003 collective bargaining agreement, Consultants/Service Representatives who are not meeting their sales objectives will be allowed to apply for non-sales related positions (positions without sales objectives or requiring sales skills) provided that they meet all other appraisal standards and other applicable qualifications except for sales objectives.

Verizon Washington, DC Inc.
Verizon Maryland Inc.
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

Communications Workers
of America

By _____
Company Bargaining Chair

By _____
Union Bargaining Chair

171

**Short Notice Excused Work Days**

This will confirm our understanding of August 3, 2003, regarding the scheduling of time off on short notice Excused Work Days.

Effective on January 1, 2001, notwithstanding the provisions of Article 31, Section 10 of the General Agreement, requests to supervision for up to three (3) paid Excused Work Days and one (1) unpaid Excused Work Day will be granted on short notice to employees eligible for paid and unpaid Excused Work Days under the following conditions:

1. The employee must request time off on short notice prior to the start of a scheduled tour or half-tour, but no more than 24 hours prior to the start of the scheduled tour or half-tour.

2. The Company will grant all EWDs on the basis of the earliest request(s) to supervision provided that the Company may deny any and all requests in work groups of five (5) or more which would result in less than eighty percent (80%) of the scheduled force being available for duty. In a work group of four (4), the Company may deny any and all requests which would result in only one or two scheduled employees being available for duty. In a work group of 3, the Company may deny any and all requests which would result in only one employee being available for duty. This paragraph does not apply to a work group of one or two employees.

3. The work group shall be the same as the group designated for purposes of vacation selection.

4. Short notice excused work days may be taken in one-half (1/2) day increments; however, no more than one full day may be requested at any one time.

5. In each work group, the Company may designate up to (4) work days in any month as unavailable for Short Notice Excused Work Days. Such designations will be made in accord with work schedule posting requirements.

6. The Company will have the right to deny any and all requests during any severe service disruption that may be caused, for example, by a natural disaster or other calamity (e.g., fires, explosions, civil disturbances, wars, acts of terrorism, major utility and transportation disruptions).

Disputes regarding the application of the terms and conditions of Short Notice Excused Work Days may be submitted to the griev-

ance procedure; however; neither these provisions nor their inter-
pretation and application shall be subject to arbitration.

This Letter of Understanding shall expire at 11:59 p.m. on
August 2, 2008.

Verizon Washington, DC Inc.             Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____

   Company Bargaining Chair                Union Bargaining Chair

**Stress Relief Committee**

This confirms our understanding of August 3, 2003 that in recognition of the need to address issues of employee stress, the parties agree to create a joint Mid-Atlantic Region-wide Company-Union Stress Relief Committee, comprised of five representatives of the Company, and five representatives of the Union, and will be co-chaired by the President of the Retail Markets Group and the District 13 representative with primary responsibility for Commercial issues.

The parties will discuss issues relating to employee stress in the Consumer, General Business Sales, and Receivables Management organizations. Among the matters that the committee will discuss are the following:

• Pro-rated sales objectives;

• Computer timing/adherence;

• Training;

• Wait Time;

• Cap of Force Movement

The committee will meet at mutually agreeable times, commencing no later than 60 days after ratification of the collective bargaining agreement. The Committee will issue an executive report containing its recommendations no later than January 31, 2001.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.              Communications Workers
Verizon Maryland Inc.                              of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
      Company Bargaining Chair              Union Bargaining Chair

**Technological Change**

This will affirm our understanding of August 3, 2003, that the Company and the Union recognize that technological changes in equipment, organization, or methods of operation have a tendency to affect job security and the nature of the work to be performed. The Company and the Union, therefore, will attempt to diminish or abolish the detrimental effects of any such technological change by continuing a joint committee know as the Technology Change Committee to oversee problems and recommend solutions of problems in this area as set forth below:

It is agreed that for the duration of the 2003 General Agreement a Technology Change Committee be constituted at the Company headquarters level. Such committee will consist of not more than three (3) representatives of the Company and not more than three (3) representatives of the Union. Such Committee may be convened at the option of either party at mutually agreeable times.

The purpose of the Committee is to provide for discussion of major technological changes (including changes in equipment, organization, or methods of operation) which may affect employees represented by the Union. The company will notify the Union at least six (6) months in advance of planned major technological changes. Meetings may be convened at the option of either party at mutually agreeable places and times, at least two (2) times each year. At such meetings, the Company will advise the Union of its plans with respect to the introduction of such changes and will familiarize the Union with the progress being made.

The impact and effect of such changes on the employees shall be appropriate matters for discussion. The Company will discuss with the Union:

(a) What steps might be taken to offer employment to employees affected;

    (1) In the same locality or other localities in jobs which may be available in occupations covered by the collective bargaining agreements between the parties;

    (2) In other occupations in the Company not covered by the collective bargaining agreement;

    (3) In an affiliate or subsidiary company within the former Bell Atlantic Network Services Group.

    (b) The applicability of various Company programs and contract provisions relating to force adjustment plans and procedures, including, Income Security Plan, Reassignment Pay Protection Program, termination allowances, retirement, training or retraining, transfer procedures and the like.

    (c) The feasibility of the Company providing training for other assignments for the employees affected. (Example: sponsorship of typing training on Company time).

The Committee shall not formulate policy or arrive at binding decisions or agreements, but rather shall be charged with the responsibility to develop facts and recommendations so that the Company can make well-informed decisions regarding the matters covered by this provision.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.      Communications Workers
Verizon Maryland Inc.            of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____    By _____
    Company Bargaining Chair        Union Bargaining Chair

**Termination Of Outside Contractors**

This will confirm our understanding of August 3, 2003, that before initiating a layoff of regular employees in the titles of Systems Technician, Cable Splicing Technician, Services Technician and Outside Plant Technician in Network Operations, pursuant to Article 35 Section 5(c), the Company shall, where practicable, first terminate all arrangements with non-affiliated independent contractors for contracting out the work performed by these titles in Network Operations; only those contracting out arrangements within thirty-five (35) miles of the normal reporting location of the affected surplus employees holding one of these titles shall be terminated.

This provision shall not be construed to require the Company to terminate any such contract contrary to its termination provision or otherwise to require the Company to breach its contract. Where such contracts require notice before termination, the Company shall not be prevented from proceeding with the other steps in Article 35 during the notification period. The Company may also retain contract labor while proceeding with the steps set forth in Article 35 (1) unless the Company's employees can safely, properly and economically perform those types of operations, or (2) where the Company's employees are not properly qualified for such work either under the law or under regulations or governmental authorities prescribing the qualifications thereunder.

This Letter of Understanding will expire on August 2, 2008.

Verizon Washington, DC Inc.       Communications Workers
Verizon Maryland Inc.                  of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____      By _____
     Company Bargaining Chair        Union Bargaining Chair

**Top Secret Security Clearance**

This will confirm our understanding of August 3, 2003, that the Company and the Union recognize the need to explore new, innovative methods for meeting customer requirements. To help assure quality service and consistent service coverage for key federal government contracts, the parties agree to the following:

Certain contracts may require the Company to utilize Technicians and other employees who hold Top Secret, Full Lifestyle Polygraph Security Clearances. For purposes of this agreement, Technicians and other employees who hold such clearances shall be called "qualified employees."

When working under contracts that require qualified employees, the Company may choose, at its sole discretion, to designate the government facilities as normal reporting locations. The Company will pay Temporary Assignment pay for each day a qualified employee is assigned to and actually performs work that requires Top Secret Full Lifestyle Polygraph Security Clearance at a designated federal facility. Qualified employees shall receive Temporary Assignment Pay of fifteen dollars ($15.00) a day if they work a full tour and Temporary Assignment Pay of ten dollars ($10.00) a day if they work a half tour. Employees who work less than a half tour will not receive any Temporary Assignment Pay. The temporary assignment payment will not be considered as time worked for any purpose under the General Agreement and will be disregarded when computing any wage progression treatments.

The parties agree that the Company shall have the right to determine whether a contract requires qualified employees. The qualified employees will only receive temporary assignment pay pursuant to this Letter of Understanding when the Company determines that a contract requires Top Secret, Full Lifestyle Security Clearance.

The Company will compile a pool of qualified employees. If the Company determines that a contract requires qualified employees on a long-term basis, it will select volunteers from this pool. If there are more volunteers than assignments, the Company will select volunteers in seniority order. Those who volunteer and who are assigned to report to a Federal facility under long term assignments must agree not to seek other jobs through RAMP for the duration of the assignment. The Company retains the right to assign employees to work on any contract and will exercise this right if there are fewer volunteers than assignments.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____     By _____

    Company Bargaining Chair         Union Bargaining Chair

**Treatment of Grievances Settled by the Parties or Arbitration
Awards Which Involve Backpay and/or Reinstatement**

This confirms our understanding of August 3, 2003, that if, as a result of the settlement of a grievance by the parties or an arbitration award, the grievant is to receive back pay and/or reinstatement following a discharge, layoff, demotion, or suspension, unless and to the extent the settlement or arbitration award specifies otherwise, the employee will be entitled to the following compensation and benefits, and no other compensation (other than any back pay awarded or agreed upon) or benefits:

1. In the case of a discharged employee reinstated to employment with full back pay, or regardless of the amount of back pay if the settlement or award specifies that the employee is to be "made whole" for the entire period off the payroll, the employee shall receive, less any applicable deductions: (a) full service credit under the pension plan for the period off the payroll; (b) reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage if the employee continued those coverage(s) under COBRA, or if the employee did not continue those coverage(s) under COBRA, reimbursement for premiums paid by the employee for medical, dental and/or vision coverage not to exceed the amount the employee would have paid as premiums for such coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-pocket medical, vision and dental expenses if, under the provisions of the applicable plans, the employee would not have incurred these expenses if they had remained on the payroll. The appropriate Plan Administrator would determine which expenses would be reimbursable. Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement; (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination; (d) any Ratification Bonus the employee would have received but for the termination; (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll; (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility; and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election on file as of the date of the employee's termination, and the employee will

receive the Companies' match in his or her Savings and Security Plan account to which the employee would have been entitled proportionate to the employee's contribution.

2. A laid off employee who is reinstated as a result of a grievance settlement or arbitration award shall receive the compensation and benefits set forth in paragraph 1 irrespective of the amount of back pay the employee is to receive.

3. In the case of a discharged employee reinstated to employment with no back pay or partial back pay, pursuant to a settlement or award which does not specify that the employee is to be "made whole" for the entire period off the payroll, the employee shall receive, less any applicable deductions, the following, each of which will be prorated as specified: (a) prorated service credit under the pension plan for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, with immediate bridging of service; (b) reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage if the employee continued those coverage(s) under COBRA, or if the employee did not continue those coverage(s) under COBRA, reimbursement for premiums paid by the employee for medical, dental and/or vision coverage not to exceed the amount the employee would have paid as premiums for such coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-pocket medical, vision and dental expenses if, under the provisions of the applicable plans, the employee would not have incurred these expenses if they had remained on the payroll, based upon the employee's coverage at the time of the discharge, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed. (The appropriate Plan Administrator will determine which expenses will be reimbursable. Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement); (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination, prorated according to Section 3 of the Corporate Profit Sharing Plan, so that the employee receives one-twelfth of the applicable Corporate Profit Sharing Award(s) for each full month's worth of backpay awarded; (d) any Ratification Bonus the employee would have received but for the termination, prorated for the period off the payroll based upon the ratio between the amount of back pay

181

and the amount which the employee would have received in pay if continuously employed; (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed; (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed; and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election on file as of the date of the employee's termination prorated for the period off the payroll based upon the ratio between the amount of backpay and the amount which the employee would have received in pay if continuously employed, and the employee will receive the Company match in his or her Savings and Security Plan account to which the employee would have been entitled proportionate to the employee's contribution.

4. Any backpay awarded or agreed upon will be reduced by the amount of money the employee received under any governmental unemployment compensation program, and the amount of money the employee received from other employment during the period the employee was discharged or suspended.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

| | |
|---|---|
| Verizon Washington, DC Inc. | Communications Workers |
| Verizon Maryland Inc. | of America |
| Verizon Virginia Inc. | |
| Verizon West Virginia Inc. | |
| Verizon Services Corp. | |
| Verizon Advanced Data Inc. | |
| Verizon Avenue Corp. | |
| Verizon South Inc. (Virginia) | |
| Verizon Corporate Services Corp. | |

By _____        By _____

   Company Bargaining Chair              Union Bargaining Chair

**Union Business In FMLA And Overtime Build**

This will confirm our understanding of August 3, 2003, that the Company agrees to include 047 time which is "unpaid excused time spent for union business" during the employee's normal daily tour within the normal work week in the build for overtime and in the build for the FMLA annual requirement. 047 time will not be considered as "time worked" for any other purpose.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DCInc.           Communications Workers
Verizon Maryland Inc.                          of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____           By _____
   Company Bargaining Chair              Union Bargaining Chair

**Vacation Buy-Back**

The Company may offer to buy back a full week or weeks of an employee's scheduled vacation in order to meet unanticipated business demands.

The decision by the Company to make a week or weeks available for buy-back in a particular group will be determined solely by the force and service conditions within that group.

All regular employees who are eligible for at least 3 weeks of vacation in the current calendar year will be eligible to sell vacation as follows:

| Vacation Eligibility Current Calendar Year | Maximum No. of Weeks Eligible for Sale |
|---|---|
| 3 | 1 |
| 4 | 2 |
| 5 | 2 |

Once the Company determines that "vacation buy-back" is appropriate, the opportunity to "buy-back vacation" is made available to employees scheduled to take that week in the designated group based on seniority. Acceptance by the employee of an offer to "buy-back" full week or weeks of scheduled vacation is voluntary, however, once vacation is bought by the Company it is not available for reselection. Rather, the employee's work scheduled will reflect a normal work week and the employee will be paid for the "vacation buy-back" on the same basis as provided for vacation payments in Article 31, Section 2 of the General Agreement. Vacation weeks bought by the Company shall not be considered time worked for any purpose under this provision. Payments made for vacation shall not be used in the computations of overtime, differential, or any other premium payments, nor in the determination of any benefits calculated on the basis of wages or other earnings. This provision applies only to full weeks of vacation including weeks with holidays.

Questions regarding the offer or acceptance of "vacation buy-back" may be submitted to the grievance procedure; however, neither the provisions of this letter nor its interpretation or application shall be subject to arbitration.

| Verizon Washington, DC Inc. | Communications Workers |
|---|---|
| Verizon Maryland Inc. | of America |

Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____          By _____

Company Bargaining Chair              Union Bargaining Chair

**Vacation Scheduling Percentages**

This will confirm our understanding of August 3, 2003 that at least 18% of the employees in each vacation administrative work group shall be permitted to schedule off in a given week.

Where the application of the percentage specified above results in other than a whole number, the number yielded will be rounded up to the next whole number.

Regarding vacation availability during traditional fall hunting season and the December holiday season, management will make a reasonable effort to consider the need for higher vacation availability.

Those work groups whose vacation availability is currently greater than the percentages specified above, will not be required to reduce their vacation scheduling availability.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.    Communications Workers
Verizon Maryland Inc.               of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____    By _____
   Company Bargaining Chair     Union Bargaining Chair

**Video Display Terminals**

This will confirm our understanding of August 3, 2003, in which the Company and the Union agreed that the introduction and expansion of the use of video display terminals (VDTs) has brought about changes in the workplace. It is a joint goal to maximize the advantages of VDTs and minimize any potential disadvantages their use may present to employees.

To that end, the Company and the Union agree that the existing Safety Committees shall meet as needed to discuss the ergonomics associated with VDTs and any other VDT related issue both deem appropriate.

This Letter of Understanding shall expire at 11:59 p.m. on August 2, 2008.

Verizon Washington, DC Inc.        Communications Workers
Verizon Maryland Inc.                           of America
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.

By _____        By _____
    Company Bargaining Chair              Union Bargaining Chair

**NOTES**

**MILITARY ABSENCE
AGREEMENT**

between

COMMUNICATIONS WORKERS OF AMERICA

and

THE CHESAPEAKE AND POTOMAC
TELEHONE COMPANY

THE CHESAPEAKE AND POTOMAC
TELEHONE COMPANY OF MARYLAND

THE CHESAPEAKE AND POTOMAC
TELEHONE COMPANY OF VIRGINIA

THE CHESAPEAKE AND POTOMAC
TELEHONE COMPANY OF WEST VIRGINIA

**August 7, 1983**

**TABLE OF CONTENTS**

| Article | Page |
|---|---|
| 1. Military Leaves of Absence | 2 |
| 2. Personal Leaves of Absence and Excused Time | 6 |
| 3. Grievances | 9 |
| 4. Definitions | 9 |
| 5. Federal or State Laws | 10 |
| 6. Cancellation and Duration | 10 |

### MILITARY ABSENCE AGREEMENT

THIS AGREEMENT made this 7th day of August 1983 by and between The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of West Virginia (hereinafter referred to collectively as the "Companies," or individually as the "Company," which shall mean the employing Company) and Communications Workers of America, hereinafter referred to as the "Union."*

WHEREAS, the parties have engaged in collective bargaining, with respect to employees in the bargaining unit, which has resulted in this Agreement resolving all issues between them:

NOW, THEREFORE, in consideration of the covenants and the terms and conditions herein contained, the parties mutually agree as follows:

---

*All references to The Chesapeake and Potomac Telephone Companies shall mean the employing Companies, of Verizon Washington, DC Inc., Verizon Maryland Inc., Verizon Virginia Inc, Verizon West Virginia Inc., Verizon Advanced Data Inc., collectively ("Verizon South"), and Verizon Services Corp., for its employees who work in the geographical territory of Verizon South.

