**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERIZON WASHINGTON, D.C. INC., <br><br> Plaintiff, <br><br> v. <br><br> COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO (as designated agent and representative for Local 2336), <br><br> Defendant. | Civil Action No. 1:07-CV-01460 (PLF) |

**PLAINTIFF VERIZON WASHINGTON, D.C.'S OPPOSITION
TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Verizon Washington, D.C. Inc. ("Verizon" or the "Company") submits this

Opposition to the Cross-Motion for Summary Judgment filed by Defendant Communications

Workers of America, AFL-CIO (the "Union").

**<u>INTRODUCTION</u>**

Verizon filed this action under Section 301 of the Labor Management Relations Act to

vacate a portion of the May 30, 2007 arbitration award issued by Paul F. Gerhart ("Award") on

grounds that the years-long retroactive effective date of the job title change and new schedule of

wage rates for the Company's Voice Mail Clerks established by the Award defies the express

and unambiguous limitation in the parties' collective bargaining agreement ("Agreement") that

"**in no event** shall the retroactive effect [of a new schedule of rates] exceed 150 days."

Agreement, Art. 16B.1(f) (emphasis added).  In an effort to circumvent this unequivocal

contractual language, the Union offers several arguments, stating variously that the effective date

of the Award should be enforced because "[t]he arbitrator acted within the scope of his authority

to interpret an ambiguous provision" of the Agreement and that equity requires the nearly six-years long effective date because the Company should not be allowed to benefit from its "perversion of the [contractual grievance] process." (U. Br. 10, 15) The Union's creative advocacy, however, cannot withstand scrutiny. There is nothing even remotely ambiguous about the express limitation in Article 16B.1(f) that would permit either an analysis of the law of the shop or an equitable assessment of the Company's purported role and motive in the timetable by which this matter was initiated and processed under Article 16B. Simply stated, black letter arbitral law requires the application of the unambiguous contractual constraint that no new schedule of wage rates resulting from an Article 16B proceeding may have an effective date exceeding 150 days from the date the new schedule is implemented. Because Arbitrator Gerhart purposely refused to adhere to this plain and unequivocal language, the Company's motion for summary judgment should be granted and the Union's cross-motion should be denied.

<u>STATEMENT OF GENUINE ISSUES</u>

The undisputed facts are set forth in the Company's memorandum in support of its Motion for Summary Judgment ("Co. Br."). Verizon disputes the following "Facts" asserted by the CWA in the memorandum in support of its Motion for Summary Judgment ("U. Br."):

1.      Verizon rejects the Union's assertion that, in 2001, it "created a new job classification of 8 to 10 'Senior Voice Mail Clerks.'" (U. Br. 3) Rather, the Company did assign Voice Mail Clerks some additional duties beginning in the late 1990s and paid them temporary pay for performing such duties for a period of time, but it did not create a new classification with the Senior Voice Mail Clerk title in 2001. That title was coined by Arbitrator Gerhart in the Award. (Award at 54-55)

2.      Verizon rejects the Union's assertion that it "protest[ed] Verizon's failure to comply with the requirements of Article 16.B" in its December 9, 2001 grievance. (U. Br. 3)

Rather, the grievance sought a wholesale upgrade of the Voice Mail Clerk position to the position of RCMAC Clerk – the highest skilled clerical grade, two clerical levels above the semi-skilled grade in which Voice Mail Clerks were classified at the time. <u>See</u> Award of Arbitrator Susan Mackenzie (attached hereto as Ex. A at 4). (That claim was rejected by Arbitrator Mackenzie.) The Union's grievance in this matter made no suggestion whatsoever that the Company had violated the contract by not initiating the Article 16B process with respect to the job title or wage schedule for Voice Mail Clerks; all it claimed was a violation of the General Agreement. <u>Id</u>.

Moreover, or around 2002, the Company conducted an internal investigation in response to the Union's December 9, 2001 grievance to determine whether the job had changed and warranted the upgrade sought by the grievance. Ex. A at 4. Following a detailed comparison of the duties and responsibilities of the positions, the Company concluded that no upgrade was appropriate at the time. <u>Id</u>. It did not "determine it appropriate to create a new job title or job classification in the bargaining unit." Agreement, Art. 16B.

## <u>ARGUMENT</u>

The crux of the Union's argument is that Arbitrator Gerhart did not exceed his contractual authority in issuing the Award because the effective date provision of Article 16B is "ambiguous" and thus permitted his creation of a new remedial scheme based on what he thought the parties must have meant in drafting the provision and because the Company's purposeful delay in initiating an Article 16B proceeding warrants the imposition of a punitive remedy. The Union's reasoning is unsupportable as a matter of fact and law. Indeed, even the cases on which the Union relies require the conclusion that where, as here, the contract imposes expressly stated limits on the arbitrator's authority, he exceeds that authority by ignoring them.