**Article 1. - Military Leaves of Absence**

**SECTION 1.** Upon application by the individual employees involved, military leaves of absence will be granted to employees leaving positions other than "temporary positions," as specified in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended, to enter the "armed forces" who:

(a) are inducted pursuant to legislation providing for the involuntary induction of persons into the "armed forces"; or

(b) enlist for a period of "active duty" not exceeding four years (except that such period may be extended so that the total of all service does not exceed five years, provided that all service in excess of four years is at the request and for the convenience of the Federal Government); or

(c) are members of the "reserve components of the armed forces" and are ordered or called into "active duty";

provided that such employees are not ineligible for reemployment rights under the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended by reason of past "military duty."

**SECTION 2.** Any leave of absence granted pursuant to this Article shall be effective until the employee is reemployed in accordance with the provisions of this Article or until the employee's right to reemployment under the law expires, whichever occurs first.

**SECTION 3.** The following provisions shall apply to employees granted military leaves of absence under this Article:

(a) *Vacation Treatment.* Employees who have not received vacations to which they are entitled at the time their leaves of absence begin shall receive a lump sum payment in lieu of the vacation of any unused portion thereof.

(b) *Pay Treatment During Absence.* Employees who are granted military leaves of absence pursuant to this Article shall, when their Company pay is greater than their Government pay, receive from the Company the difference between their Company pay and Government pay for the following periods, as applicable:

   (1) An employee with one year or less of net credited service when his military leave of absence becomes effective - the first two weeks of "military duty" or any shorter period he may serve.

2

    (2) An employee with more than one year of net credited service when his military leave of absence becomes effective - the first three months of "military duty" or any shorter period he may serve.

    (3) For this purpose Company pay shall include basic pay at the rate in effect when the military leave of absence first becomes effective plus the weekly average of evening and night differential payments received for the normal work week during the first four of the five calendar weeks worked immediately preceding the week in which the military leave of absence becomes effective. Government pay shall be determined as of the time the employee begins his "military duty" and shall include basic pay, pay for special or hazardous duty and, for those with dependents, the difference between quarters allowances established for members of the uniformed services with dependents and those established for members of the uniformed services of equal rank without dependents and, in addition, any other family allowances which may hereafter be prescribed by law.

    (4) Any periods of absence on military leave will be cumulative and will be considered as one period in computing the payments to be made in accordance with this Paragraph (b) and Paragraph (c) below. However, an employee's eligibility for payments under this Article will be reinstated for additional tours for involuntary periods of "active duty" in cases of national emergency; provided that in no event shall an employee be eligible to receive payments for more than one tour of active duty unless the employee has been on the active payroll, following a previous tour of active duty, for at least a two year period.

(c) *Payments on Behalf of Dependents During Absence.* In addition to the pay treatment prescribed in (b) above, employees, regardless of length of service, who are granted military leaves of absence pursuant to this Article and who have spouses, or dependent children under 18 years of age, at the commencement of their leaves, will, when their Company pay is greater than their Government pay, receive from the Company the difference between their Company pay and Government pay for an additional three months. For this purpose, Company pay and Government pay shall be computed as prescribed in Paragraph (b) above.

Such employees who have dependents other than spouses, or children under 18 years of age, at the commencement of their leaves shall, upon the submission of evidence of dependency satisfactory to the Company, receive special payments from the Company not to exceed those specified in the next preceding paragraph.

(d) *Employee Discount Telephone Service During Absence.* Subject to Company's applicable exchange tariffs, employees who are receiving employee discount telephone service at the time their military leaves of absence become effective, shall, if they so request, continue to receive such discount telephone service for the use of their immediate families during the period of their leaves.

Employees who are not receiving employee discount telephone service at the time their military leaves of absence become effective shall, to the extent that the same if provided for under the Company's exchange tariffs, be eligible to receive such discount telephone service for the use of their immediate families during the period of such leaves.

Such employee discount telephone service shall be limited to the territory served by The Chesapeake and Potomac Telephone Companies.

The provisions of this Paragraph (d) are subject to such change or changes as may be necessary on account of any rules or regulations which may be hereafter prescribed by any regulatory or governmental body.

(e) *Reemployment.* Employees who are granted military leaves of absence under this Article and who, upon their return from "military duty", have reemployment rights under the law and apply for reemployment with the Company within the time prescribed by law will be reemployed in accordance with the provisions of the law then in effect.

(f) *Benefits During Absence.* Employees who are granted military leaves of absence under this Article and who, upon their return from "military duty", are reemployed by the Company in accordance with Paragraph (e) above, shall receive full service credit for the period of such military leaves of absence for the purpose of determining net credited service.

Employees who are granted military leaves of absence under this Article shall be eligible for death benefits during the peri-

4

od of such leaves to the same extent and upon the same terms and conditions as if such employees had continued in the regular employment of the Company. However, such benefits, where payable, shall be based upon the term of net credited service credited to an employee at the time the absence began plus service during such absence until time of death and shall be computed at the rate of Company pay which the employee was receiving at the time the military leave of absence became effective.

Employees returning from military leaves of absence granted pursuant to this Article, who are reemployed in accordance with Paragraph (e) above, but who are unable to return to work because of sickness disability, shall be eligible for sickness payments as of the date on which they would have returned to work except for the disability, to the same extent and upon the same terms and conditions as such payments are provided for regular employees of the Company. Such payments, where made, shall be based upon the term of net credited service credited to the employee at the time his military leave of absence began plus the period of such leave of absence and shall be computed at the rate of Company pay applicable to the employee upon his reemployment.

(g) *Treatment upon Return from Military Service.* Employees who are granted military leaves of absence under this Article and who, upon their return from "military duty", are reemployed in accordance with Paragraph (e) above, shall be accorded the following treatment:

(1) Reemployment shall be at the rate of pay the employee would have received if he had been continuously on duty with the Company during the period of absence in the job classification he was in at the time he left; provided, however, that in the case of any such employee who has become incapacitated while on leave of absence on "military duty" to the extent that he is physically unable to do the same work or work similar to that which he was doing before entering military service and who is reemployed in different work, his rate of pay upon reemployment shall be subject to adjustment in accordance with the circumstances of his particular case.

(2) In the year in which the employee returns he shall be entitled, during that calendar year, to the vacation he would be entitled to under the Agreement between the parties, as if

he had been continuously on duty with the Company during the period of absence, providing there remains in that calendar year a sufficient number of days to make this possible. Otherwise the employee will receive that portion of his vacation which can be taken within the calendar year in which he returns.

(3) In addition to the pay treatment described above, employees granted military leaves of absence under this Article who, upon their return from "military duty", are reemployed in accordance with Paragraph (e) above, shall be accorded any other reemployment rights, privileges and benefits to which they may be entitled under then existing law by reason of their "military duty".

**SECTION 4.** Employees who enter the armed forces for "active duty" without having obtained military leaves of absence under this Article will, upon their return from "active duty", be granted those reemployment rights, privileges and benefits, if any, to which they may be entitled under then existing law by reason of their military duty.

### Article 2. - Personal Leaves of Absence and Excused Time

**SECTION 1.** Upon application by the individual employees involved, personal leaves of absence for military reasons, or excused time, will be granted to employees leaving positions other than "temporary positions", as specified in the Viet Nam Era Veteran's Readjustment Assistance Act of 1974, as amended, for the following types of absence:

(a) "Active duty for training" as covered in Section 2 of this Article; or

(b) "Training duty" as covered in Section 3 of this Article; or

(c) "Emergency active duty" as covered in Section 4 of this Article; and shall be effective until the employee is reemployed in accordance with the provisions of this Article or until the employee's right to reemployment under the law expires, whichever occurs first.

**SECTION 2.** *"Active Duty for Training."* Personal leaves of absence for military reasons will be granted to employees who enter upon an initial period of "active duty for training" of not less than three consecutive months.

6

(a) *Vacation Treatment.* Employees who have not received vacations to which they are entitled at the time of the commencement of their personal leaves of absence for military reasons, shall receive a lump sum payment in lieu of the vacation or any unused portion thereof.

(b) *Pay Treatment During Absence.* Employees who are granted personal leaves of absence for military reasons pursuant to this Section shall, when their Company pay is greater than their Government pay, receive from the Company the difference between their Company pay and their Government pay as follows: where the period of "active duty for training" is fifteen days or more, the difference between Company pay for eleven normal scheduled working days and one-half Government pay for one month. For this purpose, Company and Government pay shall be computed in accordance with Article 1, Section 3, Paragraph (b)(3) above. In no event shall payment for difference in pay be made for more than eleven normal scheduled working days in any one fiscal year whether for "active duty for training" under this Section or for "training duty" under Section 3 below, or both.

**SECTION 3.** *"Training Duty."* Excused time, or personal leaves of absence, as appropriate, will be granted to employees who are members of the "reserve components of the armed forces", including the National Guard, and who enter upon "training duty".

(a) *Vacation Treatment.* Such excused time, or personal leaves of absence shall not be deducted from the regular vacation periods to which the employees may be entitled; however, if an employee elects to take his "training duty" under this Article during his vacation period he shall receive only his vacation pay for this period.

(b) *Pay Treatment During Absence.* Employees who are excused, or granted personal leaves of absence, under this Section shall, when their Company pay is greater than their Government pay, receive from the Company the difference between their Company pay and their Government pay as follows:

   (1) When the period of "training duty" is fourteen consecutive days, the difference between Company pay for ten normal scheduled working days in the period of training duty" and Government pay for the entire fourteen days.

   (2) When the period of "training duty" is fifteen consecutive

7

days or more, the difference between Company pay for eleven normal scheduled working days and one-half Government pay for one month.

(3) When the period of "training duty" is less than fourteen consecutive days, the difference between Company pay for the normal scheduled working days during the period of training duty and Government pay for the entire period of such duty provided that in any one fiscal year the Company pay for the normal scheduled working days shall not exceed the normal scheduled working days in two normal work weeks.

For this purpose, Company and Government pay shall be computed in accordance with Article 1, Section 3, Paragraph (b)(3) above. In no event shall such payment of difference in pay be made for more than eleven normal scheduled working days in any one fiscal year whether for "training duty" under this Section or for "active duty for training" under Section 2 above, or both.

**SECTION 4.** *"Emergency Active duty."* Excused time, or personal leaves of absence, as appropriate, will be granted to employees who are members of the National Guard when ordered to "emergency active duty" in cases of emergencies other than for "active duty" as provided for in Article 1, Section 1 of this Agreement.

(a) *Vacation Treatment.* Such excused time, or personal leaves of absence, shall not be deducted from the regular vacation periods to which the employees may be entitled; however, if an employee's "emergency active duty" under this Section occurs during his vacation period, he shall receive only his vacation pay for this period.

(b) *Pay Treatment During Absence.* Employees who are excused, or granted personal leaves of absence, under this Section shall, when their Company pay is greater than their Government pay, receive the difference between their Company pay and their Government pay for a period not to exceed the normal scheduled working days in two normal work weeks in any one fiscal year, such difference to be computed as follows:

(1) When the period of "emergency active duty" consists of fourteen or more consecutive days, the difference between Company pay for ten normal scheduled working days and Government pay for fourteen days.

8

(2) When the period of "emergency active duty" is less than fourteen consecutive days, the difference between Company pay for the normal scheduled working days during the period of "emergency active duty" and Government pay for the entire period of such duty.

For this purpose, Company and Government pay shall be computed in accordance with Article 1, Section 3, Paragraph (b)(3) above. Time spent on such "emergency active duty" shall not affect the employee's eligibility to be granted a personal leave of absence for "active duty for training" in accordance with Section 2 of this Article, or his eligibility to be excused for "training duty" in accordance with Section 3 of this Article.

**SECTION 5.** *Reemployment.* Employees who are granted personal leaves of absence for military reasons or are excused under this Article and who, upon their return from "military duty" have reemployment rights under existing law and apply for reemployment with the Company within the time prescribed by law, will be reemployed and accorded any reemployment rights, privileges and benefits to which they may be entitled under then existing law.

**SECTION 6.** *Treatment upon Return from Military Duty.* Employees reemployed in accordance with Section 5 of this Article shall be accorded the same treatment as employees reemployed upon their return from "military duty" under Section 3, Paragraph (g) of Article 1 of this Agreement.

#### Article 3. - Grievances

Grievances involving the interpretation or application of the provision of this Military Absence Agreement may be processed through the established grievance procedure in the General Agreement between the parties, but in no event shall any such grievance be subject to arbitration.

#### Article 4. - Definitions

For purposes of interpretation and application of this Agreement, the following definitions shall apply:

(1) *"Active duty,"* sometimes referred to as "active duty for training and service", shall mean full-time duty in the active military service of the United States, other than "active duty for training", "training duty", or "emergency active duty".

(2) *"Active duty for training"* shall mean full-time duty in the active

9

military service of the United States for training purposes as specified in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended.

(3) *"Training duty,"* sometimes referred to as "inactive duty training," shall mean training, appropriate duties or instruction performed by the reserve components of the armed forces, other than that described in (2) above, as specified in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended.

(4) *"Emergency active duty"* shall mean active duty performed by the federally recognized National Guard in cases of emergency, and shall not include such "active duty" as covered in (1) above.

(5) *"Military duty"* shall mean military duty or service of any nature under orders or authorization issued by competent authority.

(6) *"Armed forces"* shall mean the armed forces of the United States as specified in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended.

(7) *"Reserve components of the armed forces"* shall mean the reserve components of the armed forces of the United States as specified in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended.

(8) *"Temporary positions"* shall mean positions of a specific, brief and non-recurrent period as referred to in the Viet Nam Era Veterans' Readjustment Assistance Act of 1974, as amended.

### Article 5. - Federal or State Laws

Should any Federal or State law or the final determination of any court of competent jurisdiction or any proclamation or order having the force of law at any time affect any provision of this Agreement, such provision shall be construed as having been changed to the extent necessary to conform to such law or decision. In the event that such law, determination or proclamation shall be repealed or held unconstitutional, the provision of this Contract affected hereby shall be read according to its original tenor.

### Article 6. - Cancellation and Duration

**SECTION 1.** This Agreement shall cancel and supersede all exist-

ing agreements with respect to treatment of employees entering, during, and upon their return from all types of "military duty" and sets forth all of the understandings, commitments and agreements existing between the parties relating thereto.

**SECTION 2.** This Agreement shall continue in effect for an initial period through August 9, 1986 or until the final termination of the General Agreement covering wages and working conditions between the parties entered into pursuant to the Memorandum of Agreement dated August 27, 1983, whichever is later, and thereafter shall continue in effect until modified, amended or terminated by sixty days written notice given by either party to the other. Following the service of such notice, the parties agree to engage in collective bargaining with respect to such modification, amendment or termination.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their names by their duly authorized representatives the day and year first above written.

The Chesapeake and Potomac     Communications Workers
 Telephone Companies                    of America

                                                    By  Edwin Lewinski

                                                    Approved:

By  A. E. Sears                         By  G. E. Watts
Assistant Vice President           President C.W.A.