### A.    This Court Must Review Whether The Award "Draws Its Essence" From The Agreement And, If Not, Vacate It

Not surprisingly, in its opening brief, the Union stresses the narrow scope of judicial review of arbitration awards.  (U. Br. 6-10)  It asserts that, if Arbitrator Gerhart "even arguably" applied the parties' contract, this Court should confirm (id. at 7); or, if this Court simply would have decided the case differently, it should confirm (id.); or, even if Arbitrator Gerhart made a "gross mistake" in the decision, this Court should confirm.  Id. at 9.  None of these situations describes what occurred in this case.

To be sure, so long as an arbitral award "draws its essence from the . . . agreement," and is not based on an arbitrator's "own brand of industrial justice," a court must confirm it.  United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960).  An award fails to draw its essence from the agreement, however, when: "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement."  Solvay Pharms., Inc. v. Duramed Pharms., Inc., 442 F.3d 471, 476 (6th Cir. 2006) (citations and internal quotations omitted).  Accordingly, when an arbitrator ignores the express terms of an agreement, a court owes the resulting award "no deference."  Int'l Union of Operating Eng'rs, Local 351 v. Cooper Natural Res., Inc., 163 F.3d 916, 919 (5th Cir. 1999).  Arbitrator Gerhart's Award thusly deserves no deference here.

As explained in the Company's opening brief (at 9-12), Arbitrator Gerhart failed to fashion an award that draws its essence from the Agreement because it conflicts with the express and unambiguous terms of Article 16B.1(f), which states in pertinent part:

> A written decision as to the appropriate schedule of wage rates will
> be rendered by the neutral third party within sixty (60) days of the

date that the matter is referred for resolution. In the event that a neutral third party determines that a different schedule of rates is appropriate, **the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days**.

Agreement, Art. 16B.1(f) (emphasis added). The crystal clarity of this provision categorically precludes an award with a retroactive effective date of more than 150 days. See, e.g., Anheuser-Busch, Inc. v. Beer Drivers, Local Union No. 744, Int'l Bhd. of Teamsters, 280 F.3d 1133, 1138-41 (7th Cir. 2002) (vacating arbitrator's award that went against agreement language that was "neither ambiguous nor incomplete"). Nonetheless, Arbitrator Gerhart awarded a new job title and wage schedule with a retroactive date of *nearly 2000* days. And he did so not because he made a "gross mistake" or misinterpreted the Agreement, but because of his purposeful conclusion that to do otherwise would "shock the sensibilities of a reasonable person." Award at 55. Because this portion of the Award thus was based on "considerations of fairness and equity instead of the exact terms of the agreement," it fails to draw its essence from the contract and should be vacated. Solvay Pharms., 442 F.3d at 476 (citation and internal quotation marks omitted).

### B.    Article 16B.1(f) Is Not Ambiguous And Thus Does Not Permit An Extrinsic Inquiry Such As Into The Law of the Shop

In an attempt to excuse this arbitral excess, the Union first characterizes Article 16B.1(f) as an "ambiguous" contractual provision, which allowed Arbitrator Gerhart to resort to tools of contractual interpretation and "the law of the shop" to divine its supposed meaning. (U. Br. 8, 10) This argument is simply specious.

As noted, the Agreement could not be more clear. "[I]n no event shall the retroactive effect exceed 150 days" can only have but one meaning – specifically, that no new schedule of rates, *under any circumstances*, may be placed into effect more than 150 days from the date of

the written decision.  The patent absence of ambiguity in this express language prohibited

Arbitrator Gerhart from interjecting his own notions of the law of the shop into the analysis.  See

Solvay Pharms., 442 F.3d at 476; Tootsie Roll Indus. v. Local Union No. 1, Bakery,

Confectionery & Tobacco Workers' Int'l Union, 832 F.2d 81, 84 (7th Cir. 1987) (holding that

"the law of the shop cannot be relied upon to modify clear and unambiguous provisions;" where

the "language of the agreement is clear and unambiguous, . . . since the parties agreed to it, they

are bound by it").[1]

        Significantly, the Union fails to cite even one case, treatise or law review article in which

a court confirmed an arbitration award in which the arbitrator ignored and exceeded an *express*

*contractual limitation* on his or her power.  Of course, the Union's inability to find such support

for its argument is not unexpected, as Verizon's argument rests solidly on the law.  It has long

been settled that courts must vacate arbitration awards where, as here, an arbitrator ignores

expressly stated limits on his or her authority and instead bases an award on notions of equity

and fairness.  See, e.g., E.I. DuPont de Nemours & Co. v. Local 900 of Int'l Chem., 968 F.2d

456, 458-59 (5th Cir. 1992) (arbitrator exceeded his authority where he found just cause for the

company to discharge an employee, but determined that discharge would be "inappropriate" in

defiance of the "plain, unambiguous language" of the parties' submission agreement); Int'l Bhd.