11

**INDEX**

| ARTICLE | | PAGE |
|---|---|---|
| 9 | ABSENCE FOR UNION BUSINESS | 10 |
| 4 | AGENCY SHOP | 5 |
| 16 | BASIC WAGE SCHEDULES | 22 |
| 41 | CANCELLATION AND DURATION | 87 |
| 2 | COLLECTIVE BARGAINING | 4 |
| 39 | CONTRACT LABOR | 81 |
| 17 | CORPORATE PROFIT SHARING PLAN | 26 |
| 40 | DEFINITIONS | 82 |
| 19 | DIFFERENTIALS | 31 |
| 27 | EMERGENCY CALL-OUTS | 46 |
| 36B | EMPLOYMENT SECURITY TRAINING | 75 |
| 33 | EXCUSED TIME | 62 |
| 38 | EXCUSED WORK DAYS | 80 |
| 15 | FEDERAL OR STATE LAWS | 22 |
| 35 | FORCE ADJUSTMENT, LAYOFF, PART-TIMING AND REHIRING AFTER LAYOFF | 67 |
| 12 | GRIEVANCES AND GRIEVANCE MEETING PROCEDURE | 14 |
| 30 | HOLIDAYS | 53 |
| 26 | INCLEMENT WEATHER | 46 |
| 36A | INCOME SECURITY PLAN | 73 |
| 6 | INFORMATION FURNISHED UNION | 7 |
| 16B | NEW JOB TITLES AND JOB CLASSIFICATIONS | 24 |
| 11 | NON-DISCRIMINATION | 14 |
| 10A | OCCUPATIONAL SAFETY AND HEALTH | 13 |
| 24 | OVERTIME AND SUNDAY PRACTICES | 42 |
| 32 | PAYMENTS DURING FIRST SEVEN DAYS OF SICKNESS ABSENCE | 61 |
| 3 | PAYROLL DEDUCTION OF UNION DUES, ETC | 5 |
| 14 | PENSION AND SICKNESS AND ACCIDENT DISABILITY BENEFIT PLANS | 21 |
| 13 | PROCEDURES FOR REGULAR AND EXPEDITED ARBITRATION | 18 |
| 7 | PROMOTION OR TRANSFER OF UNION OFFICERS | 9 |
| 21 | PROMOTIONAL WAGE ADJUSTMENTS | 32 |
| 36C | REASSIGNMENT PAY PROTECTION PROGRAM | 78 |
| 1 | RECOGNITION | 2 |
| 29 | REIMBURSEMENT OF INCIDENTAL EXPENSES | 52 |
| 10 | RESPONSIBLE UNION-COMPANY RELATIONSHIP | 12 |
| 34 | SENIORITY | 64 |
| 18 | SPECIAL CITY ALLOWANCE | 30 |
| 16C | TEAM-BASED INCENTIVE PAY PLAN | 26 |

**ARTICLE**                                                                          **PAGE**

22  TEMPORARY ASSIGNMENTS .........................................35
37  TERMINATION ALLOWANCES .........................................79
23  TRANSFER AND REASSIGNMENT .................................36
28  TRAVEL ALLOWANCES, TRAVEL TIME
      AND EXPENSE  PAYMENTS .......................................49
6A  UNION ACCESS TO EMPLOYEE PERSONNEL FILES .....8
8  UNION ACTIVITY ON COMPANY PREMISES .................9
5  UNION BULLETIN BOARDS .............................................6
20  UNION REPRESENTATION.............................................32
31  VACATIONS .....................................................................56
16A  WAGE START RATES.....................................................23
25  WORK SCHEDULES AND CHANGES IN SCHEDULED
      WORK TIME.................................................................44

EXHIBIT I
AUTHORIZATION FOR PAYROLL
DEDUCTION OF AMOUNTS EQUAL
TO UNION DUES .....................................................................89

EXHIBIT II
NEGOTIATED AGREEMENTS ON
JOB DUTIES .............................................................................91

EXHIBIT III
PENSION BAND TABLE..........................................................100

EXHIBIT IV
TRANSFER PLAN AND INTERCOMPANY
JOB BANK ...............................................................................101

EXHIBIT V
BROADBAND NETWORK EMPLOYMENT
SECURITY PROVISIONS ........................................................106

EXHIBIT VI
ENHANCED INCOME SECURITY PLAN .................................111

LETTERS OF UNDERSTANDING INDEX ...............................112

MILITARY ABSENCE AGREEMENT.......................................189

EXHIBIT A................................................................................i–x

WAGE SCHEDULES 2003....................................................1–17

WAGE SCHEDULES 2004....................................................1–17

WAGE SCHEDULES 2005....................................................1–17

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**EXHIBIT A**

To

GENERAL AGREEMENT

between

COMMUNICATIONS WORKERS OF AMERICA,
AFL-CIO

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2003**

**EXHIBIT A**

**TABLE OF CONTENTS**

**PAGE**

Wage Schedule Notes:
    Cost Of Living ...........................................................................ii
    Pension Band Increases ............................................................ii

Locality Wage Groups ..............................................................iv–vi

Job Titles and Related Categories,
    Job Title Groups and Wage Schedules ...............................vii–x

Wage Schedules Effective:
    2003.................................................................................1–17
    2004.................................................................................1–17
    2005.................................................................................1–17

**WAGE SCHEDULE NOTES**

### COST-OF-LIVING

1. Effective August 6, 2006 and August 5, 2007, adjustments will be made in basic weekly rates in each wage schedule in accordance with the following:

   a. the amount of the August 6, 2006 adjustment shall be: (i) one-half of the increase above four percent (4.0%) in the "CPI-W" (1982–84=100) for May 2006 over May 2004, applied to (ii) the scheduled rates in effect in each wage schedule on August 5, 2006, (iii) rounded to the nearest 50 cents.

   b. the amount of the August 5, 2007 adjustment shall be: (i) one-half of the increase above 2 percent (2.0%) in the "CPI-W" (1982–84=100) for May 2007 over May 2006, applied to (ii) the scheduled rates in effect in each wage schedule on August 4, 2007, (iii) rounded to the nearest 50 cents.

2. In no event shall a decrease in the CPI-W result in a reduction of any basic weekly wage rate.

3. In the event the Bureau of Labor Statistics does not issue the appropriate Consumer Price Indexes on or before the dates referred to in Paragraph 1, the cost-of-living adjustment required by such appropriate indexes shall be effective at the beginning of the first payroll week after receipt of the indexes.

4. No adjustment, retroactive or otherwise, shall be made as the result of any revision which may later be made in the first published figures for the CPI-W for May 2004, May 2006 and May 2007.

5. The cost-of-living adjustment is dependent upon the availability of the CPI-W in its present form and calculated on the same basis as the CPI-W for May 2003. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W, the Companies and the Union agree to request the Bureau to make available, for the life of this agreement, a CPI-W in its present form and calculate it on the same basis as the CPI-W for May 2003, which was 179.4 (1982-84 = 100).

### Pension Band Increases

1. There will be a pension band increase of 5% for each associate whose separation from service occurs during the win-

dow period between October 1, 2003 and December 31, 2003. The pension band increase of 5% will be eliminated at 11:59 p.m. on December 31, 2003.

2.    The Verizon Pension Plan for Mid-Atlantic Associates (the "Pension Plan") will be amended to provide for increases in pension bands by the "Percentage Increase" amounts shown in the following table, as applied to participating employees whose "Pension Effective Date" (which is the first day following the last day on the payroll) is on or after the corresponding "Effective Date" shown below.

| Effective Date | Percentage Increase |
|---|---|
| 11/1/04 | 2% |
| 10/1/05 | 3% |
| 10/1/06 | 3% |
| 10/1/07 | 3% |

3.    Pension Band Adjustment for Operators. Effective retroactive to July 1, 2003, through August 2, 2008, the Pension Band for the Operator Job Title in New Jersey, Delaware and Potomac Locality Wage Group A (Washington, D.C., Washington Suburban Area–Maryland and Northern Virginia area) will be increased from Band 107 to Band 108. On and after August 2, 2008, the Pension Band for the Operator Job title in these locations will revert to Band 107.

**LOCALITY WAGE GROUPS**
**WASHINGTON AREA**

| | |
|---|---|
| Locality Wage Group A | Washington Corp., Washington Suburban Area-Maryland, Northern Virginia Area |

**MARYLAND AREA**

Locality Wage Group B

| | | |
|---|---|---|
| Aberdeen | Elkton | Ocean City |
| Accident | Ellicott City | Odenton |
| Annapolis | Essex | Owings Mills |
| Arbutus | Federalsburg | Parkton |
| Armiger | Finksburg | Parkville |
| Baden | Flintstone | Parole |
| Bainbridge | Fork | Perryville |
| Baltimore | Frederick | Pikesville |
| Bel Air | Frostburg | Pocomoke |
| Berlin | Galesville | Prince Frederick |
| Bishop | Glen Burnie | Princess Anne |
| Braddock Heights | Glenwood | Queenstown |
| Brandywine | Hagerstown | Randallstown |
| Brooklyn | Hampstead | Reistertown |
| Brunswick | Hancock | Ridge |
| Buckeystown | Havre de Grace | Rock Hall |
| Cambridge | Hollywood | Salisbury |
| Cardiff | Hughesville | Severna Park |
| Catonsville | Hurlock | Smithsburg |
| Cecilton | Indian Head | Snow Hill |
| Centreville | Jarrettsville | Solomons |
| Chase | Keedysville | Sparks-Glencoe |
| Chestertown | Kennedyville | St. Margarets |
| Church Hill | La Plata | St. Michaels |
| Churchville | Laurel | Stevensville |
| Clarksville | Leonardtown | Still Pond |
| Clear Spring | Lexington Park | Sykesville |
| Cockeysville | Lonaconing | Taneytown |
| Columbia | Mayo | Thurmont |
| Cresaptown | Mechanicsville | Tompkinsville |
| Crisfield | Milestown | Towson |
| Crofton | Mt. Airy | Trappe |
| Cumberland | Millersville | Union Bridge |
| Damascus | Mutual | Valley Lee |
| Darlington | Myersville | Waldorf |
| Deale | Nanjemoy | Walkerville |
| Delmar | New Market | Westminster |
| Denton | New Windsor | Willards |
| Dundalk | North Beach | Williamsport |
| Easton | North East | Woodlawn |
| Edgewood | Northpoint | |
| Elkridge | Oakland | |

**LOCALITY WAGE GROUPS
VIRGINIA AREA**

| Locality Wage Group B | | | |
|---|---|---|---|
| Amherst | Goochland | Pulaski |
| Ashland | Gordonsville | Purcellville |
| Bedford | Grayson | Radford |
| Berryville | Grundy | Richlands |
| Big Stone Gap | Hampton | Richmond |
| Blacksburg | Harrisonburg | Roanoke |
| Bluemont | Hillsboro | Rustburg |
| Bowling Green | Hopewell | Salem |
| Buchanan | Jonesville | Sandston |
| Cape Charles | Lebanon | Seaford |
| Chanceller | Leesburg | Shawsville |
| Chase City | Louisa | Smithfield |
| Chatham | Lovingston | Spotsylvania |
| Chesapeake | Lynchburg | St. Paul |
| Chester | Madison | Stafford |
| Chincoteague | Madison Heights | Staunton |
| Christiansburg | Manakin | Stephens City |
| Clintwood | Manassas | Stewartsville |
| Clover | Marshall | Stuart's Draft |
| Coeburn | Maxwell | Suffolk |
| Colonial Heights | Mechanicsville | Tangier Island |
| Covington | Middleburg | Tazwell |
| Culpeper | Midlothian | Temperanceville |
| Dale City | Mineral | Toano |
| Danville | Nassawadox | Unionville |
| Dhalgren | Newport News | Varina Grove |
| Dinwiddie | Norfolk | Verona |
| Dryden | Norton | Virginia Beach |
| Dublin | Onancock | Wallops Island |
| Eastville | Onley | Warrenton |
| Emporia | Orange | Warsaw |
| Exmore | Parksley | West Point |
| Forest | Pearisburg | Williamsburg |
| Fort Lee | Pennington Gap | Winchester |
| Franklin | Petersburg | Wise |
| Fredericksburg | Poquoson | Woodbridge |
| Gloucester | Portsmouth | Yorktown |

v

**LOCALITY WAGE GROUPS**
**WEST VIRGINIA AREA**

| | | | |
|---|---|---|---|
| Locality Wage Group B | Alum Creek | Huntington | Richwood |
| | Ansted | Hurricane | Ripley |
| | Barboursville | Iaeger | Rock Cave |
| | Beckley | Kanawha | Rowlesburg |
| | Belington | Kenova | Salem |
| | Belle | Kermit | Scott Depot |
| | Berkeley Springs | Keyser | Seth |
| | Bradshaw | Kingwood | Shady Spring |
| | Bridgeport | Lewisburg | Shinnston |
| | Brushton | Logan | Sissonville |
| | Buckhannon | Lorentz | Sophia |
| | Chapmanville | Lubeck | South |
| | Charleston | Madison | Spencer |
| | Chester | Man | St. Albans |
| | Clarksburg | Martinsburg | Summersville |
| | Clendenin | Matewan | Suncrest |
| | Delbarton | Middlebourne | Sutton |
| | Dunbar | Milton | Terra Alta |
| | East Bank | Montgomery | Tyler Heights |
| | Elizabeth | Morgantown | Vienna |
| | Elkins | Moundsville | Walton |
| | Elkview | Mt. Hope | Warwood |
| | Fairmont | Mullens | Weirton |
| | Fayetteville | New Martinsville | Weirton Heights |
| | Flat Top | Nitro | Wellsburg |
| | Follansbee | Oak Hill | West Milford |
| | Fort Gay | Oceana | West Union |
| | Franklin | Omar | Weston |
| | Gassaway | Parkersburg | Wheeling |
| | Gauley Bridge | Peterstown | White Sulphur |
| | Gilbert | Philippi | Springs |
| | Glen Daniel | Piedmont | Whitesville |
| | Glenville | Pineville | Williamson |
| | Grafton | Pocatalico | Winfield |
| | Griffithsville | Pt. Pleasant | Woodsdale |
| | Hinton | Rainelle | |
| | Holden | Ravenswood | |

**EXHIBIT A**

**JOB TITLES AND RELATED CATEGORIES,**
**JOB TITLE GROUPS AND WAGE SCHEDULES**

| Notes | Job Title | Category | Job Title Group | Wage Schedule |
|---|---|---|---|---|
| | Assignment Administrator | III | 11 | 7 |
| | Assistant Technician | I | 15 | 24 |
| | Automobile Technician | II | 10 | 5 |
| | Automotive Equipment Technician | II | 9 | 3 |
| | Building Attendant | II | 15 | 9 |
| | Buildings Equipment Mechanic | II | 9 | 3 |
| (2) | Buildings Mechanic | II | 10 | 6 |
| (4) | Buildings Mechanic | II | 10 | 6A |
| | Cable Splicing Technician | I | 6 | 1 |
| | Central Office Technician | I | 7 | 1 |
| | Coin Telephone Collector | II | 10 | 5 |
| | Communications Representative | A | 5 | 14 |
| | Communications Representative #2 | A | 5 | 12 |
| | Computer Attendant—<br>Semi-skilled 2 | III | 12 | 17 |
| | Computer Attendant—<br>Semi-skilled 2 | B | 12 | 21 |
| | Consultant | A | 11 | 11 |
| | Customer Account Representative | A | 11 | 11A |
| | Customer Billing Analyst | III | 11 | 7 |
| | Customer Business Representative | A | 11 | 11A |
| | Customer Service Administrator | I | 11 | 29 |
| | Customer Service Agent | I | 7 | 30 |
| | Customer Service Clerk—Skilled 1 | B | 11 | 22 |
| (5) | Dial Administration Clerk—<br>Skilled 1 | III | 11 | 18 |
| (5) | Dial Administration Clerk—<br>Skilled 1 | B | 11 | 22 |
| | Directory Compilation Clerk—<br>Semi-Skilled | III | 12 | 17 |
| | Directory Compilation Clerk—<br>Semi-Skilled | B | 12 | 21 |
| | Dispatching Clerk-Semi-Skilled 2 | III | 12 | 17 |

vii

| Notes | Job Title | Category | Job Title Group | Wage Schedule |
|---|---|---|---|---|
| | Dispatching Clerk-Semi-skilled 2 | B | 12 | 21 |
| | Driver—Light Truck | II | 13 | 25 |
| | Driver—Medium Truck | II | 12 | 26 |
| | Driver—Heavy Truck | II | 12 | 27 |
| | Engineering Assistant | A | 7 | 13 |
| (5) | Engineering Drawing Clerk—Skilled 1 | III | 11 | 18 |
| (5) | Engineering Drawing Clerk—Skilled 1 | B | 11 | 22 |
| | Entry Typist—Entry 1 | III | 13 | 15 |
| | Entry Typist—Entry 1 | B | 13 | 19 |
| | Facilities Administrator | III | 11 | 7 |
| | Fraud Investigator | III | 11 | 7 |
| (1) | File Clerk—Entry 3 | III | 13 | 16 |
| (1) | File Clerk—Entry 3 | B | 13 | 20 |
| | Frame Attendant | I | 10 | 4 |
| | Garage Attendant | II | 15 | 9 |
| | General Clerk-Semi-skilled 2 | III | 12 | 17 |
| | General Clerk-Semi-skilled 2 | B | 12 | 21 |
| (3) | Guard | II | 15 | 23 |
| | Key Data Entry Clerk-Entry 3 | III | 13 | 16 |
| | Key Data Entry Clerk-Entry 3 | B | 13 | 20 |
| (1) | Mail Clerk—Entry 3 | III | 13 | 16 |
| (1) | Mail Clerk—Entry 3 | B | 13 | 20 |
| | Maintenance Administrator | III | 11 | 7 |
| | Management Plan Clerk—Semi-skilled 2 | III | 12 | 17 |
| | Management Plan Clerk—Semi-skilled 2 | B | 12 | 21 |
| | Manager's Clerk—Semi-skilled 2 | III | 12 | 17 |
| | Manager's Clerk—Semi-skilled 2 | B | 12 | 21 |
| | Master Automotive Equipment Technician | II | 9 | 1 |
| | Master Buildings Equipment Mechanic | II | 7 | 1 |
| | Material Equipment Technician | II | 9 | 29 |
| | Material Systems Technician | I | 7 | 1 |

| Notes | Job Title | Category | Job Title Group | Wage Schedule |
|---|---|---|---|---|
| | Message Investigation Clerk—Semi-skilled 2 | III | 12 | 17 |
| | Message Investigation Clerk—Semi-skilled 2 | B | 12 | 21 |
| | Network Services Coordinator | III | 11 | 7 |
| | Office Clerical Assistant-Entry 1 | III | 13 | 15 |
| | Office Clerical Assistant-Entry 1 | B | 13 | 19 |
| | Office Clerk-Entry 3 | III | 13 | 16 |
| | Office Clerk-Entry 3 | B | 13 | 20 |
| | Operator | IV | 14 | 10 |
| | Operator- A (Effective 10-2-98) | IV | 14 | 10A |
| | Outside Plant Technician | I | 9 | 2 |
| (5) | Plant Assignment Clerk-Skilled 1 | III | 11 | 18 |
| (5) | Plant Assignment Clerk-Skilled 1 | B | 11 | 22 |
| | Plant Records Clerk-Entry 3 | III | 13 | 16 |
| | Plant Records Clerk-Entry 3 | B | 13 | 20 |
| | Public Communications Sales Representative | A | 5 | 28 |
| | RCMAC Clerk | III | 11 | 7 |
| | Remittance Clerk-Entry 3 | III | 13 | 16 |
| | Remittance Clerk-Entry 3 | B | 13 | 20 |
| | Repair Clerk-Semi-skilled 2 | III | 12 | 17 |
| | Repair Clerk-Semi-skilled 2 | B | 12 | 21 |
| | Reproduction Clerk-Entry 3 | III | 13 | 16 |
| | Reproduction Clerk-Entry 3 | B | 13 | 20 |
| | Sales Associate (North & South) | III | | 8A |
| | Senior Traffic Office Clerk | IV | 11 | 22 |
| | Service Assistant | IV | 11 | 22 |
| | Service Order Administrator—Skilled 1 | III | 11 | 18 |
| | Service Order Administrator—Skilled 1 | B | 11 | 22 |
| | Service Order Clerk—Semi-skilled 2 | III | 12 | 17 |
| | Service Order Clerk—Semi-skilled 2 | B | 12 | 21 |
| | Service Order Correction Clerk—Skilled 1 | III | 11 | 18 |

| Notes | Job Title | Category | Job Title Group | Wage Schedule |
|---|---|---|---|---|
| | Service Order Correction Clerk— Skilled 1 | B | 11 | 22 |
| | Service Representative | A | 11 | 11 |
| | Services Technician | I | 9 | 2 |
| | Special Clerk—Skilled 1 | III | 11 | 18 |
| | Special Clerk—Skilled 1 | B | 11 | 22 |
| | Stenographer—Semi-skilled 2 | III | 12 | 17 |
| | Stenographer—Semi-skilled 2 | B | 12 | 21 |
| | Storekeeper | II | 10 | 6 |
| | Systems Technician | I | 6 | 1 |
| | Telemarketing Representative— Entry 3 | III | 13 | 16 |
| | Telemarketing Representative— Entry 3 | B | 13 | 20 |
| | Teller—Entry 3 | III | 13 | 16 |
| | Teller—Entry 3 | B | 13 | 20 |
| | Typist—Entry 3 | III | 13 | 16 |
| | Typist—Entry 3 | B | 13 | 20 |
| | Warehouse Attendant | II | 15 | 8 |

(1) No other employee shall be given this job title effective 8-7-77.