of Firemen & Oilers v. Nestle Co., 630 F.2d 474, 476-77 (6th Cir. 1980) (by making findings of

fact that employee committed insubordination and then ignoring the agreement's mandate that

insubordination "'shall' be grounds for discharge," the arbitrator dispensed his "own brand of

_____

        [1] Additionally, assuming *arguendo* that the effective date provision of Article 16B were ambiguous,
Arbitrator Gerhart's conclusion as to the parties' supposed  intent – that the parties somehow did not mean to allow
Verizon to "intentionally violate its duty under the Agreement to avoid initiating the dispute resolution procedure
under Article 16B" and then simply be faced with a brief retroactive back pay award (U. Br. 13) – is invented whole
cloth.  The Arbitrator cites to no record evidence, such as bargaining notes or testimony, to support this conclusion.
The complete absence of such support for his extrinsic interpretation only underscores the extent to which Arbitrator
Gerhart abused his authority in this case.

industrial justice"); Hay Adams Hotel v. Hotel & Rest. Employees, Local 25, No. 06-968, 2007 WL 1378490, at *4-6 (D.D.C. May 9, 2007) (arbitrator "exceeded his authority" when he contravened the plain, unambiguous language of the agreement because he thought the punishment to be unfair or harsh).[2]

### C.    The Union's Attempt To Justify The Award By Alleging Bad Faith Does Not Excuse The Award's Disregard Of The Agreement's Plain Language

Bereft of any legal support for its principal argument, the Union's opening brief also argues that the punitive remedial award is warranted and supportable because, otherwise, the Company would unfairly "benefit from its own contractual breach" and "bad faith." (U. Br. 11, 13) This argument, too, falls short.

As an initial matter, as stated above, considerations of the Company's purported intent to delay the processing of this grievance are irrelevant when the Agreement unambiguously limits an arbitrator's authority to craft the effective date. In any event, there is no record evidence or other basis whatsoever for concluding that the Company acted in bad faith in this matter. To be sure, Article 16B.1 calls for the Company to notify the Union when it determines that a new job title or classification is created and Arbitrator Mackenzie did find that the Company violated the Agreement by not giving notice and an opportunity to negotiate about the additional duties assigned to the Voice Mail Clerks. Ex. A at 12. But the finding of a contractual violation is not, by any standard, tantamount to a finding that the Company acted in bad faith – if that were true,

---

[2] Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997), on which the Union also appears to rely, is wholly consistent with these authorities. While Cole recognizes that an arbitrator properly may draw on certain external sources, including the "practices of the industry and the shop" (id. at 1474), in reaching his judgment, nothing in that decision permits an arbitrator to ignore an unambiguous contractual provision concerning the matter at issue. Indeed, the decision is clear that these sources are used in "solving the unforeseeable" problems that arise in the course of the parties' relationship that their agreement did not address (id. at 1473) – a circumstance that does not, in light of the express and on-point language in Article 16B.1(f), exist here. In this circumstance, "[w]hen the arbitrator's words manifest an infidelity" to his obligation to reach an award that draws its essence from the agreement, Cole fully recognizes that "courts have no choice but to refuse enforcement of the Award." Id. at 1474.

every contractual interpretation arbitration case that upholds the grievance likewise would reach the absurd result of a bad faith finding.

In fact, however, the record establishes that, far from acting in bad faith, the Company actually did everything it should have to ensure that the Voice Mail Clerks were properly classified, launching a comprehensive evaluation of the job soon after the grievance was filed and reaching a supportable conclusion that reclassification (and, by definition, any need to initiate the Article 16B machinery) was not warranted at the time. See Ex. A at 4. Quite clearly, such decisions, while possibly incorrect in retrospect, plainly defy any allegation of bad faith; indeed, Arbitrator Mackenzie's finding that more than 80% of the Voice Mail Clerks' job was consistent with its existing classification compels this conclusion. Although Arbitrator Mackenzie disagreed with the Company's ultimate determination on this issue, nowhere in her opinion did she find that the Company acted in bad faith in any respect.

Further, the cases on which the Union relies to support its argument (at 13-16) that an arbitrator may be required "to craft remedies that discourage the parties from acting in bad faith" are distinguishable from the instant facts in a critical aspect. While the Agreement is express and unambiguous on the matter of a newly established rate schedule's retroactive effect, none of the agreements in those cases address the specific remedies at issue. See Local 879, Allied Indus. Workers v. Chrysler Marine Corp., 819 F.2d 786 (7th Cir. 1987); Litton Unit Handling Sys. v. Shopmen's Local Union No. 522, 90 L.R.R.M. (BNA) 3176, 3177 (S.D. Ohio 1975).