(2) Except Washington Area.

(3) Washington and Maryland Areas only.

(4) Washington Area only.

(5) No other employee shall be given this job title effective 8-6-00.

NOTE: There are four (4) clerical levels: Entry 1, Entry 3, Semi-skilled 2, and Skilled 1. The appropriate wage schedules are numbered 15 through 22.

x

**2003 WAGE SCHEDULES**

**WAGE SCHEDULE: 01**

**Cable Splicing Technician, Central Office Technician, Master Automotive Equipment Technician, Master Buildings Equipment Mechanic, Material Systems Technician, Systems Technician**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $444.00 | | $430.00 | |
| 6 Mos. | 6 Mos. | $497.00 | $53.00 | $482.00 | $52.00 |
| 12 Mos. | 6 Mos. | $557.50 | $60.50 | $541.00 | $59.00 |
| 18 Mos. | 6 Mos. | $625.00 | $67.50 | $607.50 | $66.50 |
| 24 Mos. | 6 Mos. | $700.50 | $75.50 | $681.50 | $74.00 |
| 30 Mos. | 6 Mos. | $785.00 | $84.50 | $764.50 | $83.00 |
| 36 Mos. | 6 Mos. | $880.00 | $95.00 | $859.00 | $94.50 |
| 42 Mos. | 6 Mos. | $986.00 | $106.00 | $963.50 | $104.50 |
| 48 Mos. (Maximum) | | $1,105.00 | $119.00 | $1,081.50 | $118.00 |
| **Pension Band** | | **121** | | **120** | |

**WAGE SCHEDULE: 02**

**OUTSIDE PLANT TECHNICIAN, SERVICES TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $439.00 | | $422.00 | |
| 6 Mos. | 6 Mos. | $490.50 | $51.50 | $473.00 | $50.50 |
| 12 Mos. | 6 Mos. | $547.50 | $57.00 | $529.00 | $56.00 |
| 18 Mos. | 6 Mos. | $611.00 | $63.50 | $592.00 | $63.00 |
| 24 Mos. | 6 Mos. | $683.00 | $72.00 | $662.50 | $70.50 |
| 30 Mos. | 6 Mos. | $762.00 | $79.00 | $741.50 | $79.00 |
| 36 Mos. | 6 Mos. | $851.00 | $89.00 | $829.00 | $87.50 |
| 42 Mos. | 6 Mos. | $951.00 | $100.00 | $927.00 | $98.00 |
| 48 Mos. (Maximum) | | $1,061.00 | $110.00 | $1,038.00 | $111.00 |
| **Pension Band** | | **119** | | **118** | |

1

**WAGE SCHEDULE: 03**

### AUTOMOTIVE EQUIPMENT TECHNICIAN, BUILDINGS EQUIPMENT MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $438.50 | | $422.00 | |
| 6 Mos. | 6 Mos. | $489.50 | $51.00 | $472.50 | $50.50 |
| 12 Mos. | 6 Mos. | $546.00 | $56.50 | $528.00 | $55.50 |
| 18 Mos. | 6 Mos. | $609.50 | $63.50 | $590.50 | $62.50 |
| 24 Mos. | 6 Mos. | $680.00 | $70.50 | $660.50 | $70.00 |
| 30 Mos. | 6 Mos. | $759.00 | $79.00 | $738.50 | $78.00 |
| 36 Mos. | 6 Mos. | $847.00 | $88.00 | $826.50 | $88.00 |
| 42 Mos. | 6 Mos. | $944.50 | $97.50 | $923.50 | $97.00 |
| 48 Mos. (Maximum) | | $1,054.50 | $110.00 | $1,032.50 | $109.00 |
| **Pension Band** | | **119** | | **118** | |

**WAGE SCHEDULE: 04**

### FRAME ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $443.50 | | $424.50 | |
| 6 Mos. | 6 Mos. | $500.50 | $57.00 | $479.50 | $55.00 |
| 12 Mos. | 6 Mos. | $564.50 | $64.00 | $541.00 | $61.50 |
| 18 Mos. | 6 Mos. | $637.00 | $72.50 | $610.00 | $69.00 |
| 24 Mos. | 6 Mos. | $719.50 | $82.50 | $689.00 | $79.00 |
| 30 Mos. | 6 Mos. | $811.50 | $92.00 | $777.00 | $88.00 |
| 36 Mos. (Maximum) | | $916.00 | $104.50 | $877.50 | $100.50 |
| **Pension Band** | | **113** | | **112** | |

2

**WAGE SCHEDULE: 05**
**AUTOMOBILE TECHNICIAN, COIN TELEPHONE COLLECTOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $440.50 | | $424.50 | |
| 6 Mos. | 6 Mos. | $500.00 | $59.50 | $482.50 | $58.00 |
| 12 Mos. | 6 Mos. | $566.00 | $66.00 | $547.50 | $65.00 |
| 18 Mos. | 6 Mos. | $642.00 | $76.00 | $622.00 | $74.50 |
| 24 Mos. | 6 Mos. | $727.00 | $85.00 | $706.50 | $84.50 |
| 30 Mos. | 6 Mos. | $825.00 | $98.00 | $802.50 | $96.00 |
| 36 Mos. (Maximum) | | $934.00 | $109.00 | $912.00 | $109.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 06**
**BUILDINGS MECHANIC (EXCEPT WASH AREA), STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $441.00 | | $427.00 | |
| 6 Mos. | 6 Mos. | $497.50 | $56.50 | $482.50 | $55.50 |
| 12 Mos. | 6 Mos. | $560.50 | $63.00 | $546.00 | $63.50 |
| 18 Mos. | 6 Mos. | $631.50 | $71.00 | $617.50 | $71.50 |
| 24 Mos. | 6 Mos. | $712.50 | $81.00 | $698.50 | $81.00 |
| 30 Mos. | 6 Mos. | $801.50 | $89.00 | $789.00 | $90.50 |
| 36 Mos. (Maximum) | | $903.50 | $102.00 | $892.50 | $103.50 |
| **Pension Band** | | **113** | | **112** | |

**DISTRICT 2 – POTOMAC**  **EFFECTIVE AUGUST 3, 2003**

**WAGE SCHEDULE: 07**

**ASSIGNMENT ADMINISTRATOR, CUSTOMER BILLING ANALYST, FACILITIES ADMINISTRATOR, FRAUD INVESTIGATOR, MAINTENANCE ADMINISTRATOR, NETWORK SERVICES COORDINATOR, RCMAC CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $376.50 | | $365.00 | |
| 6 Mos. | 6 Mos. | $434.00 | $57.50 | $421.50 | $56.50 |
| 12 Mos. | 6 Mos. | $501.50 | $67.50 | $487.50 | $66.00 |
| 18 Mos. | 6 Mos. | $578.50 | $77.00 | $563.00 | $75.50 |
| 24 Mos. | 6 Mos. | $667.50 | $89.00 | $650.50 | $87.50 |
| 30 Mos. | 6 Mos. | $770.50 | $103.00 | $752.00 | $101.50 |
| 36 Mos. (Maximum) | | $889.50 | $119.00 | $869.00 | $117.00 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 08**

**WAREHOUSE ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $334.00 | | $334.00 | |
| 6 Mos. | 6 Mos. | $396.50 | $62.50 | $395.50 | $61.50 |
| 12 Mos. | 6 Mos. | $470.50 | $74.00 | $468.50 | $73.00 |
| 18 Mos. | 6 Mos. | $559.50 | $89.00 | $555.00 | $86.50 |
| 24 Mos. (Maximum) | | $664.50 | $105.00 | $657.50 | $102.50 |
| **Pension Band** | | **105** | | **105** | |

4

**WAGE SCHEDULE: 09**
### BUILDING ATTENDANT, GARAGE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $311.00 | | $310.00 | |
| 6 Mos. | 6 Mos. | $387.00 | $76.00 | $382.50 | $72.50 |
| 12 Mos. | 6 Mos. | $482.00 | $95.00 | $473.50 | $91.00 |
| 18 Mos. (Maximum) | | $600.00 | $118.00 | $585.00 | $111.50 |
| **Pension Band** | | **102** | | **102** | |

**WAGE SCHEDULE: 10**

### OPERATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $384.00 | | $357.00 | |
| 6 Mos. | 6 Mos. | $431.50 | $47.50 | $403.50 | $46.50 |
| 12 Mos. | 6 Mos. | $484.00 | $52.50 | $455.50 | $52.00 |
| 18 Mos. | 6 Mos. | $544.00 | $60.00 | $516.00 | $60.50 |
| 24 Mos. | 6 Mos. | $610.50 | $66.50 | $582.00 | $66.00 |
| 30 Mos. | 6 Mos. | $686.00 | $75.50 | $659.00 | $77.00 |
| 36 Mos. (Maximum) | | $770.50 | $84.50 | $744.00 | $85.00 |
| **Pension Band** | | **108** | | **107** | |

**WAGE SCHEDULE: 10A**

**OPERATOR–A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $384.00 | | $357.00 | |
| 6 Mos. | 6 Mos. | $411.50 | $27.50 | $384.00 | $27.00 |
| 12 Mos. | 6 Mos. | $441.00 | $29.50 | $413.00 | $29.00 |
| 18 Mos. | 6 Mos. | $473.50 | $32.50 | $445.00 | $32.00 |
| 24 Mos. | 6 Mos. | $507.00 | $33.50 | $479.50 | $34.50 |
| 30 Mos. | 6 Mos. | $544.00 | $37.00 | $516.00 | $36.50 |
| 36 Mos. | 6 Mos. | $583.00 | $39.00 | $554.50 | $38.50 |
| 42 Mos. | 6 Mos. | $625.50 | $42.50 | $596.50 | $42.00 |
| 48 Mos. | 6 Mos. | $670.50 | $45.00 | $642.50 | $46.00 |
| 54 Mos. | 6 Mos. | $718.50 | $48.00 | $691.00 | $48.50 |
| 60 Mos. (Maximum) | | $770.50 | $52.00 | $744.00 | $53.00 |
| **Pension Band** | | **108** | | **107** | |

**WAGE SCHEDULE: 11**
    **CONSULTANT, SERVICE REPRESENTATIVE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $437.50 | | $411.50 | |
| 6 Mos. | 6 Mos. | $496.50 | $59.00 | $469.50 | $58.00 |
| 12 Mos. | 6 Mos. | $563.50 | $67.00 | $536.50 | $67.00 |
| 18 Mos. | 6 Mos. | $639.00 | $75.50 | $612.50 | $76.00 |
| 24 Mos. | 6 Mos. | $726.00 | $87.00 | $699.00 | $86.50 |
| 30 Mos. | 6 Mos. | $823.50 | $97.50 | $797.50 | $98.50 |
| 36 Mos. (Maximum) | | $934.50 | $111.00 | $910.00 | $112.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 11A**
### CUSTOMER ACCOUNT REPRESENTATIVE
### CUSTOMER BUSINESS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $420.50 | | $396.00 | |
| 6 Mos. | 6 Mos. | $477.00 | $56.50 | $451.50 | $55.50 |
| 12 Mos. | 6 Mos. | $542.00 | $65.00 | $516.00 | $64.50 |
| 18 Mos. | 6 Mos. | $615.00 | $73.00 | $589.00 | $73.00 |
| 24 Mos. | 6 Mos. | $698.50 | $83.50 | $672.00 | $83.00 |
| 30 Mos. | 6 Mos. | $791.50 | $93.00 | $767.00 | $95.00 |
| 36 Mos. (Maximum) | | $899.00 | $107.50 | $875.00 | $108.00 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 12**
### COMMUNICATIONS REPRESENTATIVE #2

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $451.00 | | $431.00 | |
| 6 Mos. | 6 Mos. | $504.50 | $53.50 | $483.50 | $52.50 |
| 12 Mos. | 6 Mos. | $564.00 | $59.50 | $543.50 | $60.00 |
| 18 Mos. | 6 Mos. | $631.00 | $67.00 | $610.00 | $66.50 |
| 24 Mos. | 6 Mos. | $705.50 | $74.50 | $685.00 | $75.00 |
| 30 Mos. | 6 Mos. | $789.50 | $84.00 | $769.50 | $84.50 |
| 36 Mos. | 6 Mos. | $883.00 | $93.50 | $863.50 | $94.00 |
| 42 Mos. | 6 Mos. | $987.50 | $104.50 | $970.00 | $106.50 |
| 48 Mos. (Maximum) | | $1,105.00 | $117.50 | $1,090.00 | $120.00 |
| **Pension Band** | | **121** | | **120** | |

**DISTRICT 2 – POTOMAC**                    **EFFECTIVE AUGUST 3, 2003**

**WAGE SCHEDULE: 13**

### ENGINEERING ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $440.00 | | $426.50 | |
| 6 Mos. | 6 Mos. | $490.50 | $50.50 | $475.50 | $49.00 |
| 12 Mos. | 6 Mos. | $546.00 | $55.50 | $531.00 | $55.50 |
| 18 Mos. | 6 Mos. | $608.50 | $62.50 | $592.00 | $61.00 |
| 24 Mos. | 6 Mos. | $678.00 | $69.50 | $660.50 | $68.50 |
| 30 Mos. | 6 Mos. | $755.00 | $77.00 | $736.50 | $76.00 |
| 36 Mos. | 6 Mos. | $840.50 | $85.50 | $822.00 | $85.50 |
| 42 Mos. | 6 Mos. | $936.00 | $95.50 | $917.00 | $95.00 |
| 48 Mos. | 6 Mos. | $1,042.50 | $106.50 | $1,024.00 | $107.00 |
| 54 Mos. (Maximum) | | $1,161.00 | $118.50 | $1,141.50 | $117.50 |
| **Pension Band** | | **123** | | **122** | |

**WAGE SCHEDULE: 14**

### COMMUNICATIONS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $457.50 | | $428.50 | |
| 6 Mos. | 6 Mos. | $507.50 | $50.00 | $479.00 | $50.50 |
| 12 Mos. | 6 Mos. | $564.50 | $57.00 | $535.00 | $56.00 |
| 18 Mos. | 6 Mos. | $627.50 | $63.00 | $598.00 | $63.00 |
| 24 Mos. | 6 Mos. | $697.00 | $69.50 | $667.50 | $69.50 |
| 30 Mos. | 6 Mos. | $774.50 | $77.50 | $746.00 | $78.50 |
| 36 Mos. | 6 Mos. | $860.50 | $86.00 | $833.00 | $87.00 |
| 42 Mos. | 6 Mos. | $956.00 | $95.50 | $931.50 | $98.50 |
| 48 Mos. | 6 Mos. | $1,062.50 | $106.50 | $1,040.50 | $109.00 |
| 54 Mos. (Maximum) | | $1,180.00 | $117.50 | $1,163.50 | $123.00 |
| **Pension Band** | | **124** | | **123** | |

**DISTRICT 2 – POTOMAC**        **EFFECTIVE AUGUST 3, 2003**

**WAGE SCHEDULE: 15**

### ENTRY 1–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $366.00 | | $352.50 | |
| 6 Mos. | 6 Mos. | $408.00 | $42.00 | $392.50 | $40.00 |
| 12 Mos. | 6 Mos. | $454.00 | $46.00 | $437.00 | $44.50 |
| 18 Mos. | 6 Mos. | $506.00 | $52.00 | $487.00 | $50.00 |
| 24 Mos. | 6 Mos. | $563.50 | $57.50 | $543.00 | $56.00 |
| 30 Mos. | 6 Mos. | $628.50 | $65.00 | $605.00 | $62.00 |
| 36 Mos. (Maximum) | | $700.00 | $71.50 | $673.50 | $68.50 |
| **Pension Band** | | **105** | | **104** | |