In Chrysler Marine Corp., for example, Chrysler argued that the arbitrator had exceeded his authority when he imposed a severance plan because the parties' arbitration clause was silent regarding such a plan. The court confirmed the award. The court reasoned that an arbitrator needs flexibility to devise an equitable remedy where the "draftsmen [of the parties' collective

bargaining agreement] may never have thought of what specific remedy should be awarded to meet the particular contingency." 819 F.2d at 789.  Again, however, the circumstances in Chrysler Marine Corp. are inapposite to those presented here.  Arbitrator Gerhart did not encounter a situation that the "draftsmen may never have thought of what specific remedy should be awarded."  To the contrary; the parties bargained for and agreed to impose an express limitation of 150 days on any new schedule of wage rates awarded in the Article 16B process. And, by further stating that such limitation could be exceeded "in no event," the parties also expressly agreed that there would be no exceptions to it; they plainly did not agree that the 150 day limit would apply unless the arbitrator deemed that period of time unfair or unreasonable.

Similarly, in Litton Unit Handling Systems, the court confirmed an arbitrator's award of damages against the prevailing union for its persistent attempts to frustrate arbitration of the employer's grievance where the parties' agreement was silent as to the arbitrator's authority to issue such an award.  90 L.R.R.M. (BNA) at 3177.  The court specifically noted that, "[l]ike most collective bargaining agreements, the pertinent instrument does not specifically list the spectrum of remedies to which an arbitrator can resort to redress injuries which result from contractual violations."  Id. at 3179.  Here, in contrast, the "pertinent instrument" between Verizon and the Union expressly states the spectrum on which Arbitrator Gerhart could authorize a retroactive effective backdate.  Nonetheless, he blatantly ignored it.[3]

---

[3] Synergy Gas Co. v. Sasso, 853 F.2d 59 (2d Cir. 1988), likewise does not advance the Union's analysis. In Sasso, the Second Circuit upheld an arbitrator's award of attorneys' fees and other payments to the employee's representative to make it whole for costs it had expended when the employer refused to comply with a reinstatement award.  The Court held, however, that the stipulated submission to the arbitrator specifically authorized him to consider "other relief" than back pay and New York law  "does not bar the award of attorney's fees; it merely does not grant authority to do so."  Id. at 65.  Here, of course, the retroactive effective date provision in Article 16B.1(f) expressly bars Arbitrator Gerhart's Award.

## CONCLUSION

The Union's argument that Arbitrator Gerhart's blatant disregard for the plain language of the Agreement is warranted because the parties "did not form an agreement to apply Article 16.B's limitation upon remedies to situations where Verizon has violated 16.B by failing to initiate the dispute resolution process" is unavailing.  (U. Br. 16)  The parties agreed that "in no event shall the retroactive effect [of a newly established schedule of rates] exceed 150 days" and they should be held to that Agreement.  Agreement Art. 16B.1(f).  "[I]n no event" unequivocally prohibits any exceptions.  Arbitrator Gerhart disregarded that clear and unambiguous limit on his authority and instead dispensed his own brand of industrial justice.  This portion of his Award thus cannot stand.  See Tootsie Roll, 832 F.2d at 84 ("[T]he language of the agreement is clear and unambiguous, and since the parties agreed to it, they are bound by it.").

Based on the foregoing arguments and authorities and those set forth in its opening brief, Plaintiff Verizon respectfully requests that its Motion for Summary Judgment be granted and the Union's Cross-Motion for Summary Judgment be denied.

Respectfully submitted,

/s Willis J. Goldsmith
Willis J. Goldsmith (DC Bar No. 945956)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Julia M. Broas (DC Bar No. 396119)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Dated:  December 14, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 14th day of December, I caused a copy of the foregoing

Opposition to Defendant's Cross-Motion for Summary Judgment to be sent by overnight mail,

postage prepaid, to the following person:

> Nicholas M. Manicone, Headquarters Counsel
> Communications Workers of America, AFL-CIO
> 501 Third Street, NW, Suite 800
> Washington, D.C.  20001-2797

<u>Julia M. Broas /s</u>
Julia M. Broas

| | | |
|---|---|---|
| In the Matter of the Arbitration | : | |
| - between - | : | OPINION |
| | : | |
| | : | AND |
| COMMUNICATIONS WORKERS OF AMERICA, | : | |
| LOCAL 2336, AFL-CIO | : | AWARD |
| | : | |
| - and - | : | |
| | : | |
| VERIZON | : | |
| WASHINGTON, DC INC. | : | |
| | : | |
| RE: Voice Mail Clerks | : | |
|     CWA Case No. 2-04-21 | : | |
|     Verizon Case No. 2001-91650 | : | |

BEFORE:            Susan T. Mackenzie, Arbitrator

APPEARANCES:

      For the Union:          Mark F. Wilson, Esq.,
                                   Counsel

      For the Company:       Jones Day,
                                   by Aaron L. Agenbroad, Esq.
                                    Julia M. Broas, Esq.