**WAGE SCHEDULE: 16**

### ENTRY 3–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $378.00 | | $353.50 | |
| 6 Mos. | 6 Mos. | $424.50 | $46.50 | $399.00 | $45.50 |
| 12 Mos. | 6 Mos. | $477.00 | $52.50 | $451.00 | $52.00 |
| 18 Mos. | 6 Mos. | $536.50 | $59.50 | $510.00 | $59.00 |
| 24 Mos. | 6 Mos. | $602.50 | $66.00 | $576.50 | $66.50 |
| 30 Mos. | 6 Mos. | $678.00 | $75.50 | $651.50 | $75.00 |
| 36 Mos. (Maximum) | | $761.50 | $83.50 | $736.50 | $85.00 |
| **Pension Band** | | **107** | | **106** | |

**WAGE SCHEDULE: 17**

**SEMI-SKILLED 2–III CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $382.00 | | $357.00 | |
| 6 Mos. | 6 Mos. | $432.50 | $50.50 | $406.00 | $49.00 |
| 12 Mos. | 6 Mos. | $489.50 | $57.00 | $460.50 | $54.50 |
| 18 Mos. | 6 Mos. | $553.00 | $63.50 | $522.50 | $62.00 |
| 24 Mos. | 6 Mos. | $625.50 | $72.50 | $593.50 | $71.00 |
| 30 Mos. | 6 Mos. | $706.50 | $81.00 | $673.00 | $79.50 |
| 36 Mos. (Maximum) | | $799.50 | $93.00 | $764.00 | $91.00 |
| **Pension Band** | | **109** | | **107** | |

**WAGE SCHEDULE: 18**

**SKILLED 1–III CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $390.50 | | $362.50 | |
| 6 Mos. | 6 Mos. | $442.50 | $52.00 | $413.00 | $50.50 |
| 12 Mos. | 6 Mos. | $502.50 | $60.00 | $472.50 | $59.50 |
| 18 Mos. | 6 Mos. | $569.00 | $66.50 | $539.00 | $66.50 |
| 24 Mos. | 6 Mos. | $646.00 | $77.00 | $616.50 | $77.50 |
| 30 Mos. | 6 Mos. | $732.50 | $86.50 | $703.50 | $87.00 |
| 36 Mos. (Maximum) | | $830.50 | $98.00 | $804.00 | $100.50 |
| **Pension Band** | | **110** | | **109** | |

**WAGE SCHEDULE: 19**

**ENTRY 1–B CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $345.00 | | $334.50 | |
| 6 Mos. | 6 Mos. | $384.00 | $39.00 | $371.50 | $37.00 |
| 12 Mos. | 6 Mos. | $427.50 | $43.50 | $413.50 | $42.00 |
| 18 Mos. | 6 Mos. | $476.00 | $48.50 | $461.00 | $47.50 |
| 24 Mos. | 6 Mos. | $530.50 | $54.50 | $512.50 | $51.50 |
| 30 Mos. | 6 Mos. | $591.00 | $60.50 | $571.00 | $58.50 |
| 36 Mos. (Maximum) | | $658.50 | $67.50 | $634.50 | $63.50 |
| **Pension Band** | | **103** | | **102** | |

**WAGE SCHEDULE: 20**

**ENTRY 3–B CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $361.50 | | $343.00 | |
| 6 Mos. | 6 Mos. | $407.50 | $46.00 | $387.00 | $44.00 |
| 12 Mos. | 6 Mos. | $458.50 | $51.00 | $437.00 | $50.00 |
| 18 Mos. | 6 Mos. | $516.50 | $58.00 | $492.50 | $55.50 |
| 24 Mos. | 6 Mos. | $580.50 | $64.00 | $556.50 | $64.00 |
| 30 Mos. | 6 Mos. | $654.00 | $73.50 | $627.50 | $71.00 |
| 36 Mos. (Maximum) | | $736.00 | $82.00 | $707.00 | $79.50 |
| **Pension Band** | | **106** | | **105** | |

**WAGE SCHEDULE: 21**

### SEMI-SKILLED 2–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $370.00 | | $350.00 | |
| 6 Mos. | 6 Mos. | $418.50 | $48.50 | $396.50 | $46.50 |
| 12 Mos. | 6 Mos. | $473.00 | $54.50 | $449.50 | $53.00 |
| 18 Mos. | 6 Mos. | $534.50 | $61.50 | $508.50 | $59.00 |
| 24 Mos. | 6 Mos. | $604.50 | $70.00 | $576.00 | $67.50 |
| 30 Mos. | 6 Mos. | $683.00 | $78.50 | $652.00 | $76.00 |
| 36 Mos. (Maximum) | | $772.50 | $89.50 | $739.00 | $87.00 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 22**

### SENIOR TRAFFIC OFFICE CLERK, SERVICE ASSISTANT, SKILLED 1–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $408.50 | | $381.50 | |
| 6 Mos. | 6 Mos. | $456.00 | $47.50 | $430.00 | $48.50 |
| 12 Mos. | 6 Mos. | $511.00 | $55.00 | $483.50 | $53.50 |
| 18 Mos. | 6 Mos. | $571.50 | $60.50 | $544.50 | $61.00 |
| 24 Mos. | 6 Mos. | $639.00 | $67.50 | $612.50 | $68.00 |
| 30 Mos. | 6 Mos. | $715.50 | $76.50 | $689.50 | $77.00 |
| 36 Mos. (Maximum) | | $800.00 | $84.50 | $776.00 | $86.50 |
| **Pension Band** | | **109** | | **108** | |

**WAGE SCHEDULE: 23**

### GUARD (WASH & MD AREAS ONLY)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $591.50 | | $314.50 | |
| 6 Mos. | 6 Mos. | $591.50 | $0.00 | $428.50 | $114.00 |
| 12 Mos. (Maximum) | | | | $584.00 | $155.50 |
| **Pension Band** | | **102** | | **102** | |

**WAGE SCHEDULE: 24**

### ASSISTANT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $345.00 | | $332.00 | |
| 6 Mos. | 6 Mos. | $389.00 | $44.00 | $375.50 | $43.50 |
| 12 Mos. | 6 Mos. | $437.50 | $48.50 | $424.00 | $48.50 |
| 18 Mos. | 6 Mos. | $493.00 | $55.50 | $479.50 | $55.50 |
| 24 Mos. | 6 Mos. | $556.00 | $63.00 | $542.00 | $62.50 |
| 30 Mos. (Maximum) | | $627.00 | $71.00 | $612.00 | $70.00 |
| **Pension Band** | | **102** | | **101** | |

**WAGE SCHEDULE: 25**

### DRIVER – LIGHT TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $375.00 | | $350.00 | |
| 6 Mos. | 6 Mos. | $419.00 | $44.00 | $394.50 | $44.50 |
| 12 Mos. | 6 Mos. | $469.00 | $50.00 | $444.00 | $49.50 |
| 18 Mos. | 6 Mos. | $525.00 | $56.00 | $499.00 | $55.00 |
| 24 Mos. | 6 Mos. | $588.00 | $63.00 | $561.00 | $62.00 |
| 30 Mos. | 6 Mos. | $658.50 | $70.50 | $631.50 | $70.50 |
| 36 Mos. (Maximum) | | $736.00 | $77.50 | $711.00 | $79.50 |
| **Pension Band** | | **106** | | **105** | |

**WAGE SCHEDULE: 26**

### DRIVER – MEDIUM TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $379.00 | | $354.00 | |
| 6 Mos. | 6 Mos. | $427.00 | $48.00 | $399.50 | $45.50 |
| 12 Mos. | 6 Mos. | $481.00 | $54.00 | $452.00 | $52.50 |
| 18 Mos. | 6 Mos. | $541.00 | $60.00 | $511.00 | $59.00 |
| 24 Mos. | 6 Mos. | $609.50 | $68.50 | $578.00 | $67.00 |
| 30 Mos. | 6 Mos. | $686.00 | $76.50 | $653.00 | $75.00 |
| 36 Mos. (Maximum) | | $773.00 | $87.00 | $739.00 | $86.00 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 27**

### DRIVER – HEAVY TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $387.00 | | $359.00 | |
| 6 Mos. | 6 Mos. | $437.00 | $50.00 | $408.50 | $49.50 |
| 12 Mos. | 6 Mos. | $493.50 | $56.50 | $464.50 | $56.00 |
| 18 Mos. | 6 Mos. | $558.00 | $64.50 | $528.00 | $63.50 |
| 24 Mos. | 6 Mos. | $630.00 | $72.00 | $600.50 | $72.50 |
| 30 Mos. | 6 Mos. | $711.50 | $81.50 | $683.50 | $83.00 |
| 36 Mos. (Maximum) | | $804.00 | $92.50 | $777.00 | $93.50 |
| **Pension Band** | | **109** | | **108** | |

**WAGE SCHEDULE: 28**

### PUBLIC COMMUNICATIONS SALES REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $466.50 | | $453.00 | |
| 6 Mos. | 6 Mos. | $523.00 | $56.50 | $508.00 | $55.00 |
| 12 Mos. | 6 Mos. | $586.50 | $63.50 | $570.50 | $62.50 |
| 18 Mos. | 6 Mos. | $657.00 | $70.50 | $639.00 | $68.50 |
| 24 Mos. | 6 Mos. | $736.00 | $79.00 | $717.50 | $78.50 |
| 30 Mos. | 6 Mos. | $825.50 | $89.50 | $805.00 | $87.50 |
| 36 Mos. | 6 Mos. | $924.50 | $99.00 | $902.50 | $97.50 |
| 42 Mos. | 6 Mos. | $1,036.00 | $111.50 | $1,012.50 | $110.00 |
| 48 Mos. (Maximum) | | $1,161.00 | $125.00 | $1,136.00 | $123.50 |
| **Pension Band** | | **123** | | **122** | |

**WAGE SCHEDULE: 29**

### CUSTOMER SERVICE ADMINISTRATOR, MATERIAL EQUIPMENT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $449.00 | | $421.50 | |
| 6 Mos. | 6 Mos. | $511.50 | $62.50 | $483.50 | $62.00 |
| 12 Mos. | 6 Mos. | $583.00 | $71.50 | $554.50 | $71.00 |
| 18 Mos. | 6 Mos. | $665.00 | $82.00 | $636.00 | $81.50 |
| 24 Mos. | 6 Mos. | $758.50 | $93.50 | $730.50 | $94.50 |
| 30 Mos. | 6 Mos. | $865.00 | $106.50 | $837.00 | $106.50 |
| 36 Mos. (Maximum) | | $986.00 | $121.00 | $959.50 | $122.50 |
| **Pension Band** | | **116** | | **115** | |

**WAGE SCHEDULE: 30**

### CUSTOMER SERVICE AGENT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $468.50 | | $441.00 | |
| 6 Mos. | 6 Mos. | $525.00 | $56.50 | $497.50 | $56.50 |
| 12 Mos. | 6 Mos. | $589.50 | $64.50 | $560.50 | $63.00 |
| 18 Mos. | 6 Mos. | $661.00 | $71.50 | $631.50 | $71.00 |
| 24 Mos. | 6 Mos. | $741.50 | $80.50 | $712.50 | $81.00 |
| 30 Mos. | 6 Mos. | $831.00 | $89.50 | $801.50 | $89.00 |
| 36 Mos. | 6 Mos. | $932.00 | $101.00 | $903.50 | $102.00 |
| 42 Mos. | 6 Mos. | $1,045.00 | $113.00 | $1,018.00 | $114.50 |
| 48 Mos. (Maximum) | | $1,172.00 | $127.00 | $1,147.50 | $129.50 |
| **Pension Band** | | **124** | | **123** | |

**WAGE SCHEDULE: 6A**
  **BUILDINGS MECHANIC (WASH AREA ONLY)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $432.00 | |
| 6 Mos. | 6 Mos. | $489.50 | $57.50 |
| 12 Mos. | 6 Mos. | $554.00 | $64.50 |
| 18 Mos. | 6 Mos. | $628.00 | $74.00 |
| 24 Mos. | 6 Mos. | $711.00 | $83.00 |
| 30 Mos. | 6 Mos. | $805.50 | $94.50 |
| 36 Mos. (Maximum) | | $912.00 | $106.50 |
| **Pension Band** | | **113** | |

**WAGE SCHEDULE: 8A**
  **SALES ASSOCIATE (SOUTH AND NORTH)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $369.00 | |
| 6 Mos. | 6 Mos. | $417.00 | $48.00 |
| 12 Mos. | 6 Mos. | $471.50 | $54.50 |
| 18 Mos. | 6 Mos. | $533.00 | $61.50 |
| Top (Maximum) | | $603.00 | $70.00 |
| **Pension Band** | | **101** | |

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**2004 WAGE SCHEDULES**

**WAGE SCHEDULE: 01**

**Cable Splicing Technician, Central Office Technician, Master Automotive Equipment Technician, Master Buildings Equipment Mechanic, Material Systems Technician, Systems Technician**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $453.00 | | $438.50 | |
| 6 Mos. | 6 Mos. | $507.00 | $54.00 | $491.50 | $53.00 |
| 12 Mos. | 6 Mos. | $568.50 | $61.50 | $552.00 | $60.50 |
| 18 Mos. | 6 Mos. | $637.50 | $69.00 | $619.50 | $67.50 |
| 24 Mos. | 6 Mos. | $714.50 | $77.00 | $695.00 | $75.50 |
| 30 Mos. | 6 Mos. | $800.50 | $86.00 | $780.00 | $85.00 |
| 36 Mos. | 6 Mos. | $897.50 | $97.00 | $876.00 | $96.00 |
| 42 Mos. | 6 Mos. | $1,005.50 | $108.00 | $983.00 | $107.00 |
| 48 Mos. (Maximum) | | $1,127.00 | $121.50 | $1,103.00 | $120.00 |
| **Pension Band** | | **121** | | **120** | |

**WAGE SCHEDULE: 02**

**OUTSIDE PLANT TECHNICIAN, SERVICES TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $448.00 | | $431.00 | |
| 6 Mos. | 6 Mos. | $500.50 | $52.50 | $482.50 | $51.50 |
| 12 Mos. | 6 Mos. | $558.50 | $58.00 | $539.50 | $57.00 |
| 18 Mos. | 6 Mos. | $623.00 | $64.50 | $604.00 | $64.50 |
| 24 Mos. | 6 Mos. | $696.50 | $73.50 | $676.00 | $72.00 |
| 30 Mos. | 6 Mos. | $777.00 | $80.50 | $756.50 | $80.50 |
| 36 Mos. | 6 Mos. | $868.00 | $91.00 | $845.50 | $89.00 |
| 42 Mos. | 6 Mos. | $970.00 | $102.00 | $945.50 | $100.00 |
| 48 Mos. (Maximum) | | $1,082.00 | $112.00 | $1,059.00 | $113.50 |
| **Pension Band** | | **119** | | **118** | |

1

**WAGE SCHEDULE: 03**
### AUTOMOTIVE EQUIPMENT TECHNICIAN, BUILDINGS EQUIPMENT MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $447.50 | | $430.50 | |
| 6 Mos. | 6 Mos. | $499.50 | $52.00 | $482.00 | $51.50 |
| 12 Mos. | 6 Mos. | $557.00 | $57.50 | $538.50 | $56.50 |
| 18 Mos. | 6 Mos. | $621.50 | $64.50 | $602.50 | $64.00 |
| 24 Mos. | 6 Mos. | $693.50 | $72.00 | $673.50 | $71.00 |
| 30 Mos. | 6 Mos. | $774.00 | $80.50 | $753.50 | $80.00 |
| 36 Mos. | 6 Mos. | $864.00 | $90.00 | $843.00 | $89.50 |
| 42 Mos. | 6 Mos. | $963.50 | $99.50 | $942.00 | $99.00 |
| 48 Mos. (Maximum) | | $1,075.50 | $112.00 | $1,053.00 | $111.00 |
| **Pension Band** | | **119** | | **118** | |

**WAGE SCHEDULE: 04**

### FRAME ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $452.50 | | $433.00 | |
| 6 Mos. | 6 Mos. | $510.50 | $58.00 | $489.00 | $56.00 |
| 12 Mos. | 6 Mos. | $576.00 | $65.50 | $552.00 | $63.00 |
| 18 Mos. | 6 Mos. | $649.50 | $73.50 | $622.00 | $70.00 |
| 24 Mos. | 6 Mos. | $734.00 | $84.50 | $703.00 | $81.00 |
| 30 Mos. | 6 Mos. | $827.50 | $93.50 | $792.50 | $89.50 |
| 36 Mos. (Maximum) | | $934.50 | $107.00 | $895.00 | $102.50 |
| **Pension Band** | | **113** | | **112** | |

**WAGE SCHEDULE: 05**
   **AUTOMOBILE TECHNICIAN, COIN TELEPHONE COLLECTOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $449.50 | | $433.00 | |
| 6 Mos. | 6 Mos. | $510.00 | $60.50 | $492.00 | $59.00 |
| 12 Mos. | 6 Mos. | $577.50 | $67.50 | $558.50 | $66.50 |
| 18 Mos. | 6 Mos. | $655.00 | $77.50 | $634.50 | $76.00 |
| 24 Mos. | 6 Mos. | $741.50 | $86.50 | $720.50 | $86.00 |
| 30 Mos. | 6 Mos. | $841.50 | $100.00 | $818.50 | $98.00 |
| 36 Mos. (Maximum) | | $952.50 | $111.00 | $930.00 | $111.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 06**
   **BUILDINGS MECHANIC (EXCEPT WASH AREA), STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $450.00 | | $435.50 | |
| 6 Mos. | 6 Mos. | $507.50 | $57.50 | $492.00 | $56.50 |
| 12 Mos. | 6 Mos. | $571.50 | $64.00 | $557.00 | $65.00 |
| 18 Mos. | 6 Mos. | $644.00 | $72.50 | $630.00 | $73.00 |
| 24 Mos. | 6 Mos. | $727.00 | $83.00 | $712.50 | $82.50 |
| 30 Mos. | 6 Mos. | $817.50 | $90.50 | $805.00 | $92.50 |
| 36 Mos. (Maximum) | | $921.50 | $104.00 | $910.50 | $105.50 |
| **Pension Band** | | **113** | | **112** | |