Pursuant to the collective bargaining Agreement between the Communications Workers of America, AFL-CIO and Verizon (hereinafter referred to respectively as the "Union" or "CWA" and the "Company" or "Employer"), the undersigned was selected to serve as Arbitrator and to render a binding decision on the following issue, framed by the Arbitrator based on the parties' submissions:

        -    Whether the Company violated Article 16.B or Article 22
             of the General Agreement?

        -    If so, what shall be the remedy?

Hearings on the matter were held on April 1, 2005, July 14, 2005 and October 20, 2005 at the Holiday Inn, Washington, D.C.  Throughout the proceeding, the parties were afforded full opportunity to examine and cross-examine witnesses and to submit documentation and argument in support of their respective positions.  A transcript of the hearing was recorded and the parties elected to file post-hearing briefs.  The Arbitrator received the briefs and a full transcript on or before January 30, 2006.

## APPLICABLE PROVISIONS OF THE  COLLECTIVE BARGAINING AGREEMENT

### ARTICLE 16. B  – NEW JOB TITLES AND JOB CLASSIFICATIONS

Section 1.  Whenever the company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a) The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications.  Such wage rates and schedules shall be designated as temporary.  Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b) The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

(c) If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and a temporary designation removed.

(d) If agreement is reached between the parties within 60 days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed-upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e) If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party.  Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

\*\*\*\*\*\*

ARTICLE 22 – TEMPORARY ASSIGNMENTS

Section 1. On any day during which an employee in Categories II, III, IV or V is temporarily assigned by the Company to a position in the bargaining unit with a higher maximum rate than that of the employee's regular assignment and assumes full responsibility in and takes over all work associated with the position for at least the number of hours equal to a full session or have to or, the employee for that day shall receive 1/5 of the difference in maximum basic weekly rates between the two wage schedules involved, provided that in no case shall an individual employee be so assigned for more than sixty (60) calendar days for any one period or assignment.

BACKGROUND

Many of the facts and circumstances giving rise to this dispute are not contested. The "Corporate Voice Mail Group" ("Voice Mail Clerks") are the 8 to 10 Clerks working in the Company's Fairland Data Center in Silver Spring, Maryland, a center created in the mid-1990's to establish and maintain the internal voice mail system for employees in Verizon companies and subsidiaries. At present there are approximately 100,000-125,000 "internal customers" using approximately 40-45 voice mail systems. Voice Mail Clerks work a 7.5-hour shift within the 7:00 a.m.-to-7:30 p.m. time period, and they infrequently work overtime hours. Voice Mail Clerks generally receive two weeks of on-the-job training and one week of formal, off-site training by the vendor of the Octel system used at the Center. From the inception of the internal voice mail system in the mid-1990's, Voice Mail Clerks' primary functions include building, changing and deleting individual mailboxes, work requiring computer skills in accessing multiple systems for input and retrieval of data and significant communication skills with internal "customers."

It is also uncontested that at some point around 1997, the then Center Manager, Brenda Mason, began on an ad hoc basis to assign to Voice Mail Clerks certain tasks previously performed by her. Voice Mail Clerks received TA pay when performing these tasks, which included troubleshooting and investigating systems problems; building, maintaining and

correcting errors in nodes; and building and creating pager sequences.  Voice Mail Clerks continued to perform these duties on a regular basis, but at some point between 1998 and 2000 they no longer received TA pay for these additional duties.

On December 9, 2001 the Union filed a grievance on behalf of the Voice Mail Work Group, asserting a violation of the General Agreement and more specifically "unfair treatment" for performing "work of the RCMAC Clerks while titled and paid as General Clerks."  The grievance was denied by Supervisor Jackie Westbrook-Forte and appealed by the Union on March 6, 2002.  In April 2003 as part of the grievance process, the Company undertook an "Associate Job Evaluation" of the Voice Mail Clerk position. The Job Evaluation Report form prepared by Ms. Westbrook-Forte, and countersigned by Manager Randolph Harrison and Human Resources Manager Candy Caldwell on April 25, 2003, listed the "essential duties/functions" of the Voice Mail Clerk position as:

- Process and complete voice mail request, additions and changes to corporate employees.
- Handle and complete voice mail requests from the corporate web.
- Process and complete additions, deletions, and changes to nodes (exchanges) on our voice mail network.
- Handle verbal requests from corporate clients through the automated call distributor (ACD).
- Perform projects that have to do with system cut-overs and installations on an as needed basis.
- Perform other duties as requested.

The Request Form also listed as the percentages of times spent in performing different tasks as: additions, deletions and changes to mailboxes, 25%; process of request by way of incoming calls (ACD), 50%; additions, deletions and changes of the nodes (exchanges) in all systems, 25%.