**WAGE SCHEDULE: 07**
### ASSIGNMENT ADMINISTRATOR, CUSTOMER BILLING ANALYST, FACILITIES ADMINISTRATOR, FRAUD INVESTIGATOR, MAINTENANCE ADMINISTRATOR, NETWORK SERVICES COORDINATOR, RCMAC CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $384.00 | | $372.50 | |
| 6 Mos. | 6 Mos. | $442.50 | $58.50 | $430.00 | $57.50 |
| 12 Mos. | 6 Mos. | $511.50 | $69.00 | $497.50 | $67.50 |
| 18 Mos. | 6 Mos. | $590.00 | $78.50 | $574.50 | $77.00 |
| 24 Mos. | 6 Mos. | $681.00 | $91.00 | $663.50 | $89.00 |
| 30 Mos. | 6 Mos. | $786.00 | $105.00 | $767.00 | $103.50 |
| 36 Mos. (Maximum) | | $907.50 | $121.50 | $886.50 | $119.50 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 08**
### WAREHOUSE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $340.50 | | $340.50 | |
| 6 Mos. | 6 Mos. | $404.50 | $64.00 | $403.50 | $63.00 |
| 12 Mos. | 6 Mos. | $480.00 | $75.50 | $478.00 | $74.50 |
| 18 Mos. | 6 Mos. | $570.50 | $90.50 | $566.00 | $88.00 |
| 24 Mos. (Maximum) | | $678.00 | $107.50 | $670.50 | $104.50 |
| **Pension Band** | | **105** | | **105** | |

4

**WAGE SCHEDULE: 09**
### BUILDING ATTENDANT, GARAGE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $317.00 | | $316.00 | |
| 6 Mos. | 6 Mos. | $394.50 | $77.50 | $390.00 | $74.00 |
| 12 Mos. | 6 Mos. | $491.50 | $97.00 | $483.00 | $93.00 |
| 18 Mos. (Maximum) | | $612.00 | $120.50 | $596.50 | $113.50 |
| **Pension Band** | | **102** | | **102** | |

**WAGE SCHEDULE: 10**
### OPERATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $391.50 | | $364.00 | |
| 6 Mos. | 6 Mos. | $440.00 | $48.50 | $411.50 | $47.50 |
| 12 Mos. | 6 Mos. | $493.50 | $53.50 | $464.50 | $53.00 |
| 18 Mos. | 6 Mos. | $555.00 | $61.50 | $526.50 | $62.00 |
| 24 Mos. | 6 Mos. | $622.50 | $67.50 | $593.50 | $67.00 |
| 30 Mos. | 6 Mos. | $699.50 | $77.00 | $672.00 | $78.50 |
| 36 Mos. (Maximum) | | $786.00 | $86.50 | $759.00 | $87.00 |
| **Pension Band** | | **108** | | **107** | |

**DISTRICT 2 – POTOMAC**                        **EFFECTIVE AUGUST 1, 2004**

**WAGE SCHEDULE: 10A**

**OPERATOR–A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $391.50 | | $364.00 | |
| 6 Mos. | 6 Mos. | $419.50 | $28.00 | $391.50 | $27.50 |
| 12 Mos. | 6 Mos. | $450.00 | $30.50 | $421.50 | $30.00 |
| 18 Mos. | 6 Mos. | $483.00 | $33.00 | $454.00 | $32.50 |
| 24 Mos. | 6 Mos. | $517.00 | $34.00 | $489.00 | $35.00 |
| 30 Mos. | 6 Mos. | $555.00 | $38.00 | $526.50 | $37.50 |
| 36 Mos. | 6 Mos. | $594.50 | $39.50 | $565.50 | $39.00 |
| 42 Mos. | 6 Mos. | $638.00 | $43.50 | $608.50 | $43.00 |
| 48 Mos. | 6 Mos. | $684.00 | $46.00 | $655.50 | $47.00 |
| 54 Mos. | 6 Mos. | $733.00 | $49.00 | $705.00 | $49.50 |
| 60 Mos. (Maximum) | | $786.00 | $53.00 | $759.00 | $54.00 |
| **Pension Band** | | **108** | | **107** | |

**WAGE SCHEDULE: 11**
**CONSULTANT, SERVICE REPRESENTATIVE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $446.50 | | $419.50 | |
| 6 Mos. | 6 Mos. | $506.50 | $60.00 | $479.00 | $59.50 |
| 12 Mos. | 6 Mos. | $575.00 | $68.50 | $547.00 | $68.00 |
| 18 Mos. | 6 Mos. | $652.00 | $77.00 | $625.00 | $78.00 |
| 24 Mos. | 6 Mos. | $740.50 | $88.50 | $713.00 | $88.00 |
| 30 Mos. | 6 Mos. | $840.00 | $99.50 | $813.50 | $100.50 |
| 36 Mos. (Maximum) | | $953.00 | $113.00 | $928.00 | $114.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 11A**
### CUSTOMER ACCOUNT REPRESENTATIVE
### CUSTOMER BUSINESS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $429.00 | | $404.00 | |
| 6 Mos. | 6 Mos. | $486.50 | $57.50 | $460.50 | $56.50 |
| 12 Mos. | 6 Mos. | $553.00 | $66.50 | $526.50 | $66.00 |
| 18 Mos. | 6 Mos. | $627.50 | $74.50 | $601.00 | $74.50 |
| 24 Mos. | 6 Mos. | $712.50 | $85.00 | $685.50 | $84.50 |
| 30 Mos. | 6 Mos. | $807.50 | $95.00 | $782.50 | $97.00 |
| 36 Mos. (Maximum) | | $917.00 | $109.50 | $892.50 | $110.00 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 12**
### COMMUNICATIONS REPRESENTATIVE #2

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $460.00 | | $439.50 | |
| 6 Mos. | 6 Mos. | $514.50 | $54.50 | $493.00 | $53.50 |
| 12 Mos. | 6 Mos. | $575.50 | $61.00 | $554.50 | $61.50 |
| 18 Mos. | 6 Mos. | $643.50 | $68.00 | $622.00 | $67.50 |
| 24 Mos. | 6 Mos. | $719.50 | $76.00 | $698.50 | $76.50 |
| 30 Mos. | 6 Mos. | $805.50 | $86.00 | $785.00 | $86.50 |
| 36 Mos. | 6 Mos. | $900.50 | $95.00 | $881.00 | $96.00 |
| 42 Mos. | 6 Mos. | $1,007.50 | $107.00 | $989.50 | $108.50 |
| 48 Mos. (Maximum) | | $1,127.00 | $119.50 | $1,112.00 | $122.50 |
| **Pension Band** | | **121** | | **120** | |

**WAGE SCHEDULE: 13**

### ENGINEERING ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $449.00 | | $435.00 | |
| 6 Mos. | 6 Mos. | $500.50 | $51.50 | $485.00 | $50.00 |
| 12 Mos. | 6 Mos. | $557.00 | $56.50 | $541.50 | $56.50 |
| 18 Mos. | 6 Mos. | $620.50 | $63.50 | $604.00 | $62.50 |
| 24 Mos. | 6 Mos. | $691.50 | $71.00 | $673.50 | $69.50 |
| 30 Mos. | 6 Mos. | $770.00 | $78.50 | $751.00 | $77.50 |
| 36 Mos. | 6 Mos. | $857.50 | $87.50 | $838.50 | $87.50 |
| 42 Mos. | 6 Mos. | $954.50 | $97.00 | $935.50 | $97.00 |
| 48 Mos. | 6 Mos. | $1,063.50 | $109.00 | $1,044.50 | $109.00 |
| 54 Mos. (Maximum) | | $1,184.00 | $120.50 | $1,164.50 | $120.00 |
| **Pension Band** | | **123** | | **122** | |

**WAGE SCHEDULE: 14**

### COMMUNICATIONS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $466.50 | | $437.00 | |
| 6 Mos. | 6 Mos. | $517.50 | $51.00 | $488.50 | $51.50 |
| 12 Mos. | 6 Mos. | $576.00 | $58.50 | $545.50 | $57.00 |
| 18 Mos. | 6 Mos. | $640.00 | $64.00 | $610.00 | $64.50 |
| 24 Mos. | 6 Mos. | $711.00 | $71.00 | $681.00 | $71.00 |
| 30 Mos. | 6 Mos. | $790.00 | $79.00 | $761.00 | $80.00 |
| 36 Mos. | 6 Mos. | $877.50 | $87.50 | $849.50 | $88.50 |
| 42 Mos. | 6 Mos. | $975.00 | $97.50 | $950.00 | $100.50 |
| 48 Mos. | 6 Mos. | $1,084.00 | $109.00 | $1,061.50 | $111.50 |
| 54 Mos. (Maximum) | | $1,203.50 | $119.50 | $1,187.00 | $125.50 |
| **Pension Band** | | **124** | | **123** | |

8

**DISTRICT 2 – POTOMAC**                    **EFFECTIVE AUGUST 1, 2004**

WAGE SCHEDULE: 15

### ENTRY 1–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $373.50 | | $359.50 | |
| 6 Mos. | 6 Mos. | $416.00 | $42.50 | $400.50 | $41.00 |
| 12 Mos. | 6 Mos. | $463.00 | $47.00 | $445.50 | $45.00 |
| 18 Mos. | 6 Mos. | $516.00 | $53.00 | $496.50 | $51.00 |
| 24 Mos. | 6 Mos. | $575.00 | $59.00 | $554.00 | $57.50 |
| 30 Mos. | 6 Mos. | $641.00 | $66.00 | $617.00 | $63.00 |
| 36 Mos. (Maximum) | | $714.00 | $73.00 | $687.00 | $70.00 |
| **Pension Band** | | **105** | | **104** | |

WAGE SCHEDULE: 16

### ENTRY 3–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $385.50 | | $360.50 | |
| 6 Mos. | 6 Mos. | $433.00 | $47.50 | $407.00 | $46.50 |
| 12 Mos. | 6 Mos. | $486.50 | $53.50 | $460.00 | $53.00 |
| 18 Mos. | 6 Mos. | $547.00 | $60.50 | $520.00 | $60.00 |
| 24 Mos. | 6 Mos. | $614.50 | $67.50 | $588.00 | $68.00 |
| 30 Mos. | 6 Mos. | $691.50 | $77.00 | $664.50 | $76.50 |
| 36 Mos. (Maximum) | | $776.50 | $85.00 | $751.00 | $86.50 |
| **Pension Band** | | **107** | | **106** | |

**WAGE SCHEDULE: 17**

### SEMI-SKILLED 2–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $389.50 | | $364.00 | |
| 6 Mos. | 6 Mos. | $441.00 | $51.50 | $414.00 | $50.00 |
| 12 Mos. | 6 Mos. | $499.50 | $58.50 | $469.50 | $55.50 |
| 18 Mos. | 6 Mos. | $564.00 | $64.50 | $533.00 | $63.50 |
| 24 Mos. | 6 Mos. | $638.00 | $74.00 | $605.50 | $72.50 |
| 30 Mos. | 6 Mos. | $720.50 | $82.50 | $686.50 | $81.00 |
| 36 Mos. (Maximum) | | $815.50 | $95.00 | $779.50 | $93.00 |
| **Pension Band** | | **109** | | **107** | |

**WAGE SCHEDULE: 18**

### SKILLED 1–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $398.50 | | $370.00 | |
| 6 Mos. | 6 Mos. | $451.50 | $53.00 | $421.50 | $51.50 |
| 12 Mos. | 6 Mos. | $512.50 | $61.00 | $482.00 | $60.50 |
| 18 Mos. | 6 Mos. | $580.50 | $68.00 | $550.00 | $68.00 |
| 24 Mos. | 6 Mos. | $659.00 | $78.50 | $629.00 | $79.00 |
| 30 Mos. | 6 Mos. | $747.00 | $88.00 | $717.50 | $88.50 |
| 36 Mos. (Maximum) | | $847.00 | $100.00 | $820.00 | $102.50 |
| **Pension Band** | | **110** | | **109** | |

**DISTRICT 2 – POTOMAC**     **EFFECTIVE AUGUST 1, 2004**

**WAGE SCHEDULE: 19**

### ENTRY 1–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $352.00 | | $341.00 | |
| 6 Mos. | 6 Mos. | $391.50 | $39.50 | $379.00 | $38.00 |
| 12 Mos. | 6 Mos. | $436.00 | $44.50 | $422.00 | $43.00 |
| 18 Mos. | 6 Mos. | $485.50 | $49.50 | $470.00 | $48.00 |
| 24 Mos. | 6 Mos. | $541.00 | $55.50 | $523.00 | $53.00 |
| 30 Mos. | 6 Mos. | $603.00 | $62.00 | $582.50 | $59.50 |
| 36 Mos. (Maximum) | | $671.50 | $68.50 | $647.00 | $64.50 |
| **Pension Band** | | **103** | | **102** | |

**WAGE SCHEDULE: 20**

### ENTRY 3–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $368.50 | | $350.00 | |
| 6 Mos. | 6 Mos. | $415.50 | $47.00 | $394.50 | $44.50 |
| 12 Mos. | 6 Mos. | $467.50 | $52.00 | $445.50 | $51.00 |
| 18 Mos. | 6 Mos. | $527.00 | $59.50 | $502.50 | $57.00 |
| 24 Mos. | 6 Mos. | $592.00 | $65.00 | $567.50 | $65.00 |
| 30 Mos. | 6 Mos. | $667.00 | $75.00 | $640.00 | $72.50 |
| 36 Mos. (Maximum) | | $750.50 | $83.50 | $721.00 | $81.00 |
| **Pension Band** | | **106** | | **105** | |

**WAGE SCHEDULE: 21**

### SEMI-SKILLED 2–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $377.50 | | $357.00 | |
| 6 Mos. | 6 Mos. | $427.00 | $49.50 | $404.50 | $47.50 |
| 12 Mos. | 6 Mos. | $482.50 | $55.50 | $458.50 | $54.00 |
| 18 Mos. | 6 Mos. | $545.00 | $62.50 | $518.50 | $60.00 |
| 24 Mos. | 6 Mos. | $616.50 | $71.50 | $587.50 | $69.00 |
| 30 Mos. | 6 Mos. | $696.50 | $80.00 | $665.00 | $77.50 |
| 36 Mos. (Maximum) | | $788.00 | $91.50 | $754.00 | $89.00 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 22**
### SENIOR TRAFFIC OFFICE CLERK, SERVICE ASSISTANT, SKILLED 1–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $416.50 | | $389.00 | |
| 6 Mos. | 6 Mos. | $465.00 | $48.50 | $438.50 | $49.50 |
| 12 Mos. | 6 Mos. | $521.00 | $56.00 | $493.00 | $54.50 |
| 18 Mos. | 6 Mos. | $583.00 | $62.00 | $555.50 | $62.50 |
| 24 Mos. | 6 Mos. | $652.00 | $69.00 | $625.00 | $69.50 |
| 30 Mos. | 6 Mos. | $730.00 | $78.00 | $703.50 | $78.50 |
| 36 Mos. (Maximum) | | $816.00 | $86.00 | $791.50 | $88.00 |
| **Pension Band** | | **109** | | **108** | |

**DISTRICT 2 – POTOMAC**                    **EFFECTIVE AUGUST 1, 2004**

WAGE SCHEDULE: 23
### GUARD (WASH & MD AREAS ONLY)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $603.50 | | $321.00 | |
| 6 Mos. | 6 Mos. | $603.50 | $0.00 | $437.00 | $116.00 |
| 12 Mos. (Maximum) | | | | $595.50 | $158.50 |
| **Pension Band** | | **102** | | **102** | |

WAGE SCHEDULE: 24
### ASSISTANT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $352.00 | | $338.50 | |
| 6 Mos. | 6 Mos. | $397.00 | $45.00 | $383.00 | $44.50 |
| 12 Mos. | 6 Mos. | $446.50 | $49.50 | $432.50 | $49.50 |
| 18 Mos. | 6 Mos. | $503.00 | $56.50 | $489.00 | $56.50 |
| 24 Mos. | 6 Mos. | $567.00 | $64.00 | $553.00 | $64.00 |
| 30 Mos. (Maximum) | | $639.50 | $72.50 | $624.00 | $71.00 |
| **Pension Band** | | **102** | | **101** | |

**WAGE SCHEDULE: 25**

**DRIVER – LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $382.50 | | $357.00 | |
| 6 Mos. | 6 Mos. | $427.50 | $45.00 | $402.50 | $45.50 |
| 12 Mos. | 6 Mos. | $478.50 | $51.00 | $453.00 | $50.50 |
| 18 Mos. | 6 Mos. | $535.50 | $57.00 | $509.00 | $56.00 |
| 24 Mos. | 6 Mos. | $600.00 | $64.50 | $572.00 | $63.00 |
| 30 Mos. | 6 Mos. | $671.50 | $71.50 | $644.00 | $72.00 |
| 36 Mos. (Maximum) | | $750.50 | $79.00 | $725.00 | $81.00 |
| **Pension Band** | | **106** | | **105** | |