On June 2, 2003, Staffing & Development Department Employment Specialist Philip Payblas, a member of the internal committee reviewing the Voice Mail Clerk position, informed Ms. Caldwell that the evaluation had been completed and that it was "determined that this position is appropriately classified as a General Clerk and is not recommended for a new title."

Thereafter on July 28, 2003 the Union submitted the grievance to arbitration and listed as the issue to be decided: "Whether or not the Company violated Article 16.B and Article 22 of the general agreement, and if so, what is the appropriate remedy?" Labor Relations Senior Specialist David C. Seal responded in a letter dated September 5, 2003, agreeing that the grievance was arbitrable and that: "The issue to be decided is whether the Company violated Articles 16 B and 22 of the general agreement and if so, what is the appropriate remedy?" The matter was then referred to arbitration and gave rise to this proceeding.

POSITIONS OF PARTIES

The Union takes the position that the Company has violated the parties' General Agreement by assigning Voice Mail Clerks duties requiring greater skills, analysis and judgment than those set forth in the Job Description of their current title, General Clerk. It maintains that the continued assignment of this higher-level work requires either additional pay pursuant to Article 22, or alternatively a position upgrade or restructure through negotiations with the Union pursuant to Article 16.B. It asserts that the 2003 job evaluation conducted by the Company was superficial and did not encompass the full duties of the position and that the duties performed by the Voice Mail Clerk are very similar to that of the RCMAC Clerks. It also contends that the Arbitrator does have authority to direct an Article 16.B review in this circumstance because the Company restructured a position without notice to the Union.

The Union notes that the assignment of additional duties to Voice Mail Clerks was gradual over a long time period, and that their managers and supervisors expressed agreement that an increase in pay and title change was appropriate. According to the Union, it was possible that pay increases and a title change was not effected because of general economic conditions and the fact that the Voice Mail Group did not generate income or service external customers. It cites arbitral authority in support of its position. The Union asks the Arbitrator to sustain the

grievance and proposes alternative remedies, including: a make-whole remedy pursuant to Article 22; a direction to the parties to negotiate a new wage rate, with the Arbitrator maintaining jurisdiction; a direction to the Company to submit the dispute to a neutral third party pursuant to Article 16.B; or, "any other remedy the Arbitrator considers just and proper."

The Company takes the position that the Union has failed to carry its burden of establishing any contractual violation or any basis for upgrading the job of Voice Mail Clerks to the RCMAC Clerk title and pay. First, it maintains that the scope of the arbitration is limited to a comparison of the Voice Mail Clerk position to the RCMAC Clerk position as specified in the Union's grievance. It considers the work of the RCMAC Clerk as significantly more complex and requiring significantly greater analysis and exercise of judgment than that of the Voice Mail Clerk. Second, in the Company's view, the alleged changes cited by the Union took place over three years prior to the filing of the grievance, and therefore the Union's failure to contest changes at an earlier time constitutes acquiescence and a waiver of any contest. In this regard it also notes that the Union did not raise the issue of the Voice Mail Clerk title in contract negotiations as it did with several other titles, including the RCMAC Clerk title.

The Company further contends that the motivation for the grievance was not the alleged job duty changes but rather "hurt feelings" of incumbents over a 2001 job posting's characterization of their primary job function as "data entry." It claims that only the Company may trigger the application of Article 16.B, and that in addition to this "unfettered discretion," it in any event satisfied its Article 16.B obligations when it unilaterally undertook a job evaluation, with a consensus decision that no upgrade was appropriate. It distinguishes the arbitral authority cited by the Union from the case under review. The Company asks the Arbitrator to sustain its position and to deny the grievance in its entirety. Alternatively, and were the Arbitrator to

conclude otherwise, it asserts the Arbitrator's authority is limited to remanding the matter to the parties for the application of Article 16.B.

DISCUSSION

### Scope of the Arbitration

As a preliminary matter, the Company urges that the Arbitrator's inquiry, and remedial authority, is restricted to a comparison of the Voice Mail Clerk and RCMAC Clerk positions, as cited in the Union's 2001 grievance. While in other circumstances arbitral authority may be limited by the issues framed in a grievance, here the Company in its September 5, 2003 letter, as well as the Union in its July 28, 2003 letter, certified the same issue for arbitration, that is, whether or not the Company violated Article 16.B and Article 22 of the General Agreement. In framing the issue for resolution in this proceeding, the Arbitrator perforce adopted the agreed upon wording, which evidences an inquiry broader in scope than solely a comparison of the Voice Mail Clerk position to that of the RCMAC Clerk position. The Company's agreement on the submission to arbitration also moots the question of waiver although the timing of the filing of the grievance may impact on the scope of the remedy.