**WAGE SCHEDULE: 26**

**DRIVER – MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $386.50 | | $361.00 | |
| 6 Mos. | 6 Mos. | $435.50 | $49.00 | $407.50 | $46.50 |
| 12 Mos. | 6 Mos. | $490.50 | $55.00 | $461.00 | $53.50 |
| 18 Mos. | 6 Mos. | $552.00 | $61.50 | $521.00 | $60.00 |
| 24 Mos. | 6 Mos. | $621.50 | $69.50 | $589.50 | $68.50 |
| 30 Mos. | 6 Mos. | $699.50 | $78.00 | $666.00 | $76.50 |
| 36 Mos. (Maximum) | | $788.50 | $89.00 | $754.00 | $88.00 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 27**

### DRIVER – HEAVY TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $394.50 | | $366.00 | |
| 6 Mos. | 6 Mos. | $445.50 | $51.00 | $416.50 | $50.50 |
| 12 Mos. | 6 Mos. | $503.50 | $58.00 | $474.00 | $57.50 |
| 18 Mos. | 6 Mos. | $569.00 | $65.50 | $538.50 | $64.50 |
| 24 Mos. | 6 Mos. | $642.50 | $73.50 | $612.50 | $74.00 |
| 30 Mos. | 6 Mos. | $725.50 | $83.00 | $697.00 | $84.50 |
| 36 Mos. (Maximum) | | $820.00 | $94.50 | $792.50 | $95.50 |
| **Pension Band** | | **109** | | **108** | |

**WAGE SCHEDULE: 28**
### PUBLIC COMMUNICATIONS SALES REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $476.00 | | $462.00 | |
| 6 Mos. | 6 Mos. | $533.50 | $57.50 | $518.00 | $56.00 |
| 12 Mos. | 6 Mos. | $598.00 | $64.50 | $582.00 | $64.00 |
| 18 Mos. | 6 Mos. | $670.00 | $72.00 | $652.00 | $70.00 |
| 24 Mos. | 6 Mos. | $750.50 | $80.50 | $732.00 | $80.00 |
| 30 Mos. | 6 Mos. | $842.00 | $91.50 | $821.00 | $89.00 |
| 36 Mos. | 6 Mos. | $943.00 | $101.00 | $920.50 | $99.50 |
| 42 Mos. | 6 Mos. | $1,056.50 | $113.50 | $1,033.00 | $112.50 |
| 48 Mos. (Maximum) | | $1,184.00 | $127.50 | $1,158.50 | $125.50 |
| **Pension Band** | | **123** | | **122** | |

**WAGE SCHEDULE: 29**

### CUSTOMER SERVICE ADMINISTRATOR, MATERIAL EQUIPMENT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $458.00 | | $430.00 | |
| 6 Mos. | 6 Mos. | $521.50 | $63.50 | $493.00 | $63.00 |
| 12 Mos. | 6 Mos. | $594.50 | $73.00 | $565.50 | $72.50 |
| 18 Mos. | 6 Mos. | $678.50 | $84.00 | $648.50 | $83.00 |
| 24 Mos. | 6 Mos. | $773.50 | $95.00 | $745.00 | $96.50 |
| 30 Mos. | 6 Mos. | $882.50 | $109.00 | $853.50 | $108.50 |
| 36 Mos. (Maximum) | | $1,005.50 | $123.00 | $978.50 | $125.00 |
| **Pension Band** | | **116** | | **115** | |

**WAGE SCHEDULE: 30**

### CUSTOMER SERVICE AGENT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $478.00 | | $450.00 | |
| 6 Mos. | 6 Mos. | $535.50 | $57.50 | $507.50 | $57.50 |
| 12 Mos. | 6 Mos. | $601.50 | $66.00 | $571.50 | $64.00 |
| 18 Mos. | 6 Mos. | $674.00 | $72.50 | $644.00 | $72.50 |
| 24 Mos. | 6 Mos. | $756.50 | $82.50 | $727.00 | $83.00 |
| 30 Mos. | 6 Mos. | $847.50 | $91.00 | $817.50 | $90.50 |
| 36 Mos. | 6 Mos. | $950.50 | $103.00 | $921.50 | $104.00 |
| 42 Mos. | 6 Mos. | $1,066.00 | $115.50 | $1,038.50 | $117.00 |
| 48 Mos. (Maximum) | | $1,195.50 | $129.50 | $1,170.50 | $132.00 |
| **Pension Band** | | **124** | | **123** | |

**WAGE SCHEDULE: 6A**
  **BUILDINGS MECHANIC (WASH AREA ONLY)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $440.50 | |
| 6 Mos. | 6 Mos. | $499.50 | $59.00 |
| 12 Mos. | 6 Mos. | $565.00 | $65.50 |
| 18 Mos. | 6 Mos. | $640.50 | $75.50 |
| 24 Mos. | 6 Mos. | $725.00 | $84.50 |
| 30 Mos. | 6 Mos. | $821.50 | $96.50 |
| 36 Mos. (Maximum) | | $930.00 | $108.50 |
| **Pension Band** | | **113** | |

**WAGE SCHEDULE: 8A**
  **SALES ASSOCIATE (SOUTH AND NORTH)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $376.50 | |
| 6 Mos. | 6 Mos. | $425.50 | $49.00 |
| 12 Mos. | 6 Mos. | $481.00 | $55.50 |
| 18 Mos. | 6 Mos. | $543.50 | $62.50 |
| Top (Maximum) | | $615.00 | $71.50 |
| **Pension Band** | | **101** | |

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**2005 WAGE SCHEDULES**

**DISTRICT 2 – POTOMAC**                    **EFFECTIVE AUGUST 7, 2005**

**WAGE SCHEDULE: 01**

**Cable Splicing Technician, Central Office Technician, Master Automotive Equipment Technician, Master Buildings Equipment Mechanic, Material Systems Technician, Systems Technician**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $462.00 | | $447.50 | |
| 6 Mos. | 6 Mos. | $517.00 | $55.00 | $501.50 | $54.00 |
| 12 Mos. | 6 Mos. | $580.00 | $63.00 | $563.00 | $61.50 |
| 18 Mos. | 6 Mos. | $650.50 | $70.50 | $632.00 | $69.00 |
| 24 Mos. | 6 Mos. | $729.00 | $78.50 | $709.00 | $77.00 |
| 30 Mos. | 6 Mos. | $816.50 | $87.50 | $795.50 | $86.50 |
| 36 Mos. | 6 Mos. | $915.50 | $99.00 | $893.50 | $98.00 |
| 42 Mos. | 6 Mos. | $1,025.50 | $110.00 | $1,002.50 | $109.00 |
| 48 Mos. (Maximum) | | $1,149.50 | $124.00 | $1,125.00 | $122.50 |
| **Pension Band** | | **121** | | **120** | |

**WAGE SCHEDULE: 02**

**OUTSIDE PLANT TECHNICIAN, SERVICES TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $457.00 | | $439.50 | |
| 6 Mos. | 6 Mos. | $510.50 | $53.50 | $492.00 | $52.50 |
| 12 Mos. | 6 Mos. | $569.50 | $59.00 | $550.50 | $58.50 |
| 18 Mos. | 6 Mos. | $635.50 | $66.00 | $616.00 | $65.50 |
| 24 Mos. | 6 Mos. | $710.50 | $75.00 | $689.50 | $73.50 |
| 30 Mos. | 6 Mos. | $792.50 | $82.00 | $771.50 | $82.00 |
| 36 Mos. | 6 Mos. | $885.50 | $93.00 | $862.50 | $91.00 |
| 42 Mos. | 6 Mos. | $989.50 | $104.00 | $964.50 | $102.00 |
| 48 Mos. (Maximum) | | $1,103.50 | $114.00 | $1,080.00 | $115.50 |
| **Pension Band** | | **119** | | **118** | |

1

**DISTRICT 2 – POTOMAC**                                   **EFFECTIVE AUGUST 7, 2005**

**WAGE SCHEDULE: 03**

### AUTOMOTIVE EQUIPMENT TECHNICIAN, BUILDINGS EQUIPMENT MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $456.50 | | $439.00 | |
| 6 Mos. | 6 Mos. | $509.50 | $53.00 | $491.50 | $52.50 |
| 12 Mos. | 6 Mos. | $568.00 | $58.50 | $549.50 | $58.00 |
| 18 Mos. | 6 Mos. | $634.00 | $66.00 | $614.50 | $65.00 |
| 24 Mos. | 6 Mos. | $707.50 | $73.50 | $687.00 | $72.50 |
| 30 Mos. | 6 Mos. | $789.50 | $82.00 | $768.50 | $81.50 |
| 36 Mos. | 6 Mos. | $881.50 | $92.00 | $860.00 | $91.50 |
| 42 Mos. | 6 Mos. | $983.00 | $101.50 | $961.00 | $101.00 |
| 48 Mos. (Maximum) | | $1,097.00 | $114.00 | $1,074.00 | $113.00 |
| **Pension Band** | | **119** | | **118** | |

**WAGE SCHEDULE: 04**

### FRAME ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $461.50 | | $441.50 | |
| 6 Mos. | 6 Mos. | $520.50 | $59.00 | $499.00 | $57.50 |
| 12 Mos. | 6 Mos. | $587.50 | $67.00 | $563.00 | $64.00 |
| 18 Mos. | 6 Mos. | $662.50 | $75.00 | $634.50 | $71.50 |
| 24 Mos. | 6 Mos. | $748.50 | $86.00 | $717.00 | $82.50 |
| 30 Mos. | 6 Mos. | $844.00 | $95.50 | $808.50 | $91.50 |
| 36 Mos. (Maximum) | | $953.00 | $109.00 | $913.00 | $104.50 |
| **Pension Band** | | **113** | | **112** | |

**WAGE SCHEDULE: 05**
   **AUTOMOBILE TECHNICIAN, COIN TELEPHONE COLLECTOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $458.50 | | $441.50 | |
| 6 Mos. | 6 Mos. | $520.00 | $61.50 | $502.00 | $60.50 |
| 12 Mos. | 6 Mos. | $589.00 | $69.00 | $569.50 | $67.50 |
| 18 Mos. | 6 Mos. | $668.00 | $79.00 | $647.00 | $77.50 |
| 24 Mos. | 6 Mos. | $756.50 | $88.50 | $735.00 | $88.00 |
| 30 Mos. | 6 Mos. | $858.50 | $102.00 | $835.00 | $100.00 |
| 36 Mos. (Maximum) | | $971.50 | $113.00 | $948.50 | $113.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 06**
   **BUILDINGS MECHANIC (EXCEPT WASH AREA), STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $459.00 | | $444.00 | |
| 6 Mos. | 6 Mos. | $517.50 | $58.50 | $502.00 | $58.00 |
| 12 Mos. | 6 Mos. | $583.00 | $65.50 | $568.00 | $66.00 |
| 18 Mos. | 6 Mos. | $657.00 | $74.00 | $642.50 | $74.50 |
| 24 Mos. | 6 Mos. | $741.50 | $84.50 | $727.00 | $84.50 |
| 30 Mos. | 6 Mos. | $834.00 | $92.50 | $821.00 | $94.00 |
| 36 Mos. (Maximum) | | $940.00 | $106.00 | $928.50 | $107.50 |
| **Pension Band** | | **113** | | **112** | |

**WAGE SCHEDULE: 07**

**ASSIGNMENT ADMINISTRATOR, CUSTOMER BILLING ANALYST,
FACILITIES ADMINISTRATOR, FRAUD INVESTIGATOR,
MAINTENANCE ADMINISTRATOR, NETWORK SERVICES COORDINATOR,
RCMAC CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $391.50 | | $380.00 | |
| 6 Mos. | 6 Mos. | $451.50 | $60.00 | $438.50 | $58.50 |
| 12 Mos. | 6 Mos. | $521.50 | $70.00 | $507.50 | $69.00 |
| 18 Mos. | 6 Mos. | $602.00 | $80.50 | $586.00 | $78.50 |
| 24 Mos. | 6 Mos. | $694.50 | $92.50 | $677.00 | $91.00 |
| 30 Mos. | 6 Mos. | $801.50 | $107.00 | $782.50 | $105.50 |
| 36 Mos. (Maximum) | | $925.50 | $124.00 | $904.00 | $121.50 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 08**

**WAREHOUSE ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $347.50 | | $347.50 | |
| 6 Mos. | 6 Mos. | $412.50 | $65.00 | $411.50 | $64.00 |
| 12 Mos. | 6 Mos. | $489.50 | $77.00 | $487.50 | $76.00 |
| 18 Mos. | 6 Mos. | $582.00 | $92.50 | $577.50 | $90.00 |
| 24 Mos. (Maximum) | | $691.50 | $109.50 | $684.00 | $106.50 |
| **Pension Band** | | **105** | | **105** | |

4

**DISTRICT 2 – POTOMAC**                                **EFFECTIVE AUGUST 7, 2005**

**WAGE SCHEDULE: 09**
**BUILDING ATTENDANT, GARAGE ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $323.50 | | $322.50 | |
| 6 Mos. | 6 Mos. | $402.50 | $79.00 | $398.00 | $75.50 |
| 12 Mos. | 6 Mos. | $501.50 | $99.00 | $492.50 | $94.50 |
| 18 Mos. (Maximum) | | $624.00 | $122.50 | $608.50 | $116.00 |
| **Pension Band** | | **102** | | **102** | |

**WAGE SCHEDULE: 10**

**OPERATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $399.50 | | $371.50 | |
| 6 Mos. | 6 Mos. | $449.00 | $49.50 | $419.50 | $48.00 |
| 12 Mos. | 6 Mos. | $503.50 | $54.50 | $474.00 | $54.50 |
| 18 Mos. | 6 Mos. | $566.00 | $62.50 | $537.00 | $63.00 |
| 24 Mos. | 6 Mos. | $635.00 | $69.00 | $605.50 | $68.50 |
| 30 Mos. | 6 Mos. | $713.50 | $78.50 | $685.50 | $80.00 |
| 36 Mos. (Maximum) | | $801.50 | $88.00 | $774.00 | $88.50 |
| **Pension Band** | | **108** | | **107** | |

**WAGE SCHEDULE: 10A**

**OPERATOR–A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $399.50 | | $371.50 | |
| 6 Mos. | 6 Mos. | $428.00 | $28.50 | $399.50 | $28.00 |
| 12 Mos. | 6 Mos. | $459.00 | $31.00 | $430.00 | $30.50 |
| 18 Mos. | 6 Mos. | $492.50 | $33.50 | $463.00 | $33.00 |
| 24 Mos. | 6 Mos. | $527.50 | $35.00 | $499.00 | $36.00 |
| 30 Mos. | 6 Mos. | $566.00 | $38.50 | $537.00 | $38.00 |
| 36 Mos. | 6 Mos. | $606.50 | $40.50 | $577.00 | $40.00 |
| 42 Mos. | 6 Mos. | $651.00 | $44.50 | $620.50 | $43.50 |
| 48 Mos. | 6 Mos. | $697.50 | $46.50 | $668.50 | $48.00 |
| 54 Mos. | 6 Mos. | $747.50 | $50.00 | $719.00 | $50.50 |
| 60 Mos. (Maximum) | | $801.50 | $54.00 | $774.00 | $55.00 |
| **Pension Band** | | **108** | | **107** | |

**WAGE SCHEDULE: 11**
**CONSULTANT, SERVICE REPRESENTATIVE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $455.50 | | $428.00 | |
| 6 Mos. | 6 Mos. | $516.50 | $61.00 | $488.50 | $60.50 |
| 12 Mos. | 6 Mos. | $586.50 | $70.00 | $558.00 | $69.50 |
| 18 Mos. | 6 Mos. | $665.00 | $78.50 | $637.50 | $79.50 |
| 24 Mos. | 6 Mos. | $755.50 | $90.50 | $727.50 | $90.00 |
| 30 Mos. | 6 Mos. | $857.00 | $101.50 | $830.00 | $102.50 |
| 36 Mos. (Maximum) | | $972.00 | $115.00 | $946.50 | $116.50 |
| **Pension Band** | | **114** | | **113** | |

**WAGE SCHEDULE: 11A**
### CUSTOMER ACCOUNT REPRESENTATIVE
### CUSTOMER BUSINESS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $437.50 | | $412.00 | |
| 6 Mos. | 6 Mos. | $496.00 | $58.50 | $469.50 | $57.50 |
| 12 Mos. | 6 Mos. | $564.00 | $68.00 | $537.00 | $67.50 |
| 18 Mos. | 6 Mos. | $640.00 | $76.00 | $613.00 | $76.00 |
| 24 Mos. | 6 Mos. | $727.00 | $87.00 | $699.00 | $86.00 |
| 30 Mos. | 6 Mos. | $823.50 | $96.50 | $798.00 | $99.00 |
| 36 Mos. (Maximum) | | $935.50 | $112.00 | $910.50 | $112.50 |
| **Pension Band** | | **112** | | **111** | |