Nor can it be said that the Union has waived its right to pursue the matter at issue by virtue of the fact that the Union did not elect to submit the matter of changes in the Voice Mail Clerk position to contract negotiations in either 2000 or 2003. Contract negotiations are one forum for resolution of issues between the parties, but only one, and no other persuasive bar to arbitration was raised.

### Duties Performed by Corporate Voice Mail Clerks

On the record before her, the Arbitrator finds that to the extent set forth below, certain of the duties assigned to Voice Mail Clerks exceed the duties and requirements of the General Clerk title.

Voice Mail Clerks by all accounts work largely unsupervised. It is also undisputed that Voice Mail Clerks spend a substantial part of their time building, deleting and making changes in voice mailboxes based on requests received either by fax, through the corporate web site, or through the automated answering system. Bridget Plonk, a Voice Mail Clerk testifying on behalf of the Union, estimated that approximately 80% of her time was spent on the "most typical" duties that include building, deleting and making changes to mailboxes. Tr. I, 87; Tr. II, 8. [1] Similarly, the Associate Job Evaluation Request Form filled in by the Voice Mail Supervisor in April 2003 estimated that 75% of the Voice Mail Clerks' time was spent in "processing requests by way of incoming calls" and "additions, deletions and changes to mailboxes." This work does involve more than simple typing. But based on the testimony, these "typical duties" are not inconsistent with certain of the "General Duties" set forth in the "General Clerk" Job Description dated June 2000. For example, General Clerk duties set forth in the Job Description include the handling of orders and preparation of reports, accessing multiple systems for inputting retrieval of data on a computer, and "heavy client interfacing at all levels of management" The substantial part of Voice Mail Clerk functions -- that is, adding, deleting and changing mailboxes -- is consistent with the description of "General Clerk" duties. Similarly, the General Clerk Job Description includes in the "Basic Requirements" of the position such factors as excellent interpersonal skills, training through on-the-job instruction and typically daytime working hours. These requirements as well are consistent with the requirements of the Voice Mail Clerk positioned as described in testimony.

Voice Mail Clerks, however, also spend time on other duties that the record establishes involve a higher complexity and a greater degree of independent judgment and analysis than is associated with the General Clerk Job Description. Examples of some of the more complex

---

[1] References to be three transcripts are as follows: the April 1, 2005 transcript ("Tr. I"); the July 14, 2005 transcript ("Tr. II"); October 20, 2005 transcript ("Tr. III").

duties routinely performed by Voice Mail Clerks include troubleshooting, call notification and buildings sequences for pagers, inside node work such as building classes of service for mailboxes (networks between systems) and "garbage collects" (removal of old information from within the system), running short forms on the contents of individual systems, clearing error messages through the System Manager mailbox, running CDR's (a review of the inside of an individual's mailbox). Tr. I, 88-95, 111.

It was undisputed that these "non-typical" tasks had previously been performed by Supervisor Brenda Moses. When Ms. Moses began assigning Voice Mail Clerks these tasks to "help her out," Voice Mail Clerks routinely received TA pay. Tr. I, 95-98. Additionally, according to Ms. Plonk -- and her testimony was not disputed -- Ms. Moses, Manager Joyce Everett White, Supervisor Jackie Westbrook-Forte (who replaced Ms. Moses in the latter part of 1999), and second-level Manager Megan Doherty all indicated a belief that the work being performed by the Voice Mail Clerks "deserved another title." Tr. I, 99-101. Randolph Harrison, currently Manager of Corporate and Voice Mail and Video-Conferencing, was not in a managerial position when the duties at issue "migrated" from supervision to the Voice Mail Clerks. Nor in testimony did he address the assumption of additional duties by the Voice Mail Clerks in or around 1998.

The somewhat more detailed description of these "nontraditional" duties in testimony indicates that certain of the assignments--such as changing nodes where the work involves replacing a constellation of phone numbers-- entail an increase in volume as opposed to more complexity or analysis. Mr. Harrison also testified that in certain instances the volume of work in the Voice Mail Group had increased, for example, following the Verizon merger with GTE. But that increase in volume did not result in a change in duties. Tr. II, 77-78. Such increases in

work volume generally do not constitute assumption of expanded duties and therefore would be consistent with and covered by the General Clerk Job Description. Tr. I, 119-123.

By contrast, some of the cut-over, other node clearing work and running CDR's described on the record involves a level of complexity and the exercise of discretion and judgment that exceeds the scope of work included in the General Clerk Job Description. No explanation was offered as to how, or if, any of these duties previously performed by supervision were appropriately characterized as General Clerk work.

Nor is the fact that a contrary conclusion was reached in the Company's internal audit during the grievance procedure in 2003 persuasive of a different conclusion in this arbitration. As Philip Payblas, who participated in the evaluation and issued the June 2, 2003 determination, testified, the review team was not aware of certain functions performed by the Voice Mail Clerks such as garbage collects, evaluation of the system space and capacity, node work, and sequencing. Mr. Harrison acknowledged that notice of these additional functions may have had an impact on the team's determination. Tr. I, 278-280.