**WAGE SCHEDULE: 12**
### COMMUNICATIONS REPRESENTATIVE #2

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $469.00 | | $448.50 | |
| 6 Mos. | 6 Mos. | $525.00 | $56.00 | $503.00 | $54.50 |
| 12 Mos. | 6 Mos. | $587.00 | $62.00 | $565.50 | $62.50 |
| 18 Mos. | 6 Mos. | $656.50 | $69.50 | $634.50 | $69.00 |
| 24 Mos. | 6 Mos. | $734.00 | $77.50 | $712.50 | $78.00 |
| 30 Mos. | 6 Mos. | $821.50 | $87.50 | $800.50 | $88.00 |
| 36 Mos. | 6 Mos. | $918.50 | $97.00 | $898.50 | $98.00 |
| 42 Mos. | 6 Mos. | $1,027.50 | $109.00 | $1,009.50 | $111.00 |
| 48 Mos. (Maximum) | | $1,149.50 | $122.00 | $1,134.00 | $124.50 |
| **Pension Band** | | **121** | | **120** | |

**WAGE SCHEDULE: 13**

### ENGINEERING ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $458.00 | | $443.50 | |
| 6 Mos. | 6 Mos. | $510.50 | $52.50 | $494.50 | $51.00 |
| 12 Mos. | 6 Mos. | $568.00 | $57.50 | $552.50 | $58.00 |
| 18 Mos. | 6 Mos. | $633.00 | $65.00 | $616.00 | $63.50 |
| 24 Mos. | 6 Mos. | $705.50 | $72.50 | $687.00 | $71.00 |
| 30 Mos. | 6 Mos. | $785.50 | $80.00 | $766.00 | $79.00 |
| 36 Mos. | 6 Mos. | $874.50 | $89.00 | $855.50 | $89.50 |
| 42 Mos. | 6 Mos. | $973.50 | $99.00 | $954.00 | $98.50 |
| 48 Mos. | 6 Mos. | $1,085.00 | $111.50 | $1,065.50 | $111.50 |
| 54 Mos. (Maximum) | | $1,207.50 | $122.50 | $1,188.00 | $122.50 |
| **Pension Band** | | **123** | | **122** | |

**WAGE SCHEDULE: 14**

### COMMUNICATIONS REPRESENTATIVE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $476.00 | | $445.50 | |
| 6 Mos. | 6 Mos. | $528.00 | $52.00 | $498.50 | $53.00 |
| 12 Mos. | 6 Mos. | $587.50 | $59.50 | $556.50 | $58.00 |
| 18 Mos. | 6 Mos. | $653.00 | $65.50 | $622.00 | $65.50 |
| 24 Mos. | 6 Mos. | $725.00 | $72.00 | $694.50 | $72.50 |
| 30 Mos. | 6 Mos. | $806.00 | $81.00 | $776.00 | $81.50 |
| 36 Mos. | 6 Mos. | $895.00 | $89.00 | $866.50 | $90.50 |
| 42 Mos. | 6 Mos. | $994.50 | $99.50 | $969.00 | $102.50 |
| 48 Mos. | 6 Mos. | $1,105.50 | $111.00 | $1,082.50 | $113.50 |
| 54 Mos. (Maximum) | | $1,227.50 | $122.00 | $1,210.50 | $128.00 |
| **Pension Band** | | **124** | | **123** | |

**WAGE SCHEDULE: 15**

**ENTRY 1–III CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $381.00 | | $366.50 | |
| 6 Mos. | 6 Mos. | $424.50 | $43.50 | $408.50 | $42.00 |
| 12 Mos. | 6 Mos. | $472.50 | $48.00 | $454.50 | $46.00 |
| 18 Mos. | 6 Mos. | $526.50 | $54.00 | $506.50 | $52.00 |
| 24 Mos. | 6 Mos. | $586.50 | $60.00 | $565.00 | $58.50 |
| 30 Mos. | 6 Mos. | $654.00 | $67.50 | $629.50 | $64.50 |
| 36 Mos. (Maximum) | | $728.50 | $74.50 | $700.50 | $71.00 |
| **Pension Band** | | **105** | | **104** | |

**WAGE SCHEDULE: 16**

**ENTRY 3–III CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $393.00 | | $367.50 | |
| 6 Mos. | 6 Mos. | $441.50 | $48.50 | $415.00 | $47.50 |
| 12 Mos. | 6 Mos. | $496.00 | $54.50 | $469.00 | $54.00 |
| 18 Mos. | 6 Mos. | $558.00 | $62.00 | $530.50 | $61.50 |
| 24 Mos. | 6 Mos. | $627.00 | $69.00 | $600.00 | $69.50 |
| 30 Mos. | 6 Mos. | $705.50 | $78.50 | $678.00 | $78.00 |
| 36 Mos. (Maximum) | | $792.00 | $86.50 | $766.00 | $88.00 |
| **Pension Band** | | **107** | | **106** | |

**WAGE SCHEDULE: 17**

### SEMI-SKILLED 2–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $397.50 | | $371.50 | |
| 6 Mos. | 6 Mos. | $450.00 | $52.50 | $422.50 | $51.00 |
| 12 Mos. | 6 Mos. | $509.50 | $59.50 | $479.00 | $56.50 |
| 18 Mos. | 6 Mos. | $575.50 | $66.00 | $543.50 | $64.50 |
| 24 Mos. | 6 Mos. | $651.00 | $75.50 | $617.50 | $74.00 |
| 30 Mos. | 6 Mos. | $735.00 | $84.00 | $700.00 | $82.50 |
| 36 Mos. (Maximum) | | $832.00 | $97.00 | $795.00 | $95.00 |
| **Pension Band** | | **109** | | **107** | |

**WAGE SCHEDULE: 18**

### SKILLED 1–III CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $406.50 | | $377.50 | |
| 6 Mos. | 6 Mos. | $460.50 | $54.00 | $430.00 | $52.50 |
| 12 Mos. | 6 Mos. | $523.00 | $62.50 | $491.50 | $61.50 |
| 18 Mos. | 6 Mos. | $592.00 | $69.00 | $561.00 | $69.50 |
| 24 Mos. | 6 Mos. | $672.00 | $80.00 | $641.50 | $80.50 |
| 30 Mos. | 6 Mos. | $762.00 | $90.00 | $732.00 | $90.50 |
| 36 Mos. (Maximum) | | $864.00 | $102.00 | $836.50 | $104.50 |
| **Pension Band** | | **110** | | **109** | |

**DISTRICT 2 – POTOMAC**  **EFFECTIVE AUGUST 7, 2005**

**WAGE SCHEDULE: 19**

### ENTRY 1–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $359.00 | | $348.00 | |
| 6 Mos. | 6 Mos. | $399.50 | $40.50 | $386.50 | $38.50 |
| 12 Mos. | 6 Mos. | $444.50 | $45.00 | $430.50 | $44.00 |
| 18 Mos. | 6 Mos. | $495.00 | $50.50 | $479.50 | $49.00 |
| 24 Mos. | 6 Mos. | $552.00 | $57.00 | $533.50 | $54.00 |
| 30 Mos. | 6 Mos. | $615.00 | $63.00 | $594.00 | $60.50 |
| 36 Mos. (Maximum) | | $685.00 | $70.00 | $660.00 | $66.00 |
| **Pension Band** | | **103** | | **102** | |

**WAGE SCHEDULE: 20**

### ENTRY 3–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $376.00 | | $357.00 | |
| 6 Mos. | 6 Mos. | $424.00 | $48.00 | $402.50 | $45.50 |
| 12 Mos. | 6 Mos. | $477.00 | $53.00 | $454.50 | $52.00 |
| 18 Mos. | 6 Mos. | $537.50 | $60.50 | $512.50 | $58.00 |
| 24 Mos. | 6 Mos. | $604.00 | $66.50 | $579.00 | $66.50 |
| 30 Mos. | 6 Mos. | $680.50 | $76.50 | $653.00 | $74.00 |
| 36 Mos. (Maximum) | | $765.50 | $85.00 | $735.50 | $82.50 |
| **Pension Band** | | **106** | | **105** | |

**DISTRICT 2 – POTOMAC**    **EFFECTIVE AUGUST 7, 2005**

**WAGE SCHEDULE: 21**

### SEMI-SKILLED 2–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $385.00 | | $364.00 | |
| 6 Mos. | 6 Mos. | $435.50 | $50.50 | $412.50 | $48.50 |
| 12 Mos. | 6 Mos. | $492.00 | $56.50 | $467.50 | $55.00 |
| 18 Mos. | 6 Mos. | $556.00 | $64.00 | $529.00 | $61.50 |
| 24 Mos. | 6 Mos. | $629.00 | $73.00 | $599.50 | $70.50 |
| 30 Mos. | 6 Mos. | $710.50 | $81.50 | $678.50 | $79.00 |
| 36 Mos. (Maximum) | | $804.00 | $93.50 | $769.00 | $90.50 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 22**

### SENIOR TRAFFIC OFFICE CLERK, SERVICE ASSISTANT, SKILLED 1–B CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $425.00 | | $397.00 | |
| 6 Mos. | 6 Mos. | $474.50 | $49.50 | $447.50 | $50.50 |
| 12 Mos. | 6 Mos. | $531.50 | $57.00 | $503.00 | $55.50 |
| 18 Mos. | 6 Mos. | $594.50 | $63.00 | $566.50 | $63.50 |
| 24 Mos. | 6 Mos. | $665.00 | $70.50 | $637.50 | $71.00 |
| 30 Mos. | 6 Mos. | $744.50 | $79.50 | $717.50 | $80.00 |
| 36 Mos. (Maximum) | | $832.50 | $88.00 | $807.50 | $90.00 |
| **Pension Band** | | **109** | | **108** | |

**WAGE SCHEDULE: 23**

### GUARD (WASH & MD AREAS ONLY)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $615.50 | | $327.50 | |
| 6 Mos. | 6 Mos. | $615.50 | $0.00 | $445.50 | $118.00 |
| 12 Mos. (Maximum) | | | | $607.50 | $162.00 |
| **Pension Band** | | **102** | | **102** | |

**WAGE SCHEDULE: 24**

### ASSISTANT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $359.00 | | $345.50 | |
| 6 Mos. | 6 Mos. | $405.00 | $46.00 | $390.50 | $45.00 |
| 12 Mos. | 6 Mos. | $455.50 | $50.50 | $441.00 | $50.50 |
| 18 Mos. | 6 Mos. | $513.00 | $57.50 | $499.00 | $58.00 |
| 24 Mos. | 6 Mos. | $578.50 | $65.50 | $564.00 | $65.00 |
| 30 Mos. (Maximum) | | $652.50 | $74.00 | $636.50 | $72.50 |
| **Pension Band** | | **102** | | **101** | |

**WAGE SCHEDULE: 25**

### DRIVER – LIGHT TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $390.00 | | $364.00 | |
| 6 Mos. | 6 Mos. | $436.00 | $46.00 | $410.50 | $46.50 |
| 12 Mos. | 6 Mos. | $488.00 | $52.00 | $462.00 | $51.50 |
| 18 Mos. | 6 Mos. | $546.00 | $58.00 | $519.00 | $57.00 |
| 24 Mos. | 6 Mos. | $612.00 | $66.00 | $583.50 | $64.50 |
| 30 Mos. | 6 Mos. | $685.00 | $73.00 | $657.00 | $73.50 |
| 36 Mos. (Maximum) | | $765.50 | $80.50 | $739.50 | $82.50 |
| **Pension Band** | | **106** | | **105** | |

**WAGE SCHEDULE: 26**

### DRIVER – MEDIUM TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $394.00 | | $368.00 | |
| 6 Mos. | 6 Mos. | $444.00 | $50.00 | $415.50 | $47.50 |
| 12 Mos. | 6 Mos. | $500.50 | $56.50 | $470.00 | $54.50 |
| 18 Mos. | 6 Mos. | $563.00 | $62.50 | $531.50 | $61.50 |
| 24 Mos. | 6 Mos. | $634.00 | $71.00 | $601.50 | $70.00 |
| 30 Mos. | 6 Mos. | $713.50 | $79.50 | $679.50 | $78.00 |
| 36 Mos. (Maximum) | | $804.50 | $91.00 | $769.00 | $89.50 |
| **Pension Band** | | **108** | | **106** | |

**WAGE SCHEDULE: 27**

### DRIVER – HEAVY TRUCK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $402.50 | | $373.50 | |
| 6 Mos. | 6 Mos. | $454.50 | $52.00 | $425.00 | $51.50 |
| 12 Mos. | 6 Mos. | $513.50 | $59.00 | $483.50 | $58.50 |
| 18 Mos. | 6 Mos. | $580.50 | $67.00 | $549.50 | $66.00 |
| 24 Mos. | 6 Mos. | $655.50 | $75.00 | $625.00 | $75.50 |
| 30 Mos. | 6 Mos. | $740.00 | $84.50 | $711.00 | $86.00 |
| 36 Mos. (Maximum) | | $836.50 | $96.50 | $808.50 | $97.50 |
| **Pension Band** | | **109** | | **108** | |

**WAGE SCHEDULE: 28**
**PUBLIC COMMUNICATIONS SALES REPRESENTATIVE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $485.50 | | $471.00 | |
| 6 Mos. | 6 Mos. | $544.00 | $58.50 | $528.50 | $57.50 |
| 12 Mos. | 6 Mos. | $610.00 | $66.00 | $593.50 | $65.00 |
| 18 Mos. | 6 Mos. | $683.50 | $73.50 | $665.00 | $71.50 |
| 24 Mos. | 6 Mos. | $765.50 | $82.00 | $746.50 | $81.50 |
| 30 Mos. | 6 Mos. | $859.00 | $93.50 | $837.50 | $91.00 |
| 36 Mos. | 6 Mos. | $962.00 | $103.00 | $939.00 | $101.50 |
| 42 Mos. | 6 Mos. | $1,077.50 | $115.50 | $1,053.50 | $114.50 |
| 48 Mos. (Maximum) | | $1,207.50 | $130.00 | $1,181.50 | $128.00 |
| **Pension Band** | | **123** | | **122** | |

WAGE SCHEDULE: 29

### CUSTOMER SERVICE ADMINISTRATOR, MATERIAL EQUIPMENT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $467.00 | | $438.50 | |
| 6 Mos. | 6 Mos. | $532.00 | $65.00 | $503.00 | $64.50 |
| 12 Mos. | 6 Mos. | $606.50 | $74.50 | $577.00 | $74.00 |
| 18 Mos. | 6 Mos. | $692.00 | $85.50 | $661.50 | $84.50 |
| 24 Mos. | 6 Mos. | $789.00 | $97.00 | $760.00 | $98.50 |
| 30 Mos. | 6 Mos. | $900.00 | $111.00 | $870.50 | $110.50 |
| 36 Mos. (Maximum) | | $1,025.50 | $125.50 | $998.00 | $127.50 |
| **Pension Band** | | **116** | | **115** | |

WAGE SCHEDULE: 30

### CUSTOMER SERVICE AGENT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT | ZONE LOCALITY WAGE GROUP B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $487.50 | | $459.00 | |
| 6 Mos. | 6 Mos. | $546.00 | $58.50 | $517.50 | $58.50 |
| 12 Mos. | 6 Mos. | $613.50 | $67.50 | $583.00 | $65.50 |
| 18 Mos. | 6 Mos. | $687.50 | $74.00 | $657.00 | $74.00 |
| 24 Mos. | 6 Mos. | $771.50 | $84.00 | $741.50 | $84.50 |
| 30 Mos. | 6 Mos. | $864.50 | $93.00 | $834.00 | $92.50 |
| 36 Mos. | 6 Mos. | $969.50 | $105.00 | $940.00 | $106.00 |
| 42 Mos. | 6 Mos. | $1,087.50 | $118.00 | $1,059.50 | $119.50 |
| 48 Mos. (Maximum) | | $1,219.50 | $132.00 | $1,194.00 | $134.50 |
| **Pension Band** | | **124** | | **123** | |

16

**WAGE SCHEDULE: 6A**
**BUILDINGS MECHANIC (WASH AREA ONLY)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE LOCALITY WAGE GROUP A | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $449.50 | |
| 6 Mos. | 6 Mos. | $509.50 | $60.00 |
| 12 Mos. | 6 Mos. | $576.50 | $67.00 |
| 18 Mos. | 6 Mos. | $653.50 | $77.00 |
| 24 Mos. | 6 Mos. | $739.50 | $86.00 |
| 30 Mos. | 6 Mos. | $838.00 | $98.50 |
| 36 Mos. (Maximum) | | $948.50 | $110.50 |
| **Pension Band** | | **113** | |

**WAGE SCHEDULE: 8A**
**SALES ASSOCIATE (SOUTH AND NORTH)**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $384.00 | |
| 6 Mos. | 6 Mos. | $434.00 | $50.00 |
| 12 Mos. | 6 Mos. | $490.50 | $56.50 |
| 18 Mos. | 6 Mos. | $554.50 | $64.00 |
| Top (Maximum) | | $627.50 | $73.00 |
| **Pension Band** | | **101** | |

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**NOTES**

**2006 WAGE SCHEDULES**

**2007 WAGE SCHEDULES**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERIZON WASHINGTON, DC, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO (as designated agent and representative for Local 2336),<br><br>        Defendant. | Civil Action No. 1:07-CV-01460 (PLF) |

## <u>ORDER</u>

        AND NOW, upon consideration of the parties' cross-motions for summary judgment and all papers and arguments submitted in support thereof and in opposition thereto, it is hereby ORDERED that:

        1.        Plaintiff's motion is GRANTED, and

        2.        The May 30, 2007 Award rendered by Arbitrator Paul Gerhart have a retroactive effective back date of 150 days prior to its issuance, or December 31, 2006.

        SO ORDERED.  This the _____ day of _____, 200__.


                                    _____
                                    PAUL L. FRIEDMAN
                                    United States District Judge