The Company has sufficiently established that the functions of the RCMAC Clerk are substantially different from and frequently involve a greater degree of complexity than those of the Voice Mail Clerk. The Arbitrator accepts that, as the unrebutted testimony of Julie Harner, Director of Federal Organizations indicated, 80% to 90% of the RCMAC Clerk work involves significant translation of complex codes in switches as opposed to the codes used in the majority of work performed by Voice Mail Clerks. Tr. II, 130, 135. RCMAC Clerks are also required to ensure that the changes made in one service do not affect other services, or to engage in time-sensitive projects and coordinating work. Tr. II, 116, 122; Tr. III, 109-110. Ms. Harner, however, does not supervise Voice Mail Clerks and she did not address the functions they in fact perform. The fact that RCMAC Clerk duties are different from those of Voice Mail Clerks does

not mean that voice Mail Clerks are not performing duties outside of the scope of the General Clerk title, nor otherwise render the Union's claim without merit.

Remedy

The Union asserted that the appropriate remedy in this matter would be an award of backpay pursuant to Article 22.2. Article 22.2 is applicable to "temporary assignments." The assignments at issue here, however, cannot reasonably be characterized as "temporary" given that Voice Mail Clerks have on a limited but consistent basis, performed duties beyond the scope of their General Clerk title for a several-year period. This finding renders the application of Article 22.2 to this circumstance inappropriate and distinguishes this matter from that cited by the Union and presented to Arbitrator Martin F. Scheinman in 1991. There, Arbitrator Scheinman found that specific Service Representative duties were reassigned to two General Clerks and the reassignment was grieved when the reassignment was made (CWA No. 2-88-39, decided June 19, 1991), not the gradual assumption of duties over an extended period of time at issue here. Similarly, in the matter before the Board of Arbitration chaired by Arbitrator Marlin M. Volz and decided on October 18, 1979 (CWA Case No. 2-78-407), a discrete time period was under review and the record was sufficient to establish an estimate of the percentage of work time that the employees performed the disputed work during the relevant time period. Here, by contrast, the assignments at issue date back to 1998 and cannot reasonably be deemed "temporary." The record here further establishes that Voice Mail Clerks are engaged in non-General Clerk work less than 20% of their work time, but how much less than 20% is unclear.

The Arbitrator finds that on the basis of the record, the circumstance before her is subject to Article 16.B and that the extent to which additional duties assigned to Voice Mail Clerks constitutes a redefinition of the Voice Mail Clerk job classification is appropriately the subject of negotiations between the parties pursuant to Section 1 of Article 16.B. By inclusion of the

Article 16.B procedure in the General Agreement, the parties have indicated an intent that job title creation, restructuring and redefinition should first be the subject of negotiations between the parties, and not in the first instance imposed by an arbitrator or a third-party neutral. It may be a cumbersome process, as the Union indicated in its post-hearing brief, but the Arbitrator is bound by the process the parties negotiated and included in the General Agreement. The Arbitrator also accepts, as Local 2336 President Jim Pappas confirmed in testimony, that in the first instance the Company triggers the Article 16.B negotiations procedure by its determination as to the appropriateness of redefining an existing job title. Tr. III, 16. Arbitral precedent as well as sound labor-management relations, however, tell us that the Company cannot avoid its contractual obligations by failing to designate a change in a title or classification as new or restructured (see, for example, the August 16, 1993 decision of Arbitrator Charles L. Mullen, Jr. in CWA Case No. 2-92-8).

All considered, the Arbitrator concludes that the Company did violate Article 16.B by failing to give notice to the Union and afford an opportunity to negotiate over its assignment of duties to Voice Mail Clerks outside of the scope of their General Clerk Job Description, constituting a redefinition or restructure of the existing job title for purposes of Article 16.B. Within 60 days of receipt of this Opinion and Award, the Company is directed to comply with the Article 16.B.1 notification and negotiations requirements. To the extent it seeks such relief, but only to that extent, the grievance is granted and an Award to the above effect is hereby granted.

AWARD

The undersigned, acting as Arbitrator and having heard the proofs and allegations of the parties, hereby renders the following Award:

- The Company did violate Article 16.B of the General Agreement by its assignment of certain duties to Voice Mail Clerks outside of the scope of their General Clerk Job Description without notification to the Union and opportunity to negotiate.

- Within 60 days of receipt of this Opinion and Award, the Company is directed to comply with the Article 16.B.1 notification and negotiations requirements.

Date: February 28, 2006

Susan T. Mackenzie
Arbitrator

STATE OF NEW YORK
COUNTY OF NEW YORK                SS:

I, Susan T. Mackenzie, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is the Award.

Date: 2-28-06

Susan T. Mackenzie